Case 3:18-cv-00097-GEC   Document 1   Filed 10/10/18   Page 1 of 13   Pageid#: 1

CLERK'S OFFICE U.S. DIST. COURT
AT CHARLOTTESVILE, VA
FILED

10/10/2018
JULIA C. DUDLEY, CLERK
BY: /s/ H. Wheeler
DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Charlottesville Division

**MICHAEL DONALDSON,**
c/o 1825 K St., NW, Ste. 750
Washington, DC 20006

    **Plaintiff,**

        v.

**TRAE-FUELS, LLC**

    **SERVE:**
    **Business Filings Incorporated**
    4701 Cox Road, Suite 285
    Glen Allen, VA 23060

and

**ENVIROTECH SERVICES, INC.**

    **SERVE:**
    **Roger Knoph**
    910 54th Avenue, Suite. 230
    Greeley, CO 80634

    **Defendants.**

Case No.: 3:18CV00097

## COMPLAINT

COMES NOW Plaintiff Michael Donaldson, by undersigned counsel, and complains of Defendants Trae-Fuels, LLC and EnviroTech Services, Inc. as follows:

PRELIMINARY STATEMENT

1. In 2013, Plaintiff took a job as the controller of a start-up heating pellet manufacturing company, Trae-Fuels, that was effectively run by its managing member, EnviroTech. In May 2014, Plaintiff was diagnosed with stage four pancreatic cancer. Within three weeks,

EnviroTech and Trae-Fuels began to secretly document false performance concerns and then fired Plaintiff without explanation on August 20, 2014.

2. On June 27, 2018, the EEOC found reasonable cause to believe that Trae-Fuels and EnviroTech discriminated against Plaintiff in violation of the Americans with Disabilities Act.

3. Plaintiff fortunately survived his cancer and now brings this action to recover the damages he suffered as a result of Trae-Fuels's and EnviroTech's violations of the ADA.

## JURISDICTION AND VENUE

4. This Court has federal question jurisdiction over this action pursuant to the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.* and 28 U.S.C. § 1331.

5. Venue is proper in this Court pursuant to 42 U.S.C. § 2000e-5(f)(3) because Trae-Fuels and EnviroTech committed the unlawful employment practice in Virginia in this judicial district.

## PARTIES

6. Plaintiff is a former employee of Trae-Fuels and EnviroTech.

7. Trae-Fuels is an employer located in Bumpass, Virginia that, at all relevant times, employed approximately fifty employees.

8. EnviroTech is an employer headquartered in Greeley, Colorado that, at all relevant times, employed approximately 125 employees.

9. Upon information and belief, EnviroTech had more than 200 employees and joint employees, including the employees of subsidiaries EnviroTech controlled.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

10. Plaintiff exhausted his administrative remedies by timely filing a charge of discrimination with the EEOC on December 9, 2014.

11. On June 27, 2018, EEOC issued a decision finding reasonable cause that Trae-Fuels and EnviroTech violated the Americans with Disabilities Act.

12. On July 27, 2018, Plaintiff received a Notice of Right to sue dated July 25, 2018.

## FACTS

### *Background*

13. Plaintiff began working as the controller of Trae-Fuels on October 17, 2013, performing Trae-Fuels's accounting functions.

14. Plaintiff was also tasked with performing human resources duties for Trae-Fuels's.

15. Trae-Fuels was a five-member limited liability company in the heating pellet manufacturing industry.

16. EnviroTech, a larger company, had formed Trae-Fuels earlier in 2013.

17. EnviroTech was Trae-Fuels's managing member.

18. The Chief Financial Officer of Envirotech, Kevin Whyrick, and the Director of Human Resources of EnviroTech, Beth Aleman, offered Plaintiff the controller position.

19. At the time, Plaintiff had approximately thirty-two years of experience in accounting at companies of various sizes, from small to Fortune 500 companies.

20. Plaintiff also had more than twenty years of expertise in accounting issues particular to various types of manufacturing.

21. Before Whyrick and Aleman hired him, Plaintiff participated in three interviews, took a personality profile, and took an examination related to the pellet manufacturing industry.

22. Plaintiff first interviewed with Aleman by phone.

23. The second interview was with Aleman and Whyrick by phone.

24. The third interview was with John Frink, the General Manager of Trae-Fuels.

25. It seemed to Plaintiff, based on the interaction with Frink, that Aleman and Whyrick had already made the decision to hire Plaintiff.

26. The pellet manufacturing examination was prepared by Whyrick and emailed to Plaintiff for completion by Aleman.

27. Following these interviews and tests, Whyrick and Aleman offered Plaintiff the controller position in a phone call.

28. Aleman later faxed Plaintiff an offer letter that was from Aleman, though it was on Trae-Fuels letter head.

*Plaintiff performed his duties well*

29. Following his hiring, Plaintiff performed well and received positive feedback from his supervisors.

30. Plaintiff reported directly to Frink, and communicated with him on a regular basis.

31. Plaintiff also reported directly to Whyrick, the CFO of EnviroTech, who had expertise in accounting.

32. All of Plaintiff's financial work had to be approved by Whyrick.

33. Plaintiff was also required to report to Whyrick and other EnviroTech employees each Friday during weekly teleconferences and he often talked with EnviroTech throughout the week.

34. Only after Whyrick had reviewed and approved Plaintiff's accounting work such as month-end statements, would Plaintiff discuss them with Frink to inform him of the companies' finances.

35. Plaintiff was also partially supervised by EnviroTech Corporate Strategist, Chris LaRocco.

36. Further, Aleman supervised Plaintiff's performance of human resources duties.

*Plaintiff was diagnosed with pancreatic cancer*

37. On May 15, 2014, Plaintiff was diagnosed with inoperable Adenocarcinoma pancreatic cancer (Stage IV).

38. Adenocarcinoma pancreatic cancer is the deadlier and more common of the two types of pancreatic cancer.

39. In 2014, 75% of individuals diagnosed with Adenocarcinoma pancreatic cancer died within one year of diagnosis, with only 6% having a 5-year life expectancy survival rate.

40. Plaintiff's pancreatic cancer was a physical limitation that substantially limited his major bodily functions regarding his normal cell growth and his digestive functions.

41. Trae-Fuels and EnviroTech perceived Plaintiff's pancreatic cancer to be a physical impairment.

42. On May 19, 2014, Plaintiff had his first appointment with an oncologist.

43. At this appointment, Plaintiff had an elevated temperature and, as a result, was admitted to the hospital for a few days for pancreatitis (which ultimately was determined to have been misdiagnosed by the emergency room doctor).

44. On May 21, 2014, the day Plaintiff was discharged from the hospital, Whyrick told Plaintiff by phone that EnviroTech and Trae-Fuels had hired a temporary accountant to assist Plaintiff while he was sick, since Plaintiff was the only accountant in the Trae-Fuels office.

45. Immediately thereafter, Plaintiff left on a pre-planned trip to Utah to adopt a newborn, whom he and his wife had been planning to adopt since before his medical issues arose.

46. Upon his return to work on May 27, 2014 (following the Memorial Day holiday), Plaintiff began to train the temporary accountant at Whyrick's direction.

47. However, because Plaintiff was functioning well, the temporary accountant was released shortly thereafter.

48. Plaintiff learned that the temporary accountant would be released from Aleman during a visit she made to Trae-Fuels the week of June 2, 2014.

49. Aleman stated that Whyrick had prematurely hired the temporary accountant because Plaintiff had continued to perform his duties well despite his health issues.

*Plaintiff's supervisors indicate they are concerned about Plaintiff's ability to work*

50. Following his cancer diagnosis, Trae-Fuels and EnviroTech management asked Plaintiff questions about his condition with the apparent goal of assessing the effect of his illness on the company.

51. For example, EnviroTech's corporate strategist, Christopher LaRocco, asked Plaintiff something to the effect of "What do you want to do now, work part-time? Plus, you're a new father?"

52. LaRocco also told Plaintiff that his aunt had died from pancreatic cancer.

53. When Plaintiff responded that he planned to work full-time, LaRocco then inquired "Your wife must have good insurance?"

54. Plaintiff responded that he was insured by EnviroTech's policy, not his wife's insurance.

55. On another occasion, Whyrick asked Plaintiff if his cancer was slow or aggressive, to which Plaintiff responded that it was slow.

6

*Without explanation, Trae-Fuels and EnviroTech attempt to force Plaintiff to waive all past, present, and future claims against both companies*

56. Shortly after informing Trae-Fuels and EnviroTech about his diagnosis, Plaintiff and other employees were asked to sign a waiver of liability form, waiving all past, present, and future claims of any sort against Trae-Fuels and EnviroTech.

57. After Plaintiff did not initially sign this form, Director of HR Aleman personally came to Plaintiff's office and insisted that he sign and return the form in her presence.

*EnviroTech attempted to criticize Plaintiff less than two weeks after his diagnosis*

58. Prior to his cancer diagnosis, neither Frink nor Whyrick provided Plaintiff any negative written or verbal feedback, reviews, or complaints about his work.

59. Moreover, Plaintiff never received any performance improvement plans or other written complaints about his performance or conduct from anyone else at Trae-Fuels or EnviroTech.

60. However, immediately following his return to work after his cancer diagnosis, Aleman and LaRocco appeared to attempt to criticize Plaintiff.

61. On May 27, 2014, the day Plaintiff returned from Utah, Aleman called Plaintiff and Frink for a meeting she attended by telephone.

62. At the beginning of the meeting, Aleman stated "I'm documenting."

63. She then proceeded to question Plaintiff about why he had left his company cell phone at the office while he was on leave.

64. Plaintiff responded that he had done so because the phone was not working properly and required repairs.

65. Plaintiff told Aleman that he had made a specific trip to the office to give the phone to the office administrator and ask that she have it fixed.

66. Plaintiff also explained that his supervisors and colleagues knew he was available on his personal phone and that his home, company cell, and personal cell phone numbers were listed on the company contact list available to all employees.

67. In fact, Plaintiff's supervisors had called him on his personal cell phone many times before this incident.

68. Plaintiff asked Aleman if she was trying to get rid of him because he was sick.

69. Aleman paused and then said no and that the call was completed.

70. At the conclusion of the meeting, Plaintiff told Frink that he felt as though he was being targeted because of his illness and asked that Trae-Fuels and EnviroTech "please not go down this path."

71. About a week later, Aleman and EnviroTech Corporate Strategist Christopher LaRocco travelled to Trae-Fuels for a meeting.

72. On June 3, 2014, Plaintiff met with Frink, LaRocco, and Aleman.

73. LaRocco and Aleman did not criticize Plaintiff's performance in the meeting, instead, the meeting was about Trae-Fuels's profitability and what Frink needed to do to ensure Trae-Fuels was viable.

74. LaRocco and Aleman asked that Plaintiff perform more high-level tasks and that he take on a greater role in instructing Frink on financial matters.

75. Plaintiff does not recall any complaints about him other than the trivial telephone issue Aleman raised.

*Plaintiff requested and was granted reasonable accommodation of time off to attend chemotherapy*

76. After having pancreatic treatment evaluations at Cancer Treatment Centers of America in Philadelphia and at John Hopkins in Baltimore, Plaintiff informed Trae-Fuels and

8

EnviroTech in late June or early July 2014 that he would begin chemotherapy on July 3, 2014 at John Hopkins.

77. Plaintiff was to be treated with chemotherapy two out of every three Fridays.

78. Plaintiff provided Frink, Whyrick, and Trae-Fuels's office manager his chemotherapy schedule.

79. Plaintiff also told Frink that he would be able to maintain a forty-hour work week despite the chemotherapy.

80. Frink said he would talk with EnviroTech about it and then later informed Plaintiff that EnviroTech and Trae-Fuels agreed to this plan.

81. In fact, Plaintiff handled the chemotherapy extremely well.

82. He experienced no negative symptoms – no pain, nausea, vomiting, etc. – and was able to maintain a forty to forty-five-hour work week, even on weeks that he underwent chemotherapy.

*Trae-Fuels and EnviroTech fired Plaintiff because of his disability*

83. On August 20, 2014, less than two months after beginning chemotherapy and despite the fact that Plaintiff had maintained his job performance and hours, Frink and Aleman informed Plaintiff that he was being terminated and should not return to work.

84. Aleman provided no explanation for the firing, but began the conversation by saying "We are not letting you go because you are sick."

85. When Plaintiff asked why he was being terminated, Aleman said only "I think you know what it is."

86. Plaintiff said he did not know but Aleman did not respond further.

87. Frink vaguely replied that Plaintiff did not fit into the "corporate culture," even though Frink had never expressed this concern before.

88. In contrast with Plaintiff's experience in which he was not provided discipline or an opportunity to improve, other Trae-Fuels employees received performance and disciplinary "write-ups" from their direct supervisors.

89. In fact, Plaintiff was asked to act as a witness and attend disciplinary actions for other employees as he performed some HR functions for Trae-Fuels and maintained disciplinary and performance improvement records.

90. Trae-Fuels and EnviroTech did not confront Plaintiff with any concerns and did not give him the opportunity to improve his performance.

91. Upon information and belief, Trae-Fuels and EnviroTech actually terminated Plaintiff because of his actual or perceived disability of pancreatic cancer.

*EnviroTech was Plaintiff's joint employer*

92. EnviroTech was the managing member of Trae-Fuels and jointly controlled Plaintiff's employment along with Trae-Fuels.

93. EnviroTech's CFO Whyrick and Director of Human Resources Aleman interviewed Plaintiff and offered Plaintiff his position.

94. Plaintiff reported to both EnviroTech CFO Whyrick Trae-Fuels General Manager Frink, who were each responsible for day-to-day supervision of Plaintiff's work.

95. Although Plaintiff was not ever presented with written discipline or criticism during his employment, Plaintiff learned during the course of the EEOC investigation that shortly after he informed Trae-Fuels and EnviroTech of his cancer diagnosis, EnviroTech

Corporate Strategy Officer Chris LaRocco and EnviroTech Director of HR Beth Aleman claimed to have documented (false) allegations of poor performance.

96. EnviroTech was also involved in Plaintiff's termination, as LaRocco and Whyrick asked Plaintiff about his condition and Aleman participated in the termination meeting.

97. Upon information and belief, EnviroTech participated in the decision to terminate Plaintiff.

98. EnviroTech provided some of the equipment Plaintiff used to perform his work, including Enterprise Resource Planning "IFS" system that Trae-Fuels used for tracking orders, sales, and accounting.

99. EnviroTech provided Plaintiff with training, including on EnviroTech's IFS / accounting software applications in December 2013.

## DEMAND FOR JURY TRIAL

100.   Plaintiff respectfully demands a jury trial on all Counts.

## COUNT 1

Denial of Reasonable Accommodations – ADA
(42 U.S.C. § 12101 et seq.)

101.   Plaintiff repeats and realleges paragraphs 1–100, as if fully set forth herein.

102.   Plaintiff had a disability within the meaning of the ADA, and Defendants knew about Plaintiff's disability.

103.   Despite his disability, Plaintiff was qualified for his position and was able to perform the essential functions of his job with or without reasonable accommodations.

104.   By terminating Plaintiff, Defendants denied Plaintiff's request for reasonable accommodations and refused to engage in an interactive process to identify reasonable accommodations.

105.   Providing Plaintiff reasonable accommodations would not have imposed an undue

burden on Defendants.

106. By and through its conduct, Defendants violated the ADA.

107. Defendants acted intentionally, recklessly, and/or with malice.

108. As a result, Plaintiff has sustained damages including lost wages, mental anguish, emotional distress, pain and suffering, and punitive damages. Plaintiff's damages are continuing.

## COUNT 2

Discrimination on the Basis of Disability – ADA

(42 U.S.C. . § 12101 *et seq*.)

109. Plaintiff repeats and realleges paragraphs 1–100, as if fully set forth herein.

110. Plaintiff had a disability within the meaning of the ADA, and Defendants was aware of Plaintiff's disability.

111. Despite his disability, Plaintiff was qualified for his position and was able to perform the essential functions of his job with or without reasonable accommodations.

112. Plaintiff's job performance satisfied Defendants' legitimate expectations.

113. Defendants terminated Plaintiff's employment because of his disabilities or because Defendants regarded Plaintiff as disabled.

114. By and through its conduct, Defendants violated the ADA.

115. Defendants acted intentionally, recklessly, and/or with malice.

116. As a result, Plaintiff has sustained damages including lost wages, mental anguish, emotional distress, pain and suffering, and punitive damages. Plaintiff's damages are continuing.

WHEREFORE, Plaintiff requests that this Court enter judgment against Defendants on all Counts, and award Plaintiff damages consisting of lost wages and benefits; compensatory damages for emotional distress, mental anguish, and pain and suffering; punitive damages; an amount equal to the tax on any award; costs; attorney's fees; and any such other relief as the Court deems just and proper.

Respectfully submitted,

Alan Lescht & Associates, P.C.

By: */s/Jack Jarrett*
Jack Jarrett
(VSB# 86176)
1825 K St., NW, Ste. 750
Washington, DC 20006
T: 202.463.6036
F: 202.463.6067
jack.jarrett@leschtlaw.com
*Attorney for Plaintiff*