IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE  DIVISION

|  |  |  |
|---|---|---|
| _____ ) | | |
| | ) | |
| MICHAEL DONALDSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 3:18CV00097 |
| | ) | |
| TRAE FUELS, LLC., et al. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| _____ ) | | |

DEFENDANTS' BRIEF IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT

## I.    Introduction

In October 2013, Defendant Trae Fuels LLC hired Plaintiff Michael Donaldson as the company's financial controller.  In August 2014, after repeated incidents of financial mismanagement, and after Mr. Donaldson had been placed on probation for poor work performance, the Company terminated Mr. Donaldson's employment.  While Mr. Donaldson alleges that his May 2014 cancer diagnosis was the reason for his termination, and that he is entitled to relief under the Americans With Disabilities Act, the factual allegations in his own Complaint, and the undisputed facts adduced in discovery, demonstrate that this simply is not the case. Mr. Donaldson was terminated solely on the basis of his inability to competently perform the work required of a financial controller at a large manufacturing facility.

Mr. Donaldson's job performance at Trae Fuels was substandard during the entire time of his employment.  He was criticized for poor performance well ***before*** his May 2014 cancer diagnosis, and he was criticized ***after*** his cancer diagnosis.  He was provided with multiple re-training opportunities and support.  Despite extensive follow up training from his employer, he was thereafter placed on probation for poor performance on June 4, 2014 and given a specific "scorecard" with which to improve his work product.  He failed to improve his work performance, and not long after overdrawing the Company line of credit due to his mismanagement of cash flow, was terminated on August 20.  There is no evidence to suggest that his probation or his termination was motivated in any way by his cancer diagnosis or treatment.  When asked at his deposition whether the criticism of his work performance by Beth Aleman, EnviroTech's Human Resources Manager, was related to his cancer, Mr. Donaldson replied "Well, it had nothing to do with my cancer." Donaldson Dep. Tr. at 51, Exhibit 15.

Mr. Donaldson alleges that his termination by Trae Fuels (and its corporate parent EnviroTech Services) violated the ADA.  His claim fails for three reasons: (i) he was not performing his job at a level that met Trae Fuels' reasonable expectations; (ii) the circumstances surrounding his termination do not give rise to a reasonable inference of unlawful discrimination; and (iii) Mr. Donaldson was not disabled.

Mr. Donaldson also alleges that Trae Fuels / EnviroTech failed to provide him with reasonable accommodations to perform his work.  However, there is not one

fact alleged in the Complaint or developed in discovery setting forth any instance in which Mr. Donaldson was actually disabled or that he was denied an accommodation.  Instead, Mr. Donaldson repeatedly alleges and testified in his deposition that he did not need ***any*** accommodations.  And the only reference in the entire case to the concept of accommodations recites that the Company ***granted*** his request for periodic leave to attend chemotherapy treatment.

There are no facts to support Mr. Donaldson's theory that he was terminated or denied accommodations in violation of the ADA.  The Defendants are entitled to summary judgment on both counts in the Complaint.

## II.    Standard of Review

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment shall be granted when "there is no genuine issue as to any material fact" and the "moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The nonmoving party may not rest on mere allegations or denials, but he must produce "significant probative evidence tending to support the Complaint" or provide "specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248-49 (1986) (*citing First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 290 (1968)).  Thus, in order to avoid summary dismissal of his claims, Plaintiff must produce evidence establishing every element on which he will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "Unsupported speculation is not sufficient," and Plaintiff may not "[r]est upon the bald assertions of [his] pleading." *Felty v. Graves-Humphreys Co.,* 818 F.2d

1126, 1128 (4th Cir. 1987).  Likewise, conclusory statements, unsupported

assertions, and "self serving opinions without objective corroboration" are not

sufficient to survive summary judgment. *Evans v. Techs. Applications & Serv. Co.*,

80 F.3d 954, 962 (4th Cir. 1996).

## III.   Statement of Material Facts As To Which There Is No Genuine Issue

The facts relevant to the motion are derived from the Plaintiff's Complaint,

his deposition testimony, his sworn interrogatory answers, from four affidavits of

his EnviroTech supervisors, and from emails and document prepared during Mr.

Donaldson's tenure at Trae Fuels that have been exchanged in discovery.

### A.   Shortly After Being Hired, and Well Before He Was Diagnosed with Cancer, Mr. Donaldson Made Repeated and Basic Errors in the Performance of His Job

Mr. Donaldson began working as the controller of Trae Fuels on October 17,

2013. Complaint at ¶ 13.  As controller of Trae Fuels, Mr. Donaldson was

responsible for the preparation and oversight of all financial records, manufacturing

costing, inventory management, accounting, and human resources oversight of some

administrative employees. Defendants Interrogatory Response No. 6, Exhibit 16.

Moreover, Mr. Donaldson was also responsible for the strategic direction of Trae

Fuels. *Id.*  EnviroTech Services, Inc. was the managing member of Trae Fuels and

jointly controlled Mr. Donaldson's employment. Complaint at ¶ 92.

Amy Elizabeth (Beth) Aleman was the Human Resources Manager at

EnviroTech during Mr. Donaldson's employment and supervised Mr. Donaldson's

human resources job functions at Trae Fuels.  Aleman Declaration at ¶¶ 1-2,

attached hereto.  Shortly after Mr. Donaldson began working for Trae Fuels, Ms. Aleman found that he was "very disorganized and did a poor job of following company procedures . . . . *Id.* at ¶ 4.  On multiple occasions Ms. Aleman observed that Mr. Donaldson failed to obtain a valid I-9 Employment Eligibility Verification for new employees, thereby placing Trae Fuels out of compliance with federal law. *Id.* at ¶ 6.

On January 31, 2014, Ms. Aleman had a lengthy email exchange with Mr. Donaldson regarding his failure to provide proper documentation for new employees, including health insurance forms.  *Id.* at ¶ 7; Exhibit 1.  At one point Ms. Aleman wrote to Mr. Donaldson:

> You have too much going on, and Fran can handle some of this as she did fine the first months we were hiring.  The paperwork is showing up in random multiple scans with duplicates and pages missing.  I received three scans that printed over 45 pages on Michael Smith and it made no sense as most of it was duplicates.

Exhibit 1 at Bates TRAE-PROD 3650.  On that same day, Ms. Aleman became so frustrated with Mr. Donaldson she placed the following phrase in the subject line of her email to him: "Please stop and listen to me." Exhibit 1 at Bates TRAE-PROD 3640.

On February 24, 2014, Ms. Aleman again exchanged email with Mr. Donaldson regarding his failure to submit proper documentation for new employees. Exhibit 2 at Bates TRAE-PROD 5031.  Mr. Donaldson had failed to submit paperwork for a new employee Joshua Magner.  Ms. Aleman reminded Mr. Donaldson that it was his responsibility to enforce the rule that employees may not

begin work until paperwork is completed.  Mr. Donaldson responded that he felt he could not "force them to complete the paperwork." *Id.*

As a part of his job functions as controller, Mr. Donaldson was responsible for accounts payable and was trained to use the company's IFS software accounting system to accomplish this task.  EnviroTech controller Michelle Mills exercised oversight over Mr. Donaldson for this portion of his job responsibilities.  Mills Declaration at ¶¶ 1-2, attached hereto.  As early as January 2014, Ms. Mills concluded that Mr. Donaldson was unable to properly use the company IFS system despite repeated training sessions and that he was unable to follow directions.  *Id.* at ¶¶ 3-4.

Despite extensive training on the IFS system, Mr. Donaldson insisted on creating and maintaining a separate excel spreadsheet outside the IFS system to track accounts payable invoices.  *Id.* at ¶ 5.  This procedure was "grossly inefficient and resulted in a number of extra steps that were unnecessary." *Id.*  In an email exchange date April 14, 2014, Ms. Mills told Mr. Donaldson to stop creating separate "journal entries" for accounts payable because it "seems like triple the work . . . ." *Id.,* Exhibit 8 at Bates TRAE-PROD 6754.  Mr. Donaldson explained why he wanted to do it his way, and Ms. Mills then forwarded the email exchange to EnviroTech Vice President Kevin Whyrick with a note alerting Mr. Whyrick to her concerns about Mr. Donaldson's performance ("I just think Mike is spending a lot of time doing things like this and there are probably better things he can be working on."). *Id.*  Despite direct and clear instructions, Ms. Mills found that Mr. Donaldson

would continue to perform tasks "his own way" in direct contravention to her instructions. Exhibit 10 ("It seems like if he does not like my answer then he will go to someone else hoping to hear something different.").

During this time period, Mr. Whyrick, Vice-President of Finance for EnviroTech also formed an opinion about Mr. Donaldson's work performance.  His primary concern was Mr. Donaldson's inability to develop any corporate strategy for Trae Fuels. Kevin Whyrick Declaration at ¶ 3, attached hereto.  Mr. Whyrick noted that Mr. Donaldson "made repeated mistakes on the company financial software system (IFS) beginning in late 2013." *Id.* at ¶ 4.  Mr. Donaldson's failure to grasp the functioning of the IFS system caused the Company to expend additional resources in flying Mr. Donaldson to EnviroTech in Colorado and sending accounting staff to Bumpass, Virginia to train and re-train Mr. Donaldson. *Id.* at ¶¶ 4-5.  Mr. Donaldson had represented that he had experience with enterprise level software accounting systems in his prior work, but Mr. Whyrick felt that instead he had "very little understanding or experience with enterprise financial software of this kind." *Id.* at ¶ 5.  Mr. Whyrick noted that Mr. Donaldson's issues with the IFS system began long before his health issues in May 2014. *Id.* at ¶ 6.

### B. Mr. Donaldson Was Diagnosed With Cancer in May 2014, But Experienced No Symptoms That Affected His Ability to Work

On May 15, 2014, Mr. Donaldson was admitted to the hospital and diagnosed with pancreatitis and shortly thereafter pancreatic cancer.  Mr. Donaldson informed Trae Fuels General Manger John Frink and EnviroTech Vice-President Kevin

Whyrick of his diagnosis sometime between May 19 and May 21, 2014. Plaintiff's Interrogatory Response No. 1, Attached as Exhibit 14.

 During this hospital stay, Trae Fuels hired a temporary accountant to assist Mr. Donaldson. Complaint at ¶ 44.  Immediately after being released from the hospital, Mr. Donaldson flew cross-country to Utah to adopt a newborn baby. *Id.* at ¶ 45.  When he returned to work on May 27, 2014 following the Memorial Day holiday he spent some time training the temporary employee, but generally attended to his "day-to-day" duties. Plaintiff's Interrogatory Response No. 5, attached as Exhibit 14.   The temporary accountant was released shortly thereafter. *Id.*

In late June or early July, Mr. Donaldson told his supervisors that he would begin chemotherapy on July 3, 2014 at Johns Hopkins in Baltimore, and that the treatment would occur on two out of every three Fridays. Complaint at ¶¶ 76-77. After his cancer diagnosis, and through the termination of his employment on August 20, 2014, Mr. Donaldson's physician did not impose any physical restrictions or limitation on his activities. Plaintiff's Interrogatory Response No. 2, Exhibit 14; Donaldson Dep. Tr. at 116, Exhibit 15.

Mr. Donaldson told the Company he experienced "no negative symptoms –no pain, nausea, vomiting, etc. – and was able to maintain a forty to forty-five-hour work week, even on the weeks that he underwent chemotherapy." Complaint at ¶ 79-82.  Mr. Donaldson testified that after a Friday chemotherapy session he would feel "lethargic" on Saturdays or Sundays.  Plaintiff's Interrogatory Response No. 3,

attached as Exhibit 14.  He also testified that by Monday the symptom (lethargy) had dissipated. Donaldson Dep. Tr. at 11, Exhibit 15.

When asked whether he had any limitations on his ability to work when he was at Trae Fuels, Mr. Donaldson responded "No. I worked while I was taking chemotherapy at Trae Fuels, worked 40 hours a week in four days."  *Id.* Exhibit 15 at 10.  When asked whether "any part of the chemotherapy or your cancer that affected your work quality of your accounting and comptrolling work at Trae Fuels," Mr. Donaldson responded:

> No. It didn't, basically because I did it on Fridays. So I was very blessed not to have, should I say, a lot of side symptoms. There was a little bit, but that was taken care of over the weekend.

*Id.* Exhibit 15 at 10.  And, asked whether he could fully perform his job, Mr. Donaldson replied: "I could fully perform my job." *Id.* Exhibit 15 at 35.

### C. Trae Fuels and EnviroTech Modified Mr. Donaldson's Schedule so That He Could Receive Chemotherapy Treatment; No Other Accommodations Were Requested or Needed

In a heading within the Complaint titled "Plaintiff requested and was ***granted*** reasonable accommodation of time off to attend chemotherapy" (Complaint at p. 8, emphasis supplied), Mr. Donaldson alleges that he began chemotherapy on July 3, 2014 at Johns Hopkins in Baltimore. *Id.* at 76.  Mr. Donaldson provided his chemotherapy schedule to the Company, told them he could continue working full-time, and the Company "agreed to this plan." *Id.* at ¶ 80; Donaldson Dep. Tr. at 12, attached as Exhibit 15.

In his response to Interrogatory No. 10, Mr. Donaldson identifies no requests for accommodation that he made to the Company that were denied. *See* Exhibit 14. Every request he made for a schedule change to facilitate his medical treatment was granted by Trae Fuels and EnviroTech. *Id.* When asked at his deposition whether he needed any accommodation such as a "walker, wheelchair or cot in his office to take naps," Mr. Donaldson replied "No. I didn't need it. Not at all." Donaldson Dep. Tr. at 35-36, Exhibit 15. When the question was expanded to cover the entire time period of his employment with Trae Fuels and the question of the necessity of any accommodation was posed, Mr. Donaldson's answer was the same: "No. No accommodation." *Id.* at 36, attached as Exhibit 15.

**D. Mr. Donaldson's Job Performance Is Evaluated on June 4, 2014**

On June 4, 2014, Beth Aleman, John Frink and EnviroTech corporate strategist Chris LaRocca held a meeting with Michael Donaldson at the Trae Fuels facility in Bumpass, Virginia. The purpose of the meeting was to provide an in-person job performance evaluation of Michael Donaldson. *See* Aleman Declaration at ¶¶ 9-11; Whyrick Declaration at ¶ 10; LaRocca Declaration at ¶¶ 4-5. At the conclusion of the meeting Beth Aleman prepared a written "Employee Counseling Notice." Exhibit 3.

During the meeting EnviroTech corporate strategist Chris LaRocco pointed out several deficiencies Mr. Donaldson's performance and outlined the steps he needed to take in order to improve his performance (financial reporting needs to be current at all times; communicate daily with Trae's General Manager; make

decisions faster; know inventory at all times; correlate inventory data and financials). *See* Exhibit 3. Mr. LaRocco stated that he would prepare a "scorecard" for Mr. Donaldson's use to assist him in collecting vital financial information to provide to EnviroTech corporate and the general manager John Frink. *Id.;* Exhibit 11.

Ms. Aleman advised Mr. Donaldson that he needed to perform at a higher level and "not in the day-to-day 'weeds' of things going on in the office." *Id.* She removed human resources responsibilities (except 5 manager positions) from Mr. Donaldson's job and directed him to create accounts payable files for all vendors and keep them current. Exhibit 3. She reported that she found employee files out of federal compliance. *Id.*

Mr. Donaldson was told that he was expected to show improvement in selected performance areas within the next two weeks. Thus, the next two weeks were a probation period. *Id.* Mr. Donaldson later told Mr. LaRocco that he was upset about the June 4 meeting because he felt that he had not been warned in advance of performance issues, and was also upset about the manner in which the probation periods were handed down. Exhibit 13. The day after the June 4 evaluation of Mr. Donaldson, Mr. LaRocco provided a report to Kevin Whyrick and other EnviroTech corporate officers that included additional analysis of Mr. Donaldson's performance. Exhibit 12. Mr. LaRocco wrote that it was his belief that Michael Donaldson was "over analytical" and that he "lacks the ability to translate Trae's finances into actionable plans (predictive). He is also lacking in the

confidence to voice his concerns to John [Frink] in a way that protects them from missing profitability expectations and cash management objectives (financial analysis)." *Id.*

### E. Mr. Donaldson's Performance Does Not Improve After the June 4, 2014 Evaluation and Counseling Meeting

In the time period following the June 4, 2014 performance evaluation and counseling meeting with Mr. Donaldson, both Mr. Whyrick and Mr. LaRocca made additional evaluations of Mr. Donaldson's progress. On July 3, 2014, Kevin Whyrick prepared a summary of Mr. Donaldson's work performance. Mr. Whyrick wrote that Mr. Donaldson "has put some effort toward getting better with communications, but he is still lacking in leadership and strategy needed for this position. I am continually seeing more and more instances of Michael not getting us the correct information, or not getting us the information in a timely manner." Exhibit 7, Bates Trae / Enviro 000030. Mr. Whyrick also stated that "[r]ecently Michael has been dealing with some health issues. As a part of this, we have told him that we will support him, but he needs to communicate with us when he will miss work, and help us find people to fill in while he is gone." *Id.* Mr. Whyrick concluded by writing "[b]ased on these observations, I seriously question whether Michael will be able to adequately fill the role we hired him for as the manufacturing controller for Trae-Fuels." *Id.*

Mr. LaRocco also recorded observations about Mr. Donaldson's work performance after the June 4 employee counseling session and concluded that he did not make any significant improvements in the quality of his work. LaRocco

Declaration at ¶ 8.  On June 26, 2014, Mr. LaRocco wrote a memo to the file recording his observations about Mr. Donaldson's work for the period June 4 to June 20.  Exhibit 4.  Of particular concern to Mr. LaRocco was Mr. Donaldson's cash flow analysis on June 9.  Mr. LaRocca wrote in his memo, "the work product was substandard and unpresentable to the ownership."  Mr. LaRocco also noted that on June 4 Mr. Donaldson had drawn on the company line of credit and caused the company to go "cash negative/broke."  *Id.*  Mr. Whyrick also noted the serious nature of the overdrawn line of credit. Whyrick Declaration at ¶ 7.  Mr. Whyrick states:

> It was Michael's job to make sure that he projected and monitored the cash situation to be sure that this didn't happen.  In the banks' view this is not a good thing, and it was communicated to Michael that we do not want to over draw our line of credit.  However, he did not take any responsibility for this and was quick to blame the plant, the General Manager John Frink, and others for his having allowed this to happen.  This shows the lack of proactivity that we were seeing from Michael on a lot of things. This became a situation because he was not proactive in his cash projections. With more proactivity we would not have been in this situation at all. It became an emergency, and we ended up having to scramble to resolve it.

At around this same time (July 2014), EnviroTech controller Michelle Mills also prepared a memo to the file memorializing her observations about Mr. Donaldson's performance.  She wrote in her memo that "[w]e see the same issues arise and it seems like he [Mr. Donaldson] is not putting them together and identifying problems based on previous experiences.  We then have to explain and it seems like a brand new concept to him each time.  There is no correlation between the issues that arise.  He should be able to identify the issue and know there is a fix even if he does not know how to fix it. . . . In my opinion he is not performing as the controller of the company." Exhibit 10.

On July 17, 2014, Beth Aleman met with Kevin Whyrick and Chris LaRocco to discuss Michael Donaldson's progress. Aleman Declaration at ¶ 13. Ms. Aleman took handwritten notes at the meeting in which Mr. Donaldson's lack of accountability and lack of execution were discussed. Exhibit 5. The discussion specifically noted Mr. Donaldson's "lack of involvement in financial accountability to investors." *Id.*

At the end of July 2014, Mr. Donaldson again failed to provide Ms. Aleman with completed health insurance documents for new employees who started working at Trae Fuels during July. Aleman Declaration at ¶ 14. On August 4, 2014, Ms. Aleman emailed Mr. Donaldson to let him know that again the deadline had been missed and that new employees would not be insured for the following month. Aleman Declaration at ¶ 14; Exhibit 6. Again, Mr. Donaldson stated that he could not force employees to follow the rules. *Id.*

### F. Mr. Donaldson's Employment is Terminated on August 20, 2014

In early August 2014, EnviroTech personnel, after consulting Trae Fuels General Manager John Frink, decided to terminate Mr. Donaldson's employment due to his failure to improve the quality of his work and his overall job performance. Aleman Declaration at ¶ 15. The Company terminated Mr. Donaldson's employment on August 20, 2014. *Id.* at ¶ 16; Complaint at ¶ 83. When Mr. Frink and Ms. Aleman met with Mr. Donaldson on August 20 to tell him his employment was terminated, he stated "you can't fire me….I am old and I am sick." Aleman

Declaration at ¶ 16.  Ms. Aleman responded that the termination was based solely on his poor work performance. *Id.*

After Mr. Donaldson left the office on August 20, Ms. Aleman reviewed his office files and found them to be in complete disarray.  Aleman Declaration at ¶ 17. Many employee files were missing important documents and random vendor invoices were tucked into employee files for no apparent reason.  *Id.*  There were multiple Visa bills that were unopened, and she found later that he was past due on a lot of Company payables that he was responsible for.  *Id.*

### G. Mr. Donaldson States that There is No Direct Evidence of Discrimination

Mr. Donaldson does not allege in his Complaint that there is any direct evidence to support the contention that he was discriminated against on the basis of his cancer diagnosis or cancer treatment.  When asked in his deposition whether there is any evidence that any criticism of his work performance was based upon or motivated by his cancer diagnosis, Mr. Donaldson repeatedly said no.  Donaldson Dep. Tr. at 51, 54-55, 64-65, 75, Exhibit 15.  Two representative exchanges on that topic are set forth below:

> Q: Is there any information that you have that the reason why she [Ms. Aleman] was blaming you for not getting the employee documents in the right file was because of your cancer?
>
> MR. JARRETT: [Objection.]
>
> A: Well, it had nothing to do with my cancer.
>
> Tr. at 51.

Q: What is -- do you have any evidence that Ms. Mills's criticism of your use of the Excel spreadsheet is in any way related to your health condition or cancer?

A: Yeah. I don't see anything related to my cancer as far as that. No.

Tr. at 64.

Finally, Mr. Donaldson is cancer-free at this time and has been cancer free since January 2015 with no limitations on his ability to work. Donaldson Dep. Tr. at 8, Exhibit 15.

## IV.   Argument

### A.  Plaintiff Cannot Demonstrate That Trae Fuels or EnviroTech Violated The ADA

In his Complaint, Plaintiff alleges on "information and belief" that he was discriminated against because of his disability in violation of the ADA. Complaint at ¶ 91.  Thus, the entity of Mr. Donaldson's case rests upon speculation that all work performance criticism after May 15, 2014 and his August 2014 termination were based on his cancer diagnosis simply because they occurred after his cancer diagnosis.  There is no evidence to support Mr. Donaldson's claim.

When, as here, there is no direct evidence of discrimination, the United States Court of Appeals for the Fourth Circuit applies the burden-shifting scheme established by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 57-58 (4th Cir. 1995) (extending the *McDonnell Douglas* burden shifting scheme to ADA cases).  Under this analytic scheme, an employee has the burden to establish a prima facie case of discrimination. *Id*. at 58.  If the employee can satisfy

the elements of his claim, the burden shifts to the employer to articulate its legitimate, non-discriminatory explanation for its adverse employment action. *Id*.  If the employer meets this burden of production, then the employee must demonstrate that the employer's asserted explanation is pretext. *Id*.

To establish a prima facie case of discriminatory discharge because of his disability, Plaintiff must show that (1) he was disabled; (2) he was discharged; (3) at the time of discharge he was performing his job at a level that met the Company's expectations; and (4) the discharge occurred under circumstances that raise a reasonable inference of discrimination. *Ennis*, 53 F.3d at 58.

Fatal to Plaintiff's claim is that he cannot prove that at the time of his discharge he was performing his job at a level that met Trae Fuels / EnviroTech's reasonable expectations or that his discharge occurred under circumstances that raise a reasonable inference of discrimination.  Finally, Mr. Donaldson was not disabled under the ADA; he experienced no limitations or impairments in either his physical or mental attributes that affected his work in any way.

1. **Plaintiff was Not Meeting Trae's Legitimate Expectations At Any Time During His Employment with the Company**

The undisputed evidence in the record shows that Mr. Donaldson's superiors, Ms. Aleman, Mr. Whyrick, Ms. Mills, and Mr. LaRocco believed that Mr. Donaldson was performing poorly throughout the duration of his employment as controller at Trae Fuels.  Each of them repeatedly communicated their criticism directly (and constructively) to Mr. Donaldson.  The fact that Mr. Donaldson disagreed with their criticism of his work performance and preferred to perform tasks inefficiently or

incorrectly or to blame others for workplace failures does not create a triable issue of fact.  The volume, content, and circumstances surrounding the criticism demonstrates that it was legitimate and made in good faith.  "It is the perception of the decision maker which is relevant" in assessing whether an employee was performing his duties adequately. *Johnson v. Mechs. & Farmers Bank,* 309 F. App'x 675, 683 (4th Cir. 2009), *quoting Smith v. Flax,* 618 F.2d 1062, 1067 (4th Cir. 2003).

Ms. Aleman has set forth in great detail the many times Mr. Donaldson failed to provide new employee documents to her including critical I-9 forms, the absence of which placed Trae Fuels in violation of federal law.  This was Mr. Donaldson's responsibility.  Ms. Aleman's ongoing battle with Mr. Donaldson to return employee forms to her in a timely fashion spanned almost the full tenure of Mr. Donaldson's employment (Exhibit 1: January 2014 to Exhibit 6: August 4, 2014).

EnviroTech controller Ms. Mills describes the ongoing effort to teach Mr. Donaldson how to operate the IFS software accounting system – something he never properly operated.  Ms. Mills' effort to dissuade Mr. Donaldson from keeping a lengthy (300 line) excel spreadsheet of accounts payable that was outside the parameters of the central IFS system is remarkable.  Here is a man who simply refused to perform tasks in an efficient manner, and insisted on doing projects his own way contrary to the directions and instructions of his superiors. Exhibit 8; Exhibit 10.

Mr. Whyrick's description in ¶ 7 of his declaration of Mr. Donaldson's failure to compute cash flow correctly which caused Trae Fuels to "overdraw" its line of

credit is also remarkable.  Mr. Whyrick writes that Mr. Donaldson simply blamed the cash flow miscalculation on the Trae Fuels General Manger John Frink; he accepted no responsibility for overdrawing the line of credit.  The cash flow analysis that is central to the draw on the line of credit was a core responsibility of Mr. Donaldson's position. Whyrick Declaration at ¶ 7.

Mr. LaRocco and Mr. Whyrick recorded multiple instance of inaccurate financial reporting that was missing data and left the company's investors essentially in the dark as to the actual financial position and performance of the Company. Exhibit 7; Exhibit 4.

There sworn declarations and exhibits attached hereto show a steady stream of constructive criticism of Mr. Donaldson's work from January to June 2014.  None is in any way related to Mr. Donaldson's diagnosis or treatment.  On June 4, 2014 Trae Fuels / EnviroTech took the formal step of having a sit-down employee evaluation that culminated in the written counseling memo attached as Exhibit 3. Mr. Donaldson was placed on a two-week watch – effectively probation.  He was given a "scorecard" to improve his performance.  Yet, even with this support system, his performance never improved.  He made repeated errors and showed no strategic initiative for the Company.  He clearly did not meet his employer's legitimate expectations for the position of controller at Trae Fuels.

2. **Plaintiff was Terminated for Legitimate, Non-Discriminatory Reasons, and He Cannot Demonstrate Pretext**

Mr. Donaldson's "pretext" theory is presumably that he was a model employee prior to his cancer diagnosis and only suffered work performance criticism

after his cancer diagnosis therefore the post-diagnosis criticisms are a "coverup" for Trae Fuels discriminatory motivations.  The first problem with this theory is that Mr. Donaldson's superiors were clearly not satisfied with his work prior to his cancer diagnosis.  Second, the specific, detailed, and substantive job performance criticism he received after his diagnosis is legitimate, fully supported in the record, and does not raise any inference of discrimination.

In order to show pretext, Mr. Donaldson must "point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes v. Perskie,*  32 F.3d 759, 764 (3d Cir. 1994).

The declarations of Ms. Aleman, Ms. Mills and Mr. Whyrick demonstrate serious and chronic shortcomings in Mr. Donaldson's performance prior to May 2014.  He was unable to understand and operate the IFS system; he was retrained on the IFS system; he diverted support resources from EnviroTech headquarters in Colorado for work he should have performed with no assistance.  He prepared time-consuming and lengthy excel spreadsheets outside of IFS that increased his workload for no reason.  He failed to obtain critical documents from new employees causing delays in insurance coverage and placing Trae Fuels out of compliance with federal law.  There is simply no support for Mr. Donaldson's contention that his work performance was not criticized prior to his cancer diagnosis.

After his cancer diagnosis he continued to make material errors in preparing the cash flow analysis and other financial reports.  His reports were unprofessional, missing key data, and "unpresentable to the ownership" according to Mr. LaRocco.  His failure to correctly compute Trae's cash flow on June 4, 2014 caused the Company to overdraw its line of credit. Whyrick Declaration at ¶ 7.   In the world of banking and finance an "overdrawn" line of credit is a huge red flag.  Overdrawn lines of credit result in significant concern, intervention, and review from the lender and impairs future credit extension options.  As late as the end of July 2014 (10 months into Mr. Donaldson's employment) he repeated his chronic failure to secure new employee insurance forms again, obviously to the consternation of Ms. Aleman. Exhibit 6.

The controller position is not simply an accounting position.  The controller position in any manufacturing facility, including Trae Fuels, is responsible for developing and implementing a strategic plan to grow the company.  Mr. Whyrick and Mr. LaRocco in particular urged Mr. Donaldson to implement a strategic plan. Mr. Donaldson simply was unable to do so.  Exhibit 7.  Thus, the Company's decision to terminate Mr. Donaldson had nothing to do with his cancer – indeed a major player in the decision to terminate Mr. Donaldson is a cancer Stage III cancer survivor himself (Mr. Whyrick). *See* Whyrick Declaration ¶ 12.  The record shows that the decision was based solely on Mr. Donaldson's inadequate job performance.

In light of the abundance of contemporaneous, documented, specific, substantive criticism of Mr. Donaldson's works performance by four of his key

supervisors, including a cancer survivor, it is impossible for Mr. Donaldson to meet his affirmative burden of showing that the proffered reasons for his termination were pretextual.  To do so he must "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [Trae Fuels'] proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them unworthy of credence." *Id.* at 765 (quotations omitted).

### 3.  Mr. Donaldson Was Not Disabled

Under the ADA, a "disability" is defined as "a physical or mental impairment that substantially limits one or more major life activities of such individual." 42 U.S.C. § 12102(1)(A).  Thus, under the statute, there are two separate and distinct components to the definition – the "substantial limitation" prong and the "major life activities" prong.

Mr. Donaldson claims that he experienced "no negative symptoms –no pain, nausea, vomiting, etc. – and was able to maintain a forty to forty-five-hour work week, even on the weeks that he underwent chemotherapy." Complaint at ¶ 79-82. Immediately following his two-day stay in the hospital he boarded a plane, travelled to Utah, and adopted a newborn baby. *Id.* at ¶ 45.  He asked for no accommodations and he needed no accommodations.  It is simply not possible to reconcile the specific facts alleged by Mr. Donaldson regarding his ability to travel across the country, work long hours with no pain and no fatigue, and experience no digestion issues, with his formulaic disability allegation in ¶ 40.

The ADA Amendments Act of 2008, while intended to expand the definition of "disability," has no effect on the foregoing analysis. It is clear that the statute still contains two prongs – and that Mr. Donaldson has failed to offer any evidence to support the substantial impairment prong. *See, e.g., Miller v. Md. Dep't of Natural Res.*, 2018 U.S. Dist. LEXIS 165863, at *16 (D. Md. 2018).

Other courts addressing this question have determined that a cancer diagnosis does not automatically establish "disability" status under the ADA. In *Signore v. Bank of Am., N.A.*, 2013 U.S. Dist. LEXIS 145649, *20-22 (E.D. Va. 2013), a former bank employee brought an ADA claim based on her two prior bouts of cancer and Hodgkin's lymphoma. She complained of "fatigue and lack of stamina" as a result of those medical issues. After an extensive analysis, the Court concluded that the former employee failed to meet the substantial impairment prong of the disability definition:

> [H]aving a physical or mental impairment is not sufficient on its own to establish a disability under the ADA, nor is showing that the impairment merely affects one or more major life activities. Instead, an individual must also show she is *substantially limited* as a result of the impairment. "[N]ot every impairment will constitute a disability" and an individual must be limited "as compared to most people in the general population." *Id.*
>
> Plaintiff simply alleges that she suffers from fatigue and lack of stamina at the end of the day due to her prior battles with breast cancer and Hodgkin's lymphoma. Am. Compl. ¶ 20. Plaintiff felt that she "might" not be able to shop for the snacks after a full ten hour workday because of that fatigue. *Id.* She says that she "was not able to participate fully in extracurricular activities" because of having had cancer twice. *Id.* ¶ 19. . . . ***Plaintiff has made no claim that she could not handle the regular demands of the work week, nor does she provide specific information about any impact of her alleged impairment on her life's activities other than implying that she may have been too tired on one occasion***

> ___to shop after work___. *Cf. Nance v. Quickrete Co.*, 2007 U.S. Dist. LEXIS
> 40872, 2007 WL 1655154, at *3 (W.D. Va. June 5, 2007) (finding that a
> plaintiff was not disabled where "his only limitation is being able to drive a
> truck more than eleven hours a day").

*Id.* at *20-22 (emphasis added).

Further, the Fourth Circuit has determined that an employee able to work a full forty-hour week despite being diagnosed with heart ailments and leukemia was not disabled under the ADA. *Boitnott v. Corning Inc.,* 669 F.3d 172 (4th Cir. 2012). The Court concluded that the "inability to work overtime does not constitute a 'substantial' limitation on a major life activity under the ADA." *Id.* at 176. This Court recently arrived at a similar conclusion in *Cash v. Magic City Motor Corp.,* 2017 U.S. Dist. LEXIS 8128 (W.D. Va. 2017). In *Cash,* this Court rejected an employee's claim that he was actually disabled within the meaning of the ADA, holding that "[h]e has alleged no aspect of his work that he was unable to do or was otherwise limited in performing." *Id.* at *9. Mr. Donaldson's case suffers the same infirmity; he repeats throughout his Complaint that his cancer diagnosis and treatment did not impair his ability to perform his job for Trae Fuels in any way. Complaint at ¶¶ 47, 49, 53, 74-75, 79, 81, 82, 83, 103, 111. In his deposition, he plainly states that he had no limitations that affected his work. Donaldson Dep. Tr. at 10 & 35, attached as Exhibit 15.

Further, there is no evidence that supports a reasonable inference that ___at the time___ Mr. Donaldson was terminated on August 20, 2014, he was disabled. He had not requested, nor did he need, any accommodations. The temporary assistant

had been let go.  Mr. Donaldson worked long hours with no complaints or references to his condition.

Ultimately, there is absolutely no evidence that Mr. Donaldson was impaired in any tangible way by his cancer diagnosis or treatment; there is no evidence that the Company treated him as disabled or in any manner different from any other employee.  His full interrogatory response to support the contention that he was terminated because of a "perceived" disability contains nothing but speculation; there are no facts to support disability, perception of disability, or disparate treatment based on disability. Exhibit 14, at Interrogatory Response No. 11.

Finally, Mr. Donaldson may attempt to argue that because he is currently receiving Social Security disability benefits that he should be considered disabled. But, his receipt and acceptance of disability benefits is wholly inconsistent with his actual condition.  His sworn testimony is that "I am cancer free five and a half years" . . . "I am cancer free, but I am disabled according to them."  Donaldson Dep. Tr. at 8, Exhibit 15.  Further, Mr. Donaldson's testified under oath that he had no limitations on his ability to work at any time during his tenure with Trae Fuels, and has no limitations at the present time either. *Id.* at 9-10.  His continued receipt of disability payments in excess of $2,000 per month (Dep. Tr. at 30) in this scenario is not probative of whether he was disabled under the ADA at the time he was terminated.  *See Nance v. Quickrete Co.,* 2007 U.S. Dist. LEXIS 40872, *11 (W.D. Va. 2007) (disability definition used for Social Security is inconsistent with a claim for employment discrimination under the ADA).

Mr. Donaldson was not disabled and was not perceived to be disabled at the time his employment was terminated.  Trae Fuels and EnviroTech are entitled to summary judgment on Count 2 of the Complaint.

### B.   The Defendants _Granted_, Not Refused, Mr. Donaldson's Requested Accommodations for Medical Treatment

Count 1 of the Complaint attempts to set forth a claim for "Denial of Reasonable Accommodations" under the Americans with Disabilities Act. Complaint at ¶¶ 101-08.  There are four elements necessary to sustain a claim for failure to accommodate under the ADA:

> To establish a prima facie case for failure to accommodate, an employee must show: (1) she was an individual with a disability within the meaning of the ADA; (2) the employer had notice of her disability; (3) with reasonable accommodation, she could perform the essential functions of the position; and (4) the employer refused to make such accommodations.

*Haneke v. Mid-Atlantic Capital Mgmt.,* 131 Fed. Appx. 399, 400 (4th Cir. 2005). *See also Rhoads v. F.D.I.C.,* 257 F.3d 373, 387 n.11 (4th Cir. 2001); *Crabill v. Charlotte Mecklenburg Bd. of Educ.*, 423 Fed. Appx. 314, 322 (4th Cir. 2011).

Nowhere in Mr. Donaldson's Complaint or in the record is there any allegation or evidence that the Defendants refused to make an accommodation for him.  Nor is there any evidence or allegation that Mr. Donaldson actually made any request for any accommodation to perform his job at any time.   As a foundational matter, Mr. Donaldson repeats throughout his Complaint that his cancer diagnosis and treatment did not impair his ability to perform his job for Trae Fuels in any way. Complaint at ¶¶ 47, 49, 53, 74-75, 79, 81, 82, 83, 103, 111.  He does not allege that he suffered any workplace limitations whatsoever. *Id.*  Given this backdrop,

any request for an accommodation would have been superfluous.  Ultimately, the failure to make any allegation or produce any evidence of an essential element of the denial of accommodation claim must result in the entry of summary judgment.

After completing his factual recitation in paragraphs 1 through 100, Mr. Donaldson sets forth his legal claim for denial of reasonable accommodations in paragraphs 101-08 of the Complaint (Count 1).  This section of the Complaint is logically and legally deficient.  In paragraph 108, Mr. Donaldson alleges: "By terminating Plaintiff, Defendants denied Plaintiff's request for reasonable accommodations and refused to engage in an interactive process to identify reasonable accommodations."  Mr. Donaldson's response to Interrogatory No. 12 simply parrots this circular reasoning. Exhibit 14, at Interrogatory Response No. 12.  But the fact remains that Mr. Donaldson's Complaint does not identify any request he ever made for an accommodation, let alone the type of accommodation that might be required for a man experiencing "no negative symptoms" and able to work "forty to forty-five hours per week."  The only request that Mr. Donaldson alleges in the Complaint is his request for leave for medical treatment; that request was ***__granted__*** by the Company. Complaint at ¶¶ 76-82.  A naked conclusory statement that the termination itself constitutes a denial of accommodation makes no logical sense and does not articulate a legal claim under the ADA.

Further, Mr. Donaldson makes no factual suggestion of what sort of "interactive process to identify reasonable accommodations" the Company should have undertaken.  Again, because the Plaintiff claims repeatedly in his Complaint

that he was not impaired in any way, this allegation appears to simply be a recitation of the EEOC's regulations on this topic. *See* 29 C.F.R. 1630 (EEOC Interpretive Guide). Finally, "an employee cannot base a reasonable accommodation claim solely on the allegation that the employer failed to engage in an interactive process." *Walter v. United Airlines, Inc.*, 2000 U.S. App. LEXIS 26875, at *11 (4th Cir. 2000).

Trae Fuels and EnviroTech are entitled to the entry of summary judgment in their favor on Count 1 of the Complaint.

## V. Conclusion

There is a veritable mountain of evidence showing that every key person with supervisory responsibility over Mr. Donaldson believed that he was failing to carry out the functions and responsibilities of the controller position. The analysis of Mr. Donaldson's inadequate work performance is detailed, substantive, material and was documented over a significant span of time. The analysis covers the time prior to his cancer diagnosis and after his cancer diagnosis. There is no evidence whatsoever that any of the criticism and evaluation was based in any way on his diagnosis or treatment.

Mr. Donaldson will respond to this motion by arguing strenuously that he was right on each and every occasion in which he was corrected by a supervisor, and the supervisor was wrong or that someone else in the Company was responsible for the error or deficiency. First, Mr. Donaldson's desire to always be in the right and steadfast rejection of the proposition that he was mistake prone and had no

strategic plan or vision clearly contributed to his termination.  But secondly, the question of who was right or wrong in each of these workplace interactions is not relevant.  It is overwhelming clear that Mr. Donaldson's supervisors legitimately believed that he was failing to meet the functions of his job.  That was why his employment was terminated.  There is not one scrap of direct or circumstantial evidence that his cancer diagnosis or treatment played any role in his termination.

For the foregoing reasons the Defendants' motion for summary judgment should be granted.


Dated: October 31, 2019.


                                        Respectfully submitted,


                                        /s/ Jackson S. Nichols
                                        _____
                                        Jackson S. Nichols, Esq.
                                        (VSB # 87225)
                                        Cohen Seglias Greenhall Pallas & Furman PC
                                        1828 L. Street, N.W.
                                        Suite 705
                                        Washington, D.C.  20036
                                        (202) 466-4110
                                        JNichols@CohenSeglias.com


                                            --and--

/s/ Lars H. Liebeler

_____

Lars H. Liebeler, Esq. *(admitted pro hac vice)*
Lars Liebeler PC
1828 L. Street, N.W.
Suite 705
Washington, D.C. 20036
(202) 774-1510
LLiebeler@LHL-LawFirm.com

## CERTIFICATE OF SERVICE

This is to certify that I have on October 31, 2019 served all the parties in this case with this **Brief in Support of Motion for Summary Judgment** in accordance with the notice of electronic filing ("ECF"), which was generated as a result of electronic filing in this court.

/s/ Lars H. Liebeler

_____

Lars H. Liebeler, Esq.