IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE  DIVISION

| | |
|---|---|
| _____<br><br>MICHAEL DONALDSON,<br><br>　　　Plaintiff,<br><br>　　　　　v.<br><br>TRAE FUELS, LLC., et al.<br><br>　　　Defendants.　　　）<br>_____ | ）<br>）<br>）<br>）<br>）<br>）<br>）　　Case No.: 3:18CV00097<br>）<br>）<br>）<br><br>）<br>） |

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

# EXHIBIT 14

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

|  |  |
|---|---|
| MICHAEL DONALDSON,<br><br>Plaintiff,<br><br>v.<br><br>TRAE FUELS, LLC., et al.<br><br>Defendants. | Case No.: 3:18CV00097 |

## PLAINTIFF'S SUPPLEMENTAL OBJECTIONS AND RESPONSES TO DEFENDANTS' INTERROGATORIES AND DOCUMENTS REQUESTS TO PLAINTIFF

Plaintiff Michael Donaldson, by and through undersigned counsel, hereby provides his objections and responses to Defendants' Interrogatories and Document Requests as follows:

### INTERROGATORIES

1. Describe in detail the time and manner in which you informed your employer that you had been diagnosed with cancer. Your answer should include, but not be limited to, a description of all verbal communications with any other person in your workplace regarding your diagnosis.

**OBJECTION:** Plaintiff objects to the request as vague in that "all verbal communications with any other person in your workplace," could mean conversations Plaintiff had or conversations any employees had. Plaintiff further objects to the request to the extent it is unduly burdensome in that the benefit of describing all conversations regarding Plaintiff's diagnosis does not justify the burden of describing each such conversation with individuals who had no supervisory

responsibility for Plaintiff.  Subject to and without waiving the foregoing objections, Plaintiff states:

In the middle to end of April 2014, Mr. Donaldson learned that he had a mass on his pancreas.  Mr. Donaldson believes he informed John Frink in person of this at work the day he learned of his diagnosis.

Between May 15, 2014 (the date Mr. Donaldson learned of his diagnosis with pancreatic cancer) and May 19, 2014 (the date of Mr. Donaldson's first appointment with an oncologist), Mr. Donaldson told Mr. Frink that he had been diagnosed with pancreatic cancer and that he had and oncology appointment and would be into the office after his appointment.  On May 19, 2014, Mr. Donaldson called Mr. Frink and told him he had been diagnosed as having pancreatitis and was going to be hospitalized so that he would not expect him to be at work, as previously promised.

On May 21, when Mr. Donaldson was released from the hospital, he called Kevin Whyrick and Mr. Donaldson believes that he told Mr. Whyrick of his cancer diagnosis.  Mr. Donaldson and Mr. Whyrick discussed Mr. Donaldson's pancreatitis generally and Mr. Whyrick asked if he had been in pain.  At this time, Mr. Whyrick told Mr. Donaldson that the company had hired a temporary accountant that Mr. Donaldson would need to help train.

Mr. Donaldson returned to work on May 27, 2014 and believes he thereafter had conversations with Fran Holiday and Chris LaRocco about his cancer diagnosis but does not recall the specific date of those conversations.  Mr. Donaldson also had conversations with Mr. Whyrick about whether his cancer was expected to progress fast or slow.

2.  Describe in detail all physical restrictions imposed upon you by your physicians from

May 15, 2014 to August 20, 2014.

**RESPONSE:**  Mr. Donaldson's physicians did not impose any physical restrictions on him other than to instruct him to undergo chemotherapy which was first scheduled on July 3, 2014.  Mr. Donaldson took chemotherapy on three Fridays a month and took time off of work to attend those appointments.  Mr. Donaldson was able to make up the time off during the prior four days in his workweeks.

3. Identify and describe in detail all negative symptoms or conditions experienced by you as a result of your cancer and subsequent treatment. Your answer should include, but not be limited to, a specific description of how any such symptoms or conditions affected your ability to perform your work for the Company.

**RESPONSE:**  Mr. Donaldson suffered from abnormal cell growth in his pancreas.  To treat this, Mr. Donaldson underwent chemotherapy and was thus forced to work a modified schedule.  Mr. Donaldson responded well to the chemotherapy which he took on Fridays and the primary symptom he felt after chemotherapy was a lethargic feeling on Saturdays or on Sundays.

Mr. Donaldson also suffered from blood loss because the tumor on his pancreas blocked the splenic artery which caused blood to flow around the tumor to portal veins that ruptured. Mr. Donaldson had to get blood transfusions to treat this blood loss.  The first blood transfusion Mr. Donaldson received was on March 25.  A week later, Mr. Donaldson had another transfusion.  The next transfusion was in July during the period Mr. Donaldson was undergoing chemotherapy.  From July through November 2014, Mr. Donaldson continued to receive blood transfusions, originally once a month and then once every two weeks through October to

3

November.  In November, Mr. Donaldson's blood loss was so bad that he was taken off chemotherapy.

At the end of February 2015, Mr. Donaldson resumed chemotherapy following surgery to remove the tumor.  Mr. Donaldson experienced similar lethargic feelings following each chemotherapy treatment as he had before surgery.  Mr. Donaldson completed chemotherapy on June 23, 2015.

4.  Describe in detail each instance in which you "received positive feedback" from your supervisors as alleged in ¶ 29 of your Complaint.

**RESPONSE:**  The instances that Mr. Donaldson referred to in the Complaint are that when Mr. Donaldson was first hired in October 2013, he had to re-value all the assets the company had purchased to the determine the assets' current value.  Mr. Donaldson's predecessor had been unable to complete the valuation but Mr. Donaldson determined how to do it and was able to value the inventory at around $300,000.  At the same time, Mr. Donaldson dealt with a personnel issue the company had been having with an employee that had worked with Mr. Frink at a prior company and had attempted to assume authority he was not authorized to assume, which had irritated other employees.  Mr. Donaldson spoke with the individual and resolved the issue.  Mr. Donaldson discussed these two items with Mr. LaRocco who stated "I think we found the right guy."

In another instance, Mr. Donaldson devised a standard bid sheet for the Company to use when bidding on jobs and Mr. LaRocco praised him after reviewing it by stating, "this is how you do it."

Additionally, although Mr. Donaldson does not recall specific comments Mr. Whyrick, who worked almost exclusively from Colorado, made praising Mr. Donaldson's performance, Mr.

Donaldson's monthly financial statements had to be approved by Mr. Whyrick and/or Michelle Mills, his subordinate. Mr. Whyrick approved Mr. Donaldson's work and rarely had many additions.

Mr. Frink periodically praised Mr. Donaldson's performance with comments like "good job."

5. Describe in detail all verbal and written communications you exchanged with the temporary accountant referred to in ¶ 44 of your Complaint.

**OBJECTION:** Mr. Donaldson objects to the request for communications between him and the temporary as irrelevant and disproportionate to the needs of the case given the lack of importance of resolving the issues in this case. Subject to and without waiving the foregoing objections, Mr. Donaldson recalls that when he got out of the hospital following his pancreatic cancer and pancreatitis diagnosis, Kevin Whyrick informed him that they hired the temporary accountant and that Mr. Donaldson was supposed to train her. Mr. Donaldson then returned from the trip to adopt his child and met the temporary accountant.

Mr. Donaldson does not recall the specifics of any written or verbal communication with the temporary accountant. On Monday, May 27, 2014, Mr. Donaldson began training the temporary accountant. Mr. Donaldson is not positive what aspects he started training her on first but believes he showed her the general ledger and chart of accounts, and also how payroll and accounts payable worked. Over the next several days, Mr. Donaldson showed her how to do the tasks he knew how to do as he performed them, and he also watched her perform some of the tasks. Mr. Donaldson also showed her the ERP system and how to make entries. Mr. Donaldson also believes that he provided her some EnviroTech materials regarding work procedures. Mr.

Donaldson did not spend all his working time training the temporary accountant because Mr. Donaldson had to complete his day-to-day tasks and he trained her as he could. Mr. Donaldson's opinion was that the temporary accountant was capable.

In around the first or second week of June 2014, Mr. Donaldson believes that Ms. Aleman came into Mr. Donaldson's office and said that the company could not afford to employ the temporary accountant along with Mr. Donaldson. Mr. Donaldson said "well, Kevin [Whyrick] hired her," and Ms. Aleman responded that hiring the temporary accountant was premature.

Mr. Donaldson later learned that the company would release the temporary accountant. Mr. Donaldson provided the temporary accountant advance notice that she would not be retained long-term but Mr. Frink relayed the final decision to release her to her. Mr. Donaldson was not aware of the date of the temporary accountant's last day and thus did not provide this information to her.


6. Describe in detail your participation in the decision to release the temporary accountant as described in ¶ 47 of your Complaint. Your answer should include, but not be limited to, a description of all verbal communications regarding the temporary accountant.

**RESPONSE:** Mr. Donaldson was not involved in the decision to release the temporary accountant. In around the first or second week of June 2014, Mr. Donaldson believes that Ms. Aleman came into Mr. Donaldson's office and said that the company could not afford to employ the temporary accountant along with Mr. Donaldson. Mr. Donaldson said "well, Kevin [Whyrick] hired her," and Ms. Aleman responded that hiring the temporary accountant was premature.

Mr. Donaldson later learned that the company would release the temporary accountant. Mr. Donaldson provided the temporary accountant advance notice that she would not be retained

long-term but Mr. Frink relayed the final decision to release her to her.  Mr. Donaldson was not aware of the date of the temporary accountant's last day and thus did not provide this information to her.

7.  Describe in detail all difficulties you had in operating and understanding the Company's IFS system. Your answer should include, but not be limited to, a detailed description of each instance in which you requested assistance and/or clarification from another employee or supervisor related to IFS and / or those instances in which you requested or were required by the Company to engage in further training on the IFS system.

**OBJECTION:** Plaintiff objects to the request in that the phrase "difficulties in operating and understanding the Company's IFS system," is undefined and, for instance, could encompass irrelevant technical difficulties unrelated to Plaintiff's performance.  Subject to and without waiving the foregoing objection, Plaintiff states that he did not have any difficulties operating and understanding the IFS system after he was trained on it and only had day-to-day discussions with colleagues about general questions or confirmation that he was performing tasks correctly. Plaintiff went to EnviroTech's Colorado office to engage in IFS training in November 2013 to learn the structure and functionality of the system, which was similar to other enterprise resource planning ("ERP") systems Mr. Donaldson worked with in prior jobs.  ERP systems allow companies to track various information, including accounting and inventory information.  In this training, an IFS consultant showed Mr. Donaldson the various functions and modules of the IFS system and how to operate each.  Mr. Donaldson believes that this training was done using hypothetical information and was not specific to Trae Fuels which was not operational enough to provide information to use to train on IFS.

7

A month later, in December 2013, Mr. Donaldson, Mr. Frink, Mr. Walker, and EnviroTech employee Debby Vannest met to assign new standard cost valuations for the physical inventory and then enter those values into the inventory module for the IFS system. Trae Fuels decided to use a standard costing method of valuing their inventory. Under a standard costing method, a company assigns a set value to a type of inventory based on historical information and past prices rather than the actual price paid for a particular piece of inventory. These standards are used to set prices or evaluate bids and also can be used as a metric to ascertain favorable or unfavorable variances. During this meeting, Trae Fuels established standard costs for its various inventory items based largely on Mr. Frink's experience and knowledge, since he had experience in the pellet business.

After the company struggled to obtain manufacturing jobs because its prices were too high, Mr. LaRocco asked Mr. Frink if he had set the standard costs too high and Mr. Frink acknowledged that he had probably "padded," the costs. Mr. Donaldson then evaluated the standard costs against what the company had actually paid for inventory and confirmed that they had set the standard costs too high.

In May 2014, Mr Donaldson, Mr. Frink, Mr. Walker, and Debby Vannest met to discuss re-evaluating the cost standards and modify them. Mr. Donaldson and the others had a two-hour call with an IFS consultant (Mr. Donaldson cannot recall whether this call took place on one or two separate days) to ensure that they properly modified the old cost standards to the new cost standards number and utilized the right application in the cost / inventory module of the IFS system. Mr. Donaldson believes they had similarly called IFS assistance to properly set the standard costs in December 2013.

8

8. Identify each and every occasion in which you took leave from the Company and did not inform your supervisors and / or co-workers regarding the duration of your leave.

**OBJECTION:** Plaintiff objects to this request as irrelevant. Subject to and without waiving the foregoing objection, Plaintiff states that on March 25, 2014, Mr. Donaldson lost half his blood supply and took leave and was hospitalized in the intensive care unit. The next morning, Mr. Donaldson called Mr. Frink from the ICU, while his wife held the phone, and took leave and told Mr. Frink what had happened and that he had been hospitalized. Mr. Donaldson did not tell the company the duration of his leave because he did not know how long he would be hospitalized. Mr. Frink and Clayton Walker visited Mr. Donaldson in the hospital on March 26.

When Mr. Donaldson was hospitalized on May 19, 2014 with the incorrect pancreatitis diagnosis, he again was unable to tell Mr. Frink how long he would need leave.

Mr. Donaldson did not otherwise request leave without informing his supervisors how long he would be out of the office.

9. Describe in detail all "high-level tasks" which you were asked to perform and the related "greater role" you were asked to take on as described in ¶ 74 of your Complaint.

**RESPONSE:** Plaintiff states that Mr. LaRocco and Ms. Aleman directed him to take charge of reducing Trae Fuels's spending and essentially force Mr. Frink not to spend money he had been spending to fix problems in the plant and keep it operating. Mr. LaRocco and Ms. Aleman also directed Mr. Donaldson to do more to explain the financial reports to Mr. Frink, although Mr. Donaldson had already been explaining the company's financial position to Mr. Frink and did not have the authority to direct Mr. Frink's spending.

9

10. Identify and describe in detail all requests for accommodation made by you during your employment. Your answer should include, but not be limited to, a description of the full nature of the request for accommodation, the reason for the requested accommodation, and the Company's response to your request.

**RESPONSE:**   Mr. Donaldson made periodic requests for time off to attend medical appointments and also asked for time off during the two times he was hospitalized in March and May 2014. Mr. Donaldson needed this time off to obtain treatment and to recover from serious illnesses. The company granted Mr. Donaldson's requests for time off.

Additionally, Mr. Donaldson talked to Mr. Frink about his need for chemotherapy on Fridays in Baltimore and asked for a modified schedule to allow Mr. Donaldson to get his hours and work done earlier in the week. Mr. Donaldson needed this treatment to reduce the growth and size of the tumor on his pancreas. Ultimately, the company agreed to this plan and Mr. Donaldson was able to attend chemotherapy beginning July 3.

11. Describe in detail each and every fact in support of your contention in ¶ 91 of the Complaint that your employment was terminated "because of [your] actual or perceived disability of pancreatic cancer."

**OBJECTION:** Plaintiff objects to this request as unduly burdensome and disproportionate to the needs of the case in that both parties have access to the same facts from which to draw the legal conclusions as to what facts support Plaintiff's contention. Subject to and without waiving the foregoing objection, Plaintiff states that he was a successful employee and seemed well-liked by his supervisors until he informed them that he had pancreatic cancer. Kevin Whyrick

immediately hired a temporary accountant upon Mr. Donaldson's hospitalization on May 19, 2014.

When Mr. Donaldson returned to work, on Tuesday, May 27, 2014, Ms. Aleman unfairly criticized him for leaving his work cell phone in the office while he traveled to Utah to adopt his child. This criticism was unjustified because Mr. Donaldson had left his phone to be fixed because it was malfunctioning and his supervisors knew he was available on his personal cell phone, which they had used to communicate with him prior to this time.

Mr. Donaldson's supervisors asked him questions about his pancreatic cancer and about its potential effect on the company. Mr. LaRocco asked Mr. Donaldson if he planned to work part-time and stated "your wife must have good insurance." Mr. Whyrick asked Mr. Donaldson if his cancer was slow or aggressive. Mr. LaRocco mentioned that his aunt or great aunt had died from pancreatic cancer.

When the company terminated Mr. Donaldson, it did so without having provided him written or verbal discipline or providing him an opportunity to improve his supposedly deficient performance. The company provided other employees such warning or opportunities to improve. During Mr. Donaldson's termination meeting, Mr. Frink claimed that Mr. Donaldson did not fit the company culture even though he had never raised that issue prior to the meeting.

12. Describe in detail each and every fact in support of your contention in ¶ 104 that the Company "refused to engage in an interactive process to identify reasonable accommodations."

**OBJECTION:** Plaintiff objects to this request as unduly burdensome and disproportionate to the needs of the case in that both parties have access to the same facts from which to draw the legal

11

conclusions as to what facts support Plaintiff's contention. Subject to and without waiving the foregoing objection, Plaintiff states that the company terminated Mr. Donaldson without justification rather than continue to employ him. In doing so, the company ceased to accommodate Mr. Donaldson or engage in the interactive process to determine accommodations for Mr. Donaldson as he continued his treatment for pancreatic cancer.

13. Describe in detail each component of damages that you are seeking in this suit. Your answer should include, but not be limited to, a detailed description of how you computed each element of the damages you seek and the identification of every document supporting your calculations.

**OBJECTION:** Complainant objects to the request to the extent it seeks documents or information protected by the attorney-client privilege or work product protection. Complainant further objects to the request as unduly burdensome in seeking every documents supporting the calculations. Complainant also objects to providing information regarding his attorneys' fees as irrelevant until after he is a prevailing party. Subject to and without waiving the foregoing objections, Complainant states:

a. Plaintiff is entitled to back pay in the amount of $480,000 through December 2019. Plaintiff's last salary was $90,000 per year and has not found replacement employment. $90,00 per year over sixty-four months from September 1, 2014 until December 31, 2019 totals $480,000.

b. Plaintiff is entitled to front pay in lieu of resinstatement in the amount of $180,000. Plaintiff estimates that, at minimum, it will take him an additional two years to find replacement employment. At his last salary of $90,000 per year, this totals $180,000.

12

EnviroTech and Trae Fuels have not claimed that Plaintiff was unable to perform the essential functions of his position.

    17. Describe in detail the June 4, 2014 meeting between you and Trae Fuels / EnviroTech employees.

**RESPONSE:** Plaintiff met with Mr. Frink, Mr. LaRocco, and Ms. Aleman. Mr. LaRocco and Ms. Aleman did not criticize Plaintiff's performance in the meeting, instead, the meeting was about Trae-Fuels's profitability and what Mr. Frink needed to do to ensure Trae-Fuels was viable. Ms. Aleman led the meeting and said that Trae-Fuels was running out of cash. Ms. Aleman stated that they had to go back to Trae-Fuels's owners and obtain additional capital due to lack of probability. Ms. Aleman instructed Mr. Donaldson to perform cash flow projections for Mr. Frink and to do more to ensure Mr. Frink made better financial decisions. Mr. Donaldson replied that he did push back on Mr. Frink but that Mr. Frink was the General Manager and that he did not have signing authority to authorize cash expenditures or draw down on the company line of credit. Those spending decisions had to be authorized by Mr. Frink, Mr. Whyrick, or Roger Knoff of EnviroTech. Mr. LaRocco and Ms. Aleman asked that Plaintiff perform more high-level tasks and that he take on a greater role in instructing Mr. Frink on financial matters. Plaintiff does not recall any complaints about him other than the trivial telephone issue Ms. Aleman raised.

    18. Describe in detail all efforts you have made to obtain employment since the termination of your employment at Trae Fuels.

**SUPPLEMENTAL RESPONSE:** Following Mr. Donaldson's termination within a week or so, Mr. Donaldson contacted Solomon Edwards, an accounting contracting company he had

## CERTIFICATE OF SERVICE

I hereby certify that on September 27, 2019, I served the foregoing document by First Class

Mail and email, on:


Jackson S. Nichols, Esq.
Cohen Seglias Greenhall Pallas & Furman PC
1828 L. Street, N.W.
Suite 705
Washington, D.C. 20036
(202) 466-4110
JNichols@CohenSeglias.com

Lars H. Liebeler, Esq. *(admitted pro hac vice)*
Lars Liebeler PC
1828 L. Street, N.W.
Suite 705
Washington, D.C. 20036
(202) 587-4747
LLiebeler@LHL-LawFirm.com



Respectfully Submitted,

/s/Jack Jarrett
Jack Jarrett (VSB #86176

I certify that the foregoing interrogatory responses
are true and accurate to the best of my knowledge
and recollection.

10/3/2019
Date

Michael Donaldson

23