IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

|  |  |
|---|---|
| MICHAEL DONALDSON,<br><br>    Plaintiff,<br><br>        v.<br><br>TRAE FUELS, LLC., et al.<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Case No.: 3:18CV00097<br>)<br>)<br>)<br>)<br>)<br>) |

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

# EXHIBIT 15

## Page 1

```
 1           IN THE UNITED STATES DISTRICT COURT
 2           FOR THE WESTERN DISTRICT OF VIRGINIA
 3                   CHARLOTTESVILLE DIVISION
 4   - - - - - - - - - - - - x
 5   MICHAEL DONALDSON,       :
 6         Plaintiff,         :
 7      v.                    :  Civil Action No.
 8   TRAE FUELS, LLC., et     :  3:18CV00097
 9   al.,                     :
10         Defendants.        :
11   - - - - - - - - - - - - x
12
13             Deposition of MICHAEL DONALDSON
14             WASHINGTON, DISTRICT OF COLUMBIA
15                 Thursday, October 3, 2019
16                         10:30 a.m.
17
18
19
20   Job No.: 263611
21   Pages: 1 - 180
22   Reported By: Kaylee Lachmann, RPR
```

## Page 2

```
 1       Deposition of MICHAEL DONALDSON, held at the
 2   offices of:
 3
 4
 5          Cohen Seglias Pallas Greenhall & Furman PC
 6          1828 L Street, NW
 7          Suite 705
 8          Washington, DC 20036
 9          (202) 466-4110
10
11
12
13
14       Pursuant to notice, before Kaylee Lachmann,
15   Registered Professional Reporter and Notary Public
16   in and for the District of Columbia.
```

## Page 3

```
 1                    A P P E A R A N C E S
 2       ON BEHALF OF THE PLAINTIFF, DONALDSON:
 3          JACK JARRETT, ESQUIRE
 4          ALAN LESCHT & ASSOCIATE, PC
 5          1825 K Street NW
 6          Suite 750
 7          Washington, DC 20006
 8          (202) 463-6036
 9
10       ON BEHALF OF THE DEFENDANTS, TRAE FUELS, LLC,
11   et al.:
12          LARS H. LIEBELER, ESQUIRE
13          JACKSON S. NICHOLS, ESQUIRE
14          COHEN SEGLIAS PALLAS GREENHALL & FURMAN PC
15          1828 L Street, NW
16          Suite 705
17          Washington, DC 20036
18          (202) 466-4110
```

## Page 4

```
 1                    C O N T E N T S
 2   EXAMINATION OF MICHAEL DONALDSON            PAGE
 3      By Mr. Liebeler                             5
 4
 5
 6
 7                    E X H I B I T S
 8                       (Attached)
 9   DONALDSON DEPOSITION EXHIBIT                PAGE
10   Exhibit 1    Confidentiality Agreement        38
11   Exhibit 2    Employee Counseling Notice       82
12   Exhibit 3    Supplemental Interrogatories    113
13   Exhibit 4    6/23/14 E-mail Correspondence   127
14   Exhibit 5    1/31/14 E-mail Correspondence   134
15   Exhibit 6    1/31/14 E-mail Correspondence   143
16   Exhibit 7    1/31/14 E-mail Correspondence   147
17   Exhibit 8    2/24/14 E-mail Correspondence   150
18   Exhibit 9    2/24/14 E-mail Correspondence   153
19   Exhibit 10   4/14/14 E-mail Correspondence   154
20   Exhibit 11   8/7/14 E-mail Correspondence    165
21   Exhibit 12   6/26/14 E-mail Correspondence   169
```

Page 5

```
 1            P R O C E E D I N G S
 2       MICHAEL DONALDSON,
 3  having first been duly sworn, was examined and
 4  testified as follows:
 5       EXAMINATION BY COUNSEL FOR THE DEFENDANT
 6  BY MR. LIEBELER:
 7     Q  Will you state your name for the record,
 8  please, full name?
 9     A  Full name?  Michael Alan Donaldson.
10     Q  What's your birth date?
11     A  September 24, 1958.
12     Q  Your home address?
13     A  15 Hamstead Road, Fredericksburg, Virginia
14  22405-1838.
15     Q  And are you currently employed?
16     A  I am not.  No.
17     Q  Are you doing any freelance work or any
18  work of any sort at all to gain income?
19     A  No.
20     Q  When is the last time that you worked?
21     A  When I was at Trae Fuels.  That date was
22  September 8, 2014.
```

Page 6

```
 1     Q  And that's the last time you worked?
 2     A  That is the last time I worked.  Yes, sir.
 3     Q  Have you had any income at all since that
 4  point?
 5     A  Not from working, no.
 6     Q  What income have you had?
 7     A  I have an income from disability.  I've
 8  had income, at first, actually, from unemployment.
 9  That's the first thing that I did.  That was for
10  six months.  Three -- then I was on disability.
11  I'm on disability because back with that point in
12  time we didn't know what was going to happen and
13  I've been on disability since that time.
14     Q  Since -- when you refer to that time, is
15  that since 2014 when you left Trae Fuels?
16     A  Actually, I couldn't go on disability.
17  You have to be unemployed five months.  I think
18  that's the law, and so the first time that I got a
19  disability check was like March of 2015, which I
20  think is -- runs a month behind, was for February,
21  but you get paid in March.  And my unemployment
22  insurance went up through the first part of
```

Page 7

```
 1  March or March 15, so it was like maybe a week or
 2  two weeks interval where I didn't get anything.
 3  But I've been on disability because, you know, the
 4  cancer that I had.  Yeah.
 5     Q  So what was the process of you applying
 6  for disability?  Who is the disability paid
 7  through?  Is that through Social Security?
 8     A  It is through Social Security.  Yes, sir.
 9     Q  And what was the determination that was
10  made by Social Security about the nature of your
11  disability?
12     A  Well, the determination -- I mean, you
13  wouldn't get a check if you didn't have a
14  determination that you were eligible for it.  So
15  most people, as you probably know, when they try
16  to get disability, usually takes multiple times to
17  apply, or get a lawyer before that -- you are
18  actually -- can get it.  Because the nature of my
19  illness, I know I did it online.  I had to supply
20  a lot of information, and they approved me within
21  two weeks because pancreatic cancer is a deadly --
22  is very deadly cancer, as you might know.  So that
```

Page 8

```
 1  was why I think I got it.  We just didn't know how
 2  long I would have.  Most people don't make it.
 3     Q  What's your current health condition right
 4  now?
 5     A  My -- I am cancer free.  I am -- since
 6  March -- excuse me.  Since my surgery was in
 7  January 2015, so I am cancer free five and a half
 8  years.  And the statistics were in 2014 that 50
 9  percent of people die in the first six months, 75
10  to 25 percent in one year, and six -- five years
11  survival rate is only 6 percent then.
12     Q  You've beaten the odds.  Are you still
13  receiving disability right now?
14     A  I am receiving disability right now.
15     Q  But you're cancer free?
16     A  I'm cancer free, but I am disabled
17  according to them.  Yes.  And then they, you know,
18  it's -- there's a renewal period when they will
19  contact me, you know, to evaluate.
20     Q  So you've been looking for work since
21  2014, have you not?
22     A  That is correct.
```

**9**

1  Q  And have you told your potential employers
2  that you're on disability?
3  A  Well, if they offer a job, why wouldn't I
4  tell them that?
5  Q  I'm asking you whether you told them or
6  not.  I don't know.
7  A  Well, the answer is no.  I wouldn't tell
8  them that unless, you know, I was offered a job.
9  Now --
10  Q  Have you told any potential employers that
11  you have any limitations on your ability to
12  perform work?
13  A  I have no limitations, according to my
14  doctor.  I asked my oncologist, you know,
15  basically after I had my cancer surgery, could I
16  work, and she said yes.  And I went back and asked
17  her since then, you know, again, and yeah, also
18  asked my surgeon.  So I have no -- no problem
19  working, and I've been looking for work.  I have
20  records of that.
21  Q  Did you have any limitations on your
22  ability to work when you were at Trae Fuels?

**10**

1  A  No.  I worked while I was taking
2  chemotherapy at Trae Fuels, worked 40 hours a week
3  in four days.
4  Q  40 hours in four days?
5  A  Yeah.  I took --
6  Q  Did you ever work -- did you ever have any
7  weeks where you worked more than 40 hours?
8  A  Oh, yeah.  Probably between 40 and 45,
9  based on four days, you know, because the maximum
10  is probably -- while I had cancer, okay?  While I
11  had cancer, probably 45 would be the max.
12  Q  Okay.
13  A  Yeah.
14  Q  And was there any part of the chemotherapy
15  or your cancer that affected your work quality of
16  your accounting or comptrolling work at Trae
17  Fuels?
18  A  No.  It didn't, basically because I did it
19  on Fridays.  So I was very blessed not to have,
20  should I say, a lot of side symptoms.  There was a
21  little bit, but that was taken care of over the
22  weekend.

**11**

1  Q  And you said you took care of it on
2  Fridays.  You mean chemotherapy?
3  A  Yeah.  I had chemo scheduled on Fridays so
4  it wouldn't be intrusive to the company, you know,
5  and also me, because if I did it during the week,
6  you know, the next day I might have had some side
7  symptoms or something, you know.  And I didn't
8  want to impact, you know, my job performance or my
9  tenure with them.
10  Q  But any side symptoms had disappeared by
11  Monday when you went back to work?
12  A  Yeah, yeah.  It was very mild.  It was a
13  very mild.  That's correct.
14  MR. JARRETT:  Sorry.  One thing just
15  quickly.  It will be tricky, but try to let him
16  finish his question fully.  You're doing a pretty
17  good job, but it makes the record clear.
18  THE WITNESS:  Okay.  Yeah.  I'm sorry.
19  I've never done this before, so --
20  Q  All right.  Well, that answers my next
21  question.  Have you ever had your deposition taken
22  before?

**12**

1  A  No.
2  MR. LIEBELER:  Did you hear that?
3  Q  You need to have audible answer?
4  A  No.  I'm sorry.
5  Q  Have you ever testified at trial?
6  A  I have never testified at a trial before.
7  Not as a prime witness, no.
8  Q  Just confirming what you have in your
9  complaint.  Was the company okay with you taking
10  some Fridays off to do chemotherapy?
11  A  They approved it.  Yes.
12  Q  I'm going to have you take a look at the
13  complaint that's filed in the case.  I'm not going
14  to mark it as an exhibit, but if you want to take
15  a look at it, familiarize yourself with it.  Once
16  you've familiarized -- you don't have to read
17  every part of it, but you may, and I'll start
18  asking you some questions about it.  So take a
19  moment and just confirm that that's the complaint
20  that's been filed in this case.
21  A  Okay.
22  Q  Have you seen this document before,

25

1 peptic -- I mean an ulcer or whatever, called it
2 acid reflux. That's what they said. And the next
3 day, that same day, later on in the day they
4 transferred me to a regular room, and John Frink
5 and Clayton Walker, who was the plant manager,
6 they came to see me in the hospital.
7     Q  Okay.
8     A  Yeah. So they knew I had issues then and
9 ongoing they knew that I was still getting, you
10 know -- they were backing into stuff. But in
11 April, that's when they knew I had the mass on my
12 pancreas. That's what I told John Frink.
13    Q  Okay. Was it originally diagnosed as
14 pancreatitis?
15    A  No. It was not.
16    Q  Did you ever tell anyone that it was
17 pancreatitis?
18    A  In March, no.
19    Q  At any time?
20    A  Did I tell anybody that it was?
21    Q  Yes.
22    A  I told them in May after I went -- on

26

1 May 19th I went to my first oncology appointment,
2 and I had elevated temperature.
3     Q  I don't --
4     A  You just said any time. You said any
5 time.
6     Q  I'm just asking whether you told anybody
7 it was pancreatitis. That's all I'm asking.
8     A  Well --
9     Q  Just trying to narrow the question down a
10 little bit.
11    A  Yes, on May 19th. That's the first time.
12    Q  Okay. All right. And who did you tell --
13    A  I told --
14    Q  -- at the company?
15    A  At the company I told John. I told Kevin
16 Whyrick on the 21st when I got out of the
17 hospital.
18    Q  Okay.
19    A  Yes.
20    Q  All right. And what did Mr. Frink respond
21 to you? How did he respond to you?
22    A  I don't remember because I was in the

27

1 hospital. See, I was in the hospital and I
2 called, and I may have left a message. I don't
3 remember. But when I got out of the hospital on
4 the 21st, I called Kevin Whyrick and I told him.
5 He says, were you in any pain? And I said no, no.
6 I never -- and that's one of the things -- I never
7 had any pain in my stomach area ever to this whole
8 deal.
9     Q  So there was never any pain --
10    A  There was never any pain.
11    Q  -- throughout the condition?
12    A  No. And even the doctor was -- I mean,
13 not that -- the initial doctor, he kept on pushing
14 on my stomach, and are you in pain? No. I was
15 never in pain.
16    Q  Calling your attention to paragraph 44 of
17 the complaint --
18    A  Yes.
19    Q  -- it mentions that you were -- you state
20 that you were discharged from the hospital, and
21 Mr. Whyrick told you that EnviroTech and Trae
22 Fuels had hired a temporary accountant to assist

28

1 the plaintiff while he was sick since the
2 plaintiff was the only accountant in the Trae
3 Fuels office. Do you see that?
4     A  Yes. I do.
5     Q  Do you recall that specifically?
6     A  I recall it, yes, because I was talking to
7 him on the phone. We talked, and I wasn't going
8 to be back in the office until the Monday after
9 Labor Day, and he said, we hired a temporary
10 accountant.
11    Q  What did you say?
12    A  I said, okay. He said, I want you to
13 train them. I said, okay, I'll train them when I
14 get back. That's all I said.
15    Q  What was your reaction?
16    A  I was okay with it. You know, I -- do you
17 want to hear more? You don't want to hear more.
18    Q  I'll follow up. That's fine.
19    A  Okay.
20    Q  You said you were okay with it?
21    A  Yeah.
22    Q  Did it seem like a reasonable response by

29

1  the company to get the work done given the
2  unknowns of your condition at that point in time?
3      A  I --
4         MR. JARRETT:  Objection.  Relevance.
5  Objection.  Vague.  You can answer.
6      Q  Go ahead.
7      A  I would say not knowing the situation, you
8  know, especially with the diagnosis I had, I don't
9  think it was out of place for them to do that.  I
10 would -- you know, I wouldn't want to leave them
11 in the lurch, because I supervised, like I said,
12 since -- I had 32 years in before I worked with
13 them.  And I've always been careful to always have
14 some type of contingency plans.  So no, I don't
15 think it was that unreasonable.  No.
16     Q  Mr. Donaldson, I'm sorry.  I'm going to
17 jump back for just a second.  You mentioned you
18 were receiving or still receiving disability
19 benefits.  How much per month do you receive in
20 disability benefits?
21        THE WITNESS:  Do I have to say that, tell
22 them?

30

1         MR. JARRETT:  Yes.
2         THE WITNESS:  Okay.  I just wanted to know
3  before --
4      A  How much do I receive?  Well, you know,
5  it's on an incremental basis.  Every year you get
6  like a COLA, a cost of living adjustment.  So
7  basically now it's like $2,000 a month based on my
8  Social Security that I paid in since I was 16
9  years old, and --
10     Q  So that's your best estimate of what it
11 is --
12     A  It is --
13     Q  -- right now in 2019?
14     A  2,000.
15     Q  It's roughly 2,000 --
16     A  2,000.
17     Q  -- dollars per month?
18     A  Now it's probably 2,050, probably twenty
19 -- $2,050 worth of raise.  It was 2,003, and now
20 it's 2,050, I believe.
21     Q  All right.  And are those taxable benefits
22 or nontaxable?

31

1      A  They are taxable.  I elected to have
2  federal income tax taken out because I want to pay
3  my fair share of taxes, you know, in my household,
4  my wife.  And I think that tax rate is 10 percent
5  that I elected.
6      Q  Calling your attention to 40 -- paragraph
7  45 in the complaint, you say that you left on a
8  preplanned trip to Utah to adopt a newborn,
9  correct?
10     A  Yes.
11     Q  And so when you came out of the hospital,
12 did your doctor place any restrictions on your
13 ability to travel?
14     A  No.  As a matter of fact, they did not.
15 We were trying to adopt, you know.  It had been
16 going on for a year or more, and we got word that
17 we were chosen like while I was in the hospital.
18 So they wanted to -- you know, kind of force me
19 into doing some things for treatment, but I wanted
20 to see what my options were and get a second
21 opinion and all that kind of thing.  And so you
22 know, I got out of the hospital.  There was no

32

1  restrictions.  I got on a plane the next morning
2  after I went to Trae Fuels to drop off my phone
3  because I was having issues with my phone.  And
4  that's a 45-minute drive, and you know, I was weak
5  a little bit from being in the hospital and not
6  much sleeping and prodding and poking.  I drove 45
7  minutes.  I had to be on a flight at Dulles the
8  next morning at 6 a.m. going to Salt Lake City,
9  Utah.  So no.
10     Q  And did you have any health issues
11 throughout that weekend as you went to Utah --
12     A  I was tired.
13     Q  -- to pick up your child?
14     A  I was --
15     Q  Wait until I finish my question so we
16 can --
17     A  I apologize.
18     Q  She can't type all of us at the same time.
19     A  I apologize.
20     Q  Okay.  So you were tired?
21     A  Yeah.
22     Q  Okay.

**33**

1  A  Nothing major, no.
2  Q  Okay. Paragraph 46, you came back to work
3  on May 27th the following -- the day following
4  Memorial Day?
5  A  Correct.
6  Q  And you began to train the temporary
7  accountant, correct?
8  A  That's correct. Yes, sir.
9  Q  And do you remember what the name of the
10 temporary accountant was?
11 A  No, I don't.
12 Q  And how much of your time did you spend
13 training particularly in that first few days?
14      MR. JARRETT: I'll object to that as
15 vague. But answer.
16 A  Well, first, it probably wasn't a whole
17 lot, as I could do it. First, you want to start
18 with basic, rudimentary things, you know --
19 Q  Just a rough proportion. Couple hours a
20 day?
21 A  Maybe, yeah. Maybe. I can't really say.
22 We were in month-end close. That's the busy time

**34**

1  for accountants, so I would say that she always
2  had something to do, but I wasn't able to devote
3  full eight hours. But as I could do it, I did.
4  Yes.
5  Q  As you were training her during that time
6  period, did you have any restrictions on your own
7  ability to work or could you fully perform your
8  job at that time?
9  A  I could fully perform my job.
10 Q  Okay. Through the months of May and June,
11 did -- did you make any requests for
12 accommodations to Trae Fuels to make it easier to
13 do your job?
14      MR. JARRETT: Objection. Calls for legal
15 conclusion. You can answer.
16 A  When you say accommodations, specify. I
17 mean, I think I know what you mean, but specify.
18 What type of things?
19 Q  Right. Well, did you need a walker or a
20 wheelchair, a cot in your office to take naps, a
21 different work schedule in order to perform your
22 work? Those are accommodations, correct?

**35**

1  A  I figured -- I just didn't know what you
2  were getting at with that.
3  Q  Right.
4  A  Well, all the ones you said before -- you
5  know, modified work schedule, I had no issue. I
6  was fully functional. The only time I asked for a
7  modified schedule was when I was going to start
8  chemo, which was -- the first one was July 3rd.
9  That was a Thursday. And I changed -- we couldn't
10 do it on Friday. The Fourth of July was on a
11 Friday in 2014. So following that, I asked for
12 accommodation to work 40 -- at least 40 hours a
13 week, Monday through Thursday. And that's the
14 only accommodation I ever made -- asked for.
15 Q  And did the company agree to that
16 accommodation?
17 A  Yes, sir. They did. Yes, sir.
18 Q  So the other items I talked about, such as
19 a wheelchair, walker, cot, anything like that to
20 assist you? You didn't need that, did you?
21 A  I didn't.
22     MR. JARRETT: I'll object on the basis of

**36**

1  relevance. You can answer.
2  A  No. I didn't need it, not at all.
3  Q  My question originally was June, July. At
4  any time during your employment at Trae Fuels did
5  you need an accommodation of the nature that I
6  just described for physical assistance to give you
7  an accommodation to do your job?
8  A  No, no accommodation.
9  Q  In your role as comptroller, did you have
10 any lifting or carrying responsibilities?
11 A  Not necessarily, just light -- light
12 things, you know, maybe carrying checks to the
13 printer. I could lift boxes. I could -- yeah. I
14 used to walk out to the plant. You know, so -- so
15 I didn't have any restrictions at all. No.
16 Q  But your job function as an accountant,
17 you're working in the office, correct?
18 A  Correct.
19 Q  And -- but your office is at a fuel pellet
20 plant where people are doing heavy lifting and
21 unloading trucks and items like that, correct?
22 A  That's correct. Yes, sir.

### Page 49

1  Kevin had told him, it still happened. So that
2  was my responsibility, yes, and I did that.
3      Q  I hear what you're saying. Did Beth agree
4  with you all the time or did she find that you
5  were not doing your job? Did she tell you you
6  were not doing your job in getting those forms in?
7          MR. JARRETT: Objection. Vague. Are
8  we -- time frame?
9          MR. LIEBELER: At any time.
10     Q  Listen to my question, though. It's not
11 whether she's right or whether she's wrong. Did
12 she tell you that she thought you were not doing
13 the right job and getting those forms to her?
14     A  I'm going to answer it this way. If she
15 didn't get the documents, she's assuming that I
16 didn't get them and she's assuming that the
17 process was fail-safe and that everybody was doing
18 what they were supposed to do. So yes, she would
19 blame me, but --
20     Q  You're not answering.
21     A  But I am answering. If she was blaming
22 me --

### Page 50

1      Q  Did she blame you?
2      A  Yeah, yeah. But she didn't know the
3  circumstances.
4      Q  That's fine. I'm not asking for that. I
5  mean, I know that that's what you --
6      A  Yeah.
7      Q  And maybe you're right, maybe you're
8  wrong.
9      A  Well --
10     Q  I'm simply asking whether she blamed you
11 for the failure of the documents at times not to
12 be in the files.
13         MR. JARRETT: Objection. Asked and
14 answered, but --
15     A  Yes, yes. And when I had that, I would
16 tell her what happened. I would -- and it's my
17 responsibility to tell her why that wasn't there,
18 so --
19     Q  And there were times that she blamed you
20 that were before your cancer diagnosis, correct?
21     A  I don't remember.
22     Q  And there were times that she blamed you

### Page 51

1  after your cancer diagnosis?
2      A  For the employee files?
3      Q  For not getting employee files in the
4  right spot.
5      A  Insurance documents, perhaps, yeah,
6  perhaps, perhaps, yeah.
7      Q  Is there any information that you have
8  that the reason why she was blaming you for not
9  getting the employee documents in the right file
10 was because of your cancer?
11         MR. JARRETT: Objection. That calls for
12 legal conclusion. But you can answer.
13     A  Well, it had nothing to do with my cancer.
14     Q  We had started our discussion here of
15 paragraph 58 about receiving negative feedback,
16 and we just walked through your interactions with
17 Ms. Aleman. Did Mr. LaRocco -- is that how you
18 pronounce his name?
19     A  LaRocco.
20     Q  LaRocco?
21     A  Yes.
22     Q  Did he provide you with negative feedback

### Page 52

1  at any time during your employment at Trae Fuels?
2      A  I -- I would say --
3      Q  Yes or no, and then you can explain it if
4  you want to. That's fine. But yes or no: Did he
5  ever provide you with any negative feedback of
6  your performance at Trae Fuels?
7      A  I recall after my cancer diagnosis.
8      Q  What was that?
9      A  I do recall after my cancer diagnosis.
10 Yes. Yes.
11     Q  What was that negative feedback?
12     A  Well, it was initially about -- he called
13 it a cash flow analysis, I think. He referred to
14 that there.
15     Q  All right. And he thought you hadn't
16 prepared it in a workmanlike manner or accurate
17 manner?
18     A  That's what he thought, but there was some
19 ambiguity there terminology-wise. He was finance;
20 I'm an accountant. In accounting we have
21 something called a cash flow statement. It's part
22 of your -- it's part of your monthly financial

**Page 53**

1 statements. And there is -- and I thought that's
2 what he was referring to. He said cash flow.
3 That's what I'm thinking -- that's what I'm
4 thinking about, the analysis. I referred to what
5 he was really looking for is a cash forecast or
6 cash projection, which is different. And so I
7 found this nomenclature with him a few times that
8 I would have to then say, okay, show me what you
9 want, right? Because the terminology, you know,
10 is not clicking, right? And so I had provided
11 this document or whatever at first, and that
12 wasn't it. And I said, well, show me what you
13 want. And then he showed me. Okay. Then I
14 understood. So he did say that, yeah.
15   Q  So is it fair to summarize that by saying
16 that there was an inability to clearly communicate
17 between you with respect to what he wanted from
18 you?
19   A  For him --
20      MR. JARRETT: Objection. Vague. You can
21 answer.
22   A  I think it was a failure to communicate on

**Page 54**

1 his part what he wanted. Yes.
2   Q  But his -- he was -- it was negative
3 feedback for you because you provided something
4 that he didn't want. He wanted something else and
5 you didn't provide it to him until he gave you a
6 second try?
7   A  Well, until he clarified what he really
8 wanted, right? It wasn't -- what I -- I get
9 that's not what he wanted, but the terminology he
10 used was to me not the appropriate terminology.
11 So that's why I said, well, show me, show me.
12 What do you want? And when he showed me what he
13 wanted, I did it. So it's terminology.
14   Q  Do you remember when this incident you're
15 referring to occurred?
16   A  Yes. It was after my cancer diagnosis.
17 It was in June of 2014.
18   Q  Okay. And was his negative feedback with
19 respect to what you had provided him related to
20 your cancer diagnosis?
21      MR. JARRETT: Objection. Calls for legal
22 conclusion. You can answer.

**Page 55**

1   A  Can you repeat that again, please?
2   Q  Was his negative feedback toward the work
3 product that you had provided to him related to
4 your cancer diagnosis?
5      MR. JARRETT: Objection. Calls for legal
6 conclusion. You can answer.
7   A  I don't know.
8   Q  He didn't say the word cancer?
9   A  No, but --
10  Q  He just criticized your work, correct?
11  A  Right. But I didn't recall any criticism
12 before that, so I don't know -- I don't know -- I
13 don't know. I can't answer -- I can't say it was
14 cancer or not. I don't know. But all I know is
15 that I didn't have anything before that period of
16 time from Mr. LaRocco to my knowledge. And you
17 know, there's no -- I have no documentation of
18 anything to even remind me of anything, so --
19  Q  But you don't know one way or the other
20 whether he was motivated by your cancer to
21 criticize the form of the documentation you gave
22 him, right?

**Page 56**

1   A  I --
2      MR. JARRETT: Objection. Asked and
3 answered. Objection. Calls for legal conclusion.
4 Calls for speculation, too. But you can go ahead
5 and answer.
6   A  I can't get in his mind. I don't know.
7   Q  Let's move to Ms. Mills, Michelle Mills.
8   A  Yes.
9   Q  What is her position? What was her
10 position during the time you were employed with
11 Trae?
12  A  She was a controller with EnviroTech
13 services.
14  Q  And did she provide you with any negative
15 written or verbal feedback, reviews, or complaints
16 about your work at any time while you were
17 employed at Trae?
18  A  I think it was more questions. You know,
19 I don't think it was like written -- there was no
20 written like disciplinary-type things. There's
21 always questions in accounting. There's always
22 questions like, you know, why is the electricity

**Page 61**

1 wasn't it?
2   A  I don't know.  I don't know.
3   Q  But the e-mails would tell us, correct, if
4 that --
5   A  Well, yeah.  That would --
6   Q  -- exchange occurred?
7   A  That's possible, but I would say this: A
8 question could arise, and you could ask, why do I
9 do this, right, and to get an understanding.  Did
10 she do that?  I don't know.  But there are reasons
11 why people do certain things, and if they're in
12 Colorado and I'm here, they had -- their staff was
13 five or six people maybe in the accounting
14 department.  You know, I just was one accountant
15 doing financial statements.  I was doing HR,
16 payroll.  I was doing bid proposals.  There's all
17 kinds of things, right?  So --
18   Q  You felt you were doing it the right way?
19   A  I did it the right way.  They got -- they
20 got the information.  The numbers were there, and
21 I put -- I think they were called accruals.
22 That's called accruals.  And that was -- at that

**Page 62**

1 time that was the easy way.  And then what you
2 don't understand, the chain of information -- it
3 deals with the chain of information.  That's
4 mostly for accounts payable.  The office manager
5 would open the mail.  I wouldn't have all the
6 mail, and sometimes the mail would be in John
7 Frink's office, so -- but there's a reason behind
8 it.
9   Q  It's not really responsive to my question
10 anymore.  If there's a reason why you're doing it,
11 that's a different question about whether she
12 criticized you for using the Excel spreadsheet.
13 Here's my next question.
14   A  Yeah.
15   Q  After she criticized you for setting up
16 the separate Excel spreadsheet, did you continue
17 to use the Excel spreadsheet in the way that you
18 had before the criticism?
19   A  I don't know.
20      MR. JARRETT:  Objection.  Misstates the
21 testimony -- or assumes facts not in evidence.
22 But you can answer the question.

**Page 63**

1   A  I don't know.  I don't really know.
2   Q  So you didn't stop doing it even though
3 she told you it was inefficient?
4   A  No.  That's -- that's your assumption.
5   Q  I'm asking you.  You know; I don't.
6   A  You said, you didn't do it.  You said, you
7 didn't do it.
8   Q  Because you're saying you didn't know.
9 How could you not know whether you obeyed the
10 supervisor's order?
11   A  Well, I don't know.  I don't know.
12      MR. JARRETT:  Objection.  Assumes facts
13 not in evidence.  Misstates testimony.  You can
14 answer.
15   A  I don't remember, Mr. Liebeler.  I don't
16 remember.  All I know -- all I know is if there's
17 a reason, I would have told her the reason.  And
18 then there would have to be a fix to the
19 solution -- the problem, right?  And so there was
20 a fix to the problem eventually.  Yes.  So -- but
21 it wasn't like it happened overnight.
22   Q  What was the fix to the problem?

**Page 64**

1   A  Well, the fix to the problem was getting a
2 purchase order system implemented.  That was the
3 main fix.  Yes.  That was it.
4   Q  And that was not in place when you were
5 using the Excel spreadsheets on the side?
6   A  Some of it still -- I would still have to
7 use Excel spreadsheets because some things didn't
8 go through the purchase order system, like
9 professional services.  If we had a bill from your
10 company for a legal bill, you know, that messes --
11 wouldn't go through, you know, the purchase order
12 system.  So you still would have to have an Excel
13 spreadsheet to capture different invoices that
14 were not part of the operating expenditures.  You
15 still need to do that and make a journal entry.
16 Everyone makes journal entries in accounting, and
17 so that went in a journal entry.  Yeah.
18   Q  What is -- do you have any evidence that
19 Ms. Mills's criticism of your use of the Excel
20 spreadsheet is in any way related to your health
21 condition or cancer?
22      MR. JARRETT:  Objection.  Calls for legal

**65**

1 conclusion. You can answer.
2   A  No. How do I --
3       MR. JARRETT: And -- sorry. Mis --
4 assumes facts not in evidence. You can answer.
5   A  Yeah. I don't see anything related to my
6 cancer as far as that. No.
7   Q  Okay. You identified Mr. Gohar Wise?
8   A  Ms., Ms., Ms.
9   Q  Ms. Excuse me.
10  A  Yeah.
11  Q  As an additional supervisor?
12  A  Yes, mm-hmm.
13  Q  And did Ms. Wise ever provide you with any
14 negative feedback of any kind during your
15 employment at Trae Fuels?
16  A  There was questions. Yeah. There were
17 questions. I phrase them as questions.
18  Q  Well, questions are different than
19 negative feedback. I'm asking you whether --
20 negative feedback means a report or some
21 deliverable or report that you prepared that was
22 not satisfactory in the eyes of the supervisor, so

**66**

1 it's different from questions. It's negative
2 feedback on your work.
3   A  I'm not sure. I know there were
4 questions, and if I had questions I would ask.
5 Now, there may have been some things I may have
6 done wrong. I'm not going to say I haven't done
7 anything wrong, but if I was told I did something
8 wrong, I would actually try to correct it. So --
9 and then when I wasn't sure, I would ask. The
10 object is teamwork. That's the object here, so --
11  Q  Mr. Donaldson, may I ask you to turn over
12 to the next page, page 8, and take a look at
13 paragraph 72?
14  A  Okay.
15  Q  On June 3, 2014, plaintiff met with Frink,
16 LaRocco, and Aleman. Do you recall that meeting?
17  A  I do recall it.
18  Q  Describe it for me to the best your memory
19 in as much detail as you can.
20  A  Can I give you a precursor to that meeting
21 prior to that, a week before that?
22  Q  No. I just want that meeting.

**67**

1   A  I can tell you that I didn't want to go to
2 it.
3   Q  Why?
4   A  That's the first thing, when John asked me
5 to go. Because just a week before, when I got
6 back, they had the telephone meeting and said, I
7 left my phone in the office and all that, and you
8 know, it was -- it was irrelevant information. It
9 was -- it was -- and so John asked, I need you to
10 go. John was almost begging me to go. I didn't
11 want to go because I felt, you know, now that I
12 had cancer, I was being picked on. And so I went
13 to the meeting.
14  Q  Let me stop you right there.
15  A  Yeah.
16  Q  Why did you feel you were being picked on
17 because of cancer?
18  A  Well, because I didn't have these type of
19 issues, like these meetings and them calling me on
20 a document. No one did that prior to May 27th.
21 No one did it. I didn't have that issue. This is
22 -- and this is like two weeks in a row, and John

**68**

1 said, I need you to go, you know. And I went for
2 John. And so John was sitting --
3   Q  These are your supervisors, aren't they?
4 You're required to go?
5   A  Well, I did go. I told them -- I did go.
6   Q  You're required to go?
7   A  I did go. I didn't -- I didn't -- I said,
8 I didn't want to go, but I did go. And John
9 said -- I didn't refuse to go, right? I said, I
10 didn't want to go because of the way I was
11 feeling. And I went. John sat at his desk. I
12 can see it now. I was in John's office. If
13 you're John, I'm sitting right in front of you in
14 the middle. Chris LaRocco was on my left -- on
15 your left here. Beth Aleman was on the right,
16 okay? Very visual. Beth was really controlling
17 the meeting.
18  Q  Square table, round table?
19      MR. JARRETT: Objection. Relevance.
20  A  There was no table. There was no table.
21  Q  Just trying to get the --
22  A  There was no table.

73

1  Q  And you were right and she was wrong?
2  A  Well, she was wrong in the sense that -- I
3 was a one-man team. So the day-to-day work had to
4 get done. That was the weeds. You know, we had
5 to pay for --
6  Q  Mr. Donaldson, look at paragraph 73.
7  A  Yes, sir.
8  Q  Read the comment.
9  A  LaRocco and Aleman did not criticize
10 plaintiff's performance at the meeting.
11  Q  Okay. Stop right there.
12  A  Yes.
13  Q  That's not correct, is it, because you
14 just told me that Ms. Aleman criticized you
15 because she felt that you needed to get out of the
16 weeds?
17  A  Well, she did. Yes. She said that.
18  Q  Okay. So the first part of 73 is not
19 actually correct? She did criticize your
20 performance?
21  A  I guess you could say that, but it was
22 about the profitability. That's what drove it

74

1 there. She wouldn't have said anything, that
2 meeting would have never happened if the money
3 hadn't been gone. So -- but the performance was
4 not mine, right? I wasn't responsible for the
5 money, you know, being spent. Yes --
6  Q  You just felt the criticism was unfair
7 because she was wrong?
8  A  Well, yeah, in that sense, that I didn't
9 want to blame her, you know, and yeah. But I was
10 not responsible for sending money out of the door.
11 I couldn't sign checks. I would do anything we
12 paid -- if we were behind or -- I would tell John
13 where we were as far as our money is concerned,
14 what we needed in advance. I said, John, we're
15 getting low on cash. If something happened to the
16 plant, you got an emergency repair, he said, we
17 spent it. And so I would, you know, draw up a
18 wire transfer form or whatever it was and -- but I
19 couldn't approve that. They would approve it.
20 John Frink would approve it or Kevin Whyrick would
21 approve it. And mind you, we use the same bank
22 that they did in Colorado. The IFS system was

75

1 tied into EnviroTech. So they knew at all times
2 what money we had, what checks were written in
3 total. So they had knowledge of it.
4  Q  Okay.
5  A  Had the opportunity to have knowledge.
6 Yes.
7  Q  Do you feel that her comment that -- that
8 criticism of you that you needed to come out of
9 the weeds was in any way related to your health
10 condition or your cancer?
11     MR. JARRETT: Objection. Calls for legal
12 conclusion. You can answer.
13  A  I don't know. I mean, I know my cancer
14 wasn't prohibiting me doing that, but I do know
15 all of a sudden I'm getting this -- these things
16 happening to me within a week's time, you know.
17  Q  So you feel in your gut that it was
18 related?
19  A  No. I'm not saying that.
20  Q  So you don't know it was related?
21  A  I'm saying all I know, it was different.
22 No, I don't know, but I feel it was different.

76

1 Nothing -- you know, nothing happened until
2 May 27th, and I don't know. I can't really say.
3 I can't say. I'm not in their minds. I don't
4 know what motives were there. I have no idea. I
5 can't speak for nobody else. I can only speak for
6 myself.
7  Q  Were there any other criticisms of you at
8 the meeting that we're talking about that you
9 record as June 3rd?
10  A  I just remember the getting out of the
11 weeds part and I remember about John, they wanted
12 me basically to control John, tell him we can't do
13 this. And he was my manager, right? You can't do
14 this. Now, we did have -- he and I did have some
15 exchanges, collegial exchanges -- John, I wouldn't
16 do this if I were you. This would be my advice.
17 But John is the general manager. He's the
18 decision-maker, and if John does something, I
19 can't override his decision, right? I do what I'm
20 told. And then if something that is problematic
21 for EnviroTech, they need to talk to John because
22 John reported to them.

**Page 77**

1  Q  My question was just whether there was any
2  other criticism of you and your performance at the
3  meeting?
4  **A  That was it, which -- I said it's unfair.**
5     MR. LIEBELER:  Okay.  We've been going now
6  for about an hour and fifteen.  Do you want to
7  take about a five-minute break or so?
8     COURT REPORTER:  Yes, please.
9     MR. LIEBELER:  Okay.  Great.
10    (Whereupon, a recess was taken.)
11 BY MR. LIEBELER:
12 Q  We're back on the record.
13 **A  Okay.**
14 Q  Mr. Donaldson, calling your attention to
15 paragraph 75 of the complaint, plaintiff does not
16 recall any complaints about him other than the
17 trivial telephone issue Aleman raised.  Is that
18 accurate other than -- you modified it with your
19 testimony about come out of the weeds.  Is there
20 anything else other than the telephone issue and
21 the weeds testimony that was -- would be a
22 complaint about you?

**Page 78**

1  **A  When I think of complaint -- when I think**
2  **of complaints, I was thinking as far as formal**
3  **meetings, like that May 27th meeting.  That's**
4  **where this telephone issue came up.  And then out**
5  **of the weeds is on that June 3rd, June 4th**
6  **meeting.  So I'm referring as formal, documented**
7  **or meeting of complaints, that's my definition I**
8  **guess here of what the complaint is, something**
9  **serious enough to have a meeting of various**
10 **management with me.**
11 Q  Okay.  I was reading paragraph 75 as the
12 sum-up paragraph of the June 3rd meeting, so if
13 you're saying that's different, then let me know.
14 Is it not true that what you're saying in 75 is
15 plaintiff does not recall any complaints about him
16 other than the trivial telephone issue that Aleman
17 raised as a reference to the June 3rd meeting, or
18 is this broader in paragraph 75?
19 **A  Well, 75 was really to the May 27th**
20 **meeting.**
21 Q  Okay.
22 **A  That's when that happened, on a call.**

**Page 79**

1  Yeah.
2  Q  Well, let me ask you a fresh question
3  then.  Do you remember any other criticisms or
4  complaints about your performance in the June 3rd
5  meeting other than the weeds comment?
6  **A  Well, the weeds comment and then also they**
7  **wanted me to actually give John information, which**
8  **I did, and a lot of times he wasn't available**
9  **because there were so many issues with the plant.**
10 **They were coming in the middle of the night and**
11 **John would be out in the plant, so I would leave**
12 **things for him in his chair.  I've learned over 30**
13 **years, don't put it on someone's desk.  Don't put**
14 **it in their inbox.  Put it on their chair because**
15 **they have to sit down because they have to pick it**
16 **up.  And they asked me not to do that, but John --**
17 **I couldn't get ahold of John.  John, you know --**
18 **and John would basically say a lot of times even**
19 **with signing checks -- we were behind on signing**
20 **checks.  He had to approve them, the invoices.  He**
21 **said, if there's no there, in other words no**
22 **production, there's no here, there's no office.**

**Page 80**

1  **So that was -- and he was kind of right in the**
2  **sense that he was prioritizing getting the plant**
3  **running, and so -- but yes.  I don't recall**
4  **any other -- they wanted me to give them more**
5  **information, which I was already giving them, but**
6  **he wasn't available.  They didn't want me to put**
7  **it in his chair.  They wanted me to control the**
8  **spending.  They -- you know, like I said before**
9  **the break, pretty much John knew what the cash**
10 **position was.  I would inform him.  I would give**
11 **him advice, you shouldn't do this or you shouldn't**
12 **do that.  But if John says, you know, we're going**
13 **to buy this or we're -- we have to have this or we**
14 **can't operate, then I did it.  And --**
15 Q  Let me stop you for a second because
16 you've gotten off track.  My question was were
17 there any complaints about your performance?
18 **A  Well, that was a complaint.**
19 Q  All right.  So I'm trying to figure it
20 out.  It says like -- it sounds like you're saying
21 that you were criticized because you were putting
22 documents in John's chair.  So you received

97

1  payroll, HR -- some HR functions. I was doing --
2  working with sales, doing bids. If something
3  comes up for a job, I got to stop everything and
4  work out a complicated bid, you know. That takes
5  a day or more to do. And I was able to do some
6  things, like provide feedback to the managers, you
7  know, as far as their performance and stuff. But
8  I asked them for help, so that if there was
9  another task they wanted me to do, I could do
10 them. And Chris told -- LaRocco told me, we're
11 going to get you some help.
12    Q  You mean help in the form of assistants?
13    A  Yes.
14    Q  Accountants?
15    A  Correct, correct. Eventually he said he
16 was going to get me help. The next thing I know,
17 I was terminated.
18    Q  Was there any e-mail or formal request
19 that you made to anybody within the company to
20 say, I need official staffing in order to do the
21 job you want me to do?
22       MR. JARRETT: Objection. Vague. You can

98

1  answer. Vague and compound. But you can answer.
2    A  I don't know, but I do know it was verbal.
3  See, here's the disadvantage. I don't have the
4  e-mails. They could provide you with all their
5  e-mails and maybe some of mine, but I don't have
6  any of my e-mails where I responded. They could
7  be selective. I don't know. But I know I did
8  discuss it, you know, verbally. And Chris LaRocco
9  said, we're going to get you some help.
10    Q  Next line reads, I also removed all HR
11 employee file responsibilities except the five
12 exempt manager positions from Michael's
13 responsibility. Do you see that?
14    A  Yes, sir.
15    Q  Is that an accurate statement?
16    A  That is accurate. Yes, sir.
17    Q  Okay. And why did she do that? Did she
18 tell you?
19    A  It's a long story behind all this.
20    Q  Did she tell you at the meeting why she
21 was taking that responsibility away from you?
22    A  She didn't exactly say. No. But she --

99

1  she kept me with the five managers' files, and all
2  the hourly people went back to the office manager.
3  It was a -- I didn't have those in the first --
4  when I first came there, and there was some office
5  things going on between Michelle and Beth Aleman.
6  They didn't -- EnviroTech didn't want Fran to have
7  access --
8    Q  Executives?
9    A  Not only that, the hourly people in the
10 office. They didn't want her to have them, so
11 they gave everything to me.
12    Q  Let me read the next sentence.
13    A  Yeah.
14    Q  During the audit of the files in this
15 visit, I found the files to be out of federal
16 compliance. Confidentiality agreements were
17 missing and random accounts payable items were
18 placed in the employee files. Do you remember a
19 discussion of that topic during the June 3rd or
20 June 4th meeting?
21    A  I remember -- not during the meeting. I
22 remember that Beth had got Fran Holliday, who was

100

1  the office manager, and myself together -- that
2  might be in the next sentence somewhere. Yeah.
3  It's in the second sentence. She got us both
4  together because Fran was doing it, and she said
5  to both of us, these are out of federal
6  compliance. Now, what she meant by that, fully I
7  don't know. But this is -- this is the part that
8  I do remember: Any counseling notices that I put
9  in employees' files, because I've sat in a number
10 of meetings with John when they brought someone
11 from the plant in for counseling or terminating
12 them or disciplining them --
13    Q  I'm sorry. It seems like you're going off
14 in a different direction.
15    A  Well, I'm --
16    Q  Do you agree or disagree with her
17 conclusion that the files were out of federal
18 compliance?
19    A  I don't know. I don't know the federal
20 law on all that. I can't speak to that.
21    Q  Okay.
22    A  But I do know -- I do know the complaints

101

1 that were in there, she wanted me to take all the
2 counseling notices out, and I didn't understand
3 why. How would you -- why wouldn't you want to
4 keep employee counseling notices in the file?
5 Where would you put them? Why do you want to hide
6 it?
7    Q  So you disagreed with her?
8    A  Well, I didn't -- I don't think it was --
9 to me, it didn't seem like a logical -- a logical
10 thing, but I didn't argue with her about it. I --
11 she took the files away, and that was less I had
12 to do, and that was fine. But other than that, I
13 don't know.
14   Q  The files were your responsibility before
15 they were taken away from you?
16   A  They were, and they were Fran's before
17 that, but no one told me anything about federal
18 compliance. I had counseling notices in each
19 person's file. I think that's where they should
20 belong. I had insurance forms in their file,
21 applications in their file, copies of Social
22 Security cards for I-9 verifications, two that you

102

1 needed, and if there were counseling, yeah, I put
2 them there. That's where I felt they belonged,
3 but I didn't know — she said they shouldn't be in
4 there.
5    Q  So you didn't know whether they were
6 within federal compliance or not?
7    A  Yeah. I don't have any idea. No, sir. I
8 don't know that.
9    Q  You testified earlier that you had
10 previous HR functions and responsibilities?
11   A  I did. I did.
12   Q  I assume training, correct?
13   A  I did years ago, right, years ago. I
14 mean, first time I had HR responsibilities, when I
15 first started in 1981, and I just did kind of like
16 payroll stuff, but I had full range of it — of
17 that in 1986, and you know, that was 30-some years
18 ago, and the laws changed. But I-9 came in during
19 1986, because I remember that's when that came in.
20 So I knew that — what forms you had to have and
21 verifications and stuff like that, but she said it
22 was out of federal -- how was it? How it was out

103

1 of federal compliance? I don't know. She would
2 have to state how it was out. I don't know how it
3 was.
4    Q  You don't know what the federal
5 requirements were to know whether she was
6 compliant or not?
7    A  Yeah. I don't even know if she can
8 remember what was out of compliance, but I do know
9 she didn't want the counseling notices in there.
10 That I know. And I assume -- I just assume that
11 she thought that was a reason to be out of federal
12 compliance with. You know, to me that didn't
13 sound copacetic, but yeah.
14   Q  Last sentence reads, in addition I told
15 Michael he needs to create accounts payable files
16 for all the vendors they are using, and those
17 files need to be current at all time [sic]. Do
18 you remember that discussion point during the
19 meeting?
20   A  Yeah. There were accounts payable files.
21 They were there. Now, she's talking about me
22 putting files in the employee files? I mean,

104

1 prior to that, right?
2    Q  I'm just reading what it says.
3    A  Yeah.
4    Q  It says, I told Michael he needs to create
5 accounts payable files, so that certainly implies
6 that there were not accounts payable files,
7 correct?
8    A  Well, it says, during the audit of the
9 files, during this visit I found the files to be
10 out of federal compliance. Confidential
11 agreements were missing.
12       MR. JARRETT: That's not what he's reading
13 from.
14   Q  The last --
15   A  Random accounts payable items were placed
16 in employees' files. So she's saying that --
17   Q  Look at the -- look at the --
18       MR. JARRETT: Hold on.
19   Q  Please stop. Just look at the last
20 sentence in this block here.
21   A  Okay.
22   Q  It's the last sentence. Read along with

Page 109

1 activities, was to help you by creating the score
2 card, correct?
3     MR. JARRETT: Objection. Calls for
4 speculation. Assuming facts not in evidence. You
5 can answer.
6   A  Well, I don't think it was counseling -- I
7 wasn't doing anything wrong because I had never
8 done it before. I was never asked to do it
9 before, so it was something new they wanted me to
10 do. Yes.
11   Q  Reading the last section that's written,
12 the topic is next step if infraction is repeated.
13 Quote, this is not discussed as this first meeting
14 was to convey the expectations that are needed for
15 the controller position and more specifically for
16 Michael to understand he needs to produce more
17 qualitative/quantitative work and be a hands-on
18 controller. Do you see that language?
19   A  What wasn't discussed? The infractions?
20   Q  Next step is infraction, I assume.
21   A  Yeah.
22   Q  We're reading the same document.

Page 110

1   A  Yes. So there was no process improvement.
2   Q  Do you have a recollection that they asked
3 you to produce more qualitative/quantitative work
4 and be a hands-on controller?
5   A  They were saying, get out of the weeds. I
6 remember that. But I wasn't -- I was doing
7 quality work, quantitative work.
8   Q  So you disagree with the criticism?
9   A  Well, I think it's -- they're reflecting
10 getting out of the weeds again. So they may have
11 said that, but I was producing the work that I
12 could produce. I was producing it. Yeah.
13   Q  How did you feel when you got done with
14 the meeting?
15   A  I felt very bad.
16   Q  Why?
17   A  Well, I felt bad for a couple -- a couple
18 reasons. First, John was scared to go to the
19 meeting himself. And they pulled, you know, us in
20 there. I felt -- I felt bad for the company in
21 the sense that they had to do this capital call,
22 not because it was my fault. Now they're getting

Page 111

1 external pressure, you know, from the investors,
2 and you know, they were in a position as
3 management, EnviroTech, you know -- it was
4 probably shame for them.
5   Q  Do you feel that you were being unfairly
6 blamed for the financial position of the company
7 at that time?
8   A  I do. Yes, sir. I did.
9   Q  Let's turn to page 9 of the complaint. On
10 paragraph 77, please -- you can take that exhibit
11 and just set it right here in a pile.
12   A  Okay. There you are.
13   Q  Okay. It reads, plaintiff was to be
14 treated with chemotherapy two out of every three
15 Fridays, is that correct?
16   A  That is correct.
17   Q  Okay. And --
18   A  That was -- that was -- I had different
19 regimens, but that was when I had to go to the
20 hospital to have intervenous, but I also had the
21 little pill, but that had nothing to do with being
22 off on Fridays. But yeah. Two out of every three

Page 112

1 Fridays, that's correct.
2   Q  And paragraph 79, is this accurate,
3 plaintiff also told Frink that he would be able to
4 maintain a 40-hour week despite the chemotherapy?
5   A  That is correct.
6   Q  And did you, in fact, maintain a 40-hour
7 week during the time that you were employed with
8 Trae?
9   A  Yes.
10     MR. JARRETT: Objection. Asked and
11 answered. But answer.
12   A  Yeah. 40 to 45.
13   Q  40 to 45?
14   A  And they were watching me. They were
15 going to make sure I did that because they would
16 have probably wrote it up after these meetings,
17 right? I did.
18   Q  And it's true that Trae and EnviroTech
19 agreed to your four-day workweek on some weeks
20 while still performing 40 to 45 hours per week?
21   A  I assume that's correct. I told John.
22 John talked to Kevin. They approved that. I gave

113

1 the schedule, you know, not only to John and the
2 office manager but also sent it to EnviroTech.
3 Yes. So they approved it.
4  Q And they were okay with it?
5  A Yes, sir.
6  Q And paragraph 82, he experienced no
7 negative symptoms, no pain, nausea, vomiting, et
8 cetera. That was correct?
9  A That is correct. Yes, sir.
10     MR. LIEBELER: Okay. Why don't we do
11 this? I got the signed supplemental
12 interrogatories -- that's the original right
13 there. Can you -- why don't we mark that as an
14 exhibit, please.
15     (Whereupon, Exhibit 3, Supplemental
16 Interrogatories, was marked for identification.)
17     MR. LIEBELER: Copiers are so good you
18 can't tell which one is the original anymore, so
19 they all look pretty good.
20     MR. JARRETT: I guess I have the original,
21 actually. Do you want to change it?
22     MR. LIEBELER: It doesn't matter.

114

1     MR. JARRETT: Yeah.
2     MR. LIEBELER: I think we're good.
3 BY MR. LIEBELER:
4  Q Okay. Mr. Donaldson, I know that you just
5 spent some time thumbing through this, but I --
6 and your signature is on the -- can you turn to
7 the final page of Exhibit 3?
8  A The final page where I signed it? Is that
9 what you're referring to?
10  Q Right. I just wanted to confirm that this
11 is in fact your certification, that the foregoing
12 interrogatory responses are true and accurate to
13 the best of my knowledge and recollection?
14  A Yeah. I mean, I didn't read the whole
15 thing again, but I had read it, you know, at home
16 probably before it was sent, but I haven't -- last
17 week or whatever.
18  Q Let's just go through a couple of them and
19 make sure that we're all on the same page. If you
20 could turn to page 3, that's interrogatory and
21 response number three.
22  A Okay.

115

1  Q The interrogatory asks you to identify and
2 describe in detail all negative symptoms or
3 conditions experienced by you as a result of your
4 cancer and subsequent treatment. I just want to
5 make sure that this is a full and complete and
6 accurate answer that you've given here and there's
7 nothing else that you need to add at this point to
8 make it a full and complete, accurate answer?
9  A Just number three, right?
10  Q Correct.
11  A And this is just in regard to chemotherapy
12 basically, right?
13  Q Well, just read the question again if you
14 have any questions. It says, identify and
15 describe in detail all negative symptoms or
16 conditions experienced by you as a result of your
17 cancer and subsequent treatment. I want to make
18 sure that this is an accurate answer.
19  A So basically the topic is negative
20 symptoms?
21  Q Right.
22  A So I would say that this is fairly

116

1 accurate, yeah, as far as, you know, what happened
2 to me.
3  Q Okay. And in reading the second sentence
4 of your response, Mr. Donaldson responded well to
5 the chemotherapy, which he took on Fridays, and
6 the primary symptom he felt after chemotherapy was
7 a lethargic feeling on Saturday or Sunday. Is
8 that true and accurate?
9  A That is true and accurate. Yes, sir.
10  Q Okay.
11  A Yes, sir.
12  Q Okay. Sorry I'm going to go backwards to
13 number two, which is -- starts very much on the
14 bottom of page 2. Just want to make sure that
15 this is the full answer for this. Number two
16 reads, describe in detail all physical
17 restrictions imposed upon you by your physicians
18 from May 15, 2014, to August 20, 2014. Just take
19 a look at that answer and just verify that that's
20 a full and complete answer.
21  A And that is correct. Yes, sir.
22  Q I'm going to call your attention to page

177

1 that. Yes.
2 Q Any time prior to it not getting done, did
3 you ask anyone for any assistance to help getting
4 it done [sic]?
5 A Well, like I said, the 15th, right?
6 They're showing me on the 15th. I'm leaving for a
7 doctor's appointment on the 15th. I didn't get
8 back until the 27th.
9 Q My question is, did you ask -- did you
10 tell anyone you needed help getting the job done?
11 A There was no one there to help me.
12 Q Did you ask for help to get the job done?
13    MR. JARRETT: Yes or no?
14 A No, no, because there's no one to ask.
15 I'm doing financial statements. There's no one to
16 ask. There's no one to ask. But then he says,
17 you know, I'm very good at accounting and detailed
18 -- I'm very detailed in my communications and
19 detailed as an auditor, so I don't know. But we
20 did get that PO system done so they wouldn't have
21 to enter those 300 lines anymore. So we got them
22 done in June.

178

1 Q Okay.
2 A We got them done.
3 Q All right. Is there anything -- any
4 medications that you're taking that would have
5 interfered with you giving full and complete
6 answers here today for the deposition?
7 A None.
8 Q Thinking back over your testimony from the
9 time we started at 10:30, are you satisfied with
10 all your answers or is there anything upon
11 reflection that you need to change to any of the
12 questions I've asked you?
13 A No, no. I'm pretty satisfied with the
14 answers I gave. Yes, sir.
15 Q Okay. All right. Thank you for your
16 time. The deposition is over.
17    (Off the record at 1:50 p.m.)

179

1           ACKNOWLEDGMENT OF DEPONENT
2       I, MICHAEL DONALDSON, do hereby
3 acknowledge that I have read and examined the
4 foregoing testimony and the same is a true,
5 correct, and complete transcription of the
6 testimony given by me and any corrections appear
7 on the attached errata sheet signed by me.
8
9 _____    _____
10   (SIGNATURE)                (DATE)

180

1       CERTIFICATE OF SHORTHAND REPORTER-NOTARY PUBLIC
2       I, Kaylee Lachmann, the officer before
3 whom the foregoing deposition was taken, do hereby
4 certify that the foregoing transcript is a true
5 and correct record of the testimony given; that
6 said testimony was taken by me stenographically
7 and thereafter reduced to typewriting under my
8 direction; that reading and signing was requested;
9 and that I am neither counsel for, related to, nor
10 employed by any of the parties to this case and
11 have no interest, financial or otherwise, in its
12 outcome.
13       IN WITNESS WHEREOF, I have hereunto set my
14 hand and affixed my notarial seal this 9th day of
15 October, 2019.
16
17
18 *[signature: Kaylee Lachmann]*
19
20 My commission expires: March 14, 2024