UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Charlottesville Division

MICHAEL DONALDSON,

     Plaintiff,

          v.

TRAE-FUELS, LLC, *et al.*

     Defendants.

Case No.: 3:18-cv-00097

## MEMORANDUM OF LAW IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

The Court should deny Defendants' motion for summary judgment in this case because there is overwhelming evidence that Defendants' justifications for terminating Donaldson are fabricated and a pretext for discrimination. The contemporaneous documents exchanged in this case show that Defendants' central contention that Donaldson caused Trae Fuels to overdraw its line of credit is untrue – Trae Fuels did not overdraw its line of credit during Donaldson's employment. Further, nothing Donaldson did as an accountant caused Trae Fuels to need to borrow against the line of credit. The start-up manufacturing company lost $1.7 million dollars in the first two quarters of the 2013-2014 fiscal year because of difficulties keeping the plant running and securing sales. Defendants' other contentions about Donaldson's performance are likewise incorrect or misconstrued.

Meanwhile, there is significant evidence that Defendants terminated Donaldson because of his pancreatic cancer diagnosis. While Defendants had not documented performance concerns prior to Donaldson's diagnosis with cancer, immediately after he returned to work, HR employee Beth Aleman and others began secretly and rapidly documenting supposed performance

concerns.   Donaldson's supervisors and coworkers made comments about his diagnosis indicating their concern about its effect on the company and his potential death.   Additionally, Defendants hired a potential replacement temporary accountant within less than a week of Donaldson's diagnosis.   Taken together with the patent fabrications Defendants have proffered for Donaldson's termination, a reasonable jury could and should find that Defendants terminated Donaldson because of his pancreatic cancer.

## MATERIAL FACTS IN DISPUTE

### *Background*

1.      Plaintiff Michael Donaldson worked as an accountant and controller for various companies for thirty-two years.  Ex. 1, Donaldson Decl. ¶ 2.

2.      On October 17, 2013, Donaldson began working for Defendant Trae Fuels.  Ex. 1, Donaldson Decl. ¶ 3.

3.      Defendant EnviroTech formed Trae Fuels in the summer of 2013 to operate a plant manufacturing heating pellets in Bumpass, Virginia.   EnviroTech was the managing member of Trae Fuels, owning a 67% interest in the company, Trae Fuels General Manager John Frink owned 20% of the company, and three other entities or individuals owned the remaining 13%.  Ex. 2, 30(b)(6) Dep. 18:22-21:22.

4.      EnviroTech is a Colorado company that specializes in de-icing roads and other surfaces, as well as dust control related to mining.   EnviroTech exercised control over Trae Fuels and Donaldson's employment and has stipulated that, along with Trae Fuels, it jointly employed Donaldson.  Ex. 2, 30(b)(6) Dep. 11:19-12:4, 22:1-13.

5.      After several months of preparation, Trae Fuels began producing heating pellets in around January 2014.  Ex. 2, 30(b)(6) Dep. 23:22-24:10.

*Trae Fuels*

6.      Trae Fuels had between fifteen and twenty employees during 2013 and 2014, including both office staff and employees that worked on the production line.  The office staff consisted of General Manager John Frink, who was responsible for the overall management of Trae Fuels, Plant Manager Clayton Walker, who was responsible for managing the production line, Christian Bach, who was responsible for sales, Controller Donaldson, who was the accountant and also managed human resources files, and Office Manager Fran Holliday, who was responsible for assisting the other office staff and working in the scale house measuring incoming inventory and outgoing product.  Ex. 1, Donaldson Decl. ¶ 4.

*Donaldson's job duties*

7.      As Controller, Donaldson was responsible for creating various financial reports and for informing Frink of the financial position of Trae Fuels.  As part of his duties, Donaldson created monthly financial reports that Trae Fuels sent to EnviroTech and eventually sent to Trae Fuels's and EnviroTech's bank to support a line of credit Trae Fuels had with the bank. Donaldson also provided Frink frequent cash reports explaining the funds Trae Fuels was spending, making, and had available to spend.  Ex. 2, 30(b)(6) Dep. 49:5-50:8; Ex. 1, Donaldson Decl. ¶ 5.

8.      To track Trae Fuels's finances, Donaldson used a computer program called IFS, which is an enterprise resource planning ("ERP") system similar to systems Donaldson had used in prior jobs.  ERP systems allow companies to track various information, including accounting and inventory information.  Donaldson and Defendants also used computer spreadsheets and word processing systems to create and track reports.  Ex. 3, Donaldson Suppl. Interrogatory Response, p. 7; Ex. 2, 30(b)(6) Dep. 32:17-33:10.

9.     Additionally, Trae Fuels made Donaldson responsible for maintaining employee files and sending hiring and insurance paperwork to EnviroTech's Human Resources Manager, Beth Aleman.  Donaldson was also responsible for managing Trae Fuels's payroll system.  Ex. 2, 30(b)(6) Dep. 49:5-50:8; Ex. 1, Donaldson Decl. ¶ 6.

10.     Donaldson was not responsible for hiring or firing employees.  Ex. 1, Donaldson Decl. ¶ 7.

11.     Donaldson did not have authority to sign checks or send wire transfers without approval on behalf of Trae Fuels.  Only Frink, EnviroTech Chief Financial Officer Kevin Whyrick, EnviroTech Controller Michelle Mills, and EnviroTech Chief Executive Officer Roger Knoph had authority to sign checks or approve wire transfers.  Ex. 2, 30(b)(6) Dep. 68:3-69:8; Ex. 1, Donaldson, Decl. ¶ 8.

12.     Donaldson did not have authority to borrow against Trae Fuels's line of credit with the bank without supervisor approval.  Ex. 1, Donaldson Decl. ¶ 9.

13.     Donaldson was not responsible for sales and did not have authority to decide how much inventory to buy or product to produce.  Those responsibilities were handled by Trae Fuels salesman Christian Bach, General Manager Frink, and Plant Manager Clayton Walker, who were experienced in the heating pellet business.  Ex. 1, Donaldson Decl. ¶ 10; Ex. 2, 30(b)(6) Dep. 74:15-75:3; Ex. 2, 30(b)(6) Dep. 231:10-17.

14.     For about the first two months of Donaldson's employment, Trae Fuels was not producing pellets and was instead preparing the plant to be operational.  In December 2013, Donaldson began completing monthly financial reports that he sent to his EnviroTech accounting supervisors, CFO Whyrick and Controller Michelle Mills.  Ex. 1, Donaldson Decl. ¶ 11; Ex. 4, Dec. 26, 2014 email, Bates # Trae 2227-29.

*Trae Fuels struggled with operational and sales problems and lost money*

15.     Throughout the beginning of Donaldson's employment, Trae Fuels struggled with operational problems that prevented Trae Fuels from producing pellets from the logs it purchased.  General Manager Frink, and others, spent significant portions of their time attempting to fix the various problems that prevented the plant from running. Ex. 1, Donaldson Decl. ¶ 12.

16.     On April 30, 2014, for instance, Frink and EnviroTech corporate strategist Chris LaRocco exchanged emails in which Frink expressed his frustration that the financials will be "tight," and stated that if he (Frink) could not successfully make Trae Fuels profitable he should "go home."  LaRocco responded that Frink "sound[ed] beyond dismayed," and Frink explained that he was frustrated with having to explain "why things break," and that they are fighting a battle with maintenance every day due to leftover problems from the plant's prior operators.  Ex. 5, April 30, 2014 email chain, Trae 7335-38.

17.     Trae Fuels also struggled to obtain significant sales and only had one major customer.  Ex. 1, Donaldson Decl. ¶ 13; Ex. 2, 30(b)(6) Dep. 57:4-15.

18.     Further, unclear communications between salesman Bach and other customers led to issues receiving payment, including an instance at the end of May 2014 when a customer did not pay $515,000 when it was due.  Ex. 6, May 29, 2014 email, Trae 8084.

19.     Trae Fuels was funded by an initial investment from EnviroTech and its minority owners with the exception of Frink, who failed to provide Trae Fuels the funds for his 20% ownership.  CFO Whyrick repeatedly directed Donaldson to ask Frink about these funds but Frink failed to pay.  Ex. 1, Donaldson Decl. ¶ 14.

20.     In addition to its initial funding, Trae Fuels was approved for a line of credit with UMB Bank, the same bank EnviroTech used.  Ex. 1, Donaldson Decl. ¶ 15.

*From October 2013 until mid-May 2014, Donaldson's employment went well*

21.     From his hiring in October 2013 until mid-May 2014, Donaldson's supervisors praised his work and indicated they were satisfied with his performance.  Frink indicated he was happy with Donaldson's work, as did Whyrick, LaRocco, and Aleman.  Ex. 1, Donaldson Decl. ¶ 16; Ex. 7, Dec. 19, 2013 email from LaRocco, Trae 2105-07; Ex. 8, Jan. 22, 2014 email from Aleman, Trae 3160-61; Ex. 9, Feb. 6, 2014 email from LaRocco, Trae 4053-54; Ex. 10, Feb. 19, 2014 email from Whyrick, Trae 4637.

22.     Whyrick, for instance, emailed EnviroTech CEO Knoph in November 2013 and stated that an email from Donaldson showed that Donaldson was "getting it."  Whyrick stated he thought that Donaldson would "be the guy that can take this stuff and run with it, and make sure that it is accurate."  Ex. 11, Nov. 8, 2013 email from Whyrick, Trae 747-49.

23.     Donaldson and his supervisors exchanged day-to-day questions and instructions about how EnviroTech wanted Trae Fuels to characterize certain accounting items, the payroll system and IFS system, and requests and instructions regarding insurance and new hire paperwork.   These interactions were normal in accounting and with these systems, and experienced EnviroTech employees Aleman, Whyrick, Controller Michelle Mills, Debby Vannest, and Gohar Wise had similar questions or problems arise in their day-to-day work.  Ex. 1, Donaldson Decl. ¶ 17; Ex. 12, December 18, 2013 email from Mills, Trae 2028; Ex. 13, Jan. 2, 2014 email from Mills, Trae 2444-49; Ex. 14, Jan. 9, 2014 email from Aleman, Trae 2660; Ex. 15, Jan. 15, 2014 email from Wise, Trae 2826; Ex. 16, Feb. 18, 2014 email from Mills, Trae

6

4613-14; Ex. 17, Mar. 18, 2014 email from Wise, Trae 5833; Ex. 18, Mar. 20, 2014 email from Donaldson, Trae 5958-59.

24.     CFO Whyrick approved Donaldson's monthly financial reports each month. Additionally, Whyrick periodically agreed with Donaldson's suggestions for better processes for Trae Fuels's accounting procedures and financial practices, although Donaldson was constricted in the changes he was authorized to make and had to get permission for simple tasks, such as adding an account to the general ledger.  Ex. 1, Donaldson Decl. ¶ 18; Ex. 19, Dec. 27, 2013 email from Whyrick, Trae 2330; Ex. 20, Jan 7, 2014 email from Whyrick, Trae 2587; Feb. 12, 2014 email from Whyrick, Trae 4200-01; Ex. 21, Feb. 18, 2014 email from Whyrick, Trae 4509-11; Ex. 22, April 1, 2014 email from Whyrick, Trae 6297-98.

25.     To the extent Donaldson made mistakes in his work, they were minor and his supervisors gave no indication that they believed his performance was deficient.  Prior to his diagnosis with cancer, Donaldson was not provided any counseling forms nor was he told by anyone that he needed to improve his work. Ex. 2, 30(b)(6) Dep. 158:16-19 ("As far as a written counseling situation like they did [June 4, 2014], no, I don't think any of those were sit-down, write down, put it on paper, saying, We had this counseling session with Michael."); Ex. 1, Donaldson Decl. ¶ 19.   When instructed to do something differently, Donaldson made the corrections and followed the advice of his supervisors.  Ex. 1, Donaldson Decl. ¶ 19.

*Donaldson experienced health issues and was diagnosed with pancreatic cancer*

26.     On March 25, 2014, Donaldson experienced significant blood loss and had to be hospitalized in the intensive care unit.  The next morning, Donaldson called Trae Fuels and informed them that he was at the ICU and would need leave.  Frink and Walker visited Donaldson in the hospital.  Ex. 1, Donaldson Decl. ¶ 20.

27. To discover why he had experienced this blood loss, Donaldson began undergoing medical testing. In April 2014, Donaldson learned that he had a mass on his pancreas. Donaldson informed Frink of this the day of his diagnosis as they were both at work at the time. On Thursday May 15, Donaldson learned he had Adenocarcinoma pancreatic cancer (Stage IV) and that he would need to see an oncologist on Monday, May 19. On May 19, Donaldson called Frink and told him of the diagnosis and that he would be out that Monday morning. Ex. 1, Donaldson Decl. ¶ 21; Ex. 23, Feb. 13, 2019 letter from Dr. Le, Donaldson 161-62 ; Ex. 24, medical notes from Mary Washington Healthcare, Donaldson 180-83.

28. On May 19, during his appointment with his oncologist, Donaldson was diagnosed with pancreatitis and taken to the hospital. Donaldson called Frink and informed him that he was being hospitalized and not to expect him at work. Ex. 1, Donaldson Decl. ¶ 22.

29. On May 20, Whyrick emailed Donaldson and informed him they had hired a temporary accountant to work at Trae Fuels. Donaldson responded and said that he was "more than willing to train so there will be continuity for Trae-Fuels regardless of the ultimate outcome." Ex. 25, May 20, 2014 email from Whyrick, Trae 7921-25; Ex. 26, May 20, 2014 email from Donaldson, Trae 7927-31.

30. In 2014, 75% of individuals diagnosed with Adenocarcinoma pancreatic cancer died within one year of diagnosis, with only 6% having a 5-year life expectancy survival rate. Ex. 1, Donaldson Decl. ¶ 21.

31. On May 21, Donaldson was able to go home from the hospital. While Donaldson was in the hospital, he and his wife had learned that we were chosen to be adoptive parents by the birth mother of a baby that would be born on Friday, May 23, 2014 and that she wanted to meet them on Thursday, May 22, 2014. Immediately after his discharge from the hospital and

before leaving for Utah the next morning, Donaldson drove one hour to Trae Fuels and dropped off his company phone (which he had been using to work from the hospital) because it was not charging properly.  Donaldson went to Utah, adopted his son, and returned to work the day after Memorial Day on May 27, 2014.  Ex. 1, Donaldson Decl. ¶ 23.

*Trae Fuels immediately subjected Donaldson to intense scrutiny and unfair criticism following his return to work after his cancer diagnosis*

32.     On the day Donaldson returned to work, Frink asked him to have a meeting in his office.  When Donaldson met with Frink, he learned that EnviroTech's head of HR Beth Aleman was on the phone.  Aleman started off the meeting by saying "I'm documenting," and then began interrogating Donaldson about his leaving his work phone at work during his trip to Utah.  Ex. 1, Donaldson Decl. ¶ 24.

33.     Donaldson explained that he had brought the phone to the office because it had not been charging properly and had asked that it be sent to be fixed.  He further explained that he had been available on his personal cell phone number, which Trae Fuels and EnviroTech were aware of and had called him on before his trip.  Ex. 1, Donaldson Decl. ¶ 25.

34.     Aleman backed off her criticism at that point and the call ended.   Ex. 1, Donaldson Decl. ¶ 26.

*Whyrick directed Trae Fuels to get the temporary accountant up to speed*

35.     On May 27, Whyrick emailed Trae Fuels Office Manager Fran Holliday and explained that he wanted the temporary accountant working three to five days per week regardless of whether Donaldson was at work.  Whyrick stated that "the key is to get her up to speed quickly, so that when [Donaldson] is away she can step in."  Ex. 27, May 27, 2014 email from Whyrick, Trae 8108-09.

*Aleman and LaRocco met with Donaldson and Frink on June 4, 2014*

36.     About a week later, Aleman and corporate strategist LaRocco traveled to Virginia and met with Donaldson and Frink.  Ex. 1, Donaldson Decl. ¶ 27.

37.     In this meeting, Aleman and LaRocco told Donaldson and Frink that EnviroTech was not happy with Trae Fuels's financial losses and the fact that Trae Fuels was running out of cash.  They told Donaldson to focus on ensuring that Frink understood Trae Fuels's finances and LaRocco said that he would develop a "score card," to help capture Trae Fuels's financial position.  Aleman and LaRocco directed Donaldson to essentially force Frink not to spend money he had been spending to fix issues in the plant and keep it operating. Donaldson explained that he had been informing Frink of the financial status and that he could not control Frink or other external factors that caused Trae Fuels to lose money.  Ex. 1, Donaldson Decl. ¶ 28.

*Trae Fuels and EnviroTech secretly documented false performance concerns about Donaldson*

38.     After the June 4 meeting, Aleman drafted an Employee Counseling Form that claimed Donaldson had engaged in deficient performance.  Ex. 28, June 9, 2014 email from Aleman, Trae 8429-30; Ex. 1, Donaldson Decl. ¶ 29.

39.     Even though Trae Fuels's and EnviroTech's policy was to provide the employee a copy of a counseling form (and the form has a place for the employee's signature acknowledging receipt), Aleman did not provide the form to Donaldson or even inform him that she had created it.  Donaldson did not learn of the form until Defendants provided it to EEOC in response to his charge of discrimination.  Ex. 1, Donaldson Decl. ¶ 30; Ex. 2, 30(b)(6) Dep. 85:6-8.

40.     LaRocco and Aleman did not tell Donaldson he was on probation or that he needed to improve his performance.[1]  LaRocco and Aleman also did not mention that Donaldson had two weeks to improve his performance, (LaRocco, Aleman, Donaldson, and Frink discussed how Trae Fuels would operate while Frink was out of town between June 9 and June 26).  Ex. 1, Donaldson Decl. ¶ 31.

41.     From Donaldson's cancer diagnosis through to his termination on August 20, 2014, Aleman, Whyrick, and Whyrick's subordinates engaged in near-constant questioning and testing of Donaldson and secretly documented what they claimed were performance concerns. *See, e.g.,* Ex. 29, May 29, 2014 email from Aleman, Trae 8104; Ex. 30, June 2, 2014 email from Aleman, Trae 8256-57; Ex. 31, June 9, 2014 email chain, Trae 8429-31; Ex. 32, June 26, 2014 email and performance report from LaRocco, Trae 8962-63; Ex. 33, July 22, 2014 email from Vannest to Aleman, Trae 9760-62.

42.     Following the June 4 meeting, LaRocco sent criticism to Aleman on June 26, 2014.  Ex. 32, June 26, 2014 email and performance report from LaRocco.

43.     Whyrick compiled a list of negative observations regarding Donaldson.  Ex. 34, Whyrick Donaldson Report, Trae 28-31.  Michelle Mills also compiled a "Mike Donaldson Report," outlining supposed performance deficiencies.  Ex. 35, Mills Donaldson Report, Trae 6-7.

44.     On July 22, 2014, EnviroTech accounting employees Gohar Wise and Debby Vannest suddenly forwarded several old emails in which Donaldson had asked questions or

---

[1] It is true that several weeks later, LaRocco sent an email in which he claimed Donaldson was concerned about suddenly being criticized after informing Defendants that he had cancer, however, the term "probation" was the word LaRocco used in the email, not Donaldson.  No one told Donaldson he was on probation.  Ex. 36, June 21, 2014 email from LaRocco, Trae 8816; Ex. 1, Donaldson Decl. ¶ 32.

corrected inventory or reports, in an apparent effort to collect evidence of deficient performance. Ex. 37, July 22, 2014 email from Wise, Trae 9781-85; Ex. 33, July 22, 2014 email from Vannest to Aleman, Trae 9760-62.

45.     For his part, Frink actually documented that Donaldson's performance improved. Ex. 38, June 17, 2014 email from Frink, Trae 8671-72.

46.     Although Defendants were expending significant effort to document Donaldson's supposedly deficient performance, they were not sharing these documents with Donaldson or explaining what they wanted him to do to improve his performance.  Ex. 1, Donaldson Decl. ¶ 34.

*Donaldson took periodic leave to undergo treatment but was able to complete his tasks*

47.     While Defendants secretly created justifications to terminate Donaldson's employment, Donaldson continued performing the tasks of his position.  Donaldson worked from the hospital on May 20, 2014, the day after he was sent to the ER with a diagnosis of pancreatitis, when his wife arrived from out of town and was able to bring him his work phone. The CEO of EnviroTech, Roger Knoph, had directed EnviroTech's various divisions to project revenue and Donaldson explained to Whyrick various issues they were having obtaining realistic projections from Trae Fuels salesman Bach as part of that effort.  Ex. 39, May 20, 2014 email from Donaldson, Trae 7886; Ex. 40, May 20, 2014 email from Donaldson, Trae 7911-14.

48.     Following his cancer diagnosis Donaldson requested periodic medical leave to obtain treatment and then worked a modified schedule that allowed him to attend chemotherapy on Fridays.  Defendants permitted Donaldson to take this time off, though it appears that at least

Aleman was critical of Donaldson for taking leave.  Ex. 41, July 23, 2014 email from Donaldson, Trae 9828; Ex. 43, June 9, 2014 email from Aleman, Trae 8468-69.[2]

*Donaldson's supervisors asked about and commented on his cancer diagnosis*

49.    Following his cancer diagnosis, Trae-Fuels and EnviroTech management asked Donaldson questions about his condition with the apparent goal of assessing the effect of his illness on the company.  For example, EnviroTech's corporate strategist, Christopher LaRocco, asked Donaldson something to the effect of "What do you want to do now, work part-time? Plus, you're a new father?"  LaRocco also told Donaldson that his aunt or great aunt had died from pancreatic cancer.  When Donaldson responded that he planned to work full-time, LaRocco then inquired "Your wife must have good insurance?"  Donaldson responded that he was insured by EnviroTech's policy, not his wife's insurance.  Ex. 1, Donaldson Decl. ¶ 37.

50.    On another occasion, Whyrick asked Donaldson if his cancer was slow or aggressive, to which Donaldson responded that it was slow.  Ex. 1, Donaldson Decl. ¶ 38.

*Defendants terminated Donaldson on August 20, 2014*

51.    On August 20, 2014, Defendants terminated Donaldson.  In the termination letter from Frink, Frink mentioned that the issue was not the amount of time Donaldson was working but instead just a "cultural difference."  Ex. 43, Termination Letter, Trae 58.

52.    Frink's claim in the termination letter that Donaldson had been provided a "written warning about 4 weeks earlier," was false.  At deposition, Defendants were unable to

---

[2] Aleman's complaint that Donaldson got permission to extend his leave from two to three days but not from three to four days was incorrect because Donaldson only took three days of leave – June 10, 11, and 12.  Donaldson received permission to take these three days of leave.  Ex. 78, May 30, 2014 email from Donaldson, Trae 8176; Ex. 79, June 16, 2014 email from Donaldson, Trae 8626-28 (stating that Donaldson was catching up from being out three days the prior week).

identify any document Frink was referring to with this claim.  Termination Letter, Trae 58; Ex. 2, 30(b)(6) Dep. 235:5-14.

*Having sick employees made Defendants' insurance more expensive and they negotiated their annual insurance contract in around September*

53.     Defendants partially self-insured their health insurance.  Each month, Defendants' insurance provider Cigna would bill Defendants for their monthly premium and the maximum possible claims for that month.  If Defendants' employees were "healthy and [Defendants'] come in under the claim amount, then [Defendants would] get money back."  Ex. 44, February 20, 2014 email from Mills, Trae 4786-87.

54.     Defendants renegotiated their health insurance annually and the costs typically went up each year.  Defendants began the renegotiation process for their health insurance in around September.  Ex. 2, 30(b)(6) Dep. 248:10-250:18.

*Defendants' Response to EEOC*

55.     In response to Donaldson's charge with the EEOC, Defendants filed a position statement outlining their supposed legitimate explanations for Donaldson's termination.  With the exception of the claim that Donaldson needed to be retrained on the IFS system on May 14-15, 2014, none of Defendants' purported explanations predated Donaldson's cancer diagnosis.  Regardless, as explained below, these criticisms were fabricated and inaccurate.  Ex. 45, Trae Fuels Position Statement.

*The explanations Defendants have proffered for Donaldson's termination are demonstrably false*

A.  Donaldson never caused Trae Fuels to overdraw its line of credit

56.     Defendants claim that one of the biggest problems they had with Donaldson's performance was that he allowed Trae Fuels to overdraw its line of credit.

"The biggest -- one of the main reasons we weren't happy was that he had -- he had allowed the credit line, the line of credit, to overdraw. So we had a certain amount of money for a line of credit. And he was in charge of letting us know cash flow and cash flow needs and all that as I mentioned earlier. Well, the line of credit overdrew, meaning it went past its limit, and it was a pretty large number."

Ex. 2, 30(b)(6) Dep. 110:9-111:1; Defs. Memo. in Support of Summ. Judg., pp. 18-19.

57.     At deposition, Defendants were adamant that the issue was not that some action of Donaldson had caused Trae Fuels to have to draw on its line of credit, but that they had *overdrawn* their line of credit.

As I mentioned last time, it was an overdraft on the line of credit. **The drawing on the line of credit is why it's there. You know, you have a line of credit so you can draw on it for needs** and, as I mentioned last time, it's a zero balance account.

**What the criticism was, was the overdraft of that line of credit. It was drawn on in excess of what was allowed at the bank.**

Ex. 2, 30(b)(6) Dep. 225:13-21.

58.     This allegation is patently false.  Trae Fuels never overdrew its line of credit during Mr. Donaldson's employment.  Ex. 1, Donaldson Decl. ¶ 41.

59.     What actually happened is that in June 2014, Trae Fuels drew on its line of credit—as Defendants concede is appropriate—to pay its operating expenses after months of operating at a loss while getting the plant operational.  Ex. 1, Donaldson Decl. ¶ 42.

60.     On May 20, 2014, Whyrick emailed the bank and asked about the process Trae Fuels would need to follow "if/when," it needed to draw on its line of credit.  Ex. 46, May 20, 2014 email from Whyrick, Trae .

61.     On May 29, 2014, Donaldson exchanged emails informing Whyrick of Trae Fuels's cash position and asked how long it would take for the fund to arrive when they drew on

the line of credit. Whyrick said Donaldson's analysis "look[ed] good overall." Ex. 47, May 29 email chain, Trae 8147-48.

62.     On May 30, Donaldson emailed the bank and asked to draw $669,000 on Trae Fuels's line of credit with Frink's approval. Ex. 48, May 30, 2014 email from Donaldson, Trae 8178. On June 3, Donaldson followed up and reduced the amount of the draw to $500,000, again with Frink's approval. Ex. 49, June 3, 2014 email from Donaldson, Trae 8290. Whyrick confirmed that he was "good with the borrowing schedule as mentioned by [Donaldson]." Ex. 50, June 3, 2014 email from Whyrick, Trae 8298-300.

63.     On June 16, Donaldson emailed the bank and withdrew the remaining funds on the line of credit, approximately $227,000, to cover Trae Fuels's operating expenses. Again, Donaldson had permission to make this draw. Ex. 51, June 16, 2014 email from Donaldson, Trae 8618.

64.     On June 17, 2014, after reviewing a cash flow analysis by Donaldson, Whyrick notified Frink that Trae Fuels would need to make a "capital call," on its investors to "sustain us through this slow period of revenue," and that the operating agreement provided that it was Frink's responsibility to determine the amount of the capital call. Ex. 52, June 17, 2014 email from Whyrick, Trae 8637-38.

65.     Donaldson prepared documents in support of the capital call and eventually EnviroTech and the other investors provided additional funds to allow Trae Fuels to operate despite the lack of revenue. Ex. 53, July 3, 2014 email from Whyrick, Trae 9246-47.

66.     Defendants' claim that Donaldson caused Trae Fuels to overdraw its line of credit is simply false.

B. Donaldson's use of IFS did not cause Trae Fuels to need to draw on its line of credit.

67.     Defendants' claim that Donaldson's mismanagement of IFS was the reason Trae Fuels had to draw on its line of credit at all is also a total fabrication.  *See* Ex. 54, Defs. Response to Discovery, p. 5.

68.     On April 30, 2014, Donaldson prepared a cash flow analysis for May 2014 that relied on just two cash inflows, one from a customer named Northcrest Forest Products and the other from a customer named Eco – Pellet.  Donaldson explicitly mentioned that these payments were based on information provided by salesman Bach.  Ex. 55, April 30, 2014 email from Donaldson, Trae 7314-15.  In response, Frink noted that "[i]t will be tight but we have to do it!" Ex. 56, April 30, 2014 email from Frink, Trae 7324-26.

69.     As it turns out, Eco – Pellet failed to timely pay for the pellets Trae Fuels produced for it from April 15 to May 15, 2014, causing Trae Fuels a shortfall of $515,000.  Ex. 57, May 29, 2014 email from Donaldson, Trae 8084.

70.     Further, Trae Fuels was generally unprofitable throughout the time period leading up to its draw on its line of credit.  Through the first two quarters of the 2013-2014 fiscal year, Trae Fuels had lost more than $1.7 million dollars.  Ex. 58, May 5, 2014 email from Donaldson and financial report, Trae 7476-78.

71.     Donaldson's use of IFS had nothing to do with Trae Fuels's need to draw on its line of credit.

C.   <u>Donaldson's use of the IFS system was proper and he was not "re-trained" on Trae Fuels on May 14-15.</u>

72.     Defendants' claim that Donaldson failed to appropriate use and understand the IFS system are likewise incorrect.  *See* Ex. 54, Defs. Response to Discovery, pp.4-5.

73.     First, Donaldson was not re-trained on IFS on May 14-15.  Trae Fuels used a standard costing method to value its inventory.  Under a standard costing method, a company

17

assigns a set value to a type of inventory based on historical information and past prices rather than the actual price paid for a particular piece of inventory. These standards are used to set prices or evaluate bids and also can be used as a metric to ascertain favorable or unfavorable variances. In December 2013, Trae Fuels established standard costs for its various inventory items based largely on Frink's experience and knowledge, since he had experience in the pellet business. Ex. 1, Donaldson Decl. ¶ 49.

74.     After the company struggled to obtain manufacturing jobs because its prices were too high, LaRocco asked Frink if he had set the standard costs too high and Frink acknowledged that he had probably "padded," the costs. Donaldson then evaluated the standard costs against what the company had actually paid for inventory and confirmed that they had set the standard costs too high. Ex. 1, Donaldson Decl. ¶ 50.

75.     In May 2014, Donaldson, Frink, Walker, and Debby Vannest met to discuss re-evaluating the cost standards and modify them. Donaldson and the others had a two-hour call with an IFS consultant (Donaldson cannot recall whether this call took place on one or two separate days) to ensure that they properly modified the old cost standards to the new cost standards number and utilized the right application in the cost / inventory module of the IFS system. Ex. 1, Donaldson Decl. ¶ 51.

76.     Additionally, while Whyrick and Gohar Wise were in Virginia for other reasons in May 2014, they and Donaldson discussed optimizing IFS by implementing a Purchase Order module. Although this module, and many other optional modules had been shown to Donaldson when he first began learning about IFS in November 2013, he had not been directed to use the Purchase Order IFS module. The May 14-15 adjustments to IFS was not a re-training of Donaldson. Ex. 1, Donaldson Decl. ¶ 52; Ex. 59, May 19, 2014 email from Vannest, Trae 7866

(stating on the Monday following the May 14-15 meeting that "I am starting the re-costing of your inventory parts.").

77.    Donaldson's use of IFS was appropriate and his periodic questions about how to perform certain tasks were not indicative of deficient performance.  Even EnviroTech accounting employees with more time working in the IFS system periodically had questions or issues.  Ex. 1, Donaldson Decl. ¶ 53; Ex. 60, Dec. 17, 2013 email from Whyrick, Trae 2297 (stating Whyrick would need to get IFS's help to properly set up a report); Ex. 61, Feb. 14, 2014 email from Vannest, Trae 4348-49 (stating Whyrick did not know how an IFS formula was established); Ex. 62, Mar. 18, 2014 email from Wise, Trae 5833 (Wise stating that one IFS "functionality works on and off.").

D.   Donaldson did not inappropriately manage HR files.

78.    Defendants' claims that Donaldson demonstrated poor performance my inappropriately managing HR files is also false.  *See* Ex. 54, Defs. Response to Discovery, p. 5.

79.    When Aleman came to Virginia to counsel Donaldson the week after he returned from being diagnosed with cancer, Aleman audited Trae Fuels HR files and claimed they were "out of federal compliance," confidentiality agreements were missing, and accounts payable documents were in some files.  Ex. 63, June 4 counseling form, Trae 20.

80.    To the extent these files were not organized in the manner Aleman preferred, this was because she had not trained or directed Donaldson on what to include in the files and how to organize documents within the file.  Without this direction, Donaldson placed managers' credit card statements in their files and also made notes when Frink approved a payroll advance to an employee, which is what Aleman apparently refers to in claiming there were accounts payable items in the folder.  Ex. 1, Donaldson Decl. ¶ 56.

81.     With respect to the files' purported "federal compliance," Donaldson ensured all employees had appropriate authorization to work and I9 forms before beginning work, however, on occasions Frink ignored Donaldson's directives and had people work before they completed their paperwork.  While Donaldson does not recall if any I9s were actually missing, it would only have been for employees that he did not know Frink had hired.  Ex. 1, Donaldson Decl. ¶ 57.

82.     In any event, Donaldson and Fran Holliday followed Aleman's directives regarding future organization of the files after Aleman communicated her alleged expectations in June 2014.  Notably, Aleman had periodically visited Trae Fuels prior to June 2014 and had not said anything about the HR files being managed incorrectly.  Ex. 1, Donaldson Decl. ¶ 58.

E.   Donaldson did not fail to keep Frink informed of company finances and was appropriately strategic in his role.

83.     Defendants also claimed that Donaldson exhibited poor performance by failing to keep General Manager Frink aware of Trae Fuels's finances and by not being "strategic," in his role.  Ex. 63, June 4 counseling form, Trae 20; Ex. 2, 30(b)(6) Dep. 126:7-11.

84.     This criticism was also false, as Donaldson had provided Frink detailed cash projections and financial explanations throughout his employment.  To the extent Donaldson was ever forced to provide Frink a financial document without explaining it to Frink, it was because Frink did not have the time to meet with Donaldson due to Frink's other responsibilities.  *See, e.g.,* Ex. 64, Jan. 16, 2014 email from Donaldson, Trae 2896-900; Ex. 65, Jan. 20, 2014 email from Donaldson, Trae 3039; Ex. 66, Jan. 24, 2014 email chain, Trae 3241-42 (Frink stating that the profit margins were smaller than he had thought); Ex. 67, Feb. 13, 2014 email from Donaldson, Trae 4258 (Donaldson sating sending the report he would normally "hand-deliver."); Ex. 1, Donaldson Decl. ¶ 60.

85.     Donaldson also had been appropriately strategic, recommending cost-cutting methods and providing analyses concerning Trae Fuels's production and profitability.  Ex. 68, Feb. 6, 2014 email from LaRocco, Trae 4028-29; Ex. 69, Apr. 3, 2014 email from Donaldson, Trae 6467-70 (Donaldson stating that they needed to control costs by reducing overtime); Ex. 1, Donaldson Decl. ¶ 61.

F.     Donaldson's financial reports, production logs, and cash flow analyses did not evidence poor performance.

86.     Trae Fuels's claim that Donaldson's financial reports were inaccurate and demonstrated poor performance are also incorrect.  EnviroTech CFO Whyrick had to approve each of Donaldson's monthly financial reports and reviewed other reports Donaldson created regularly.  Any questions or corrections Whyrick had were within the normal course of business in deciding how Trae Fuels and EnviroTech wanted to classify certain items.  Ex. 1, Donaldson Decl. ¶ 62; Ex. 70, Dec. 27, 2014 email from Whyrick, Trae 2330; Ex. 71, Jan. 7. 2014 email from Whyrick, Trae 2587; Ex. 72, Apr. 1, 2014 email from Whyrick, Trae 6297-98 (forwarding Donaldson's cash flow analyses to CEO Knoph without modification).

87.     Likewise, the claims that Donaldson's cash flow analyses were deficient and evidenced poor performance are false.  Donaldson regularly provided cash flow analyses (which along with Frink, CFO Whyrick and CEO Knoph relied upon).  Ex. 72, Apr. 1, 2014 email from Whyrick (forwarding Donaldson's cash flow analyses to CEO Knoph without modification); Ex. 73, Jan. 24, 2014 email chain, Trae 3241-42 (Frink stating that the profit margins were smaller than he had thought).

88.     When LaRocco proposed that they use a different format he called a "scorecard" to project cash flow and provided Donaldson the format he suggested, Donaldson successfully provided that information.  The only issue that Donaldson had once he was provided the

scorecard was his reluctance to include Frink's and Bach's risky projected sales with new customers to paint a rosier picture of Trae Fuels's finances than was accurate, but LaRocco and other supervisors did not criticize Donaldson for this directly. Ex. 1, Donaldson Decl. ¶ 64; Ex. 74, July 2, 2014 email from Donaldson, Trae 9195-96.

89.     Donaldson's work with respect to inventory counts and production logs was not deficient either. Donaldson repeatedly directed plant employees to keep accurate production logs and inventory counts, and when they failed to do so, appropriately raised the issue to EnviroTech leadership. Donaldson's actions with respect to inventory and production logs were appropriate. Ex. 1, Donaldson Decl. ¶ 65.

G.     Donaldson's implementation of the IFS Purchase Order functionality in June 2014 did not evidence poor performance.

90.     Another criticism Defendants allege against Donaldson is that he failed to implement a purchase order functionality in IFS between May and June 2014. Ex. 54, Defs. Discovery Responses, p. 6.

91.     This criticism is a fabrication. Although it is true that Donaldson and his supervisors discussed using IFS's purchase order functionality during meetings in May 2014, no one directed Donaldson to prioritize the implementation of the system and it was not a high priority item. Ex. 1, Donaldson Decl. ¶ 67.

92.     Donaldson then immediately was out of work for twelve days following his cancer diagnosis and adoption of his son. Then, when Donaldson returned to work on May 27, Donaldson had to complete the month-end tasks, catch up on determining the cash position, train the temporary accountant, and deal with drawing on the line of credit to address the issue caused by a customer not timely paying for purchase. Ex. 1, Donaldson Decl. ¶ 68.

93.     Donaldson did not have time to implement the purchase order functionality until mid-June, and when Defendants directed him to do so, he immediately took steps to implement the procedure.  Ex. 75, June 18, 2014 email from Donaldson, Trae 8700; Ex. 76, June 27, 2014 email from Donaldson, Trae 9060.

H.  Various additional unfair and incorrect criticisms

94.     In addition to the unfair criticisms explained above, EnviroTech controller Michelle Mills criticized Donaldson's process for paying accounts payable (AP).  Ex. 35, Mills's Donaldson Report, Trae 6.  This criticism is improper because EnviroTech and Frink set up the procedure by which Frink would have to sign off on every accounts payable item before it was entered in IFS, and although Donaldson wanted to change the procedure, he did not have authority to do so.

95.     Whryick also criticized Donaldson for using a separate spreadsheet to perform this accounts payable process.  Ex. 34, Whyrick's Donaldson report, Trae 28-31.  However, the process Donaldson followed was efficient and Donaldson completed the work in IFS as requested.  Donaldson did not disregard any instructions in using both the spreadsheet to maintain account of the accounts payable while Donaldson waited for Frink to approve the payment so that he could enter it into IFS  Ex. 1, Donaldson Decl. ¶ 71.

96.     Last, Aleman criticized Donaldson for failing to get an employee's insurance paperwork in on time for the employee to be covered by insurance in August 2014.  This criticism is improper because Donaldson had warned the employee of the deadline and the consequences of missing it—the exact same procedure Aleman herself had used with employees that were slow to return their insurance paperwork.  Ex. 77, Aug. 4, 2014 email from Donaldson, Trae 10198-99; Ex. 1, Donaldson Decl. ¶ 72.

## ARGUMENT

To establish a claim for disability discrimination under the ADA, a plaintiff must prove "(1) that he has a disability, (2) that he is a 'qualified individual' for the employment in question, and (3) that [his employer] discharged him (or took other adverse employment action) because of his disability." *EEOC v. Stowe-Pharr Mills, Inc.*, 216 F.3d 373, 377 (4th Cir. 2000).  Disability discrimination may be proven through direct and indirect evidence or through the *McDonnell Douglas* burden-shifting framework.  *See Raytheon Co. v. Hernandez*, 540 U.S. 44, 49-50& n.3 (2003).

### I.   A Reasonable Jury Could Determine That Donaldson Had An Actual Disability Within The Meaning Of The ADA.

The plain language of the ADA and implementing regulations conclusively establish that Stage IV pancreatic cancer is an actual disability within the meaning of the ADA.  Thus, the Defendants' argument that even if they discriminated against Donaldson because of his cancer, they did not violate the ADA because his Stage IV pancreatic cancer did not limit his ability to work, is incorrect.

Since 2008, the ADA has defined "disability," with respect to an individual as:

"(A) a physical or mental impairment that substantially limits one or more major life activities of such individual;

(B)  a record of such an impairment; or

(C)  being regarded as having such an impairment (as described in paragraph (3)).

42 U.S.C. § 12102(1). "Major life activities," are defined as:

(A)  In general. For purposes of paragraph (1), major life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working.

>(B) Major bodily functions. For purposes of paragraph (1), **a major life activity also includes the operation of a major bodily function**, including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions.

42 U.S.C. § 12102(2) (emphasis added).

Accordingly, there are two separate ways in which an impairment can substantially limit a "major life activity," and qualify as an actual disability under the ADA: either (1) the impairment can substantially limit an individual's ability to perform major activities like walking or working; or (2) the impairment can substantially limit the operation of an individual's major bodily functions like the functions of the immune system or normal cell growth. *Id.* The plain language of this definition does not require that an impairment that substantially limits the operation of a major bodily function also substantially limit the performance of an activity to be an actual disability.

EEOC's final regulations implementing the amendments provide a list of impairments that, because they substantially limit a major life activity, will "in virtually all cases, result in a determination of coverage under [the actual disability prong]." 29 C.F.R. § 1630.2(j)(3)(ii) (effective May 24, 2011). One of the impairments listed is "cancer" because it "substantially limits [the major life activity] of normal cell growth." *Id.* at § 1630.2(j)(3)(iii). *See also* the EEOC's interpretive guidance accompanying its final regulations, 76 FR 16978-01, 2011 WL 1060575, at **17007, 17011, & 17012 (citing examples in the legislative history of the ADAAA where Congress named cancer as the kind of impairment that would qualify as a disability under the amended Act).

A reasonable jury should conclude that Donaldson was actually disabled because he had deadly Stage IV pancreatic cancer for which he was undergoing chemotherapy to treat. Pancreatic cancer substantially limits the major bodily function of normal cell growth.

**II.    A Reasonable Jury Could Determine That Donaldson Was Qualified For His Position And Defendants Terminated Donaldson Because Of His Cancer Because There Is Significant Evidence That Defendants' Proffered Non-Discriminatory Explanations Are Pretext**

Once a plaintiff establishes that he is disabled, he must show that he was qualified for his position and that the Defendant discriminated against him because of his disability. *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 572 (4th Cir. 2015).  A plaintiff may prove this through the *McDonnel Douglas* indirect evidence framework.  *Id.*  Evidence that an employer's purported non-discriminatory justifications for an action are pretext can establish both that an employee was qualified for their position and that the employer's adverse action was caused by discrimination.  *Id.* at 574-77.

In this case, there is significant evidence that Defendants' proffered explanations are pretext for discrimination, and accordingly, summary judgment is inappropriate.

**A. Defendants' false explanations for Donaldson's termination are sufficient evidence for a reasonable jury to conclude that Defendants discriminated against Donaldson.**

In *Reeves v. Sanderson Plumbing Prods.*, the Supreme Court held that the factfinder's disbelief of an employer's justification for an adverse action is sufficient evidence to permit a jury to find discrimination.  530 U.S. 133, 147 (2000).  Indeed, the Supreme Court noted that such evidence might be "quite persuasive," and that in the event the employer's explanation is shown to be false, "discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision."  *Id.*

26

In this case, Defendants provided false explanations about their central justifications for Donaldson's termination.  Although (1) Donaldson never caused Trae Fuels to overdraw its line of credit and (2) Trae Fuels did not overdraw its line of credit during his employment (if ever), Defendants cite a supposed overdraw as one of the biggest reasons for his termination.  As explained above, this overdraw never happened.

Likewise, Trae Fuels's claim that Donaldson's mismanagement of IFS caused Trae Fuels to have to use its line of credit is also demonstrably false.  The contemporaneous documents show that Trae Fuels was hemorrhaging money for months due to its lack of sales and operational problems with the plant, not Donaldson's work as an accountant.  Further, the contemporaneous documents show that the acute need to draw on the credit was caused by a customer failing to pay a $515,000 bill when expected.  Again, Defendants' attempt to blame Donaldson, an accountant, for these issues is disingenuous and false.

Similar falsehoods litter Trae Fuels's attempted explanations for Donaldson's termination.  For instance, the contemporaneous documents show that Donaldson was not re-trained on IFS on May 14-15 as Defendants claim.  The documents also show that Donaldson was not criticized or counseled regarding the financial reports he created prior to his diagnosis with cancer.  These repeated falsehoods preclude summary judgment.

### B. Defendants' inconsistent and shifting explanations are significant evidence of pretext and preclude summary judgment.

Defendants' shifting and inconsistent explanations with respect to Donaldson's termination also are substantial enough, standing alone, to preclude summary judgment.  *Jacobs*, 780 F.3d at 576 (stating that "[a]mong other methods," a plaintiff may show pretext "by demonstrating that the asserted justifications, even if true, are post hoc rationalizations invented for the purposes of litigation) (internal citations omitted).  "The fact that an employer has offered

27

different justifications at different times for [an adverse employment action] is, in and of itself, probative of pretext." *Id.* (internal citations omitted).

Perhaps the most significant shifting explanation (which is false to begin with) is Defendants' claim that Donaldson routinely produced inaccurate financial reports in a manner that evidenced poor performance and that any errors were not within the normal accepted bounds. Ex. 2, 30(b)(6) Dep. 114:22-120:18.  However, Defendants did not include inaccurate financial reporting in their June 6 counseling of Donaldson, nor in the summaries drafted by Controller Mills, CFO Whyrick (who was the corporate deposition designee), and LaRocco. Instead, Defendants wrote just the opposite.  Whyrick noted "[Donaldson] was a very analytical and methodical worker," while LaRocco said "Mr. Donaldson is very good at accounting.  Mr. Donaldson is very detailed in his communications, and is very detailed as an auditor."  This shifting explanation, and others such as the abandoned claim that Donaldson had inappropriately left his phone in the office, are evidence that Defendants are fabricating their justifications for terminating Donaldson.  This evidence is sufficient to preclude summary judgment.

### C. Defendants' increased scrutiny of Donaldson immediately upon learning of his cancer diagnosis is sufficient evidence of pretext to preclude summary judgment.

Additionally, Defendants' increased scrutiny of Donaldson following his cancer diagnosis is evidence of pretext.  The Fourth Circuit's decision in *EEOC v. Navy Federal Credit Union* is instructive.  424 F.3d 397, 407-09 (4th Cir. 2005).  In the *Navy Federal* case, the Fourth Circuit held that evidence of differing treatment and increased scrutiny after an individual engaged in protected activity was sufficient evidence of pretext to overcome summary judgment. *Id.* at 408-09.

In the case at bar, Defendants concede that they did not formally counsel Donaldson prior to his cancer diagnosis.  Instead, Defendants only point to bland, day-to-day questions and

instructions that were common among all of Defendants' employees to attempt to show that they had performance concerns before they knew Donaldson had pancreatic cancer.  Following his diagnosis, however, Defendants initiated a "full court press," rapidly attempting to document performance concerns, almost of which were without a factual basis.  This pivot in treatment of Donaldson at the exact time of his cancer diagnosis is evidence of pretext.  *See also, Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 572 (4th Cir. 2015) (stating that a lack of documentation is evidence of pretext).

**D. Defendants' failure to follow their own performance procedures is evidence of pretext.**

Last, Defendants' failure to follow its own performance procedures in failing to show Donaldson the counseling form Aleman created and failing to have Donaldson sign the form is evidence of pretext.  "[A]n employer's deviation from its own standard procedures may serve as evidence of pretext."  *Basham v. Select Specialty Hosp.*, Civil Action No. 2:15-15432, 2017 U.S. Dist. LEXIS 83673, at *27 (S.D. W. Va. June 1, 2017) (quoting *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1299 (11th Cir. 2006).  If Defendants were actually concerned with Donaldson's performance, they would not have hidden the employee counseling form from him and would have used it to help explain how his performance needed to improve.  Rather than following their normal procedure, however, the Defendants largely documented alleged performance concerns in secret.  Donaldson also did not see Mills's, Whyrick's, or LaRocco's purported performance reports until this litigation.  This failure to follow procedure and notify and assist Donaldson in improving his allegedly deficient performance is also evidence of pretext.

**E. Additional evidence of causation.**

In addition to the significant pretext evidence in this case, there is also additional evidence that the reasons Defendants terminated Donaldson was because of his cancer diagnosis. Chief among this evidence is the difference in the way Defendants treated Donaldson before they knew he had cancer and how they treated him after they knew he had cancer.

Additionally, there is evidence that Donaldson's coworkers were concerned about the effect of his pancreatic cancer on the company, as his coworkers asked about his prognosis and expressed their understanding that pancreatic cancer was deadly.  Defendants also hired a temporary accountant to potentially replace Donaldson during the first few days when he was hospitalized.  This too shows Defendants' concern with Donaldson's diagnosis.  Last, the evidence that it cost Defendants' money when Donaldson made claims on their insurance and the fact that they were about to renegotiate their annual insurance contract in September 2014 is evidence of discriminatory motive.  While the pretext evidence is sufficient on its own to require a trial, this additional evidence supports Donaldson's claim of disability discrimination.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that this Court deny Defendant's Motion for Summary Judgment.

Respectfully submitted,

MICHAEL DONALDSON

By:   /s/_____
Jack Jarrett (VSB #86176)
Alan Lescht and Associates, P.C,
1825 K St., NW, Ste. 750
Washington, D.C. 20006
(202) 463-6036 (phone)
(202) 463-6067 (fax)
jack.jarrett@leschtlaw.com
*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on November 11, 2019, I filed the foregoing with the Clerk of Court using the Court's CM/ECF system, which will send a notification of such filing to each counsel of record in this matter.

/s/
_____
Jack Jarrett (VSB #86176)
*Counsel for Plaintiff*