# EXHIBIT 1

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Charlottesville Division

| | |
|---|---|
| MICHAEL DONALDSON, | |
| **Plaintiff,** | Case No.: 3:18-cv-00097 |
| v. | |
| TRAE-FUELS, LLC, *et al.* | |
| **Defendants.** | |

## DECLARATION OF MICHAEL DONALDSON

Pursuant to 28 U.S.C. § 1746, I, Michael Donaldson, affirm that I am competent to testify to the matters stated herein, and hereby declare as follows:

1.      I am an adult citizen of the U.S., competent to testify to the matters in this Affidavit, and I have personal knowledge of the facts set forth herein.

2.      I worked as an accountant and controller for various companies for thirty-two years.

3.      On October 17, 2013, I began working for Defendant Trae Fuels.

4.      Trae Fuels had between thirty and forty employees during 2013 and 2014, including both office staff and employees that worked on the production line. The office staff consisted of General Manager John Frink, who was responsible for the overall management of Trae Fuels, Plant Manager Clayton Walker, who was responsible for managing the production line, Christian Bach, who was responsible for sales, myself, who was the controller, and Office Manager Fran Holliday, who was responsible for assisting the other office staff and working in the scale house measuring incoming inventory and outgoing product.

*My job duties*

1

5.     As Controller, I was responsible for creating various financial reports and for informing Frink of the financial position of Trae Fuels.  As part of my duties, I created monthly financial reports that Trae Fuels sent to EnviroTech and eventually sent to Trae Fuels's and EnviroTech's bank to support a line of credit Trae Fuels had with the bank.  I also provided Frink frequent cash reports explaining the funds Trae Fuels was spending, making, and had available to spend.

6.     Additionally, Trae Fuels made me responsible for maintaining employee files and sending hiring and insurance paperwork to EnviroTech's Human Resources Manager, Beth Aleman.  I was also responsible for managing Trae Fuels's payroll system.

7.     I was not responsible for hiring or firing employees.

8.     I did not have authority to sign checks or send wire transfers without approval on behalf of Trae Fuels.  To my knowledge, only Frink, EnviroTech Chief Financial Officer Kevin Whyrick, of EnviroTech, and EnviroTech Chief Executive Officer Roger Knoph had authority to sign checks or approve wire transfers.

9.     I did not have authority to borrow against Trae Fuels's line of credit with the bank without supervisor approval.

10.     I was not responsible for sales and did not have authority to decide how much inventory to buy or product to produce.  Those responsibilities were handled by Trae Fuels salesman Christian Bach, General Manager Frink, and Plant Manager Clayton Walker, who were experienced in the heating pellet business.

11.     For about the first two months of my employment, Trae Fuels was not producing pellets and was instead preparing the plant to be operational.  In December 2013, I began

completing monthly financial reports that I sent to my EnviroTech accounting supervisors, CFO Whyrick and Controller Michelle Mills.

*Trae Fuels struggled with operational and sales problems and lost money*

12.     Throughout the beginning of my employment, Trae Fuels struggled with operational problems that prevented Trae Fuels from producing pellets from the logs it purchased.     General Manager Frink, and others, spent significant portions of their time attempting to fix the various problems that prevented the plant from running.

13.     Trae Fuels also struggled to obtain significant sales and only had one major customer.

14.     Trae Fuels was funded by an initial investment from EnviroTech and its minority owners with the exception of Frink, who failed to provide Trae Fuels the funds for his 20% ownership.  CFO Whyrick repeatedly directed me to ask Frink about these funds but Frink failed to pay.

15.     In addition to its initial funding, Trae Fuels was approved for a line of credit with UMB Bank, the same bank EnviroTech used.

*From October 2013 until mid-May 2014, my employment went well*

16.     From my hiring in October 2013 until mid-May 2014, my supervisors praised my work and indicated they were satisfied with my performance.  Frink indicated he was happy with my work, as did Whyrick, LaRocco, and Aleman.

17.     My supervisors and I exchanged day-to-day questions and instructions about how EnviroTech wanted Trae Fuels to characterize certain accounting items, the payroll system and IFS system, and requests and instructions regarding insurance and new hire paperwork.  These interactions were normal in accounting and with these systems, and experienced EnviroTech

employees Aleman, Whyrick, Controller Michelle Mills, Debby Vannest, and Gohar Wise had similar questions or problems arise in their day-to-day work.

18.     CFO Whyrick approved my monthly financial reports each month. Additionally, Whyrick periodically agreed with my suggestions for better processes for Trae Fuels's accounting procedures and financial practices, although I was constricted in the changes I was authorized to make and had to get permission for simple tasks, such as adding an account to the general ledger.

19.     To the extent I made mistakes in my work, they were minor and my supervisors gave no indication that they believed my performance was deficient. Prior to my diagnosis with cancer, I was not provided any counseling forms nor was I told by anyone that I needed to improve my work. When instructed to do something differently, I made the corrections and followed the advice of my supervisors.

*I experienced health issues and was diagnosed with pancreatic cancer*

20.     On March 25, 2014, I experienced significant blood loss and had to be hospitalized in the Intensive Care Unit. The next morning, I called Trae Fuels and informed them that I was at the ICU and would need leave. Frink and Walker visited me in the hospital.

21.     To discover why I had experienced this blood loss, I began undergoing medical testing. In April 2014, I learned that I had a mass on my pancreas. I informed Frink of this the day of my diagnosis as we were both at work at the time. On Thursday May 15, I learned I had Stage IV inoperable adenocarcinoma pancreatic cancer and that I would need to see an oncologist on Monday, May 19. In 2014, seventy-five of people diagnosed with this cancer died within one year while the five-year survival rate was 6%. On Monday, May 19, 2014, I called Frink and told him of the diagnosis and that I would be out that Monday morning.

4

22.     On May 19, during my appointment with my oncologist, I was diagnosed with pancreatitis and taken to the hospital. I called Frink and informed him that I was being hospitalized and not to expect me at work.

23.     On May 21, I was able to go home from the hospital. While I was in the hospital, my wife and I had learned that we were chosen to be adoptive parents by the birth mother of a baby that would be born on Friday, May 23, 2014 and that she wanted to meet us on Thursday, May 22, 2014. The next morning after being discharged from the hospital we would have to fly to Utah to meet the birth mother and adopt the baby. Immediately after my discharge from the hospital and before leaving for Utah the next morning, I drove one-hour to Trae Fuels and dropped off my company phone (which I had been using to work from the hospital) because it was not charging properly. I went to Utah, adopted my son, and returned to work the day after Memorial Day on May 27, 2014.

*Defendants immediately subjected me to intense scrutiny and unfair criticism following my return to work after my cancer diagnosis*

24.     On the day I returned to work, Frink asked me to have a meeting in his office. When I met with Frink, I learned that EnviroTech's head of HR Beth Aleman was on the phone. Aleman started off the meeting by saying "I'm documenting," and then began interrogating me about me leaving my work phone at work during my trip to Utah.

25.     I explained that I had brought the phone to the office because it had not been charging properly and had asked that it be sent to be fixed. I further explained that I had been available on my personal cell phone number, which Trae Fuels and EnviroTech were aware of and had called me on before my trip.

26.     Aleman backed off her criticism at that point and the call ended.

*Aleman and LaRocco met with Frink and I on June 4, 2014*

27.     About a week later, Aleman and corporate strategist LaRocco traveled to Virginia and met with Frink and me.

28.     In this meeting, Aleman and LaRocco told Frink and I that EnviroTech was not happy with Trae Fuels's financial losses and the fact that Trae Fuels was running out of cash. They told me to focus on ensuring that Frink understood Trae Fuels's finances and LaRocco said that he would develop a "score card," to help capture Trae Fuels's financial position. Aleman and LaRocco directed me to essentially force Frink not to spend money he had been spending to fix issues in the plant and keep it operating. I explained that I had been informing Frink of the financial status and that I could not control Frink or other external factors that caused Trae Fuels to lose money.

*Trae Fuels and EnviroTech secretly documented false performance concerns about me*

29.     After the June 4 meeting, Aleman drafted an Employee Counseling Form that claimed I had engaged in deficient performance.

30.     Even though Trae Fuels's and EnviroTech's policy was to provide the employee a copy of a counseling form (and the form has a place for the employee's signature acknowledging receipt), Aleman did not provide the form to me or even inform me that she had created it. I did not learn of the form until Defendants provided it to EEOC in response to my charge of discrimination.

31.     LaRocco and Aleman did not tell me that I was on probation or that I needed to improve my performance. LaRocco and Aleman also did not mention that I had two weeks to improve my performance, (LaRocco, Aleman, Frink, and I discussed how Trae Fuels would operate while Frink was out of town between June 9 and June 26).

32.     It is true that several weeks later, LaRocco sent an email (which I didn't learn of until my deposition on October 3, 2019)  in which he claimed I was concerned about suddenly being criticized after informing Defendants that I had cancer, however, the term "probation" was the word LaRocco used in the email, not me.  No one told me that I was on probation.

33.     From my cancer diagnosis through to my termination on August 20, 2014, Aleman, Whyrick, and Whyrick's subordinates engaged in near-constant questioning and testing of me and secretly documented what they claimed were performance concerns.

34.     Although Defendants were expending significant effort to document my supposedly deficient performance, they were not sharing these documents with me or explaining what they wanted me to do to improve my performance.

*I took periodic leave to undergo treatment but was able to complete my tasks*

35.     While Defendants secretly created justifications to terminate my employment, I continued performing the tasks of my position

36.     Following my cancer diagnosis, I requested periodic medical leave to obtain treatment and then worked a modified schedule that allowed me to attend chemotherapy on Fridays.  Defendants permitted me to take this time off and I was able to continue working at least forty hours a week

*My supervisors asked about and commented on his cancer diagnosis*

37.     Following my cancer diagnosis, Trae-Fuels and EnviroTech management asked me questions about my condition with the apparent goal of assessing the effect of my illness on the company.  For example, EnviroTech's corporate strategist, Christopher LaRocco, asked me something to the effect of "What do you want to do now, work part-time? Plus, you're a new father?"  LaRocco also told me that his aunt or great aunt had died from pancreatic cancer.

7

When I responded that I planned to work full-time, LaRocco then inquired "Your wife must have good insurance?"  I responded that I was insured by EnviroTech's policy, not my wife's insurance.

38.     On another occasion, Whyrick asked me if my cancer was slow or aggressive, to which I responded that it was slow.

*Defendants terminated me on August 20, 2014*

39.     On August 20, 2014, Defendants terminated me.

*The explanations Defendants have proffered for my termination are demonstrably false*

A. I never caused Trae Fuels to overdraw its line of credit

40.     Defendants claim that one of the biggest problems they had with my performance was that I allowed Trae Fuels to overdraw its line of credit.

41.     This allegation is patently false.  Trae Fuels never overdrew its line of credit during my employment.

42.     What actually happened is that in June 2014, Trae Fuels drew on its line of credit to pay its operating expenses after months of operating at a loss while getting the plant operational.

B. My use of IFS did not cause Trae Fuels to need to draw on its line of credit.

43.     Defendants' claim that my mismanagement of IFS was the reason Trae Fuels had to draw on its line of credit at all is also a total fabrication.

44.     On April 30, 2014, I prepared a cash flow analysis for May 2014 that relied on just two cash inflows, one from a customer named Northcrest Forest Products and the other from

a customer named Eco – Pellet. I explicitly mentioned that these payments were based on information provided by salesman Bach.

45.    As it turns out, Eco – Pellet failed to timely pay for the pellets Trae Fuels produced for it from April 15 to May 15, 2014, causing Trae Fuels a shortfall of $515,000.

46.    Further, Trae Fuels was generally unprofitable throughout the time period leading up to its draw on its line of credit. Through the first two quarters of the 2013-2014 fiscal year, Trae Fuels had lost more than $1.7 million dollars.

47.    My use of IFS had nothing to do with Trae Fuels's need to draw on its line of credit.

C.    My use of the IFS system was proper and I was not "re-trained" on IFS on May 14-15.

48.    Defendants' claim that I failed to appropriate use and understand the IFS system are likewise incorrect.

49.    I was not re-trained on IFS on May 14-15. Trae Fuels used a standard costing method to value its inventory. Under a standard costing method, a company assigns a set value to a type of inventory based on historical information and past prices rather than the actual price paid for a particular piece of inventory. These standards are used to set prices or evaluate bids and also can be used as a metric to ascertain favorable or unfavorable variances. In December 2013, Trae Fuels established standard costs for its various inventory items based largely on Frink's experience and knowledge, since he had experience in the pellet business.

50.    After the company struggled to obtain manufacturing jobs because its prices were too high, LaRocco asked Frink if he had set the standard costs too high and Frink acknowledged that he had probably "padded," the costs. I then evaluated the standard costs against what the

company had actually paid for inventory and confirmed that we had set the standard costs too high.

51.     In May 2014, Frink, Walker, Debby Vannest, and I met to discuss re-evaluating the cost standards and modify them. We had a two-hour call with an IFS consultant (I cannot recall whether this call took place on one or two separate days) to ensure that we properly modified the old cost standards to the new cost standards number and utilized the right application in the cost / inventory module of the IFS system.

52.     Additionally, while Whyrick and Gohar Wise were in Virginia for other reasons in May 2014, we discussed optimizing IFS by implementing a Purchase Order module. Although this module, and many other optional modules had been shown to me when I first began learning about IFS in November 2013, I had not been directed to use the Purchase Order IFS module. The May 14-15 adjustments to IFS was not a re-training.

53.     My use of IFS was appropriate and my periodic questions about how to perform certain tasks were not indicative of deficient performance. Even EnviroTech accounting employees with more time working in the IFS system periodically had questions or issues.

D. I did not inappropriately manage HR files.

54.     Defendants' claims that I demonstrated poor performance by inappropriately managing HR files is also false.

55.     When Aleman came to Virginia to counsel me the week after I returned from being diagnosed with cancer, Aleman audited Trae Fuels HR files and claimed they were "out of federal compliance," confidentiality agreements were missing, and accounts payable documents were in some files.

10

56.     To the extent these files were not organized in the manner Aleman preferred, this was because she had not trained or directed me on what to include in the files and how to organize documents within the file. Without this direction, I had placed managers' credit card statements in their files and also made notes when Frink approved a payroll advance to an employee, which is what Aleman apparently refers to in claiming there were accounts payable items in the folder.

57.     With respect to the files' purported "federal compliance," I ensured all employees had appropriate authorization to work and I9 forms before beginning work, however, on occasions Frink ignored my directives and had people work before they completed their paperwork without my knowledge. While I do not recall if any I9s were actually missing on June 4, 2014, it would only have been for employees that I did not know Frink had hired.

58.     In any event, Fran Holliday and I followed Aleman's directives regarding future organization of the files after Aleman communicated her alleged expectations in June 2014. Notably, Aleman had periodically visited Trae Fuels prior to June 2014 and had not said anything about the HR files being managed incorrectly.

E.     I did not fail to keep Frink informed of company finances and was appropriately strategic in my role.

59.     Defendants also claimed that I exhibited poor performance by failing to keep General Manager Frink aware of Trae Fuels's finances and by not being "strategic," in my role.

60.     This criticism was also false, as I had provided Frink detailed cash projections and financial explanations throughout my employment. To the extent I was ever forced to provide Frink a financial document without explaining it to Frink, it was because Frink did not have the time to meet with me, despite my repeated attempts to do so, due to Frink's other responsibilities.

61.     I also been appropriately strategic, recommending cost-cutting methods and providing analyses concerning Trae Fuels's production and profitability.

F.   My financial reports, production logs, and cash flow analyses did not evidence poor performance.

62.     Trae Fuels's claim that my financial reports were inaccurate and demonstrated poor performance are also incorrect.  EnviroTech CFO Whyrick had to approve each of my monthly financial reports and reviewed other reports I created regularly.  Any questions or corrections Whyrick had were within the normal course of business in deciding how Trae Fuels and EnviroTech wanted to classify certain items, which are typical in any accounting cycle operation and review.  My financial reports were always approved.

63.     Likewise, the claims that my cash flow analyses were deficient and evidenced poor performance are false.  I regularly provided cash flow analyses (which along with Frink, CFO Whyrick and CEO Knoph relied upon).

64.     When LaRocco proposed that they use a different format he called a "scorecard" to project cash flow and provided me the format he suggested, I successfully provided that information.  The only issue that I had once he was provided the scorecard was my reluctance to include Bach's and Frink's projected sales with new customers to paint a rosier picture of Trae Fuels's finances than was accurate, but LaRocco and other supervisors did not criticize me for this directly.

65.     My work with respect to inventory counts and production logs was not deficient either.  I repeatedly directed plant employees to keep accurate production logs and inventory counts, and when they failed to do so, I appropriately raised the issue to EnviroTech leadership.  My action with respect to inventory and production logs were appropriate.

G. <u>My implementation of the IFS Purchase Order functionality in June 2014 did not evidence poor performance.</u>

66.     Another criticism Defendants allege against me is that I failed to implement a purchase order functionality in IFS between May and June 2014.

67.     This criticism is a fabrication. Although it is true that my supervisors and I discussed using IFS's purchase order functionality during meetings in May 2014, no one directed me to prioritize the implementation of the system and it was not a high priority task.

68.     After May 15, I was immediately out of work for twelve days following my cancer diagnosis and adoption of my son. Then, when I returned on May 27, I had to complete the month-end tasks, catch up on determining the cash position, train the temporary accountant, and deal with drawing on the line of credit to address the issue caused by a customer not timely paying for purchase.

69.     I did not have time to implement the purchase order functionality until mid-June, and when Defendants directed me to do so, I immediately took steps to implement the procedure.

H. <u>Various additional unfair and incorrect criticisms</u>

70.     In addition to the unfair criticisms explained above, EnviroTech controller Michelle Mills criticized my process for paying accounts payable (AP). This criticism is improper because EnviroTech and Frink set up the procedure by which he would have to sign off on every accounts payable item before it was entered in IFS, and although I wanted to change the procedure, I did not have authority to do so until Envirotech and Frink eventually approved the change.

71.     Whryick also criticized me for using a separate spreadsheet to perform this accounts payable process. However, the process I followed was efficient and I completed the work in IFS as requested. I did not disregard any instructions in using both the spreadsheet to

13

maintain accounting of the accounts payable while I waited for Frink to approve the payment so that I could enter them in IFS.After Whyick and Frink changed the process and the Purchase Order System was implemented, this resolved the majority of the redundancy.

72.     Last, Aleman criticized me for failing to get an employee's insurance paperwork in on time for the employee to be covered by insurance in August 2014.  This criticism is improper because I had warned the employee of the deadline and the consequences of missing it—the exact same procedure Aleman herself had used with employees that were slow to return their insurance paperwork.

DATED this ___11___ day of ___November___ , 2019

_Michael Donaldson_
Michael Donaldson

by JS w/ permission

# EXHIBIT 2

1
                      UNITED STATES DISTRICT COURT
                  FOR THE WESTERN DISTRICT OF VIRGINIA
2                        Charlottesville Division

3
       MICHAEL DONALDSON,
4
       Plaintiff,                    Case No.:3:18-cv-00097
5
       v.
6
       TRAE-FUELS, LLC, et al.
7
       Defendants.
8

9
                TELECONFERENCE DEPOSITION OF KEVIN WHYRICK
10                            October 30, 2019

11

12            Pursuant to Notice and the Federal Rules of

13     Civil Procedure, the teleconference deposition of

14     KEVIN WHYRICK, taken by Plaintiff, was held at 910

15     54th Avenue #230, Greeley, Colorado 80634, on

16     Wednesday, October 30, 2019, at 9:00 a.m., before

17     Jason T. Meadors, RPR, CRR, CRC, and Notary Public

18     for the State of Colorado.

19

20

21

22

```
 1              THE WITNESS:  Okay.  Yeah.

 2       Q    (By Mr. Jarrett)  Okay.  Okay.  Do you

 3  understand that with respect to some questions that

 4  the topics we've noticed and provided that you are

 5  testifying with the knowledge of the corporations,

 6  EnviroTech, and Trae-Fuels?

 7       A    Yes.  Yes.  I was -- you know, I mean, I

 8  wasn't involved in everything, obviously, but I'm --

 9  you know, I've -- I've probably got the most

10  cross-knowledge of anybody in the company, so I think

11  that's why I was picked to do this.

12       Q    Okay.  Without telling me anything that was

13  said between you and any attorneys, what did you do

14  to prepare for the deposition?

15       A    I looked over my prior stuff that I'd sent

16  out.  I mean, it's been five years now or more since

17  a lot of this happened.  So went and looked over my

18  notes, as far as, you know, the -- I forget what I

19  called it, my observations around Michael.  I think I

20  had gotten something ahead of time on some of the

21  items you were going to address and ask.

22              And then I late, late -- or this morning, I
```

1   got information on a number of items that I think you

2   had sent to Lars.  Didn't get a chance to look at all

3   of them, but I kind of skimmed through everything

4   just to get a general feel for what -- what was in

5   there.

6           Other than that, I haven't spent a lot of

7   time on this.  I've been traveling six weeks -- last

8   six weeks, so I haven't had a whole lot of time to

9   spend, looking at this stuff.

10      Q    Okay.  Were you able to speak with anyone

11  other than attorneys?

12      A    Just on a general basis.  Our attorney,

13  Brian Cross, our in-house, and Lars, but those are

14  both attorneys.  I haven't really talked to anybody

15  else about this, other than, I've got a deposition

16  today.

17      Q    Okay.  Did you review any documents other

18  than your own notes and that, I think you referenced,

19  the observation document that you created?  Did you

20  view any other documents?

21      A    They had an -- an affidavit or I forget

22  what it was called that I signed --

```
 1            MR. LIEBELER:  Interrogatories -- sorry,
 2    just wanted to interject, interrogatory.  I don't
 3    think he knows the legal term for it.  The
 4    interrogatory responses that Mr. Whyrick signed is
 5    what he reviewed, and just to make the record clear,
 6    I believe everything that he reviewed has been
 7    produced in the litigation.
 8         A    Yeah, and other than that, the information
 9    that was sent.  Lars, you just sent this morning.
10    Had a bunch of stuff in there.  It was a lot.  I
11    didn't -- like I said, that -- that item, I just
12    skimmed over, because there was so much in it.  I
13    think it was stuff that you had sent to Lars.
14         Q    (By Mr. Jarrett)  Okay.  Did you review any
15    emails?
16         A    Well, that had -- that appeared to have
17    copies of emails in there.  But --
18         Q    You did not have an opportunity to review
19    them yet?
20         A    No, I mean, that was a lot of stuff.
21         Q    Did you review any contemporaneous
22    documents back from that time period, 2014/2015 time
```

1    period, like financial reports, any sort of, like,

2    the underlying documents that you guys were working

3    on back at that time?

4         A     No, I have not.

5         Q     Is there anything that we haven't talked

6    about that you reviewed?

7         A     No, not that I can think of.

8         Q     Okay.  So a couple -- one ground rule I

9    forgot that I'm reminded of is that unless I specify

10   otherwise, the period I'm talking about is the

11   period, you know, sort of the start of

12   Mr. Donaldson's employment, around October 2013 until

13   a few months after his employment ended, December 2014.

14           So to the extent the question is ambiguous,

15   I'm asking how EnviroTech does something, how

16   Trae-Fuels does something, what I'm asking is for

17   that time period.  Is that understood?

18        A     Yes.

19           MR. LIEBELER:  Jack, I'm going to interject

20   just to maybe it'll save you a little bit of time.

21           You've alleged in the Complaint

22   Mr. Donaldson has that Trae-Fuels and EnviroTech are

1   essentially joined or co-employers of Mr. Donaldson.

2   We stipulate to that fact, so that, you know, at the

3   time that you're asking questions about his employer,

4   the terms are, to us, essentially interchangeable.

5            MR. JARRETT:   Okay.   That should help.

6            MR. LIEBELER:   Yeah, because -- yeah,

7   you've got, you know, it's sort of a dual list right

8   here, and I don't think there's much distinction

9   between the two.   So I'm just going to let you know

10  that that's an issue that we are not contesting.

11           MR. JARRETT:   Okay.   That should help.

12       Q    (By Mr. Jarrett)   To the extent something,

13  an answer may be different from EnviroTech and

14  Trae-Fuels, I can't imagine a circumstance in which

15  that would happen, but if it comes up today, just let

16  me know, and we'll figure out a way to deal with

17  that, okay?

18       A    Okay.

19       Q    Okay.   So I just want to go through a

20  little bit of background on you personally, just to

21  get some knowledge of who you are.   What is your

22  educational background?

 1   portion of your job.  So what -- what is involved in
 2   that?
 3        A    As -- as the -- are you talking about now,
 4   in that time frame, or now?
 5        Q    Let's do both.  So if it's changed, let me
 6   know, but start off with that time frame, and if
 7   your -- what -- if your duties with respect to
 8   overseeing finance, accounting have changed, let me
 9   know that as well.
10        A    Okay.  Yeah.  So back then, I was more
11   finance, accounting.  Had less other stuff.  As we've
12   progressed and grown, my roles you know, of
13   accounting finance is maybe 50 percent of time now,
14   used to be 75 back then.
15             But basically, from the accounting and
16   finance side of the world, you know, I'm ultimately
17   in charge of making sure that, you know, we've got
18   accurate and timely financial information.  You know,
19   I'm involved heavily with our banking and banking
20   relationships.
21             None of this is the day-to-day stuff.  I
22   don't do any day-to-day and back then, I didn't

Case 3:18-cv-00097-GEC Document 29-1 Filed 11/11/19 Page 24 of 142 Pageid#: 325

1  either, as far as, you know, AP/AR entry, those kinds
2  of things.  You know, I oversee and I run a number of
3  our financial reports, depending on what division or
4  business unit it is.  I may run it or we may have
5  someone like a controller, like we did with
6  Trae-Fuels where they're submitting that information
7  to me and our controller.  And we're looking it over
8  to make sure it looks good, it's timely, accurate,
9  those kinds of things.
10           I've got our -- another function is
11  treasurer role.  I'm a director and an officer, the
12  treasurer.  So I oversee cash flow.  A lot of our
13  investment accounts.  Relationships with those
14  investment accounts.  You know, general other things.
15           Overseeing our controller, making sure that
16  she's, you know, doing everything okay, setting her
17  goals.  Those kinds of things, to -- to make sure
18  that we're functioning well.
19           We meet on a monthly basis to talk about
20  the company, talk about accounting, how everything's
21  going, you know.  Audits, annual audits.  We do
22  annual audits, so oversee that.  I mean, in general,

Transcript of Kevin Whyrick, Volume I
Conducted on October 30, 2019                    18

```
 1    that's everything.
 2              Strategic side, a lot of my job now is
 3    strategy.  So as it relates to accounting and finance
 4    and financials, I -- I'm involved in a lot of the
 5    strategy relating to -- when we form companies or if
 6    we do an acquisition or something like that.  You
 7    know, making sure that everything's on track and we
 8    should -- you know, we're getting info like we
 9    should, we're set up like we should, those kinds of
10    things.
11       Q    Okay.  You said AP/AR entries.  Is that
12    accounts payable and accounts receivable entries?
13       A    Yeah.  Yeah.  I'm not -- I don't do any of
14    that.  But it is accounts payable and accounts
15    receivable.
16       Q    Okay.  Just trying to make acronyms --
17       A    Yeah.  We've -- we've got a lot of them.
18       Q    Okay.  So I just have a few questions, sort
19    of structurally, about Trae-Fuels and EnviroTech.
20    Some of these may be alleviated by the prior
21    discussion with your counsel.
22              So when was Trae-Fuels formed?
```

1      A    It was roughly -- I believe it was around

2   July of '13.  If I remember right.  We might have

3   formed the entity a little before that.  Maybe June,

4   July-ish of 2013.

5           Q    Who formed Trae-Fuels?

6      A    Our in-house counsel at the time was Chuck

7   Dixon.  He formed it, drew up the operating

8   agreement, filed the SS-4 with the IRS, those kinds

9   of things.

10          Q    Trae-Fuels is an LLC, correct?

11          A    Correct.

12          Q    Which, of course, that's the acronym right

13  after it, limited liability company, correct?

14          A    Right.  Yes.

15          Q    Who is the managing member?

16          A    Managing members were EnviroTech -- or

17  actually, ESI Ventures, which is a subsidiary,

18  wholly-owned subsidiary of EnviroTech.  That company

19  owned the -- owned 67 percent of Trae-Fuels.  John

20  Frink, who was GM, was also one of the managing

21  members.  Roger Knoph, our president of EnviroTech, I

22  believe, was considered a managing member through ESI

1    Ventures and EnviroTech.  I think that was the only

2    two actual managing members.  And then myself, I was

3    a manager of -- the accounting manager, actually, of

4    Trae-Fuels.

5         Q    Do you know what percentage Frink owned of

6    Trae-Fuels?

7         A    Yeah, he was 20 percent.

8         Q    So that takes us to what, 87 percent?  Who

9    were the other owners?

10        A    There were a couple of minority owners.  A

11   company out of Fort Collins.  I think it's called

12   Creekside Investments.  And then a couple of

13   individuals that had -- I think Chris Osborne was

14   one.  He has like -- so Creekside had 10 percent.

15   Then I think Chris Osborne has 2.  And R.V. Borkert

16   [phonetic] -- Borchardt or Borchhart has 1 percent.

17              And we've since -- we had since bought John

18   Frink's shares of Trae-Fuels out or his membership, I

19   should say.  We bought that out -- oh, it's been four

20   or five years ago.  So now EnviroTech, through ESI

21   Ventures, has 87 percent of Trae-Fuels.

22        Q    Okay.  Did EnviroTech -- let me back up.

1           Can you tell me, generally, what

2    Trae-Fuels' business was during that time period?

3         A    Yes.   They produced manufactured wood

4    pellets for home heating.  Originally, we had -- we

5    had formed the company to take it into Europe for --

6    they're converting coal-powered plants into bio-mass

7    fueled power plants.  We later -- we later have sent

8    these pellets out there.

9           But during this time frame, we were

10   manufacturing wood pellets and bagging those for home

11   heating in that New England, mid-Atlantic, kind of

12   northeast region of the country.  And those -- those

13   were used for pellet stoves that people have in their

14   homes.  They use it for heating instead of, say,

15   heating oil or something like that.

16        Q    How many physical locations does Trae-Fuels

17   have?

18        A    That was Trae-Fuels' only physical

19   location.

20        Q    A manufacturing plant in Bumpass, Virginia?

21        A    Yes.   Yes.   Yeah, we manufactured from raw

22   logs all the way down to the pellet.

1      Q    Okay.  And then can you generally describe

2   EnviroTech's business?

3      A    EnviroTech is -- primarily, we're in

4   deicing of roads and, you know, surfaces.  We do

5   parking lots, sidewalks, those kinds of things.  A

6   majority of our business is with government, DOT,

7   City, Department of Transportation, cities, counties,

8   commercial folks like snow -- people that do snow

9   clearing of parking lots, those kinds of things.

10          And in the off-season we do dust control,

11  road stabilization.  Similar client base.  We also

12  get involved with mining and oil and gas with dust

13  control.

14     Q    Did EnviroTech own other subsidiaries, like

15  outside its normal business, like Trae-Fuels at that

16  time?

17          MR. LIEBELER:  Objection.  Relevance.  It's

18  a 30(b)(6) witness on Donaldson's termination.  So

19  owning other businesses is way outside the scope of

20  the 30(b)(6) and it's not relevant to the lawsuit at

21  all.

22     Q    (By Mr. Jarrett)  Okay.  You can still

```
 1   answer the question with your personal knowledge.
 2        A    I'm trying to remember during that time
 3   frame.  We had -- we had formed an entity to
 4   purchase -- I believe it was prior to that, to
 5   purchase properties related to a plant facilities in
 6   Minnesota and Nevada.
 7             So basically, we formed an LLC to purchase
 8   the land for those -- those particular investments.
 9   The land and the equipment.  And then we built plants
10   for our dust control and deicing businesses at those
11   locations.
12             I believe that was it during that time
13   frame.
14        Q    Okay.  How many employees did Trae-Fuels
15   have?
16        A    During that time frame, that was early in
17   our -- that was the first year, really, of
18   Trae-Fuels.  So we probably averaged maybe 15, 20
19   employees at that time.  We weren't -- we weren't
20   fully up to max production during Michael's time at
21   Trae.
22        Q    When did Trae-Fuels start production?  You
```

1   said it was formed July of 2013.  When did Trae-Fuels
2   start making product?
3        A    We had to -- we had to kind of -- one, the
4   plant, we bought it, and so we had to get it
5   operating again because it had been shut down.  So we
6   got it operating.  We kind of streamlined it a little
7   bit.  So there was probably six months of that.  So
8   probably, you know, early 2014, I would say, maybe
9   January 2014 is when we actually started producing
10  pellets.
11       Q    Okay.  During that time period, how many
12  employees did EnviroTech have?
13       A    EnviroTech was pretty consistent.  We
14  believe probably were in that 95 to 105 range.
15       Q    Did the other entity that you mentioned
16  have any employees?
17       A    No.  No.  It just owned the land,
18  properties.
19       Q    Okay.  How was Trae-Fuels funded?
20       A    It was initially funded -- the acquisition
21  of the plant, was initially funded by the members.
22  And then we had loan facilities that we had gotten

| | |
|---|---|
| 1 | some longer-term, I believe they were five-year loans |
| 2 | with our bank, UMB bank.  And we used those for |
| 3 | additional equipment that we had to install for the |
| 4 | plant and property.  Any items to fix up those kinds |
| 5 | of things.  And we had a line of credit also with the |
| 6 | bank, so those were our funding mechanisms at that |
| 7 | point in time. |
| 8 |     Q    So who was entitled to Trae-Fuels' any |
| 9 | profits or loss? |
| 10 |         MR. LIEBELER:  Objection to the scope.  You |
| 11 | know, Jack, I think you're entitled to some |
| 12 | background of the witness.  We've been goings for 30 |
| 13 | minutes right now.  We have an agreed on-upon list of |
| 14 | topics on the 30(b)(6) notice and we've hit zero of |
| 15 | those 21 topics.  Who funded.  It's not relevant at |
| 16 | all to any issue in this case.  And it's beyond the |
| 17 | scope 30(b)(6). |
| 18 |         I'll allow him to answer this last question |
| 19 | but I'd like to move into the topics for which the |
| 20 | deposition was originally noticed. |
| 21 |         MR. JARRETT:  This is on the topic of the |
| 22 | relationship, contractual and otherwise, between |

```
1    Trae-Fuels and EnviroTech.

2              MR. LIEBELER:  No, it's not.  It's about

3    profits of Trae-Fuels which has nothing to do with

4    the relationship between an employment discrimination

5    case between EnviroTech and Trae-Fuels, who has the

6    profits has nothing to do with any of the issues with

7    the control or ownership, and direction of the

8    employees.

9              Mr. Whyrick, you can answer the question.

10   If you need it read back or --

11             THE WITNESS:  Yeah, can you repeat it

12   again?

13        Q    (By Mr. Jarrett)  Yeah, so what entities

14   were entitled to Trae-Fuels' profit or loss?

15        A    That -- that would be the members that I

16   mentioned earlier.  EnviroTech, Frink, and the

17   others.

18        Q    Did EnviroTech have access to Trae-Fuels'

19   bank accounts?

20        A    Yes, we did.  We -- they were under the

21   same bank.  Separate entity, separate accounts, all

22   that stuff.
```

1      Q    Okay.  So let's jump forward a little bit

2    to Mr. Donaldson's employment directly.

3           Who -- was EnviroTech involved in

4    Mr. Donaldson's hiring?

5      A    Yes.  Our HR manager, Beth Aleman, I

6    believe we had Beth, who worked for EnviroTech, I

7    think I was on the interview, Michelle Mills, maybe

8    Chris LaRocco, who's our business development, kind

9    of corporate strategy manager, and then John Frink on

10   the -- on the Trae-Fuels side, and I can't remember,

11   but maybe Clayton Walker was also in that

12   interview -- in those interviews.

13     Q    Okay.  Who provided Mr. Donaldson training,

14   if anyone?

15     A    There were a lot of us.  We brought him out

16   here to Greeley.  We had a third party IFS vendor.  I

17   think their name was Kogga [phonetic] at the time.

18   They -- we brought Michael in here for a week.  Had

19   Kogga's financial BA, who is an IFS expert in the

20   financial side, the financial side of IFS.  We also

21   had the manufacturing -- they call them BAs.  I think

22   they're business analysts or something that they call

1  them.

2          So we had the manufacturing person.  We had

3  the -- the financial person from Kogga.  We had

4  myself, Michelle Mills, Gohar Wise, Debby Vannest,

5  who has a lot of experience with costing, those kinds

6  of things, in IFS.  There was one other.  I can't

7  remember now.  I think that's it.  I seem to remember

8  someone else, but that's everybody.

9          So we -- we brought him out here for a

10  week, we trained him.  He went back.  I know that

11  Michelle and Gohar and even myself had regular

12  meetings with Michael on IFS-related items, as well

13  as our payroll system, which is -- I think was Paycor

14  at the time.  We sent Michelle, myself -- I didn't go

15  out as often as they did, but I went out there and

16  helped train on some things and talked about setup

17  and those kinds of things.

18          We sent Michelle, Gohar, Debby Vannest went

19  out there multiple times to help train.  Beth Aleman

20  went out there several times for the -- for the HR --

21  you know, HR file-type stuff.  There was a lot of

22  training involved for Michael on all different types

1    of things.

2         Q    Okay.  So when did the week-long training

3    occur?

4         A    That was -- I want to say that was maybe a

5    week or two into his employment.  We brought him out

6    here.  I think we gave him a couple of weeks to get

7    the lay of the land out there, and then we brought

8    him in to Greeley.

9         Q    And you mentioned that training consisting

10   of mostly about IFS; is that correct?

11        A    Yeah, a lot of it was IFS.  We did do some

12   non-IFS stuff as well, because he were here.  So, you

13   know, there was, like I said, the payroll system

14   through Paycor, you know, how to set up employees

15   when -- when they're hired, how to, you know, do

16   payroll runs and those kinds of things.

17        Q    Other than IFS and Paycor, what other

18   training was provided during that week-long period?

19        A    Trying to think if there were other

20   systems.  Obviously, there was a lot of work done in

21   Excel.  Michael tended to like Excel as well.  But

22   there wasn't anything, like, Excel training.  It was

1    more -- it was probably more related to financial

2    information that we wanted, you know, how to -- cash

3    flows.  The manufacturing costing formulas.

4            You know, just things that relate to

5    financial information, like score cards and those

6    kinds of things that we wanted to see.  There was a

7    lot of that training.  It wasn't in a system,

8    necessarily.  It was more what we want to see, the

9    items we have in Excel, those -- those different

10   things that we look for.

11      Q   Okay.  So other than that, IFS and

12   Paycor -- let me restate that.

13           So he trained with IFS.  He was trained on

14   payroll system, which I think is called Paycor, and

15   then he was trained with respect to financial items

16   that aren't in a particular system, but you guys use.

17   Was there any other training he was provided during

18   that week?

19      A   Probably not during that week.

20      Q   Okay.  Then you mentioned that Ms. Mills

21   is -- is Gohar Wise a woman?

22      A   Yes.

1      Q    Woman.  Okay.  Ms. Wise, Ms. Mills, and you

2    had some meetings with Mr. Donaldson later following

3    that period; is that correct?

4      A    Yeah.  I mean, that was -- that would have

5    been early in his career, so -- or in his time there.

6    So we -- you know, we met with him continuously from

7    that point on, whether it be over the phone.  We had

8    set up weekly meetings with him on training

9    questions, anything like that, and as I mentioned, we

10   sent people out there numerous times to help train.

11     Q    Okay.  When did you start weekly meetings

12   with him?

13     A    I think we started them fairly early, but

14   we didn't -- we didn't get -- we got other people

15   involved as needed.  And then when we started

16   noticing we were having issues with Michael taken --

17   you know, understanding what he needed to do and all

18   the information, how to do it, we involved more

19   people, like Chris LaRocco.  He's kind of a financial

20   analyst type person, and business development.

21          So he had a lot of good score card

22   knowledge, and he was trying to help Michael with

 1    that.  We brought -- we brought others in as needed.

 2    But I believe it was probably -- it was probably a

 3    couple of weeks after our original training that we

 4    started doing those.

 5            Can't -- I can't remember if it was weekly

 6    or monthly at that point.  I know we went to weekly,

 7    but I don't remember if it was biweekly or monthly,

 8    early on.  That part, I don't remember.

 9        Q    Were these trainings or were they just

10    meetings about his work?  What -- please describe,

11    generally, what these meetings were.

12        A    It was all of the above.  So training, if

13    he needed it.  You know, if he had questions on

14    things.  How to do things, which would be training.

15    Discussions on, you know, we had numerous discussions

16    on errors that he was making.  And trying to help him

17    understand how to correct those and not do them

18    again.

19            Michelle had a lot of calls.  A lot of

20    those discussions included Michelle talking to

21    Michael about, he had -- he started using redundant

22    systems where he was doing things offline and then

1    Trae-Fuels or EnviroTech?

2         A    No, we -- we've since shut the plant down,

3    so it's in a shuttered status, I guess.  We're in the

4    process of selling the plant.  It's been shuttered

5    probably for nine months to a year.  So Clayton, once

6    we shuttered that, Clayton got a different job.

7              He does -- he does consult, though.  We

8    were -- we were running -- we had quite a bit of

9    extra inventory in the plant.  So Clayton got

10   involved in some of the projects, even though he was

11   working for another company.  And he still does

12   today, if we have, you know, people have questions or

13   things that we need from a manufacturing standpoint.

14        Q    Okay.  Is Ms. Mills still employed by

15   EnviroTech?

16        A    Yes.

17        Q    Who made the final determination to

18   terminate Mr. Donaldson?

19        A    It was -- it was a group -- group of us.  I

20   think it was probably myself, Beth, John Frink,

21   and -- I think that was probably it.  We -- we had a

22   discussion -- we had several discussions about

1   Michael and that he was having a really hard time

2   grasping things.

3            And so we -- we kind of collectively got

4   together and said, It's just not working.  He's not

5   getting it.  We're not getting the info we need.  We

6   want to ramp this thing up.  We're going to do more,

7   not less.  So that group decided, Yeah, we just need

8   to let Michael go.

9        Q    Did you replace Mr. Donaldson?

10       A    We did.  We hired a -- a controller out

11   there.  I can't remember the individual's name.  But,

12   yeah, we did replace him.

13       Q    How long did that replacement work for

14   Trae-Fuels?

15       A    He was there -- man, I'm not a hundred

16   percent sure on the timelines.  I would say another

17   year or so.  And there was a point in time where

18   things started slowing down and we let him go.  And

19   we decided to absorb that and actually have Gohar

20   Wise, who's our assistant controller, we promoted her

21   to controller.

22            And we had her become the controller about

1   a year -- year, year and a half later, maybe, I

2   think.  And she went out there half-time and was here

3   half-time, and she was the controller until we shut

4   it down.

5        Q    Okay.  What was Mr. Donaldson's job duties

6   during his employment?

7        A    Mentioned a lot of them.  He did -- he was

8   in charge of the financials, making sure they were

9   accurate and timely.  That included making sure items

10  were input directly into the system.  We had an

11  individual that worked in the office, did the scale

12  house work.  She did a fair amount of input.

13            So he -- I don't think he over -- I don't

14  think he managed that person.  I don't remember, to

15  be honest, but he overseen to make sure all of that

16  was accurate and timely.  He was in charge of

17  payroll.  Making sure payroll was correct and timely.

18  He was in charge of the HR files.  General -- general

19  strategy items, like I talked about, relating to

20  financial score cards, cash flow statements, getting

21  things ready to deliver to the bank.  The bank

22  requires monthly reporting because we had loans with

1    them.

2            So he was in charge of putting that

3    information together.  He also was supposed to be the

4    one that got with John and the management team and

5    went over the financial information, discussed

6    manufacturing efficiencies and things from a

7    financial standpoint.  He was in charge of that.

8    Basic controller duties, as we kind of define them.

9        Q    He was in charge of the financials to make

10   sure they were accurate and timely.  He was in charge

11   of payroll.  Again, making sure it was accurate and

12   timely.  He was in charge of HR files.  He was in

13   charge of strategy, which involved cash flow and

14   score cards.  And he was responsible for going over

15   the financial information with, I guess, Frink?  Is

16   there anything else?

17       A    Frink and the -- and the management team,

18   which was the EnviroTech group.

19            Well, I mean, I could sit here all day and

20   list things within that controller duty.  You know,

21   inventory management's one of them.  It's going to be

22   hard for me to list.  Under a controller's duties,

Case 3:18-cv-00097-GEC Document 29-1 Filed 11/11/19 Page 44 of 142 Pageid#: 345

1    it's all financial-related items for that company,

2    which includes manufacturing costing, it includes

3    inventory management, those types of things as well.

4           So to sum it up into a brief group of

5    things, I would just say, it's all financial related

6    items within Trae-Fuels.

7      Q    So did Mr. Donaldson have the -- was he

8    responsible for deciding how much -- how many pellets

9    to produce or was that someone else's job?

10     A    No, a lot of that was driven --

11   market-driven, first of all.  So customers, you know,

12   who are we selling it to, what's their demand

13   schedule.  Michael was involved, but he wasn't the

14   one running the plant, so that team I mentioned

15   earlier, John, Michael, Clayton, they kind of

16   strategized in what should our production be, how

17   much are we going to make per month, how many shifts

18   do we need, those -- those things.

19          So he wasn't directly saying, We need to

20   make 5,000 tons of pellets this month, but he was

21   involved in helping strategize in that.

22     Q    Yes, that's what I'm trying to understand.

1    I get that he's responsible for financial reports and

2    accurate input.  Did he have any response -- what I

3    don't understand is what the controller is

4    responsible for as far as, like, strategic decisions.

5    What is that?

6          A      It -- as I mentioned with my job, you know,

7    a majority of it is going to be financial, cash flow,

8    inventory management protocols and efficiencies

9    within the plant related to costing.  But also

10   there's a strategy part as being a member of

11   management for that company that is beyond financial.

12         It's -- it's more so helping strategize

13   with that management team to say, Okay, we've got

14   this customer base.  We need to -- you know, we're

15   not -- we're not making money at this level, where

16   Michael would need to be in charge.  He never did get

17   to that point where he could say that.

18         But it's -- the controller's role to say,

19   We need to be producing this much in order to be

20   profitable.  And therefore, do we have the customer

21   base, you know.  Who's out there.  I think Christian

22   Bach was the salesperson at the time.  Who's out

1    there selling?  Is that customer base going to be big

2    enough in order for us to be profitable and be most

3    efficient from a plant standpoint.

4            And then -- and then you've got to

5    determine -- and that was -- that management team has

6    to determine, how many shifts do we need, you know.

7    Is it two.  Is it three.  If each shift -- and

8    Clayton had a lot to do with that and so did John

9    Frink, because he ran a wood pellet production

10   facility.

11           But Michael's role, the controller's role

12   is to be involved in a strategic standpoint to say,

13   you know, Hey, this -- this isn't going to make us

14   money.  Cash flow is going to be tight.  Running

15   models, you know, cash flow models, pro formas, those

16   types of things that are strategic in nature to make

17   sure that you understand as a business what you need

18   to do to be profitable.

19           And those were -- those were the strategic

20   expectations, not only from a controller, but from a

21   manager within the company.

22       Q    Okay.  So Mr. Donaldson did not have

1   experience in particular with pellets, correct?

2        A    No, I do not believe so.  He -- he

3   maintained he had experience in manufacturing

4   settings, but not with pellets.

5        Q    So your expectation was that he would

6   report -- get to look at financial information and

7   determine whether a course of action would be

8   profitable or not?  Is that right?

9        A    Yeah, based on financial models, cash flow,

10  expectations, volumes.

11       Q    So what information would go into those

12  cash flow projections?

13       A    Inventory movements -- sorry?

14       Q    Just, general.  I don't need like

15  super-specific.

16       A    Okay.  Ins and outs, so cash flow models.

17  You try to predict your cash in, cash out.  So that

18  would be sales and collection of sales coming in.

19  And then cost of goods.  Material costs.  Expenses.

20  Things like payroll going out.  And when you're a

21  startup like that, you have to project that on a more

22  frequent basis.

1           So you're projecting out a year, but you're

2    also projecting out a week, and sometimes daily.

3    Depending on the situation.

4           Q    Are those projections relying on sales

5    numbers?

6           A    More so -- sales, yes, but more so

7    collecting those sales.  So, you know, the actual

8    money coming in the door or in the bank account.

9    You're running the sales, but what's your time frame

10   on collecting that money.  Because they were on --

11   you know, the customers were not cash customers.

12   They were customers with terms.

13          So he would work with the salesperson.  He

14   would work with the plant.  We would work with John

15   Frink to say, Okay, I'm trying to project the cash

16   flow out a year, a month.  And Michael struggled with

17   this concept.  I mean, this is basic cash flow

18   principles.  He struggled a lot on that.

19          But basically, what you need to do is

20   you -- is you look out a month, and you say, Okay,

21   what do we think we're going to have in demand from

22   sales and do we have the inventory.  Is our cash

1    going to be coming in based on collecting that?  And
2    then how much are we going to be spending in cost of
3    goods and payroll and expenses?  And does that number
4    look positive or negative?  And if not, what do we
5    need to do to -- to make that number positive.

6            And obviously, if it was negative, you have
7    to go to management well ahead of time and say, Look,
8    our cash flow projections are negative.  We've got to
9    -- we've got to find another source of income,
10   assuming you didn't have enough revenue coming in.

11       Q    Isn't that cash flow relying on analysis of
12   potential sales?

13       A    Correct.  Yeah, the further out you look,
14   the more so, yes.  The closer, no, I mean, you're
15   pretty well knowing what you sold if you're looking
16   at it on a daily or weekly basis.  You're looking at
17   accounts receivable and how quickly they're going to
18   pay.

19       Q    And -- all right.  So you've got an
20   accounts receivable at work already done, and you
21   know you're going to get some -- paid for that at
22   some point.  Do you use that information to decide

Case 3:18-cv-00097-GEC Document 29-1 Filed 11/11/19 Page 50 of 142 Pageid#: 351

1  whether, you know, how the plant should operate over

2  the next month?  Accounts receivables determines how

3  the plant should operate?

4       A      Not current.  The future.  So in the case

5  of Trae-Fuels, and I -- my timelines, I don't

6  remember for sure which customers we had back then,

7  early on.  But we had one major customer that took a

8  majority of our pellets.  And they had demand.  They

9  would forecast their demand.

10         Because they were selling pellets into the

11  big box stores like Lowe's, Home Depot, you know,

12  those large home stores.  And different grocery

13  stores, those kinds of things, Ace Hardware.  And

14  they were sort of a broker, pellet broker, in that

15  industry.  And they were a majority of our revenue.

16         So based on their forecasts, you could --

17  you could say, Okay, revenue should be coming in

18  based on receivables in these months.  So in the

19  winter months, they're going to have a higher demand

20  than they are in the summer, because they're home

21  heating.

22         So you could look at that and say, Okay,

Transcript of Kevin Whyrick, Volume I
Conducted on October 30, 2019                    58

```
1    they're going to need 5,000 tons in January, 3,000

2    tons -- or 6,000 tons in February, whatever the

3    numbers were.  And you would say, All right, we know

4    we're going to charge them this, therefore, our

5    accounts receivable and our cash in should be X.  And

6    as you got further down and closer to that time frame

7    on a monthly basis, you had even better information

8    from the customer.

9              They would be saying, Yeah, we're going to

10   -- we need 3,000 tons within the next two weeks.

11   Okay, so you know, you're going to go billing them

12   for 3,000 tons in the next two weeks.  Therefore, if

13   they pay on a net 30 basis, you're going to get cash

14   at that point in time.  So you use all that

15   information to understand what that cash in looks

16   like.

17        Q    Okay.  You mentioned financial reports.

18   What responsibility did Mr. Donaldson have for

19   generating financial reports?

20        A    He had -- first and foremost, he needed to

21   make sure they were accurate before he sent them.  So

22   he had to watch out -- you've got an income
```

Transcript of Kevin Whyrick, Volume I
Conducted on October 30, 2019                          59

1    statement, balance sheet, cash flow statement that we

2    just talked about, bank required income statement,

3    balance sheet, inventory reports, receivable reports,

4    and what they call a bank borrowing base, because we

5    had a line of credit.

6              He had to make sure all that was accurate

7    and produce it in a report format.  So he would -- he

8    would run those reports and export them into Excel, I

9    believe, and then submit those both to us first,

10   because we wanted to make sure they were accurate

11   from our standpoint, you know, from a big picture --

12        Q    What do you mean by --

13        A    Go ahead.

14        Q    Sorry to break in, but what do you mean by

15   us?

16        A    It would have been Michelle, myself,

17   mostly.  We would be like a final check before he'd

18   send it to the bank.  And that's where we started

19   seeing kind of some issues with it, where some stuff

20   was missing and we'd be, like, hm.  We don't -- we

21   didn't do the day to days, but we seen -- when we've

22   been doing this long enough, we see -- we have an eye

1   They're all considered HR files, but they may not be
2   in the same file.
3        Q    Okay.  You're not sure about that, though?
4        A    No.
5        Q    Did Mr. Donaldson have any responsibility
6   for hiring employees?
7        A    He -- he was involved with the group to
8   hire them.  So it would have been Beth Aleman,
9   Michael, and John, and then whoever else was hiring.
10  If it was for the plant, it would have been Clayton.
11  So it wasn't one individual that would say, Yeah, I'm
12  hiring this person.  We have a group that interviews
13  them and does -- you know, does all that stuff, and
14  then they kind of decide as a group, Yeah, that
15  person's good.
16            And it varied.  It may not have been
17  involved in everything, because there was a lot of
18  hiring going on at the time.  So he might have only
19  been involved in certain types of hirings.
20       Q    Okay.  Do you know if he had any
21  involvement in terminating employees, making a
22  decision to terminate employees?

1       A     He might have had a say, but I doubt he was

2    the final call, unless it was someone that was under

3    him.  Typically, it's the supervisor -- pardon?

4       Q     I'm sorry.  I cut you off.  You can finish.

5       A     Typically, it's the supervisor and HR that

6    gets involved in that decision.  And sometimes their

7    manager.

8       Q     Did Mr. Donaldson have any subordinates?

9       A     I don't remember who was under him.  I --

10   there was a temporary employee at -- at one point

11   that he -- said he didn't need, but that person would

12   have been under him.  I can't remember if Fran was

13   under Michael or not.  I don't remember.

14      Q     Who is Fran?

15      A     Fran was the scale house office manager

16   person that kind of managed the ins and outs.  She

17   also was involved in putting information into IFS for

18   billing purposes.

19      Q     What do you mean by scale house?

20      A     At this facility, there were a lot of

21   trucks coming and going.  Logs trucks coming in.

22   Pellet trucks going out.  And there's a scale.  And

1   so she would -- she would weigh them, document it,

2   all of that stuff, as they came in and went out.

3       Q    Okay.  Did Mr. Donaldson have signing

4   authority on accounts payable checks?

5       A    No, I don't believe so.  I think it was

6   John Frink, myself, or Roger Knoph.

7       Q    Did Mr. Donaldson have the authority to

8   make a wire transfer without approval?

9       A    The way -- the way wires work is you

10  initiate the wire.  So I think he had the ability to

11  initiate a wire to say, Hey, we need to send this,

12  basically, that's all the info that goes into

13  initiate it, and then it required a secondary

14  approval to actually send it.

15      Q    Who was authorized to make that secondary

16  approval?

17      A    Typically, it was John, myself.  I believe

18  Michelle had some authority on that as well.

19      Q    But someone other than Mr. Donaldson had to

20  approve a wire transfer.

21      A    Yeah, you can't -- you can't have someone

22  submit it and authorize it.  That's a breach of

1    controls.  So you have -- he would do all the

2    submittals and someone else would authorize it.  It's

3    all -- it's all through the bank's website.

4        Q    I understand.  Did he have the authority to

5    approve someone else's submittal?

6        A    I don't remember.  I don't -- maybe up to a

7    certain dollar amount.  I can't recall a hundred

8    percent, though.

9        Q    Did Mr. Donaldson have the authority to

10   draw down the line of credit?

11       A    Draw down.  It's a sweep system.  So what

12   it -- what it would do is, it would sweep cash that

13   come into the account toward the line.  If we were --

14   if we were borrowing money, let's say, if we got cash

15   into the account, it would automatically sweep into

16   the line of credit.  And if we had more cash going

17   out than -- could the -- the bank accounts, what's

18   called a zero balance account, so it would sweep in

19   and out, based on check draws and payments that came

20   in.  So he wasn't physically calling and drawing down

21   on it.  His -- should I elaborate or is that all you

22   needed?

1     Q    I'm just trying to figure out who had the

2   authority to, I guess, borrow against or draw down

3   the line of credit.

4     A    As I mentioned, it wasn't a person calling.

5   It was a sweep system. Michael's job was to make

6   sure that we didn't overdraw that line of credit or

7   go above our borrowing base. But there wasn't

8   someone that had authority to do it, because it

9   automatically sweeps, you know what I mean?

10    Q    Okay. I think I understand.

11         When -- I guess -- did you have the

12   opportunity at any point to review, let's say, a

13   check that -- actually, strike that. Sorry.

14         So what, if any, decision-making authority

15   did Mr. Donaldson have with respect to Trae-Fuels'

16   committing money -- paying money out?

17    A    He -- he was the one that would say,

18   who's -- Here's who we should pay, based on the check

19   runs. He would -- he would do the check runs. You

20   know, he would be -- basically be -- be the person

21   that monitored who needed to be paid when. And how

22   much. Based on the -- the aging, those payable

1    agings and their due dates and those things.

2            So he'd be -- he would be in charge of

3    running those checks, and then either cutting the

4    checks for them to be signed.  It -- normally, you

5    don't -- again, from a segregation of duties

6    standpoint, you don't want the same person that's

7    cutting the check, signing the check.  I mean, that's

8    any company, not just us.

9            But so he would cut the checks, get them

10   all ready, say, here's who needed to be paid, and he

11   would either initiate the wire or ACH, or cut the

12   check, and someone would either approve the wire ACH

13   or sign the check.  Which typically, because of

14   the -- the -- John Frink was the person that was

15   there, he would be the one signing checks.

16           But we weren't there physically, so we

17   couldn't -- it wouldn't be cost-effective or timely

18   to have us try to sign them.  So John signed those

19   checks.  We would do the wire approvals and those

20   things back here, Michelle and myself.

21       Q    Okay.  So were there any decisions that

22   Mr. Donaldson could make to commit Trae-Fuels' money

1   without approval of a supervisor?

2        A    Yeah, I mean, if -- if it was due, he -- he

3   would make that decision.  We've got to pay this, and

4   we're running, you know, I've got to make sure that

5   this check's cut and signed so we can pay this

6   vendor.  So, yeah, I mean, he was in charge of that.

7             He was also in charge -- he didn't

8   physically sign the check, but he was the one that

9   said, We have to pay these things.  It wasn't John or

10  myself or Michelle that -- that decided who we paid

11  and how much.  It was Michael's job to do that.

12       Q    But these obligations that you guys paid,

13  they were incurred -- what are these, business

14  expenses?

15       A    Yeah, it would be anything.  You know,

16  logs -- logs that come in that we've got to pay for,

17  inventory, expenses, payroll, any of those things

18  that require you pay as a business.

19       Q    Right.

20       A    The loan -- the loans.

21       Q    So as far as operational items,

22  Mr. Donaldson was not responsible for deciding how

1    many logs to buy, correct?

2         A    Correct.  No.  He wasn't in charge of that.

3         Q    And he wasn't responsible for deciding

4    which obligation that Trae-Fuels incurred, right?

5              MR. LIEBELER:  Objection to the form of the

6    question.  Can you rephrase or if it's unclear, ask

7    him to do so, Kevin, but if you understand it, you

8    can answer.  I didn't understand it, so why don't you

9    rephrase it.

10        Q    (By Mr. Jarrett)  Do you understand the

11   question?

12        A    Well, I mean, it's pretty broad.

13             MR. LIEBELER:  Objection.  Broad.  Why

14   don't you just ask him the question.  It was really

15   confusing.  Jack, just start it and break it down

16   into pieces.

17        Q    (By Mr. Jarrett)  What obligations did

18   Mr. Donaldson have the authority to -- sorry.

19             I mean, what financial obligation did

20   Mr. Donaldson have authority to enter into on behalf

21   of Trae-Fuels?

22        A    It would have been payroll.  And he was the

```
 1    one -- he would have been in charge of making sure
 2    all the clocks, time, and things like that, and
 3    overtime was correct, so he -- he had the authority
 4    to say, Okay, here it is.  I need this to be correct
 5    and I'll pay it.  Anything relating to the accounting
 6    side of things.
 7              So if he brought in a temp or they -- you
 8    know, if he needed to bring in -- we had people --
 9    people that would come in and measure the inventory,
10    for instance.  Michael would be in charge of -- would
11    have been in charge of, you know, finding some of
12    those people and bringing them in to -- to help them
13    with certain things relating to either year-end or
14    accounting or those things.
15              So his -- his authority was mostly around
16    the accounting side, including payroll and any
17    accounting function, you know, hiring a -- an
18    accounting firm to help with certain things.  He --
19    he had the authority to do those types of things.  He
20    wasn't the one, though, that was in charge of
21    determining how much we produce, how many logs we
22    brought in.  How -- you know, whether we brought in
```

1    an engineer to help.  Those -- those were functions

2    that other departments had.  His was limited to his

3    accounting and financial functions.

4         Q    Do you know whether Mr. Donaldson ever

5    hired a temporary accountant to help?

6         A    I don't remember the timelines there.  I

7    know we brought in -- originally, we brought in

8    someone to help him.  I don't think -- I don't think

9    from a timeline perspective he had brought anyone in

10   to help there, but he might have been involved in

11   bringing someone in to help in the office and things.

12   I just don't recall the timing of it.

13        Whether he -- he got involved in actual --

14   person to help with accounting.  I know the one --

15   the one that's referenced in all the documents, he

16   and I had exchanged emails about bringing that person

17   on, and I said, Hey, do you need some help?  I think

18   it was when he announced he had pancreatitis, and I

19   had emailed him and said, Do you need some help?  We

20   can bring in a temp from Account Temps.  And he said,

21   Yeah, it sounds like a good idea.

22        So we kind of decided together on that one,

1    and then later, he said he didn't need her.  But that

2    one, he did help on.  I ended up doing -- calling

3    them and getting them out there, because he was -- he

4    was, you know, in the hospital.

5         Q    Okay.  And as far as -- so you don't

6    recall, other than the involvement you just described

7    with the one temporary accountant to help him.

8         A    Yeah.

9         Q    You don't recall if he hired anyone,

10   correct?

11        A    No, I don't recall.

12        Q    And then with respect to -- you said

13   payroll, he was responsible for ensuring that the

14   payroll was correct.  Did he have any responsibility

15   for scheduling workers' hours or was that someone

16   else?

17        A    That would have been the plant.  Like I

18   said, I don't know if he overseen anybody in the

19   office.  If he did, he would have been responsible

20   for their hours.  But I don't -- I don't remember

21   whether he -- he was Fran's supervisor or not.

22        Q    Okay.  So we've talked about the practices

Transcript of Kevin Whyrick, Volume I
Conducted on October 30, 2019                    77

1    and procedures that EnviroTech and Trae-Fuels used to

2    address employee performance, to the extent there

3    were any.  So what is -- what was Trae-Fuels' policy

4    for addressing deficient employee performance?

5         A    I'm not going to know all the specifics.  I

6    would just be highlighting general items.  But I'm

7    not the right person to ask on, you know, what was

8    the policy at that point and what were all the

9    procedures.

10        Q    Do you know whether there was like an

11   established policy for addressing employee

12   performance at Trae-Fuels?

13        A    Yeah, I believe so.  I wasn't -- I wasn't

14   over HR at the time, but I believe they had

15   procedures around counseling forms, write-ups, you

16   know, when you talk to an employee, you know, you'd

17   do a counseling -- a counseling form.  Those types of

18   things.

19             I don't remember the specifics, though, and

20   I'm not real sure on those, because I didn't manage

21   HR back then.  It was Chuck Dixon that did.

22             MR. LIEBELER:  I'll just make a

```
 1    for an employee is necessary?

 2         A    For --

 3              MR. LIEBELER:  Objection to form.  I want

 4    to be really, really clear.  You keep using the

 5    present tense and I want to make sure those questions

 6    are going to the past tense.

 7              And also, if you're making a distinction

 8    between Trae-Fuels and EnviroTech, the directive

 9    needs to be clear about what the questions are, so

10    reform your question so it's more specific, please.

11         Q    (By Mr. Jarrett)  So every single question

12    is about the time frame, unless I say otherwise, and

13    every single question, if there's a difference

14    between Trae-Fuels and EnviroTech, I've asked to you

15    identify that difference.

16              MR. LIEBELER:  Okay.

17         Q    (By Mr. Jarrett)  The question is, who

18    determined that a counseling form is necessary.

19              MR. LIEBELER:  Okay.  You asked previously

20    about Trae and the line of questions you just asked

21    about was EnviroTech, because he already testified

22    that he didn't know what the policies were with
```

1    respect to Trae.

2              And so if your question now is EnviroTech,

3    let's say it's EnviroTech so that it's clear for the

4    record.

5         Q    (By Mr. Jarrett)  All right.  This question

6    is to both.  Who determined that an employee

7    counseling is necessary?

8         A    Are you talking in general or about

9    Michael?

10        Q    In general.  So --

11        A    So Trae, I don't know --

12        Q    So --

13        A    Trae, I don't know.  Because I mentioned

14   that earlier.  EnviroTech, it would their supervisor

15   and HR would discuss and sometimes that supervisor's

16   manager would be involved.  They would -- they would

17   determine that.

18        Q    Okay.  And then you mentioned the employee

19   counseling form.  What is the purpose of the

20   format -- so I guess, did you only know about

21   EnviroTech, so you can say that, and let me -- let me

22   know.

1        A      The purpose is to let that employee know

2   that they're not performing well in their job duties.

3   And then specifically what those things are and how,

4   you know -- it needs to be a conversation on how to

5   correct that.

6        Q      Is an employee counseling form shown to the

7   employee?

8        A      Yeah, it is.

9        Q      Is it signed by the employee?

10       A      I don't recall on that.

11       Q      What happens to an employee counseling

12   form?  Is it placed in the file?  Actually, is it --

13   I think you testified it was shown to the employee.

14   What happens to the employee counseling form after

15   that?

16       A      For EnviroTech, I believe it -- I believe

17   it's put in their file during that time frame.  Trae,

18   it should have been the same process, but I can't

19   testify to that.

20       Q      Okay.  So you don't know what would happen

21   with the employee counseling form at Trae, correct?

22       A      Correct.  Not a hundred percent.

1        Q     Okay.  Other than employee counseling

2    forms, write-ups, and then you noted like, a

3    termination, are there any other documents that

4    EnviroTech used regarding performance at the time

5    frame?

6        A     Not that I recall.

7        Q     And then same question for Trae-Fuels.  Do

8    you know -- do you know the answer for Trae-Fuels?

9        A     No.  I wasn't involved in any of those

10   things at Trae.

11       Q     Okay.  Does EnviroTech have any, like,

12   formal meetings -- so let me rephrase this.

13             Did EnviroTech do, like, annual reviews or

14   any other types of nondocumentary performance

15   evaluations?

16       A     Yeah.  Annual reviews were documented.  Or

17   are.  And back then, they were.  They were twice a

18   year, and it was the employee and the manager would

19   sit down and go through a form.  One -- basically, a

20   form that had categories, like, communication and

21   teamwork and those kinds of things.  And they would

22   be ranked on a scale of, I believe, 1 to 5 back then.

1           And then they also have a section for the

2    goals for that employee, and that would be discussed

3    as to, Okay, here's how you did on this.  Here's how

4    you did on that.  And we did that -- we did that

5    twice a year at EnviroTech.

6         Q    What time period --

7         A    It would have been -- it would have been --

8    March -- we're on a fiscal year, October through

9    September.  So it would have been -- they would have

10   been done in April for the half year and in October

11   for the full year.

12        Q    Okay.  Did Trae-Fuels have annual reviews?

13        A    I don't remember.  I'm sure we were in the

14   process of installing them.  But as this was the

15   startup, I don't recall whether we got to that point

16   during that time frame or not.

17        Q    So you don't know whether Trae-Fuels --

18        A    No.

19        Q    -- did employee performance reviews during

20   that time period?

21        A    I don't recall.

22             MR. LIEBELER:  Kevin, just to remind you to

1    vague about it, as to when it was, how often it was.

2    And maybe, you know, give him the benefit of the

3    doubt. I don't know if he knew all that. But it was

4    very hard for us to pin down timing and things as far

5    as what that schedule looked like.

6           And -- and again, the whole idea was, Can

7    we get someone in here to help? And he kept saying

8    no.

9    Q    Okay. So how many times were there

10   communications where he was vague in explaining his

11   chemotherapy?

12   A    The whole time. I don't remember exactly

13   when, from when he was diagnosed and started doing

14   chemo to when he was let go, but he was pretty vague

15   the whole time, at least from my experience.

16   Q    Do you know whether Mr. Donaldson informed

17   Trae-Fuels and EnviroTech that he would need chemo --

18   he would need Fridays off for chemotherapy?

19   A    I don't remember when. No. That was one

20   of the things I had heard, that he had told me, but

21   it wasn't always the case.

22   Q    Did Trae-Fuels or EnviroTech have

1    attendance records for its employees?

2         A    Sorry.  Repeat that?

3         Q    Did EnviroTech or Trae-Fuels have

4    attendance records that would reflect when

5    Mr. Donaldson was at work or not?

6         A    Not for a salaried employee.  It would for

7    hourlies, yes, because they clock in and clock out.

8    Salaried employees, I do not believe we had -- I'm

9    pretty sure we didn't have a clock in, clock out

10   system or anything like that.

11        Q    For salaried employees such as

12   Mr. Donaldson, did you keep records of requested days

13   off?

14        A    Yeah.  There is a paid time off system

15   within the payroll system.  And if the employee asks

16   for that day off, then it would be approved by their

17   supervisor.  If they didn't show up, and didn't -- or

18   if they called in sick or something, just in general,

19   then that person -- then that person was supposed to

20   put that in the PTO system when they got back.

21             But they were always required to call in

22   and let their supervisor know they were sick or call

1    or text or whatever that they were sick or -- or

2    weren't going to make it in, those kinds of things.

3        Q    Okay.  Did you review any records such as

4    that to determine when Mr. Donaldson would be -- when

5    he missed work?

6        A    No.

7        Q    Okay.  So let's talk about Mr. Donaldson's

8    termination.

9             So what was the basis for Mr. Donaldson's

10   termination from Trae-Fuels?

11       A    That he -- he just didn't -- he wasn't

12   understanding the job.  He didn't have the ability to

13   do the things that we needed him to do.  Based on all

14   the mistakes and errors and inaccuracies.

15            The biggest -- one of the main reasons we

16   weren't happy was that he had -- he had allowed the

17   credit line, the line of credit, to overdraw.  So we

18   had a certain amount of money for a line of credit.

19   And he was in charge of letting us know cash flow and

20   cash flow needs and all that as I mentioned earlier.

21            Well, the line of credit overdrew, meaning

22   it went past its limit, and it was a pretty large

```
 1   number.  And the bank called us and said, Hey,

 2   what -- what's going on here.  You're -- you're --

 3   you know, you're overdrawn with your line of credit.

 4   What's going on.

 5            And we had to scramble as a group to -- to

 6   get cash -- I think EnviroTech ended up having to

 7   loan money or something in a short-term basis for us

 8   to get enough money in -- in the account to bring it

 9   back within line of its -- of its limit.

10            And when we had talked to Michael about

11   this, one, he had -- he had blamed everyone else but

12   himself.  But two, he -- he tried not to take, you

13   know, the blame or the accountability for allowing

14   this to happen.  And we -- we talked to him about,

15   Hey -- and I think in the counseling form, they

16   talked to him as well, Hey, this is your job.

17            You need to let us know when -- how much

18   cash we need and those things.  And that's a key job

19   as a -- as a controller.  We need to understand this.

20   And it's a huge no-no with the bank to allow a line

21   of credit to overdraw.

22            So that was a big part of our reasoning as
```

```
1    to why we let him go.
2        Q    Okay.  So not understanding the job, errors
3    and inaccuracies, and then there was a line of credit
4    overdrawn.  Is there anything else?
5        A    Yeah, just in general, as I mentioned, with
6    all the trainings, and you've seen all the -- my
7    observations.  He just was not getting it.  He wasn't
8    understanding.  He had maintained that he had certain
9    abilities and skill sets to be that controller when
10   we hired him.
11           And we weren't seeing those in him.  He
12   just didn't -- he didn't understand and didn't have
13   that strategic knowledge and ability to perform those
14   things.
15       Q    When did Trae-Fuels or EnviroTech first
16   inform Mr. Donaldson that he was not performing his
17   job duties adequately?
18       A    I don't know.  I'm not sure if there
19   were -- there were several discussions about that.  I
20   just don't know the timing or who did them.
21       Q    Okay.  As far as, like, errors and
22   inaccuracies, and that is talking about errors and
```

Transcript of Kevin Whyrick, Volume I
Conducted on October 30, 2019                    113

1   inaccuracies in financial reports?

2       A    Financial reports.  Cash flow reports.

3   Inventory logs.  All those things.  Even -- even some

4   payroll information was inaccurate or not timely.

5       Q    What payroll information was inaccurate or

6   not timely?

7       A    There was -- one of his jobs was to make

8   sure that managers within Trae-Fuels were -- that

9   their people were clocking in and clocking out

10  correctly and if they were taking breaks and stuff.

11  And there were several occasions where there would be

12  a non-clock-out, and so then he couldn't run payroll.

13          And he didn't understand why, and we'd have

14  to counsel him on, Well, you need to go back in the

15  system.  It tells you when there's not a -- when

16  someone hasn't clocked out or something like that or

17  they didn't clock in properly.  He -- it was his job

18  to go to those managers.

19          And there were several occasions where he

20  would try to run payroll and he couldn't.  And he

21  would call Michelle, and Michelle would walk him

22  through it again.  On several occasions.  She would

1     called him on his personal cell phone?

2          A     I don't remember having his personal cell

3     phone.  Typically, the ways I contacted him was at --

4     either his work phone in the office or his work cell

5     phone or email.  I don't remember ever having called

6     him on a personal phone.

7          Q     Do you know whether anyone at EnviroTech or

8     Trae-Fuels had contacted Mr. Donaldson on his

9     personal cell phone?

10         A     No, I don't remember one way or the other.

11         Q     Okay.  I guess, since you don't -- just

12    knowing what you know of sort of the cell phone

13    allegations with respect to Mr. Donaldson, are you

14    aware of any issue that EnviroTech and Trae-Fuels

15    had, you know, being unable to reach Mr. Donaldson

16    during that time period, with the cell phone being

17    left at work?

18         A     Not specifically --

19               MR. LIEBELER:  Objection.  There's no --

20    objection.  There's no foundation.  He just testified

21    that he didn't know about it and he heard secondhand,

22    so if want to ask him a specific question, you can,

```
 1    but he's already exhausted his memory on that.
 2         Q    (By Mr. Jarrett)  I just want to know if
 3    you're aware of a problem reaching him because his
 4    cell phone was left at work.
 5         A    No, not specifically because of that.  I
 6    don't remember anything around that.
 7         Q    Okay.  So EnviroTech and Trae-Fuels met
 8    with Mr. Donaldson on around June 4th, 2014, about
 9    his performance, correct?
10         A    Sorry.  Repeat that first part again?
11         Q    Yeah, actually, this might be a good time
12    for, like, a five-minute break.  We're going to go
13    through a few documents, and then we should be done.
14         A    Okay.
15              MR. JARRETT:  So we can go off the record.
16              MR. LIEBELER:  Okay.
17              MR. JARRETT:  Five minutes?
18              MR. LIEBELER:  Yes, why don't we go seven
19    minutes.  I'm actually -- just a little bit more
20    time.  So why don't we say seven minutes.  I'll try
21    to keep on the line here.  I'm on my cell phone.
22    I've got enough power here.  Okay.  Why don't we go
```

1  about seven minutes, if that's all right?

2            (Recess from 11:41 a.m. to 11:49 a.m.)

3            MR. JARRETT:  Okay.  Let's go back on.

4       Q    (By Mr. Jarrett)  So we just took a quick

5  break.  We're going to move on to some of these

6  exhibits.

7            So Mr. Whyrick, are you aware of whether

8  EnviroTech and Trae-Fuels met with Mr. Donaldson on

9  June 4th, 2014?

10      A    Can you be more specific?  I don't remember

11  the date.  I know -- I know there was a group that

12  went out there and did that counseling form with him.

13      Q    Okay.  That's the meeting I'm talking

14  about.

15      A    Okay.

16      Q    What -- what led to that meeting occurring?

17      A    Just that, you know, Michael was -- we had

18  gone through several -- you know, rounds of training

19  and we're still seeing issues.  We weren't getting

20  the info we wanted as far as -- there was a score

21  card involved at some point that we were wanting him

22  to -- to produce for the company.

Transcript of Kevin Whyrick, Volume I
Conducted on October 30, 2019                    126

1          Which included kind of -- kind of

2    consolidated some of the information we wanted, which

3    I think it included, like, cash flow and financial

4    information, maybe inventory and different things

5    like that.  So we were trying to get him to do

6    something there, and he was struggling with that.

7          So they had a -- a sit-down with him to let

8    him know that, you know, he wasn't getting this stuff

9    done, that he wasn't -- you know, he needed to be

10   more involved in the strategy and getting us this

11   information that we need.

12         So I think Chris -- Chris LaRocco had given

13   him like, a template of the score card or something

14   during that meeting as well.

15         MR. JARRETT:  Did we lose anybody?  My

16   phone is making noise, I'm sorry.

17         MR. LIEBELER:  That was me.  Can I make --

18   one question before were continue.  I just want to

19   make sure the record is clear, Jack.  Is there

20   anybody in your conference room with you or are you

21   just by yourself?

22         MR. JARRETT:  Yeah, I'm in my office, by

1    myself.

2              MR. LIEBELER:  Okay.  I wanted to make sure

3    that the record is clear of everybody of who was on

4    the line and parties.  Thank you.

5              MR. JARRETT:  Yes, no problem.

6         Q    (By Mr. Jarrett)  Okay.  So you mentioned

7    score cards.  Had -- when was -- what score card are

8    you referencing with respect to this June meeting?

9         A    Chris, I believe, if I remember right,

10   Chris had talked to Michael about things we wanted to

11   see as part of a score card financial, and

12   manufacturing score card that, as I mentioned,

13   consolidated a bunch of different things,

14   information-wise.  So that that could be sent out on

15   a regular basis to the key managers so they could see

16   how things were performing.

17             And we had -- we had -- you know, prior to

18   this, going back, I don't know, several weeks, we had

19   tried to form this and get Michael to get us this

20   information, and he was struggling with that as well.

21   So I think Chris, during this meeting, had said he

22   was going to get him a template of the score card

```
 1   that he kind of helped develop.  And for Michael to
 2   use.
 3           It was, like, a template for him to fill
 4   in, because he was having a hard -- Michael wasn't
 5   able to come up with this on his own.
 6       Q    Okay.  So is it your understanding that in
 7   that meeting, Mr. LaRocco provided Mr. Donaldson the
 8   template or is that after?
 9       A    I'm guessing it was after.  I'm not a
10   hundred percent sure on that.
11       Q    Okay.  And then is it your -- you're saying
12   that -- that Mr. LaRocco or others had asked
13   Mr. Donaldson to create this score card prior to the
14   meeting?
15       A    Yeah.  There were -- there were
16   conversations on what we wanted him to provide to
17   management leading well before then.  And we were
18   wanting him to develop a system with -- with Trae
19   management that -- that basically got us this
20   information in a -- in a -- sort of a summary or
21   consolidated format.  And he struggled with that.  So
22   I think this -- at this meeting, part of that
```

1    meeting, was Mr. Donaldson provided a list of items

2    on which he needed to improve his performance?

3         A    I -- I don't remember a specific list.  I

4    do remember the discussions afterwards relating to

5    score cards and, you know, some of the inaccuracies

6    in financials in cash flow statements and inventory

7    reports specifically.  I don't -- I never did see a

8    list of items that I remember.

9         Q    Okay.  Do you know whether during his

10   employment, Mr. Donaldson was ever provided a list of

11   items on which he needed to improve?

12        A    Yeah, there were times when -- when we

13   were -- throughout the process, especially early on,

14   where it was for training purposes, trying to come up

15   with lists with him as to say, Okay, here's what you

16   need to do.  These are the items you need to make

17   sure happen on a regular basis, and those things.

18             It would have been as we were meeting

19   together over the phone or stuff like that.  I -- I

20   don't recall who documented them or when or where,

21   whether they were sent emails or any of that stuff.

22        Q    Do you know whether Mr. Donaldson -- is it

1   your understanding that during the June 4th meeting,

2   Mr. Donaldson was informed that his overall

3   performance was not satisfactory?

4        A     Repeat that again?

5        Q     Sure.  Was it your understanding that in

6   the June 4th meeting, Mr. Donaldson was informed that

7   his performance was not satisfactory?

8        A     Yes.  That's what -- that's what they went

9   there for, and I -- as far as what I read in that

10  other document, they had stated that.

11       Q     Okay.  Do you know whether there were any

12  meetings prior to June 4th in which Mr. Donaldson was

13  informed that his performance was not satisfactory?

14       A     There were -- there were points in time

15  when John Frink had -- had mentioned to us that he

16  had talked to Michael on different occasions relating

17  to him not just throwing the financials on his desk

18  but them having meetings.  And that he needed Michael

19  to be the person -- that he was supposed to be the

20  expert on those financials.

21             So he was supposed to come in and meet with

22  John regularly, at least monthly, on those, to show

Case 3:18-cv-00097-GEC Document 29-1 Filed 11/11/19 Page 84 of 142 Pageid#: 385

1    where we're at.  Kind of, you know, those score cards

2    and different things.  And Michael was not doing

3    that.  So John Frink -- I wasn't involved in any of

4    those meetings, but I know John had told us that he

5    would get with Michael and say, Look, Michael, you've

6    got to do this.  I don't want you to just throw these

7    on my desk.

8           So specifically, I remember that.  There

9    were times when we had conversation with them saying,

10   Michael, you've got to do better than this.  It would

11   have been part of our phone conversations.  A lot of

12   times, it was, you know, You're not doing this right.

13   You need to do better.  Is there anything you don't

14   understand as to why you can't do this accurately.

15          So there were several of those occasions as

16   well.  As far as a written counseling situation like

17   they did in this, no, I don't think any of those were

18   sit-down, write down, put it on paper, saying, We had

19   this counseling session with Michael.  It was more

20   during his work time saying, Look, we're seeing these

21   issues.  You need to do this better.  How can we

22   help?  Is there training?  Is there -- you know, what

1    else?  And those were regular.  Those happened all

2    the time.

3            We typically, at EnviroTech, anyway, we

4    don't just write people up.  We try to solve problems

5    with employees over time to help them understand

6    their deficiencies and work through them.  Usually,

7    when we sit down and do a counseling form like this,

8    you're to the point that you're, like, this is -- You

9    aren't getting it.  We've got to -- we've got to sit

10   you down and really bring this home by -- by having a

11   written form.

12       Q    Okay.  So you mentioned some conversations

13   about -- I think it's you or your team were involved

14   in as far as Mr. Donaldson performing better.  Do you

15   recall saying that?

16       A    Yeah.  On multiple things.

17       Q    Yeah, and since these were conversations

18   that occurred prior to this June 4th meeting, right?

19       A    Yes.

20       Q    Would there be any documents to reflect

21   that those conversations occurred?

22       A    No, like I said earlier, we -- it wasn't

1    like we sat down and wrote this out into a form

2    saying, We had this counseling with you, Michael.

3    Typically, it was during our meeting -- our weekly or

4    monthly calls that we're seeing these issues.  Now,

5    Michelle may have -- there may be some emails out

6    there, I don't remember, that have -- to that effect,

7    that show that we were talking about these things.

8         But it wasn't like we physically sat down

9    with him and wrote it out, because we were in

10   Colorado, and he was in Virginia.  So most of the

11   time, it was on the phone.

12        Q    Okay.  And you said Mr. Frink had some, I

13   believe, meetings in which he talked about

14   Mr. Donaldson needing, I believe, giving him more

15   information about financials?  Is that right?

16        A    Yes.

17        Q    How did you learn that Mr. Frink thought

18   that Mr. Donaldson needed to get him more

19   information?

20        A    He told our group.  We had weekly meetings

21   with Mr. Frink, and later, we started bringing

22   Michael into these meetings.  Those meetings were

```
 1              UNITED STATES DISTRICT COURT

 2          FOR THE WESTERN DISTRICT OF VIRGINIA

 3                CHARLOTTESVILLE DIVISION

 4    ------------------------------------------------

 5    MICHAEL DONALDSON,                   :

 6                    Plaintiff,           :

 7              v.                   : Case No.:

 8    TRAE-FUELS, LLC, et al.,          :  3-18-CV-00097

 9    ------------------------------------------------

10    CONTINUED TELECONFERENCE 30 (b)(6) DEPOSITION OF

11                    KEVIN WHYRICK

12    ------------------------------------------------

13        Pursuant to Notice and the Federal Rules of

14    Civil Procedure, the teleconference deposition of

15    KEVIN WHYRICK, taken by Plaintiff, was held at

16        910 54th Avenue #230, Greeley, CO  80634 on

17                TUESDAY, NOVEMBER 5, 2019

18                AT 3:02 P.M. EST/1:02 P.M. MT

19

20    Job No.:  271490

21    Pages 210 - 262 Volume II

22    Reported by:  Caryn S. Keilman, RPR
```

1    know approvals, and so on expense related items, a

2    requisition has to be created first, then it needs

3    to be approved in the system in order to have a PO

4    made.

5              So, it wouldn't allow that, but if he

6    tried, which happened a couple of times to my

7    knowledge, he made a PO, a straight PO instead of

8    going through the requisition process, and those

9    were probably the corrections.

10             Like, I know Gohar had been working

11   with him on this and Michelle to say, look, you

12   can't do that, you have to go through the

13   requisition process.

14       Q     If you look at the last sentence, it

15   says:  When asked if that procedure of

16   implementation was executed, Mr. Donaldson stated

17   that he had not gotten around to it.

18             Can you explain what the procedure of

19   implementation means?

20       A     It's in that same paragraph?

21       Q     Yeah, the last sentence in that

22   paragraph that starts 6-18-14?

1          A      That's what I was talking about a

2    minute ago.  You have to follow that procedure on

3    an expense payable.  You have to create a purchase

4    requisition, that then has to be approved and then

5    it's turned into a PO.  So, that's what that

6    procedure of implementation would have been.

7          Q      You are saying he would have

8    intermittently do that but not every single time?

9          A      At times, sorry.

10         Q      You can go ahead.

11         A      There were times where he would instead

12   of going through the requisition process, he was

13   making a straight PO or he was slow to get it in.

14   You have to go through this, in order for it to

15   post in IFS, for financials to be accurate that

16   process has to be followed timely.  So that would

17   have needed to be done on a regular basis for

18   those various expense payables that were coming

19   in.

20         Q      Okay, and I believe your testimony was

21   that he had previously been directed to follow

22   this process, correct?

1          A      That would have been part of his

2     training, correct.

3          Q      Are you aware of any documents

4     criticizing him for not following the process

5     prior to June of 2014?

6          A      Not offhand, no.

7          Q      So, I believe one of the criticisms

8     that you guys had regarding Mr. Donaldson was that

9     his alleged or excuse me, his mismanagement of IFS

10    caused Trae-Fuels to draw on Trae-Fuels' line of

11    credit to pay for the company's general operating

12    costs.  Are you aware of that incident?

13         A      As I mentioned last time, it was an

14    overdraft on the line of credit.  The drawing on

15    the line of credit is why it's there.  You know,

16    you have a line of credit so you can draw on it

17    for needs and, as I mentioned last time, it's a

18    zero balance account.

19                What the criticism was, was the

20    overdraft of that line of credit.  It was drawn on

21    in excess of what was allowed at the bank.

22         Q      Can you just describe what caused that

1    overdraft?

2         A     The cash flow statements that we talked

3    about last time were not accurate, and so we

4    didn't know about this cash demand.  The idea of

5    cash flow statements were so that we knew what the

6    cash demand would be for the company and whether

7    or not we needed to fund in addition to what the

8    line of credit would allow for.

9         It caught us all by surprise when we

10   got a call from the bank that it had been

11   overdrafted.  As I mentioned last time, that's a

12   big no-no, according, you know, when it comes to

13   the bank.

14        So, his, Michael's problems with

15   understanding the cash flow statement and

16   accurately and timely bringing that cash flow

17   statement to us allowed that to happen.  We were

18   dependent on the Controller of the company to

19   provide that information on a regular basis.

20        Q     When did you receive the call from the

21   bank that the line of credit had been overdrafted?

22        A     I don't remember the date, it's too

1    long ago to remember that.

2         Q     Did you receive any documents from the

3    bank regarding the overdraft?

4         A     I don't remember.

5         Q     In your experience as an accountant, if

6    you over draft a line of credit, is it normal to

7    receive a document from the bank?

8         A     Typically the bank will call because we

9    have good standing relations with the bank.  So,

10   typically our loan officer would call and say,

11   hey, what's going on here?  It overdrafted your

12   line of credit, what do you want to do?

13        We had to scramble the funds up.

14   EnviroTech having to transfer money to the bank so

15   that we were back within line of that line credit.

16   So, typically, no, we wouldn't get an email or a

17   document, it would be a call.

18        Q     Do you know, I am trying to place this

19   on the calendar sort of, do you know how, I

20   believe that the overdraft must have occurred

21   before the June 4th counseling, right?

22        A     I don't remember.  I can't definitively

1    say.

2         Q    You say the cash flow statements were

3    inaccurate and that's what lead to the overdraft,

4    is that correct?

5         A    Yeah, they were inaccurate quite a few

6    times and in this case, they were inaccurate as

7    well.

8              So, we didn't know what was coming, and

9    if I remember correctly, we got those on like a

10   weekly and sometimes a daily basis depending on

11   cash need, inventory, inventory demand, those

12   things.  And so, if, you know, if we knew it was

13   getting tight, we would say hey, we want to look

14   at this daily so that we knew whether or not we

15   needed to fund or what we had at the line because

16   we did not want that to happen.

17             It caught us offguard because the cash

18   flow statements did not show that we would over

19   draft the line of credit, so, that means they were

20   inaccurate.

21        Q    What was inaccurate about the cash flow

22   statement that caused the overdraft?

1        A    From my memory, there were a couple of

2   things we were having issues with.  One was

3   correct the incoming cash, which I mentioned last

4   time from receivables and as you collect on those

5   receivables, that was inaccurate and the cash

6   outlays were not timely, so that would be any cash

7   outlay, whether it's for inventory, expenses,

8   labor, those kinds of things, it wasn't accurate

9   either.  So, that created, you know, more than one

10  reason for it to be out of whack, it wasn't

11  accurate.

12       Q    Specifically with the cash flow reports

13  that were inaccurate before that lead to the

14  overdraft, do you know what specifically was

15  inaccurate about those cash flow statements?

16       A    I don't remember exactly, but it would

17  have been one of those two things or both.

18       Q    How much was the overdraft?

19       A    I don't remember.  Just off the top of

20  my head, I think it was a million or more, but I

21  don't have that in front of me and I don't recall.

22       Q    Was there a particular payment that

 1    caused the overdraft?  Were you paying for

 2    inventory, were you paying for electricity?  Do

 3    you know what the payment was that, what the

 4    actual payment was that caused the overdraft?

 5         A    I don't remember, that was too long

 6    ago, I would have to go back to my records.

 7         Q    What records would show what the

 8    payment was?

 9         A    We would have to dig back into old

10    information to see if it was there, what was

11    available, emails, spreadsheets, those kind of

12    things.

13         Q    Do you know whether the overdraft

14    occurred while Mr. Donaldson was out on leave?

15         A    No, I don't think it was, I think it

16    was before that.

17         Q    So, I will represent to you that

18    Mr. Donaldson took leave between about May 15th,

19    when he learned of his pancreatitis and pancreatic

20    cancer and May 27th after he went to Utah and

21    adopted a baby.  You don't know whether, you tell

22    me, do you know whether the overdraft occurred

Transcript of Kevin Whyrick, Volume 2
Conducted on November 5, 2019                    231

1    during that time period?

2         A    Again, I can't remember the exact date,

3    so, I would have to go back and look and see when

4    that occurred.

5         Q    What would you look at, you said

6    emails, what else would you look at besides emails

7    to figure out when the overdraft occurred?

8         A    Well, we would have to go back and look

9    at the bank records of emails and what not.

10        Q    Just some clarifying questions,

11   Mr. Donaldson did not have responsibilities for

12   generating sales at Trae-Fuels, did he?

13        A    No, he did not.

14        Q    Mr. Donaldson was not responsible for

15   ensuring the plant didn't have mechanical problems

16   with its equipment, right?

17        A    Correct.

18        Q    There was an issue, do you recall an

19   issue with Trae-Fuels having a mechanical problem,

20   which turned out to be a crimped wire?

21        A    No, not specifically.

22        Q    Do you recall Trae-Fuels having issues

1    with the plant mechanical operation or its

2    equipment working properly?

3         A    Yeah, with a plant like that, you have

4    to schedule for downtime and so, you know, you are

5    going to have downtime in that process.

6              Whether it's scheduled or not

7    scheduled, if there was a problem, there could be

8    many a reason why the plant could go down at any

9    given time, it could be clogged mills, it could be

10   you know you got to clean out stuff, and the

11   further we got in, the more we tried to make that

12   preventative so we didn't have that downtime, but .

13   you are always going to have that in a plant.

14        Q    Was there a time that Trae-Fuels had to

15   make a capitol call to its investors to get

16   additional capitol?

17        A    Yes.

18        Q    How many times has that occurred?

19        A    I don't remember exactly.  It was more

20   than two, probably two to four.  EnviroTech ended

21   up doing more than that, but all investors, I

22   think it was in that two to four range.

```
 1        Q     Were the capitol calls before
 2   Trae-Fuels had overdrafted its line of credit or
 3   after?
 4        A     I don't remember.  I know the one, we
 5   had to scramble to do the one after it had
 6   happened, so EnviroTech ended up loaning the money
 7   to Trae because we had to transfer it across, so
 8   we had to account for that.
 9             I believe we had started a loan with
10   them, EnviroTech was loaning Trae money.  So
11   that's when we started doing that because we had
12   scrambled for that purpose.
13        Q     For that purpose, you are saying
14   because of the overdraft on the line of credit?
15        A     Correct.
16        Q     Do you remember whether EnviroTech had
17   made loans to Trae-Fuels prior to the overdraft?
18        A     Like I said, I don't remember the date
19   of that overdraft, so I can't pin it on when those
20   were loans were made or not, all I remember is the
21   one that happened right after the overdraft.
22        Q     Was this the only time that EnviroTech
```

1    or excuse me, was this the only time that

2    Trae-Fuels overdrafted its line of credit?

3         A    Yes, from my memory, yes.

4         Q    Can we go to Pages 43 and 44 of Exhibit

5    1, email from Mr. Donaldson to Michelle Mills

6    copying you, dated July 21st, 2014.  Do you see

7    that?

8         A    Yes.

9         Q    Please take a second to review this

10   email chain, it goes on to Page 44 as well.

11        A    I just read the first email from

12   Michael.

13        Q    Do you want to look at the next one,

14   the one from Michelle, it's about three lines.

15        A    Okay, I am good.

16        Q    I am trying to figure out, do you

17   think, is this email evidence of poor performance

18   by Mr. Donaldson or is this just day-to-day

19   communication?

20        A    It looks like day-to-day communication.

21        Q    Can we go to Page 58, it's the last

22   page, I think?

1          A     Okay.

2          Q     This appears to be Mr. Donaldson's

3     termination letter, is that correct?

4          A     I don't know, I have not looked at it.

5          Q     If you look at the last paragraph, it

6     says Michael had been warned with a written

7     warning about four weeks earlier and then signed

8     by the name Mr. John Frink?

9          A     Okay.

10         Q     What is the written warning this is

11    referring to?

12         A     I have no idea.  I didn't write the

13    email, so I don't know what John was writing

14    there.

15         Q     Can we go to Exhibit 3, which has been

16    previously marked as Plaintiff's Exhibit 3.   It

17    was not incorporated in the prior day's

18    deposition, but it should be incorporated in this.

19    Let me know when you get there.

20         A     I am there.

21         Q     All right.  Have you seen this document

22    before?

1              A      I don't recall, I haven't looked

2       through it.  I don't know if I have seen it or

3       not.

4              Q      Take your time and look through it and

5       particularly on Page 10, if that signature is

6       yours?

7              A      Yes, that's my signature.

8              Q      Do you recall reviewing this document?

9              A      Yes, I do.

10             Q      Can you go to Pages 4 and 5, starting

11      on 4 and going onto 5?

12             A      Okay.

13             Q      Looking at Question Number 5 and in the

14      response on Page 4, the second sentence of the

15      response starts, in May, 2014, more than six

16      months after he was hired and initially trained,

17      Mr. Donaldson was still unable to understand and

18      correctly use the company's IFS/accounting

19      software applications, which are crucial to the

20      company's operational success and a core function

21      of his position as Controller.

22                    What specifically was Mr. Donaldson

1    unable to understand and use with the IFS system?

2         A    We went over this in the last

3    deposition, there were a number of things.  The

4    IFS is an ERP system so it fully implements

5    everything from shop orders for inventory mixing,

6    to the purchase requisitions, purchase orders,

7    invoicing.  It's got a lot of functions.

8              As I mentioned last time, he had

9    struggled with the shop order functionality, the

10   inventory management functionality. He had, as we

11   had mentioned in the prior emails, he had some

12   issues with the timeliness and accuracy but also I

13   think from an understanding standpoint of the

14   purchase requisition and purchase order system.

15             There were a lot of things that he was

16   struggling with and some of them, the financial

17   reporting side of it, he had some hard times with

18   because he would send us inaccurate financials.

19             We would come back and say, hey, these

20   aren't accurate, and most of the time it stemmed

21   from the inventory management, expense management

22   posting correctly to the correct accounts, just

1  of Mr. Donaldson's employment, he would have been

2  directed to create cash flow analysis?

3       A    Yes, it would have been easier in the

4  early stages because we were just ramping up so it

5  would mostly have been cash out.  Once we started

6  producing pellets, that's when it required more

7  information, cash in, cash out and all of those

8  things.

9       Q    How often did Mr. Donaldson -- I am

10 sorry, let me rephrase.  How often was Mr.

11 Donaldson required to create cash analysis?  How

12 frequently is my question?

13      A    It varied.  We always had to have it

14 monthly, but when we were really watching cash

15 closely it would have been weekly or even daily

16 depending on the time of year and what we were

17 doing during that timeframe.  For sure, weekly.

18           I remember looking at them on a weekly

19 basis.  The monthly would have been more for the

20 financial reporting, the weekly would have been so

21 that we knew what was going on with cash during

22 that timeframe.

1        Q    Let's go to Plaintiff's Exhibit 2.

2        A    Okay.

3        Q    Do you know what this document is?

4        A    I have never seen it before, but I can

5    read, it says Termination Notice For Employee

6    Benefits.

7        Q    So, I will just ask you -- you have not

8    seen this document?

9        A    Not that I remember.

10       Q    Apart from this deposition, correct?

11       A    Not that I remember.

12       Q    Did Trae-Fuels provide its employees

13   health insurance?

14       A    They did.

15       Q    Did Trae-Fuels, did providing that

16   health insurance cost Trae-Fuels money?

17       A    Yes.

18       Q    Did the employee also have to pay a

19   portion of their health insurance?

20       A    Yes, I believe so.

21       Q    Do you know who provided the insurance

22   for Trae-Fuels' employees, what company?

```
 1          A      Factoring in this timeframe, I don't
 2    remember a hundred percent.
 3          Q      Do you know how the total cost paid by
 4    Trae-Fuels was determined?
 5                 ATTORNEY LIEBELER:   Objection to form,
 6    do you mean for health care costs?
 7                 ATTORNEY JARRETT:   Yes, I will
 8    rephrase.
 9    BY ATTORNEY JARRETT:
10          Q      Do you know how the cost Trae-Fuels
11    paid for the health insurance was determined?
12          A      Yes, every year we would go to renewal,
13    the company on here, Shirazi Benefits, is our
14    broker and they would go out and get quotes on
15    health insurance.   Trae-Fuels' policy was a
16    sub-policy under EnviroTech because EnviroTech
17    owned the majority of Trae-Fuels, it was a
18    sub-policy.
19                 So, they would go out and get quotes,
20    they would come back, we would take several
21    factors into account, is it the existing health
22    care provider?   Do they do a good job?   How much
```

1    is their increase, those things, and we would look

2    at that and say, all right next year, it's going

3    to be "X" per employee, you had four categories of

4    employees:  Employee, employee/spouse, employee/

5    children, and family.  Typical categories for

6    health insurance, and we would look at those every

7    year and say, okay, is health insurance going up

8    and if so, you know we would typically pass some

9    of that along to the employee and the company

10   would cover some of it, it varied by years.

11          It seems like health insurance always

12   goes up every year, but it would vary by year and

13   as to how much that would go up.  So, we would

14   divvy that up based on employee, those four

15   categories I mentioned, and what Market would

16   cover.  Market covered most of it, especially with

17   employee only.  Market and Trae, they would cover

18   a majority of the health insurance so employee

19   only would have a smaller amount come out of their

20   check on a monthly basis than say employee/family

21   because the costs are just different and higher.

22          Q    You said that contract -- excuse me.

1    So, I think that you used Trae-Fuels and

2    EnviroTech would get a new contract for health

3    insurance annually, is that correct?

4         A    It would be a new quote annually, yes

5    we would go through it.  I don't know that there

6    was a specific contract or something like that,

7    but we would choose who we were going with and we

8    would do that on an annual basis.

9         Q    Do you know what part of the year that

10   would occur in, the quote process?

11        A    We switched it at one point, but right

12   now it's a calendar year end, we start that

13   process, like right now we are going through it,

14   it's called open enrollment.  We would start that

15   process probably in September-ish and then we

16   would have everybody enrolled by the end of

17   November, then the new health insurance would kick

18   in as of January 1.

19        Q    Let's go to Plaintiff's Exhibit 6.

20        A    Okay.

21        Q    Are you a looking at an email from

22   Chris LaRocco from you and Beth Aleman on, it

1    looks like June 21st, 2014, is that the document

2    that you are looking at?

3          A    Yes, from me to Chris?

4          Q    I think it's from Chris to you and

5    Beth, it should be on the bottom right corner,

6    TRAE-PROD0008816?

7          A    Oh, you are right, it's to Kevin from

8    Chris, okay.

9          Q    So, in this email from Chris LaRocco,

10   it says Michael that had voiced a concern quote,

11   that he had never been informed of any performance

12   issues by John, and is therefore upset about the

13   manner in which the recent review and probation

14   periods were handed down, end quote.

15              Do you know whether Mr. Donaldson had

16   been informed of any issue by John Frink prior to

17   this email?

18         A    I only know what I was told by

19   Mr. Frink in discussions he said he had with

20   Michael.

21         Q    But Mr. Frink said he had discussed, I

22   guess, Mr. Donaldson's poor performance with him?

1          A       Correct.

2          Q       Do you know whether anyone had any

3     communications with Mr. Donaldson saying you're

4     wrong, Mr. Frink did warn you?

5          A       No, I don't recall whether that

6     happened or not.

7          Q       Can you go to Plaintiff's Exhibit 8.

8     It's a document that should be in the bottom

9     right-hand corner, TRAE-PROD 0003612, it's a

10    two-page document?  Do you see that?

11         A       I do.

12         Q       So, this is, there is not signature

13    here, it looks like it's an email from Beth Aleman

14    to Michael and you as well, discussing some

15    processes as far as a new employee starting.  Do

16    you see that?

17         A       Yes.

18         Q       Do you know whether Mr. Frink directed

19    employees to start working for Trae-Fuels before

20    they had all of their insurance documents

21    submitted?

22         A       No, I don't recall, I don't recall any

# EXHIBIT 3

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## CHARLOTTESVILLE DIVISION

|  |  |
|---|---|
| MICHAEL DONALDSON, )<br><br>Plaintiff, )<br><br>v. )<br><br>TRAE FUELS, LLC., et al. )<br><br>Defendants. ) | Case No.: 3:18CV00097 |

## PLAINTIFF'S SUPPLEMENTAL OBJECTIONS AND RESPONSES TO DEFENDANTS' INTERROGATORIES AND DOCUMENTS REQUESTS TO PLAINTIFF

Plaintiff Michael Donaldson, by and through undersigned counsel, hereby provides his objections and responses to Defendants' Interrogatories and Document Requests as follows:

### INTERROGATORIES

1. Describe in detail the time and manner in which you informed your employer that you had been diagnosed with cancer. Your answer should include, but not be limited to, a description of all verbal communications with any other person in your workplace regarding your diagnosis.

**OBJECTION:** Plaintiff objects to the request as vague in that "all verbal communications with any other person in your workplace," could mean conversations Plaintiff had or conversations any employees had. Plaintiff further objects to the request to the extent it is unduly burdensome in that the benefit of describing all conversations regarding Plaintiff's diagnosis does not justify the burden of describing each such conversation with individuals who had no supervisory

May 15, 2014 to August 20, 2014.

**RESPONSE:** Mr. Donaldson's physicians did not impose any physical restrictions on him other than to instruct him to undergo chemotherapy which was first scheduled on July 3, 2014. Mr. Donaldson took chemotherapy on three Fridays a month and took time off of work to attend those appointments. Mr. Donaldson was able to make up the time off during the prior four days in his workweeks.

3. Identify and describe in detail all negative symptoms or conditions experienced by you as a result of your cancer and subsequent treatment. Your answer should include, but not be limited to, a specific description of how any such symptoms or conditions affected your ability to perform your work for the Company.

**RESPONSE:** Mr. Donaldson suffered from abnormal cell growth in his pancreas. To treat this, Mr. Donaldson underwent chemotherapy and was thus forced to work a modified schedule. Mr. Donaldson responded well to the chemotherapy which he took on Fridays and the primary symptom he felt after chemotherapy was a lethargic feeling on Saturdays or on Sundays.

Mr. Donaldson also suffered from blood loss because the tumor on his pancreas blocked the splenic artery which caused blood to flow around the tumor to portal veins that ruptured. Mr. Donaldson had to get blood transfusions to treat this blood loss. The first blood transfusion Mr. Donaldson received was on March 25. A week later, Mr. Donaldson had another transfusion. The next transfusion was in July during the period Mr. Donaldson was undergoing chemotherapy. From July through November 2014, Mr. Donaldson continued to receive blood transfusions, originally once a month and then once every two weeks through October to

3

Donaldson's monthly financial statements had to be approved by Mr. Whyrick and/or Michelle Mills, his subordinate.  Mr. Whyrick approved Mr. Donaldson's work and rarely had many additions.

Mr. Frink periodically praised Mr. Donaldson's performance with comments like "good job."

5.  Describe in detail all verbal and written communications you exchanged with the temporary accountant referred to in ¶ 44 of your Complaint.

**OBJECTION:** Mr. Donaldson objects to the request for communications between him and the temporary as irrelevant and disproportionate to the needs of the case given the lack of importance of resolving the issues in this case.  Subject to and without waiving the foregoing objections, Mr. Donaldson recalls that when he got out of the hospital following his pancreatic cancer and pancreatitis diagnosis, Kevin Whyrick informed him that they hired the temporary accountant and that Mr. Donaldson was supposed to train her.  Mr. Donaldson then returned from the trip to adopt his child and met the temporary accountant.

Mr. Donaldson does not recall the specifics of any written or verbal communication with the temporary accountant.  On Monday, May 27, 2014, Mr. Donaldson began training the temporary accountant.  Mr. Donaldson is not positive what aspects he started training her on first but believes he showed her the general ledger and chart of accounts, and also how payroll and accounts payable worked.  Over the next several days, Mr. Donaldson showed her how to do the tasks he knew how to do as he performed them, and he also watched her perform some of the tasks.  Mr. Donaldson also showed her the ERP system and how to make entries.  Mr. Donaldson also believes that he provided her some EnviroTech materials regarding work procedures.  Mr.

long-term but Mr. Frink relayed the final decision to release her to her. Mr. Donaldson was not aware of the date of the temporary accountant's last day and thus did not provide this information to her.

7. Describe in detail all difficulties you had in operating and understanding the Company's IFS system. Your answer should include, but not be limited to, a detailed description of each instance in which you requested assistance and/or clarification from another employee or supervisor related to IFS and / or those instances in which you requested or were required by the Company to engage in further training on the IFS system.

**OBJECTION:** Plaintiff objects to the request in that the phrase "difficulties in operating and understanding the Company's IFS system," is undefined and, for instance, could encompass irrelevant technical difficulties unrelated to Plaintiff's performance. Subject to and without waiving the foregoing objection, Plaintiff states that he did not have any difficulties operating and understanding the IFS system after he was trained on it and only had day-to-day discussions with colleagues about general questions or confirmation that he was performing tasks correctly. Plaintiff went to EnviroTech's Colorado office to engage in IFS training in November 2013 to learn the structure and functionality of the system, which was similar to other enterprise resource planning ("ERP") systems Mr. Donaldson worked with in prior jobs. ERP systems allow companies to track various information, including accounting and inventory information. In this training, an IFS consultant showed Mr. Donaldson the various functions and modules of the IFS system and how to operate each. Mr. Donaldson believes that this training was done using hypothetical information and was not specific to Trae Fuels which was not operational enough to provide information to use to train on IFS.

7

8. Identify each and every occasion in which you took leave from the Company and did not inform your supervisors and / or co-workers regarding the duration of your leave.

**OBJECTION:** Plaintiff objects to this request as irrelevant. Subject to and without waiving the foregoing objection, Plaintiff states that on March 25, 2014, Mr. Donaldson lost half his blood supply and took leave and was hospitalized in the intensive care unit. The next morning, Mr. Donaldson called Mr. Frink from the ICU, while his wife held the phone, and took leave and told Mr. Frink what had happened and that he had been hospitalized. Mr. Donaldson did not tell the company the duration of his leave because he did not know how long he would be hospitalized. Mr. Frink and Clayton Walker visited Mr. Donaldson in the hospital on March 26.

When Mr. Donaldson was hospitalized on May 19, 2014 with the incorrect pancreatitis diagnosis, he again was unable to tell Mr. Frink how long he would need leave.

Mr. Donaldson did not otherwise request leave without informing his supervisors how long he would be out of the office.

9. Describe in detail all "high-level tasks" which you were asked to perform and the related "greater role" you were asked to take on as described in ¶ 74 of your Complaint.

**RESPONSE:** Plaintiff states that Mr. LaRocco and Ms. Aleman directed him to take charge of reducing Trae Fuels's spending and essentially force Mr. Frink not to spend money he had been spending to fix problems in the plant and keep it operating. Mr. LaRocco and Ms. Aleman also directed Mr. Donaldson to do more to explain the financial reports to Mr. Frink, although Mr. Donaldson had already been explaining the company's financial position to Mr. Frink and did not have the authority to direct Mr. Frink's spending.

immediately hired a temporary accountant upon Mr. Donaldson's hospitalization on May 19, 2014.

When Mr. Donaldson returned to work, on Tuesday, May 27, 2014, Ms. Aleman unfairly criticized him for leaving his work cell phone in the office while he traveled to Utah to adopt his child. This criticism was unjustified because Mr. Donaldson had left his phone to be fixed because it was malfunctioning and his supervisors knew he was available on his personal cell phone, which they had used to communicate with him prior to this time.

Mr. Donaldson's supervisors asked him questions about his pancreatic cancer and about its potential effect on the company. Mr. LaRocco asked Mr. Donaldson if he planned to work part-time and stated "your wife must have good insurance." Mr. Whyrick asked Mr. Donaldson if his cancer was slow or aggressive. Mr. LaRocco mentioned that his aunt or great aunt had died from pancreatic cancer.

When the company terminated Mr. Donaldson, it did so without having provided him written or verbal discipline or providing him an opportunity to improve his supposedly deficient performance. The company provided other employees such warning or opportunities to improve. During Mr. Donaldson's termination meeting, Mr. Frink claimed that Mr. Donaldson did not fit the company culture even though he had never raised that issue prior to the meeting.

12. Describe in detail each and every fact in support of your contention in ¶ 104 that the Company "refused to engage in an interactive process to identify reasonable accommodations."

**OBJECTION:** Plaintiff objects to this request as unduly burdensome and disproportionate to the needs of the case in that both parties have access to the same facts from which to draw the legal

11

c.  Plaintiff is entitled to damages for lost insurance benefits in the amount of $16,000.20

When Defendants terminated Plaintiff, he lost his insurance and had to purchase replacement insurance through his wife's employer.  In 2014, this caused Plaintiff to have to pay an additional $6,000 deductible (he had already paid his deductible on his EnviroTech and Trae Fuels insurance).  Additionally, Plaintiff has had to pay an additional $166.67 per month from January 1, 2015 to present for insurance coverage through his wife.  Over sixty months through December 31, 2019, this totals $10,000.20.

d.  Plaintiff is entitled to emotional distress damages in the amount of $300,000.

Plaintiff experienced significant emotional distress as a result of his unlawful termination that Plaintiff calculates to exceed the caps on damages available under the Americans with Disabilities Act.  Plaintiff thus calculates his damages at the maximum available pursuant to those caps.

e.  Plaintiff's damages include pre- and post-judgment interest and attorney's fees, and may include expert witness fees, costs, and expenses.

Should Plaintiff prevail, the Court will award pre and post-judgment interest on the award. The Court may also award attorney's fees. Those fees are not relevant until Plaintiff prevails, however, at which point the parties will have the opportunity to contest Plaintiff's fee petition.

14. Identify each person who contributed the facts set forth in your answers to these Interrogatories, identify which Interrogatory he/she contributed the facts for, and

13

EnviroTech Logistics Analyst.

Plaintiff believes Ms. Vannest has first-hand knowledge of the relationship between EnviroTech and Trae Fuels and general knowledge of Plaintiff's employment, performance, and termination.

g.  Michelle Mills
    EnviroTech Corporate Controller

Plaintiff believes Ms. Mills has first-hand knowledge of the relationship between EnviroTech and Trae Fuels and general knowledge of Plaintiff's employment, performance, and termination.

h.  Gohar Wise
    EnviroTech Assistant Controller

Plaintiff believes Ms. Wise has first-hand knowledge of the relationship between EnviroTech and Trae Fuels and general knowledge of Plaintiff's employment, performance, and termination.

i.  John Frink
    Trae Fuels General Manager

Plaintiff believes that Mr. Frink has first-hand knowledge of Plaintiff's employment and performance, the relationship between EnviroTech and Trae Fuels, and the reasons for Plaintiff's termination.

j.  Fran Holliday
    Trae Fuels Office Manager

Plaintiff believes Ms. Holliday has general knowledge of the relationship between EnviroTech and Trae Fuels, Plaintiff's employment, performance, and termination.

k.  Clayton Walker
    Trae Fuels Plant Manager

Plaintiff believes Mr. Walker has general knowledge of the relationship between EnviroTech and Trae Fuels, Plaintiff's employment, performance, and termination.

l.  Chris Bach
    Trae Fuels Sales Manager

EnviroTech and Trae Fuels have not claimed that Plaintiff was unable to perform the essential functions of his position.


17. Describe in detail the June 4, 2014 meeting between you and Trae Fuels / EnviroTech employees.

**RESPONSE:** Plaintiff met with Mr. Frink, Mr. LaRocco, and Ms. Aleman. Mr. LaRocco and Ms. Aleman did not criticize Plaintiff's performance in the meeting, instead, the meeting was about Trae-Fuels's profitability and what Mr. Frink needed to do to ensure Trae-Fuels was viable. Ms. Aleman led the meeting and said that Trae-Fuels was running out of cash. Ms. Aleman stated that they had to go back to Trae-Fuels's owners and obtain additional capital due to lack of probability. Ms. Aleman instructed Mr. Donaldson to perform cash flow projections for Mr. Frink and to do more to ensure Mr. Frink made better financial decisions. Mr. Donaldson replied that he did push back on Mr. Frink but that Mr. Frink was the General Manager and that he did not have signing authority to authorize cash expenditures or draw down on the company line of credit. Those spending decisions had to be authorized by Mr. Frink, Mr. Whyrick, or Roger Knoff of EnviroTech. Mr. LaRocco and Ms. Aleman asked that Plaintiff perform more high-level tasks and that he take on a greater role in instructing Mr. Frink on financial matters. Plaintiff does not recall any complaints about him other than the trivial telephone issue Ms. Aleman raised.


18. Describe in detail all efforts you have made to obtain employment since the termination of your employment at Trae Fuels.

**SUPPLEMENTAL RESPONSE:** Following Mr. Donaldson's termination within a week or so, Mr. Donaldson contacted Solomon Edwards, an accounting contracting company he had

Fredericksburg, Virginia area to include temporary contractor positions that were scheduled to last at least six months. Mr. Donaldson believes he has applied to a handful of these positions, but he has not found many. Mr. Donaldson did not receive any job offers for these positions.

On July 10, 2017, Mr. Donaldson had another telephone interview for a controller position with IDX. Mr. Donaldson interviewed for the same position on June 27, 2018. Mr. Donaldson did not receive a job offer following either interview.

Mr. Donaldson had a telephonic interview for a Senior Controller position with Qiagen, a company in Germantown, Maryland, on September 26, 2018 but did not receive an offer. Mr. Donaldson also interviewed for a CFO consulting position on January 8, 2019 with B2B, but again did not receive an offer.

Mr. Donaldson also periodically spoke with recruiters from staffing companies who looked for positions for him.

For records of his job search, Mr. Donaldson refers Defendants to his document production in this case.

19. Describe in detail each occasion upon which you participated in counseling, reprimanding, or terminating a Trae Fuels employee. Your answer should include, but not be limited to, the name of the employee, a description of any job performance issues related to the employee, and the result of the process (i.e., reprimand, probation, termination, etc.).

**OBJECTION:** Mr. Donaldson objects to the request as unduly burdensome and irrelevant in seeking detailed descriptions of irrelevant discipline against other employees. Subject to and without waiving the foregoing objection, Mr. Donaldson states that he believes he sat in on five to ten meetings in which Trae Fuels plant employees were counseled, reprimanded, or fired. In these

attorney-client privilege or work product doctrine. Subject to and without waiving the foregoing objection, Plaintiff will produce responsive documents.

4. Produce all documents related to your job performance.

**OBJECTION:** Plaintiff objects to the request to the extent it seeks information protected by the attorney-client privilege or work product doctrine. Plaintiff objects to the request as unduly burdensome in seeking all documents related to his job performance, which encompasses any number of documents without probative value in this case. Plaintiff will produce all documents he received from Trae Fuels or EnviroTech concerning his job performance.

5. Produce all documents you intend to offer as exhibits at trial.

**OBJECTION:** Plaintiff objects to the request to the extent it seeks to impose standards that are different than the Scheduling Order in this matter. Subject to and without waiving the foregoing objection, Plaintiff will produce responsive documents.

6. Produce the "waiver of liability form" referred to in ¶ 56 of your Complaint.

**RESPONSE:** Plaintiff does not have the form in his possession, custody, or control.

7. Produce the chemotherapy schedule referred to in ¶ 78 of your Complaint.

**RESPONSE:** Plaintiff does not have the form in his possession, custody, or control.

8. Produce all communications with persons outside the Company in which you describe limitations on your ability to perform your job responsibilities with Trae Fuels. Your response

## CERTIFICATE OF SERVICE

I hereby certify that on September 27, 2019, I served the foregoing document by First Class

Mail and email, on:


Jackson S. Nichols, Esq.
Cohen Seglias Greenhall Pallas & Furman PC
1828 L. Street, N.W.
Suite 705
Washington, D.C. 20036
(202) 466-4110
JNichols@CohenSeglias.com

Lars H. Liebeler, Esq. *(admitted pro hac vice)*
Lars Liebeler PC
1828 L. Street, N.W.
Suite 705
Washington, D.C. 20036
(202) 587-4747
LLiebeler@LHL-LawFirm.com


Respectfully Submitted,

/s/Jack Jarrett
Jack Jarrett (VSB #86176

23

# EXHIBIT 4

**To:**      Kevin Whyrick[kwhyrick@envirotechservices.com]
**Cc:**      Michael Donaldson[mdonaldson@traefuels.com]
**From:**  Michael Donaldson
**Sent:**   2013-12-26T11:46:16-05:00
**Importance:**    Normal
**Subject:**  Re: October 2013 - Journal Entries attached
**Received:**        2013-12-26T11:46:16-05:00
<u>October 2013 - Journal Entries - Reclass.xlsx</u>

Good Morning Kevin,
I hope that you had a great Christmas.

I'm back from North Carolina and in the office early this morning. I'm sure you're finding this a great time to catch up on things when the phones aren't ringing and others (both internal and external contacts) are out.

Please find attached the October 2013 Journal Entries that I'm going to make so far. I've highlighted in yellow some items that you might just want to take a good look at (either questions, proposed accounts or explanations).

When you have a moment early in the day today, could you please give me a call to discuss the following?


1) What I'd like to do is print out a complete detail general ledger (transactions for the month of October) to review, just to see if things look good. I find it a great tool to take a look at the monthly transactions by account to see that everything is posted to the correct account, missed any accruals, or reversals, etc. Want to make sure I have all the entries I need for October in. Not sure exactly how I run this report, but I've looked and have an educated guess.

2) Is there a inquiry that will give me the G/L balance per account only? I did look at the GL Balance analysis and it seems to give me by period the net debits/credits and net activity for the month, but not the ongoing balance. It may be that is has to be run out of the GL Trial balance Inquiry.

3) After this I'll be ready to enter the JE's and close out October. I may need you to walk through one JE with me (In case there are some quirks or things indigenous to IFS), then I'll enter the rest. I would guess we might have to open the Period 1 for GL to book the entries and then close it after the fact???? We can walk through that as well.

4) After JE's are entered, I'll need to run reports (Income Statement, Balance Sheet), not sure if you run a monthly T/B, G/L, GL Transaction Report????? I haven't seem an ERP system that can produce a Statement of Cash Flows, so if IFS can do it, it will be the first.

5) After being satisfied with all the JE's and reports (presentation) we can close out the month officially. May need you to walk me through that as well. You mentioned that is was an easy process that takes a couple of right clicks.

6) Are there "formal Balance Sheet Account General Ledger Reconcilations" done for 9/30/2013? I'm sure that the auditors would have wanted to review them. If you have them, could you please send them to me? If there were any reconciling items on the 9/30/2013 recons, I want to make sure that they have/or will be taken care of in October 2013.

7) Additionally, I want to start preparing the recons for October 2013 (all balance sheet accounts and some expense accounts) that auditors generally look at. Also, I want to keep a master excel worksheet of "reconciling items" by account, dollar and days outstanding to always know what might be at risk in making an adjustment.

However, since I've never been through a Year End with your auditors, I do not know what their PBC's (Provide by Client) entails. You mentioned that you were probably going to get a regional audit firm to do a review for Ttrae-Fuels, I imagine that your auditors would want to have some of the same info that ESI has, as Trac-Fuels Accounts "roll-up" to ESI.

As I'm at a stopping point for October 2013, I'll start reviewing and filling in an Excel spreadsheet for November 2013 JE's until I hear from you.

Thanks and talk with you soon!

Mike


--
Michael A. Donaldson
Controller

Trae-Fuels
1376 Fredericks Hall Road
Bumpass, VA 23024
Office: (540) 205-2440 Ext# 102
Mobile: (540) 642-3858
Fax:    (540) 205-2455
E-mail: mdonaldson@traefuels.com

TRAE-PROD0002228

# EXHIBIT 5

| | |
|---|---|
| **To:** | John Frink[jfrink@traefuels.com] |
| **From:** | Chris LaRocco |
| **Sent:** | 2014-04-30T12:32:02-04:00 |
| **Importance:** | Normal |
| **Subject:** | Re: Trae-Fuels Cash Report as of Tuesday, April 29,2014 and Project Cash Flow for May 2014 |
| **Received:** | 2014-04-30T12:32:02-04:00 |

Okay, sounds good and sounds like a plan of action is being put in place.

On Apr 30, 2014 11:30 AM, "John Frink" <jfrink@traefuels.com> wrote:

Chris,
The plant will do well, it is the best opportunity in the industry , frustrated with getting on a call explaining why things break. Clayton has told me many times that we are now paying the price for Envivas lack of maintenance. Things some times take longer than anticipated and I believe we have done a great job getting us to the level we are at. We fight the battle everyday and know we will win and do better.  Lowell will be on site next week.( told him I would castrate him if he didn't come out and fix remaining problems). I have no problem with the hours and the work just want it to be successful !



John Frink

General Manager

540 205-2440 (office)

540 205-2455 (fax)

540 642-2067 (cell)

jfrink@traefuels.com

www.traefuels.c

On Wed, Apr 30, 2014 at 11:17 AM, Chris LaRocco <clarocco@envirotechservices.com> wrote:

You sound beyond dismayed John.

Question:

With as much opportunities to win at the pellet industry (because of an abundance of sales and a low cost of plant purchase) isn't it your time to win?

If you need R&R then please suggest to Roger the same.

On Wed, Apr 30, 2014 at 11:13 AM, John Frink <jfrink@traefuels.com> wrote:

Chris,
It will be tight but we have to do it ! If we don't you should come run it and I should go home.



John Frink

TRAE-PROD0007335

General Manager

540 205-2440 (office)

540 205-2455 (fax)

540 642-2067 (cell)

jfrink@traefuels.com

www.traefuels.c

On Wed, Apr 30, 2014 at 11:08 AM, Chris LaRocco <clarocco@envirotechservices.com> wrote:

What do you think John?

On Wed, Apr 30, 2014 at 11:05 AM, John Frink <jfrink@traefuels.com> wrote:

Chris,
Thought you might want to see this.



John Frink

General Manager

540 205-2440 (office)

540 205-2455 (fax)

540 642-2067 (cell)

jfrink@traefuels.com

www.traefuels.c

---------- Forwarded message ----------
From: **Michael Donaldson** <mdonaldson@traefuels.com>
Date: Wed, Apr 30, 2014 at 10:15 AM
Subject: Re: Trae-Fuels Cash Report as of Tuesday, April 29,2014 and Project Cash Flow for May 2014
To: Roger Knoph <rknoph@envirotechservices.com>
Cc: John Frink <jfrink@traefuels.com>, Kevin Whyrick <kwhyrick@envirotechservices.com>

Good Morning Roger:
John has asked me to forward to you the Cash Report, which has been prepared through Close of Business, Tuesday, April
29, 2014.  I've also provided a May 2014 Cash Flow synopsis.

As far as Cash Flow for May 2014 is concerned (pending any major system repairs, replacements or Cap Ex purchases),
I'm estimating them as following.

**Projected Cash Inflows:**

**Northcrest Forest Products -** 50% deposit on 4,000 ton  order   - $310,000.00 2000 tons  @ 155.00 per ton  (due around
May 7 2014 according to Christian Bach, I'm told).

TRAE-PROD0007336

Northcrest Forest Products -  Should be able to produce and have cash in the bank, by end of May for another 1000 tons (which is scheduled to ship each week) -  $155,000.  Should ship out all 4000 tons in May, but last weeks shipment of 1000 tons, won't be in bank until 1st week in June.

Eco - Pellet - Possibility of additional revenue stream for Eco-Pellet (which bags are due to arrive next week according to Christian Bach), but contingent on production constraints.  We are contracted to ship 2,500 tons a month, but Christian believes that the customer is flexible and we can ship perhaps 500 tons during May @ @ $206 a month

**Total Estimated Cash Inflows for May 2014:**

Northcrest Forest Products    - $465,000.00  (3000 tons @ 155)

Eco-Pellet                   - $103,000.00 (500 tons @ $206)

**Total estimated Cash Inflows:  $568,000.00**

**Total Estimated Cash Outflows for May 2014**

**Accounts Payable -  $400,000.00**  ($100,000 per week bearing any major repairs, capex,

**Payroll -          $150,000.00** (estimated based on increase levels in production around 4,500 -5,000 tons of production and increase in staff to support 24/7 days of productions with minimum overtime.  Could be more if there are hiccups in production schedule (due to repairs, downtime, etc), or less if production is at lower levels.

**Estimated Outflows of Cash for May 2014 $550,000.00**

**Net cash Flow for May 2014    -          Positive $18,000**
**Plus current Cash Balance @ 4/29/2014   -  Positive $377,700.55**

**Net Cash positive Balance projected @ 5/31/2014    $395,700.55**

Thanks,

Mike

--
Michael A. Donaldson
Controller

Trac-Fuels
1376 Fredericks Hall Road
Bumpass, VA 23024
Office:  (540) 205-2440 Ext# 102
Mobile: (540) 642-3858
Fax:    (540) 205-2455
E-mail: mdonaldson@tracfuels.com

--
Respectfully;

Chris LaRocco
Corporate Strategist

**EnviroTech Services, Inc**
9663 Berrien St.
Suite 1
Union Pier Michigan, 49129

*Work: 970-346-3923*
*Ext: 407*
Cell: 773.875.2053
Fax: 269-645-5909
Web: www.envirotechservices.com

**Confidentiality Notice:**
The information contained in this electronic communication may be privileged work product, or otherwise confidential information. If
you have accidentally received this communication, you are hereby notified that any disclosure, dissemination, distribution, or
copying of this communication is strictly prohibited. If you received this communication in error, please notify us immediately by e-
mail, attaching the original message, and delete the original message from your computer, and any network to which your
computer is connected.

--
Respectfully;

Chris LaRocco
Corporate Strategist

**EnviroTech Services, Inc**
9663 Berrien St.
Suite 1
Union Pier Michigan, 49129

*Work: 970-346-3923*
*Ext: 407*
Cell: 773.875.2053
Fax: 269-645-5909
Web: www.envirotechservices.com

**Confidentiality Notice:**
The information contained in this electronic communication may be privileged work product, or otherwise confidential information. If
you have accidentally received this communication, you are hereby notified that any disclosure, dissemination, distribution, or
copying of this communication is strictly prohibited. If you received this communication in error, please notify us immediately by e-
mail, attaching the original message, and delete the original message from your computer, and any network to which your
computer is connected.

TRAE-PROD0007338

# EXHIBIT 6

**To:**        riccardo@ecopellet.it[riccardo@ecopellet.it]
**Cc:**        John Frink[jfrink@traefuels.com]; Christian Bach[cbach@traefuels.com]
**From:**      Michael Donaldson
**Sent:**      2014-05-29T10:10:47-04:00
**Importance:**      Normal
**Subject:**   Re: Trae-Fuels
**Received:**        2014-05-29T10:10:47-04:00

Good Morning Riccardo,
My name is Mike Donaldson, controller for Trae-Fuels in Bumpass, VA in the USA.

I've been working with Christian Bach to assist in setting up Eco-Pellet as a customer and was involved in the contract drafting which Eco-Pellet and Trae-Fuels executed for the production of 30,000 Metric tons for the period of April 15, 2014 - May 15, 2015, with a monthly production volume equal to 2,500 Metric tons.

In the signed contract, Eco-Pellet agreed to forward a wire transfer 14 days in advance to the shipment of the product. We have been producing product for Eco-Pellet and have purchased the bags for the job and incurred considerable "up-front" expense in attempting to execute our responsibilities under the contract in good faith.

We feel that we are getting off to not so good of a start in our relationship, as we have been awaiting a wire transfer for the first month's product production to be shipped of 2,500 tons. I know that Christian Bach has been in communication with you, to follow up on the status of your wire transfer.

Unfortunately, we have stopped production for Eco-Pellet until we receive the wire transfer for the the first month's production as agreed in the amount of $515,000.00 USD (2,500 MT @ $206 per MT). We would at least $257,500 USD wired immediately to hold your contract, with balance of payment of $257,500 in 7 days before we will ship the product for the first month. If we do not hear from you soon, then under the terms of the contract we will have to seek other parties to sell what has already been produced for Eco-Pellet.

Please advise us of your intentions within the next two days, or we will begin contacting other parties to sell the product. If you have any questions or concerns, please feel free to contact me at (540) 205-2440.

Thank you,
-
Michael A. Donaldson
Controller

Trae-Fuels
1376 Fredericks Hall Road
Bumpass, VA 23024
Office:  (540) 205-2440 Ext# 102
Mobile: (540) 642-3858
Fax:    (540) 205-2455
E-mail: mdonaldson@traefuels.com

TRAE-PROD0008084

# EXHIBIT 7

**To:**       Michael Donaldson[mdonaldson@traefuels.com]
**From:**     Chris LaRocco
**Sent:**     2013-12-19T13:38:08-05:00
**Importance:**    Normal
**Subject:**  Re: International Forest Products - Credit Information
**Received:**        2013-12-19T13:38:08-05:00

Great work! Keep those sales guys on the straight and narrow.


On Thu, Dec 19, 2013 at 12:34 PM, Michael Donaldson <mdonaldson@traefuels.com> wrote:

Chris,
Yes, this is IFP's Credit Information sheet and it is signed, but it is not our credit application.  Our credit application stipulates our terms and when signed grants us permission to run the credit checks etc.  This is what we need from Steve Maneri.

I just got off the phone with Christian and is going to attempt to get Steve to sign the Trae-Fuels Credit Application.  In addition, Kevin suggested we get a copy of their P.O., obtain our customer-set up form completed and if possible financial statements.  Christian did tell me they are a privately held corp, so it may be difficult to get that.  So, we are moving in the right direction.


On Thu, Dec 19, 2013 at 12:24 PM, Chris LaRocco <clarocco@envirotechservices.com> wrote:

This one is there's and is signed correct Michael?


On Thu, Dec 19, 2013 at 12:14 PM, Michael Donaldson <mdonaldson@traefuels.com> wrote:

Kevin,
I just spoke with Christian Bach and he forwarded their Credit Information Sheet (Please see attached).

Christian told me that Steve is going on vacation starting tomorrow and wanted to get booked before he left.

As, I understand it, from Christian that IFP is a Fortune 500 Corporation and the Kraft's also own the New England Patriots and Gillette Stadium in Foxboro, MA.

I will see if we can get the Steve Maneri to sign the Credit App. get a copy of the P.O, customer set-up form. and maybe go on-line to obtain their financial.

Mike


--
Michael A. Donaldson
Controller

Trae-Fuels
1376 Fredericks Hall Road
Bumpass, VA 23024
Office:  (540) 205-2440 Ext# 102
Mobile: (540) 642-3858
Fax:    (540) 205-2455
E-mail: mdonaldson@traefuels.com

TRAE-PROD0002105

--
Respectfully;

Chris LaRocco
Corporate Strategist

***EnviroTech Services, Inc***
9663 Berrien St.
Suite 1
Union Pier Michigan, 49129

*Work: 970-346-3923*
*Ext: 407*
Cell: 773.875.2053
Fax: 269-645-5909
Web: www.envirotechservices.com

**Confidentiality Notice:**
The information contained in this electronic communication may be privileged work product, or otherwise confidential information. If you have accidentally received this communication, you are hereby notified that any disclosure, dissemination, distribution, or copying of this communication is strictly prohibited. If you received this communication in error, please notify us immediately by e-mail, attaching the original message, and delete the original message from your computer, and any network to which your computer is connected.


--
Michael A. Donaldson
Controller

Trae-Fuels
1376 Fredericks Hall Road
Bumpass, VA 23024
Office: (540) 205-2440 Ext# 102
Mobile: (540) 642-3858
Fax:    (540) 205-2455
E-mail: mdonaldson@traefuels.com


--
Respectfully;

Chris LaRocco
Corporate Strategist

***EnviroTech Services, Inc***
9663 Berrien St.
Suite 1
Union Pier Michigan, 49129

*Work: 970-346-3923*
*Ext: 407*
Cell: 773.875.2053
Fax: 269-645-5909
Web: www.envirotechservices.com

**Confidentiality Notice:**

The information contained in this electronic communication may be privileged work product, or otherwise confidential information. If you have accidentally received this communication, you are hereby notified that any disclosure, dissemination, distribution, or copying of this communication is strictly prohibited. If you received this communication in error, please notify us immediately by e-mail, attaching the original message, and delete the original message from your computer, and any network to which your computer is connected.

TRAE-PROD0002107

# EXHIBIT 8

To:        Beth Aleman[baleman@envirotechservices.com]
From:      Michael Donaldson
Sent:      2014-01-22T15:40:38-05:00
Importance:        Normal
Subject:   Re: Daniel Horseman
Received:          2014-01-22T15:40:38-05:00

You're Welcome!


On Wed, Jan 22, 2014 at 2:35 PM, Beth Aleman <baleman@envirotechservices.com> wrote:

Yes! We are done!!! yea!!
Thank you.


On Wed, Jan 22, 2014 at 12:34 PM, Michael Donaldson <mdonaldson@traefuels.com> wrote:

Hi Beth:

Danny completed the CIGNA questionnaire today and I scanned it over to you a few hours ago.

Mike
--
Michael A. Donaldson
Controller

Trae-Fuels
1376 Fredericks Hall Road
Bumpass, VA 23024
Office:  (540) 205-2440 Ext# 102
Mobile: (540) 642-3858
Fax:     (540) 205-2455
E-mail: mdonaldson@traefuels.com



--
Beth Aleman PHR
Human Resources Generalist
*EnviroTech Services, Inc*
*910 54th Ave, Suite 230*
*Greeley, CO 80634*
*970-346-3904*

Website: www.envirotechservices.com
Twitter:


  @envirotechsvcs
Facebook:


  envirotechservices

TRAE-PROD0003160

--
Michael A. Donaldson
Controller

Trae-Fuels
1376 Fredericks Hall Road
Bumpass, VA 23024
Office:  (540) 205-2440 Ext# 102
Mobile: (540) 642-3858
Fax:    (540) 205-2455
E-mail: mdonaldson@traefuels.com

TRAE-PROD0003161

# EXHIBIT 9

**To:**      Michael Donaldson[mdonaldson@traefuels.com]
**From:**    Chris LaRocco
**Sent:**    2014-02-06T18:18:26-05:00
**Importance:**    Normal
**Subject:**  Re: ECO -PELLET (ITALY)
**Received:**        2014-02-06T18:18:26-05:00

Okay, great data Mike!


On Thu, Feb 6, 2014 at 5:15 PM, Michael Donaldson <mdonaldson@traefuels.com> wrote:

I've scanned over to you the D&B for ECO-PELLET (Christian gave me the name of the President and I was able to find this report. We do not have the official customer set up form so I can confirm it, so tread lightly, but it seems correct). I believe that you will be impressed with the growth of this company, if the financial numbers are correctly reported to D&B, also their timely payments. Went from sales of 295,000 Euros in 2008 to 11,000,000 Euro in 2012.
I think they want some sort of credit terms according to Christian and will not prepay. It may be in the form of an LC.
As I won't be on the 11 AM call tomorrow and if this comes up, you have some preparation time.

Mike



--
Michael A. Donaldson
Controller

Trae-Fuels
1376 Fredericks Hall Road
Bumpass, VA 23024
Office:  (540) 205-2440 Ext# 102
Mobile: (540) 642-3858
Fax:      (540) 205-2455
E-mail: mdonaldson@traefuels.com



--
Respectfully;

Chris LaRocco
Corporate Strategist

***EnviroTech Services, Inc***
9663 Berrien St.
Suite 1
Union Pier Michigan, 49129

*Work: 970-346-3923*
*Ext: 407*
Cell: 773.875.2053
Fax: 269-645-5909
Web: www.envirotechservices.com

**Confidentiality Notice:**
The information contained in this electronic communication may be privileged work product, or otherwise confidential information. If you have accidentally received this communication, you are hereby notified that any disclosure, dissemination, distribution, or copying of this communication is strictly prohibited. If you received this communication in error, please notify us immediately by e-

TRAE-PROD0004053

mail, attaching the original message, and delete the original message from your computer, and any network to which your computer is connected.

TRAE-PROD0004054