# EXHIBIT 80

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Charlottesville Division

| | |
|---|---|
| MICHAEL DONALDSON,<br><br>　　　　Plaintiff,<br><br>　　　　v.<br><br>TRAE-FUELS, LLC, *et al.*<br><br>　　　　Defendants. | Case No.: 3:18-cv-00097 |

## PLAINTIFF'S STATEMENT OF MATERIAL FACTS IN DISPUTE

Plaintiff states the following material facts are in dispute[1]:

1.　　On March 25, 2014, Donaldson experienced significant blood loss and had to be hospitalized in the intensive care unit. The next morning, Donaldson called Trae Fuels and informed them that he was at the ICU and would need leave. Frink and Walker visited Donaldson in the hospital. Ex. 1, Donaldson Decl. ¶ 20.

To discover why he had experienced this blood loss, Donaldson began undergoing medical testing. In April 2014, Donaldson learned that he had a mass on his pancreas. Donaldson informed Frink of this the day of his diagnosis as they were both at work at the time. On Thursday May 15, Donaldson learned he had Adenocarcinoma pancreatic cancer (Stage IV) and that he would need to see an oncologist on Monday, May 19. On May 19, Donaldson called Frink and told him of the diagnosis and that he would be out that Monday morning. Ex. 1, Donaldson Decl. ¶ 21; Ex. 23, Feb. 13, 2019 letter from Dr. Le, Donaldson 161-62 ; Ex. 24, medical notes from Mary Washington Healthcare, Donaldson 180-83.

---

[1] Plaintiff has endeavored to correspond his numbering to roughly correspond with Defendant's assertions of material facts not in dispute.

On May 19, during his appointment with his oncologist, Donaldson was diagnosed with pancreatitis and taken to the hospital. Donaldson called Frink and informed him that he was being hospitalized and not to expect him at work. Ex. 1, Donaldson Decl. ¶ 22.

On May 20, Whyrick emailed Donaldson and informed him they had hired a temporary accountant to work at Trae Fuels. Donaldson responded and said that he was "more than willing to train so there will be continuity for Trae-Fuels regardless of the ultimate outcome." Ex. 25, May 20, 2014 email from Whyrick, Trae 7921-25; Ex. 26, May 20, 2014 email from Donaldson, Trae 7927-31.

In 2014, 75% of individuals diagnosed with Adenocarcinoma pancreatic cancer died within one year of diagnosis, with only 6% having a 5-year life expectancy survival rate. Ex. 1, Donaldson Decl. ¶ 21.

2. No dispute.

3. Plaintiff attended chemotherapy on Fridays. Ex. 41, July 23, 2014 email from Donaldson, Trae 9828.

4. Plaintiff requested leave and a modified schedule to permit him to obtain treatment for Stage IV pancreatic cancer. Ex. 41, July 23, 2014 email from Donaldson, Trae 9828; Ex. 43, June 9, 2014 email from Aleman, Trae 8468-69.[2]

5. Plaintiff requested leave and a modified schedule to permit him to obtain treatment for Stage IV pancreatic cancer. Ex. 41, July 23, 2014 email from Donaldson, Trae 9828; Ex. 43, June 9, 2014 email from Aleman, Trae 8468-69.

---

[2] Aleman's complaint that Donaldson got permission to extend his leave from two to three days but not from three to four days was incorrect because Donaldson only took three days of leave – June 10, 11, and 12. Donaldson received permission to take these three days of leave. Ex. 78, May 30, 2014 email from Donaldson, Trae 8176; Ex. 79, June 16, 2014 email from Donaldson, Trae 8626-28 (stating that Donaldson was catching up from being out three days the prior week).

2

6. From his hiring in October 2013 until mid-May 2014, Donaldson's supervisors praised his work and indicated they were satisfied with his performance. Frink indicated he was happy with Donaldson's work, as did Whyrick, LaRocco, and Aleman. Ex. 1, Donaldson Decl. ¶ 16; Ex. 7, Dec. 19, 2013 email from LaRocco, Trae 2105-07; Ex. 8, Jan. 22, 2014 email from Aleman, Trae 3160-61; Ex. 9, Feb. 6, 2014 email from LaRocco, Trae 4053-54; Ex. 10, Feb. 19, 2014 email from Whyrick, Trae 4637.

Whyrick, for instance, emailed EnviroTech CEO Knoph in November 2013 and stated that an email from Donaldson showed that Donaldson was "getting it." Whyrick stated he thought that Donaldson would "be the guy that can take this stuff and run with it, and make sure that it is accurate." Ex. 11, Nov. 8, 2013 email from Whyrick, Trae 747-49.

Donaldson and his supervisors exchanged day-to-day questions and instructions about how EnviroTech wanted Trae Fuels to characterize certain accounting items, the payroll system and IFS system, and requests and instructions regarding insurance and new hire paperwork. These interactions were normal in accounting and with these systems, and experienced EnviroTech employees Aleman, Whyrick, Controller Michelle Mills, Debby Vannest, and Gohar Wise had similar questions or problems arise in their day-to-day work. Ex. 1, Donaldson Decl. ¶ 17; Ex. 12, December 18, 2013 email from Mills, Trae 2028; Ex. 13, Jan. 2, 2014 email from Mills, Trae 2444-49; Ex. 14, Jan. 9, 2014 email from Aleman, Trae 2660; Ex. 15, Jan. 15, 2014 email from Wise, Trae 2826; Ex. 16, Feb. 18, 2014 email from Mills, Trae 4613-14; Ex. 17, Mar. 18, 2014 email from Wise, Trae 5833; Ex. 18, Mar. 20, 2014 email from Donaldson, Trae 5958-59.

CFO Whyrick approved Donaldson's monthly financial reports each month. Additionally, Whyrick periodically agreed with Donaldson's suggestions for better processes for

3

Trae Fuels's accounting procedures and financial practices, although Donaldson was constricted in the changes he was authorized to make and had to get permission for simple tasks, such as adding an account to the general ledger. Ex. 1, Donaldson Decl. ¶ 18; Ex. 19, Dec. 27, 2013 email from Whyrick, Trae 2330; Ex. 20, Jan 7, 2014 email from Whyrick, Trae 2587; Feb. 12, 2014 email from Whyrick, Trae 4200-01; Ex. 21, Feb. 18, 2014 email from Whyrick, Trae 4509-11; Ex. 22, April 1, 2014 email from Whyrick, Trae 6297-98.

To the extent Donaldson made mistakes in his work, they were minor and his supervisors gave no indication that they believed his performance was deficient. Prior to his diagnosis with cancer, Donaldson was not provided any counseling forms nor was he told by anyone that he needed to improve his work. Ex. 2, 30(b)(6) Dep. 158:16-19 ("As far as a written counseling situation like they did [June 4, 2014], no, I don't think any of those were sit-down, write down, put it on paper, saying, We had this counseling session with Michael."); Ex. 1, Donaldson Decl. ¶ 19. When instructed to do something differently, Donaldson made the corrections and followed the advice of his supervisors. Ex. 1, Donaldson Decl. ¶ 19.

7. *See* response to Defendants' Fact # 6. After the June 4, 2014 meeting, Aleman drafted an Employee Counseling Form that claimed Donaldson had engaged in deficient performance. Ex. 28, June 9, 2014 email from Aleman, Trae 8429-30; Ex. 1, Donaldson Decl. ¶ 29.

Even though Trae Fuels's and EnviroTech's policy was to provide the employee a copy of a counseling form (and the form has a place for the employee's signature acknowledging receipt), Aleman did not provide the form to Donaldson or even inform him that she had created it. Donaldson did not learn of the form until Defendants provided it to EEOC in response to his charge of discrimination. Ex. 1, Donaldson Decl. ¶ 30; Ex. 2, 30(b)(6) Dep. 85:6-8.

4

LaRocco and Aleman did not tell Donaldson he was on probation or that he needed to improve his performance.[3] LaRocco and Aleman also did not mention that Donaldson had two weeks to improve his performance, (LaRocco, Aleman, Donaldson, and Frink discussed how Trae Fuels would operate while Frink was out of town between June 9 and June 26). Ex. 1, Donaldson Decl. ¶ 31.

From Donaldson's cancer diagnosis through to his termination on August 20, 2014, Aleman, Whyrick, and Whyrick's subordinates engaged in near-constant questioning and testing of Donaldson and secretly documented what they claimed were performance concerns. *See, e.g.,* Ex. 29, May 29, 2014 email from Aleman, Trae 8104; Ex. 30, June 2, 2014 email from Aleman, Trae 8256-57; Ex. 31, June 9, 2014 email chain, Trae 8429-31; Ex. 32, June 26, 2014 email and performance report from LaRocco, Trae 8962-63; Ex. 33, July 22, 2014 email from Vannest to Aleman, Trae 9760-62.

Following the June 4 meeting, LaRocco sent criticism to Aleman on June 26, 2014. Ex. 32, June 26, 2014 email and performance report from LaRocco.

Whyrick compiled a list of negative observations regarding Donaldson. Ex. 34, Whyrick Donaldson Report, Trae 28-31. Michelle Mills also compiled a "Mike Donaldson Report," outlining supposed performance deficiencies. Ex. 35, Mills Donaldson Report, Trae 6-7.

On July 22, 2014, EnviroTech accounting employees Gohar Wise and Debby Vannest suddenly forwarded several old emails in which Donaldson had asked questions or corrected inventory or reports, in an apparent effort to collect evidence of deficient performance. Ex. 37,

---

[3] It is true that several weeks later, LaRocco sent an email in which he claimed Donaldson was concerned about suddenly being criticized after informing Defendants that he had cancer, however, the term "probation" was the word LaRocco used in the email, not Donaldson. No one told Donaldson he was on probation. Ex. 36, June 21, 2014 email from LaRocco, Trae 8816; Ex. 1, Donaldson Decl. ¶ 32.

5

July 22, 2014 email from Wise, Trae 9781-85; Ex. 33, July 22, 2014 email from Vannest to Aleman, Trae 9760-62.

For his part, Frink actually documented that Donaldson's performance improved. Ex. 38, June 17, 2014 email from Frink, Trae 8671-72.

Although Defendants were expending significant effort to document Donaldson's supposedly deficient performance, they were not sharing these documents with Donaldson or explaining what they wanted him to do to improve his performance. Ex. 1, Donaldson Decl. ¶ 34.

8. On June 4, 2014, Aleman and corporate strategist LaRocco traveled to Virginia and met with Donaldson and Frink. Ex. 1, Donaldson Decl. ¶ 27.

In this meeting, Aleman and LaRocco told Donaldson and Frink that EnviroTech was not happy with Trae Fuels's financial losses and the fact that Trae Fuels was running out of cash. They told Donaldson to focus on ensuring that Frink understood Trae Fuels's finances and LaRocco said that he would develop a "score card," to help capture Trae Fuels's financial position. Aleman and LaRocco directed Donaldson to essentially force Frink not to spend money he had been spending to fix issues in the plant and keep it operating. Donaldson explained that he had been informing Frink of the financial status and that he could not control Frink or other external factors that caused Trae Fuels to lose money. Ex. 1, Donaldson Decl. ¶ 28.

9. Defendants claim that one of the biggest problems they had with Donaldson's performance was that he allowed Trae Fuels to overdraw its line of credit.

> "The biggest -- one of the main reasons we weren't happy was that he had -- he had allowed the credit line, the line of credit, to overdraw. So we had a certain amount of money for a line of credit. And he was in charge of letting us know

6

> cash flow and cash flow needs and all that as I mentioned earlier. Well, the line of credit overdrew, meaning it went past its limit, and it was a pretty large number."

Ex. 2, 30(b)(6) Dep. 110:9-111:1; Defs. Memo. in Support of Summ. Judg., pp. 18-19.

At deposition, Defendants were adamant that the issue was not that some action of Donaldson had caused Trae Fuels to have to draw on its line of credit, but that they had *overdrawn* their line of credit.

> As I mentioned last time, it was an overdraft on the line of credit. **The drawing on the line of credit is why it's there. You know, you have a line of credit so you can draw on it for needs** and, as I mentioned last time, it's a zero balance account.
>
> **What the criticism was, was the overdraft of that line of credit. It was drawn on in excess of what was allowed at the bank.**

Ex. 2, 30(b)(6) Dep. 225:13-21.

This allegation is patently false. Trae Fuels never overdrew its line of credit during Mr. Donaldson's employment. Ex. 1, Donaldson Decl. ¶ 41.

What actually happened is that in June 2014, Trae Fuels drew on its line of credit—as Defendants concede is appropriate—to pay its operating expenses after months of operating at a loss while getting the plant operational. Ex. 1, Donaldson Decl. ¶ 42.

On May 20, 2014, Whyrick emailed the bank and asked about the process Trae Fuels would need to follow "if/when," it needed to draw on its line of credit. Ex. 46, May 20, 2014 email from Whyrick, Trae.

On May 29, 2014, Donaldson exchanged emails informing Whyrick of Trae Fuels's cash position and asked how long it would take for the fund to arrive when they drew on the line of credit. Whyrick said Donaldson's analysis "look[ed] good overall." Ex. 47, May 29 email chain, Trae 8147-48.

7

On May 30, Donaldson emailed the bank and asked to draw $669,000 on Trae Fuels's line of credit with Frink's approval. Ex. 48, May 30, 2014 email from Donaldson, Trae 8178. On June 3, Donaldson followed up and reduced the amount of the draw to $500,000, again with Frink's approval. Ex. 49, June 3, 2014 email from Donaldson, Trae 8290. Whyrick confirmed that he was "good with the borrowing schedule as mentioned by [Donaldson]." Ex. 50, June 3, 2014 email from Whyrick, Trae 8298-300.

On June 16, Donaldson emailed the bank and withdrew the remaining funds on the line of credit, approximately $227,000, to cover Trae Fuels's operating expenses. Again, Donaldson had permission to make this draw. Ex. 51, June 16, 2014 email from Donaldson, Trae 8618.

On June 17, 2014, after reviewing a cash flow analysis by Donaldson, Whyrick notified Frink that Trae Fuels would need to make a "capital call," on its investors to "sustain us through this slow period of revenue," and that the operating agreement provided that it was Frink's responsibility to determine the amount of the capital call. Ex. 52, June 17, 2014 email from Whyrick, Trae 8637-38.

Donaldson prepared documents in support of the capital call and eventually EnviroTech and the other investors provided additional funds to allow Trae Fuels to operate despite the lack of revenue. Ex. 53, July 3, 2014 email from Whyrick, Trae 9246-47.

Defendants' claim that Donaldson caused Trae Fuels to overdraw its line of credit is simply false.

10. Defendants' did not have genuine performance concerns regarding Donaldson and instead documented alleged concerns to cover up their discriminatory motives. For instance, Defendants' claim that Donaldson's mismanagement of IFS was the reason Trae Fuels had to

8

draw on its line of credit at all is also a total fabrication. *See* Ex. 54, Defs. Response to Discovery, p. 5.

On April 30, 2014, Donaldson prepared a cash flow analysis for May 2014 that relied on just two cash inflows, one from a customer named Northcrest Forest Products and the other from a customer named Eco – Pellet. Donaldson explicitly mentioned that these payments were based on information provided by salesman Bach. Ex. 55, April 30, 2014 email from Donaldson, Trae 7314-15. In response, Frink noted that "[i]t will be tight but we have to do it!" Ex. 56, April 30, 2014 email from Frink, Trae 7324-26.

As it turns out, Eco – Pellet failed to timely pay for the pellets Trae Fuels produced for it from April 15 to May 15, 2014, causing Trae Fuels a shortfall of $515,000. Ex. 57, May 29, 2014 email from Donaldson, Trae 8084.

Further, Trae Fuels was generally unprofitable throughout the time period leading up to its draw on its line of credit. Through the first two quarters of the 2013-2014 fiscal year, Trae Fuels had lost more than $1.7 million dollars. Ex. 58, May 5, 2014 email from Donaldson and financial report, Trae 7476-78.

Donaldson's use of IFS had nothing to do with Trae Fuels's need to draw on its line of credit.

### A. Donaldson's use of the IFS system was proper and he was not "re-trained" on Trae Fuels on May 14-15.

Defendants' claim that Donaldson failed to appropriate use and understand the IFS system are likewise incorrect. *See* Ex. 54, Defs. Response to Discovery, pp.4-5.

First, Donaldson was not re-trained on IFS on May 14-15. Trae Fuels used a standard costing method to value its inventory. Under a standard costing method, a company assigns a set value to a type of inventory based on historical information and past prices rather than the actual

9

price paid for a particular piece of inventory. These standards are used to set prices or evaluate bids and also can be used as a metric to ascertain favorable or unfavorable variances. In December 2013, Trae Fuels established standard costs for its various inventory items based largely on Frink's experience and knowledge, since he had experience in the pellet business. Ex. 1, Donaldson Decl. ¶ 49.

After the company struggled to obtain manufacturing jobs because its prices were too high, LaRocco asked Frink if he had set the standard costs too high and Frink acknowledged that he had probably "padded," the costs. Donaldson then evaluated the standard costs against what the company had actually paid for inventory and confirmed that they had set the standard costs too high. Ex. 1, Donaldson Decl. ¶ 50.

In May 2014, Donaldson, Frink, Walker, and Debby Vannest met to discuss re-evaluating the cost standards and modify them. Donaldson and the others had a two-hour call with an IFS consultant (Donaldson cannot recall whether this call took place on one or two separate days) to ensure that they properly modified the old cost standards to the new cost standards number and utilized the right application in the cost / inventory module of the IFS system. Ex. 1, Donaldson Decl. ¶ 51.

Additionally, while Whyrick and Gohar Wise were in Virginia for other reasons in May 2014, they and Donaldson discussed optimizing IFS by implementing a Purchase Order module. Although this module, and many other optional modules had been shown to Donaldson when he first began learning about IFS in November 2013, he had not been directed to use the Purchase Order IFS module. The May 14-15 adjustments to IFS was not a re-training of Donaldson. Ex. 1, Donaldson Decl. ¶ 52; Ex. 59, May 19, 2014 email from Vannest, Trae 7866 (stating on the

10

Monday following the May 14-15 meeting that "I am starting the re-costing of your inventory parts.").

Donaldson's use of IFS was appropriate and his periodic questions about how to perform certain tasks were not indicative of deficient performance. Even EnviroTech accounting employees with more time working in the IFS system periodically had questions or issues. Ex. 1, Donaldson Decl. ¶ 53; Ex. 60, Dec. 17, 2013 email from Whyrick, Trae 2297 (stating Whyrick would need to get IFS's help to properly set up a report); Ex. 61, Feb. 14, 2014 email from Vannest, Trae 4348-49 (stating Whyrick did not know how an IFS formula was established); Ex. 62, Mar. 18, 2014 email from Wise, Trae 5833 (Wise stating that one IFS "functionality works on and off.").

### B. Donaldson did not inappropriately manage HR files.

Defendants' claims that Donaldson demonstrated poor performance my inappropriately managing HR files is also false. *See* Ex. 54, Defs. Response to Discovery, p. 5.

When Aleman came to Virginia to counsel Donaldson the week after he returned from being diagnosed with cancer, Aleman audited Trae Fuels HR files and claimed they were "out of federal compliance," confidentiality agreements were missing, and accounts payable documents were in some files. Ex. 63, June 4 counseling form, Trae 20.

To the extent these files were not organized in the manner Aleman preferred, this was because she had not trained or directed Donaldson on what to include in the files and how to organize documents within the file. Without this direction, Donaldson placed managers' credit card statements in their files and also made notes when Frink approved a payroll advance to an employee, which is what Aleman apparently refers to in claiming there were accounts payable items in the folder. Ex. 1, Donaldson Decl. ¶ 56.

11

With respect to the files' purported "federal compliance," Donaldson ensured all employees had appropriate authorization to work and I9 forms before beginning work, however, on occasions Frink ignored Donaldson's directives and had people work before they completed their paperwork. While Donaldson does not recall if any I9s were actually missing, it would only have been for employees that he did not know Frink had hired. Ex. 1, Donaldson Decl. ¶ 57.

In any event, Donaldson and Fran Holliday followed Aleman's directives regarding future organization of the files after Aleman communicated her alleged expectations in June 2014. Notably, Aleman had periodically visited Trae Fuels prior to June 2014 and had not said anything about the HR files being managed incorrectly. Ex. 1, Donaldson Decl. ¶ 58.

### C. Donaldson did not fail to keep Frink informed of company finances and was appropriately strategic in his role.

Defendants also claimed that Donaldson exhibited poor performance by failing to keep General Manager Frink aware of Trae Fuels's finances and by not being "strategic," in his role. Ex. 63, June 4 counseling form, Trae 20; Ex. 2, 30(b)(6) Dep. 126:7-11.

This criticism was also false, as Donaldson had provided Frink detailed cash projections and financial explanations throughout his employment. To the extent Donaldson was ever forced to provide Frink a financial document without explaining it to Frink, it was because Frink did not have the time to meet with Donaldson due to Frink's other responsibilities. *See, e.g.*, Ex. 64, Jan. 16, 2014 email from Donaldson, Trae 2896-900; Ex. 65, Jan. 20, 2014 email from Donaldson, Trae 3039; Ex. 66, Jan. 24, 2014 email chain, Trae 3241-42 (Frink stating that the profit margins were smaller than he had thought); Ex. 67, Feb. 13, 2014 email from Donaldson, Trae 4258 (Donaldson sating sending the report he would normally "hand-deliver."); Ex. 1, Donaldson Decl. ¶ 60.

Donaldson also had been appropriately strategic, recommending cost-cutting methods and providing analyses concerning Trae Fuels's production and profitability. Ex. 68, Feb. 6, 2014 email from LaRocco, Trae 4028-29; Ex. 69, Apr. 3, 2014 email from Donaldson, Trae 6467-70 (Donaldson stating that they needed to control costs by reducing overtime); Ex. 1, Donaldson Decl. ¶ 61.

### D. Donaldson's financial reports, production logs, and cash flow analyses did not evidence poor performance.

Trae Fuels's claim that Donaldson's financial reports were inaccurate and demonstrated poor performance are also incorrect. EnviroTech CFO Whyrick had to approve each of Donaldson's monthly financial reports and reviewed other reports Donaldson created regularly. Any questions or corrections Whyrick had were within the normal course of business in deciding how Trae Fuels and EnviroTech wanted to classify certain items. Ex. 1, Donaldson Decl. ¶ 62; Ex. 70, Dec. 27, 2014 email from Whyrick, Trae 2330; Ex. 71, Jan. 7. 2014 email from Whyrick, Trae 2587; Ex. 72, Apr. 1, 2014 email from Whyrick, Trae 6297-98 (forwarding Donaldson's cash flow analyses to CEO Knoph without modification).

Likewise, the claims that Donaldson's cash flow analyses were deficient and evidenced poor performance are false. Donaldson regularly provided cash flow analyses (which along with Frink, CFO Whyrick and CEO Knoph relied upon). Ex. 72, Apr. 1, 2014 email from Whyrick (forwarding Donaldson's cash flow analyses to CEO Knoph without modification); Ex. 73, Jan. 24, 2014 email chain, Trae 3241-42 (Frink stating that the profit margins were smaller than he had thought).

When LaRocco proposed that they use a different format he called a "scorecard" to project cash flow and provided Donaldson the format he suggested, Donaldson successfully provided that information. The only issue that Donaldson had once he was provided the

13

scorecard was his reluctance to include Frink's and Bach's risky projected sales with new customers to paint a rosier picture of Trae Fuels's finances than was accurate, but LaRocco and other supervisors did not criticize Donaldson for this directly. Ex. 1, Donaldson Decl. ¶ 64; Ex. 74, July 2, 2014 email from Donaldson, Trae 9195-96.

Donaldson's work with respect to inventory counts and production logs was not deficient either. Donaldson repeatedly directed plant employees to keep accurate production logs and inventory counts, and when they failed to do so, appropriately raised the issue to EnviroTech leadership. Donaldson's actions with respect to inventory and production logs were appropriate. Ex. 1, Donaldson Decl. ¶ 65.

### E. Donaldson's implementation of the IFS Purchase Order functionality in June 2014 did not evidence poor performance.

Another criticism Defendants allege against Donaldson is that he failed to implement a purchase order functionality in IFS between May and June 2014. Ex. 54, Defs. Discovery Responses, p. 6.

This criticism is a fabrication. Although it is true that Donaldson and his supervisors discussed using IFS's purchase order functionality during meetings in May 2014, no one directed Donaldson to prioritize the implementation of the system and it was not a high priority item. Ex. 1, Donaldson Decl. ¶ 67.

Donaldson then immediately was out of work for twelve days following his cancer diagnosis and adoption of his son. Then, when Donaldson returned to work on May 27, Donaldson had to complete the month-end tasks, catch up on determining the cash position, train the temporary accountant, and deal with drawing on the line of credit to address the issue caused by a customer not timely paying for purchase. Ex. 1, Donaldson Decl. ¶ 68.

14

Donaldson did not have time to implement the purchase order functionality until mid-June, and when Defendants directed him to do so, he immediately took steps to implement the procedure. Ex. 75, June 18, 2014 email from Donaldson, Trae 8700; Ex. 76, June 27, 2014 email from Donaldson, Trae 9060.

## F. Various additional unfair and incorrect criticisms

In addition to the unfair criticisms explained above, EnviroTech controller Michelle Mills criticized Donaldson's process for paying accounts payable (AP). Ex. 35, Mills's Donaldson Report, Trae 6. This criticism is improper because EnviroTech and Frink set up the procedure by which Frink would have to sign off on every accounts payable item before it was entered in IFS, and although Donaldson wanted to change the procedure, he did not have authority to do so.

Whryick also criticized Donaldson for using a separate spreadsheet to perform this accounts payable process. Ex. 34, Whyrick's Donaldson report, Trae 28-31. However, the process Donaldson followed was efficient and Donaldson completed the work in IFS as requested. Donaldson did not disregard any instructions in using both the spreadsheet to maintain account of the accounts payable while Donaldson waited for Frink to approve the payment so that he could enter it into IFS Ex. 1, Donaldson Decl. ¶ 71.

Last, Aleman criticized Donaldson for failing to get an employee's insurance paperwork in on time for the employee to be covered by insurance in August 2014. This criticism is improper because Donaldson had warned the employee of the deadline and the consequences of missing it—the exact same procedure Aleman herself had used with employees that were slow to return their insurance paperwork. Ex. 77, Aug. 4, 2014 email from Donaldson, Trae 10198-99; Ex. 1, Donaldson Decl. ¶ 72.

11. *See* response to Defendants' Number 10.

15

12. *See* response to Defendants; Number 10.

                                              Respectfully submitted,

                                              MICHAEL DONALDSON

By:   /s/_____
       Jack Jarrett (VSB #86176)
       Alan Lescht and Associates, P.C,
       1825 K St., NW, Ste. 750
       Washington, D.C. 20006
       (202) 463-6036 (phone)
       (202) 463-6067 (fax)
       jack.jarrett@leschtlaw.com
       *Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on November 11, 2019, I filed the foregoing with the Clerk of Court using the Court's CM/ECF system, which will send a notification of such filing to each counsel of record in this matter.

/s/_____
Jack Jarrett (VSB #86176)
*Counsel for Plaintiff*