IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE  DIVISION

| | |
|---|---|
| _____ ) | |
| ) | |
| MICHAEL DONALDSON, ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| v. ) | **Case No.: 3:18CV00097** |
| ) | |
| TRAE FUELS, LLC., et al. ) | |
| ) | |
| **Defendants.** ) | |
| ) | |
| _____ ) | |

**DEFENDANTS' REPLY BRIEF IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**

## I.   Introduction

The Fourth Circuit has forcefully and repeatedly ruled that federal courts adjudicating employment discrimination cases do "not sit as a kind of super-personnel department weighing the prudence of employment decisions made by firms charged with employment discrimination . . . ." *DeJarnette v. Corning, Inc.,* 133 F.3d 293, 299 (4th Cir. 1998) *quoting Giannopoulos v. Brach & Brock Confections, Inc.*, 109 F.3d 406, 410 (7th Cir. 1997) (quotations and citations omitted).

But, that is precisely what Mr. Donaldson asks the Court to do in this case. He has spilled out 80 separate exhibits consisting of nearly 400 pages of work history covering his ten months of employment at Trae Fuels.  Not one page

supports the proposition that the real reason he was terminated was in any way related to his cancer diagnosis or treatment. Instead, the Opposition Brief and the exhibits show that Mr. Donaldson strenuously disagreed with nearly every single one of the many contemporaneous comments and communications that criticized his job performance. His response to nearly every personnel or financial mishap at the Company is to blame someone else. He asks the Court now to sift through 80 exhibits and conclude that in fact he was a competent employee. But the Fourth Circuit is equally clear on a related point: "In evaluating performance, [it] is the perception of the decision maker which is relevant." *Johnson v. Mechanics & Farmers Bank*, 309 F. App'x 675, 683 n.8 (4th Cir. 2009) (alteration in original) (quoting *Smith v. Flax*, 618 F.2d 1062, 1067 (4th Cir. 1980)). A plaintiff's own testimony "cannot establish a genuine issue as to whether" the plaintiff met the defendant's expectations. *King v. Rumsfeld*, 328 F.3d 145, 149 (4th Cir. 2003). *See David v. Winchester Med. Ctr.*, 2018 U.S. Dist. LEXIS 2530, *35-37, 2018 WL 310140 (W.D. Va. 2019).

Ultimately, in order to avoid summary judgment, Mr. Donaldson is required to offer probative evidence that illegal discrimination was more likely than not the real reason for his termination. Indeed, is settled law that, with a pretext inquiry, Mr. Donaldson "must prove '*both* that the reason was false, *and* that discrimination was the real reason' for the challenged conduct." *Jiminez v. Mary Washington College,* 57 F.3d 369, 378 (4th Cir. 1995) (emphasis in original) (quoting *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 515 (1993). *See also Lovett v. Cracker Barrel*

*Old Country Store, Inc.*, 700 Fed. Appx. 209, 2017 U.S. App. LEXIS 12181 (4th Cir. 2017). The *McDonnell-Douglas* burden shifting rubric is simply a method in which to pose and answer the ultimate question: is there sufficient evidence of intentional discrimination that a rational factfinder could rest upon to conclude that discrimination was more likely than not the employer's motivation?  "Courts must … resist the temptation to become so entwined in the intricacies of the proof scheme that they forget that the scheme exists solely to facilitate determination of 'the ultimate question of discrimination *vel non*.'" *Proud v. Stone*, 945 F.2d 796, 798 (4th Cir. 1991) *quoting United States Postal Serv. Bd. of Govs. v. Aikens*, 460 U.S. 711, 714, (1983); *see also Nelson v. Green Ford, Inc.*, 788 F.2d 205, 208 (4th Cir. 1986).

While Mr. Donaldson's subjective opinion is that his performance was uniformly stellar throughout his employment, he fails to offer any evidence that the "real reason" for his termination was unlawful discrimination.  He has presented no evidence, direct or circumstantial, to suggest that Trae Fuels' and EnviroTech's decision to terminate his employment was motivated in any way by his cancer diagnosis or his health care treatment.  In order to avoid summary judgment he was required to produce some evidence to elevate his suspicions of discrimination from the realm of "mere possibility" to "reasonable probability"; in this case there is no such evidence. *See Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.,* 53 F.3d 55, 58 (4th Cir. 1995).

II.     **Reply Arguments**

Mr. Donaldson's lengthy Opposition Brief and bevy of exhibits have missed the forest for the trees.  Court after court has been faced with this same scenario.  A terminated employee claims discrimination and when confronted in a motion for summary judgment with evidence showing the employer had legitimate non-discriminatory reasons to terminate the at-will employee, simply responds by disagreeing with the reasons; they fail to show any evidence of unlawful discrimination.  In *Hawkins v. Pepsico, Inc.,* 203 F.3d 274 (4th Cir. 2000), a terminated employee filed a § 1981 race discrimination action against her former employer.  At trial, she offered no evidence of race discrimination, but instead simply challenged the judgment of her superiors in concluding that her work was unsatisfactory.  The trial court entered a directed verdict for Pepsico and the Fourth Circuit affirmed, writing:

> In short, we do not sit to appraise [Pepsi's] appraisal.  Rather, '[o]ur sole concern is whether the reason for which the defendant discharged the plaintiff was discriminatory.' *Id.* . . . Hawkins' extensive efforts to rebut [Pepsi's] assessment of her performance simply do not provide a legally sufficient basis for this conclusion.

203 F.3d at 280, *quoting Conkwright v. Westinghouse Elec. Corp.,* 933 F.2d 231, 235 (4th Cir. 1991).

This bedrock principle has been articulated by courts in ADA cases around the country.  Most recently, in *Mekonnen v. OTC Management, L.L.C.,* 394 F. Supp.3d 134 (D. Mass. 2019), the court granted summary judgment on a terminated employee's disability discrimination claim.  The court wrote that the plaintiff

"cannot meet her burden of showing pretext 'simply by questioning [OTG's] articulated reason' or by demonstrating the OTG was wrong to believe she was not performing her job well.'" *Id.* at 156, quoting *Gadson v. Concord Hosp.,* 966 F.2d 32, 35 (1st Cir. 1992). *See also, Brooks v. Potomac Family Dining Group Operating Co. LLC*, 2019 U.S. Dist. LEXIS 55024, *24-25, 2019 WL 1441628 (W.D. Va. 2019).

### A. Mr. Donaldson Has Not Proffered Any Evidence That Would Support an Inference of Unlawful Discrimination

We argued in the October 31 Motion for Summary Judgment that Mr. Donaldson has failed to establish a prima facie case of discrimination for the following reasons (i) he was not meeting his employer's legitimate expectations, (ii) there were legitimate, non-discriminatory reasons to terminate, and (iii) he was not disabled. Defendants' Brief (ECF 27) at 16-26.  Mr. Donaldson's Opposition Brief argues that the prima facie case has been met.  We disagree, but if Mr. Donaldson is correct, then he has the burden now to proffer some evidence of discrimination in response to the abundance of evidence that Mr. Donaldson was terminated for a legitimate non-discriminatory reason:

> Having found that [Employer] met its burden of production and has articulated a legitimate nondiscriminatory reason for the adverse employment action, "the *McDonnell Douglas* frame-work—with its presumptions and burdens—disappear[s], and the sole remaining issue [is] discrimination *vel non*." *Reeves,* 530 U.S. at 142-43 (internal quotation marks and citations omitted). To show pretext, [Employee] must prove that the explanation given for his termination "is unworthy of credence," *id.* at 143 (quoting *Burdine, 450 U.S. at 256*), which requires more than a mere showing that the "proffered reason is unpersuasive, or even obviously contrived," *id. at 146* (quoting *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 524, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993)*). **_"At this last step the burden to demonstrate pretext merges with the ultimate burden of persuading the court that [the plaintiff] has been the victim of intentional_**

***discrimination." Lettieri v. Equant Inc., 478 F.3d 640, 646-47 (4th Cir.
2007) (citations and internal quotation marks omitted).***

*Brooks v. Potomac Family Dining Group Operating Co. LLC*, 2019 U.S. Dist. LEXIS
55024, at *24-25, 2019 WL 1441628 (W.D. Va. 2019) (emphasis added).

Scouring the 30-page Opposition Brief reveals that only page 30 itself
attempts to address the ultimate question of whether Mr. Donaldson has been the
victim of intentional discrimination.  Indeed, pages 1-29 of the Brief simply argue
that the workplace criticism of Mr. Donaldson was incorrect.  We address below
each of the four putative pieces of evidence Mr. Donaldson offers on page 30 to show
that illegal discrimination was the "real reason" for his termination.

> 1. **Temporal Proximity Alone is Not Suggestive of Discrimination**

On page 30 of his Opposition, Mr. Donaldson argues that intentional and
unlawful discrimination is proved because the Company treated Mr. Donaldson
differently after the employees knew he had been diagnosed with cancer.  The facts
do not support differential treatment because Mr. Donaldson's work was criticized
both before and after May 2014, but in any event a temporal proximity between
knowledge of a disability and termination, while possibly relevant to a prima facie
case, does not establish pretext:

> [C]ourts have routinely ruled that this sort of temporal connection alone
> cannot establish pretext. *See, e.g., Fairchild v. All Am. Check Cashing, Inc.*,
> 815 F.3d 959, 968 (5th Cir. 2016) (determining "temporal proximity between
> the plaintiff revealing her disability to her employer and her termination, by
> itself, was not enough to establish pretext" when affirming a verdict for the
> employer in a Title VII case); *Joostberns v. United Parcel Servs., Inc.*, 166 F.
> App'x 783, 798 (6th Cir. 2006) ("[I]t is very clear that temporal proximity
> alone cannot create a genuine issue of material fact as to whether

Defendant's proffered reason for termination was pretext, and that the actual motivation was disability discrimination.")

*Powers v. Covestro LLC*, 2017 U.S. Dist. LEXIS 71258, at *17-18, 2017 WL 1952230 (D. W.Va. 2017).  *See also Keogh v. Concentra Health Servs.*, 752 Fed. Appx. 316, 324 (6th Cir. 2018) (temporal proximity alone does not establish pretext).  In addition, there are no extenuating circumstances that indicate the temporal proximity of the cancer diagnosis and the termination suggest unlawful discrimination.

The three months between Mr. Donaldson's diagnosis (May 15, 2014) and termination (August 20, 2014) is not particularly short, but there is substantial evidence in the record that intervening events preclude temporal proximity argument.  On June 26, 2014, over a month after the cancer diagnosis, Mr. LaRocco prepared a written report (Defendants' Exhibit 4) memorializing his judgment that:

o   On June 9, 2014, Mr. Donaldson's cash-flow analysis was "substandard" and '[un]presentable to the ownership;"

o   On June 17, 2014, Mr. Donaldson provided a current cash-flow analysis and a current cash figure that was inaccurate;

o   On June 18, 2014, Mr. Donaldson had not, as of that date, implemented IFS procedures to input Purchase Orders and Requisites as directed on May 14-15;

Mr. LaRocco summarized his June 26 comments by writing "Mr. Donaldson has failed however in his responsibilities to keep Trae-Fuels cash position in line with production outputs." *Id.*

Page 7 of 25

In addition, On July 17, 2014, the HR Manager Beth Aleman noted that the following topics would be discussed with Mr. Donaldson the following week: "lack of accountability;" "lack of execution;" " lack of involvement in financial accountability to investors, & presenting situation." Defendants' Exhibit 5.  On Monday, August 4, 2014, just two weeks before Mr. Donaldson was terminated, Beth Aleman informed him again that he had missed the month-end deadline to submit new employee insurance papers and that she had reminded Mr. Donaldson of this deadline by email July 28. Defendants' Exhibit 6.

Several courts have noted that intervening events sever the temporal proximity of a protected event (e.g., disability announcement) and a termination. *See, e.g., Feldman v. Law Enforcement Assocs. Corp.*, 955 F. Supp. 2d 528, 555 (E.D. N.C. 2013); *Fraser v. Fiduciary Trust Co. Int'l,* 2009 U.S. Dist. LEXIS 75565, at *18 (S.D.N.Y. 2009) (also noting that no inference of causation can be made if adverse employment action occurs more than two months after protected activity).

And evidence that an employee was criticized for performance issues prior to protected activity also renders the temporal proximity argument a nullity:

> 'Where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise.' *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001); *see also Frazier v. Fairhaven Sch. Comm.*, 276 F.3d 52, 67 (1st Cir. 2002) (noting that conduct that occurs both before and after the event leading to the alleged retaliation cannot form the basis of a Title IX retaliation claim).

*Francis v. Booz, Allen & Hamilton, Inc.*, 452 F.3d 299, 309 (4th Cir. 2006).

Defendants have set forth full evidentiary support that Mr. Donaldson received work performance criticism both before and after his cancer diagnosis. The criticism was substantive and documented at the time it occurred. Mr. Donaldson was given ample opportunity and guidance to improve his performance, but he did not. The mere fact that Mr. Donaldson was eventually terminated after his diagnosis is insufficient to sustain his burden to show evidence that unlawful discrimination was the real reason for his termination.

2.  **Mr. Donaldson's Co-Worker's Concerns About His Cancer Diagnosis Are Not Probative of Discrimination**

Mr. Donaldson's second piece of evidence is described as follows: "Donaldson's coworkers were concerned about the effect of his pancreatic cancer on the company, as his coworkers asked about his prognosis and expressed their understanding that pancreatic cancer was deadly." Opposition Brief at 30. First, Plaintiff's counsel has misrepresented the alleged statements; the statements expressed concern about Mr. Donaldson himself. Mr. Donaldson's legal counsel inserts his spin on the comment with the following language "with the apparent goal of assessing the effect of his illness on the company." Opp. at 13, ¶ 49. The "apparent goal" language is counsel's. The actual statement are in no way suggestive of unlawful discriminatory intent, and Mr. Donaldson cites no authority to support the proposition that they are. Common sense suggests just the opposite; it is perfectly natural for co-workers to ask questions about a co-worker's health and prognosis especially in the time immediately after his diagnosis. Such questions are far more indicative of personal concern and care for Mr. Donaldson than any unlawful intent.

The supposed evidentiary support for these inquiries comes from ¶¶ 37-38 of Mr. Donaldson's declaration (identical to the language in ¶¶ 51-55 of the Complaint).[1] Mr. Donaldson does not specify when any of these comments were made.  There is no evidence or inference that even if the questions were asked, that they were asked at any time near the date Mr. Donaldson was terminated.

One inquiry was made by a cancer survivor, Kevin Whyrick.  Donaldson Declaration ¶ 38.  The only inference from the statement that Mr. LaRocco made ("What do you want to do now, work part-time?") is that he was offering Mr. Donaldson an accommodation.  As noted in the Complaint and his declaration, Mr. Donaldson refused any accommodation and continued to "maintain a forty to forty-five-hour work week, even on weeks when he underwent chemotherapy." Complaint at ¶ 82.

Mr. Donaldson's co-workers' expressions of sympathy, and in Mr. Whyrick's case empathy, for him do not create an inference of illegal discrimination.

### 3.   Hiring a Temporary Accountant to Assist Mr. Donaldson Does Not Suggest a Discriminatory Motive

Next, Mr. Donaldson claims that the Company's decision to hire a temporary accountant to "potentially replace Donaldson during his first few days when he was hospitalized" is somehow evidence of discriminatory intent. Opposition Brief at 30. This theory falls flat as well.  First, Mr. Donaldson uses the word "temporary" in his

---

[1] Mr. Donaldson's counsel, Jack Jarrett, signed his declaration.  The declaration is not made under oath under penalty of perjury and should be stricken.  *See infra* § C.4.

Complaint (¶¶ 44, 46-49) and in his Opposition.  According to Webster's, the term

temporary "implies an arrangement established with no thought of continuance but

with the idea of being changed soon." Webster's Encyclopedic Unabridged

Dictionary of the English Language, 1996.  And, as Mr. Donaldson then correctly

contends, the temporary employee was dismissed when it became immediately

apparent that Mr. Donaldson's diagnosis and condition did not interfere in any way

with his ability to work in excess of 40 hours each week.  As it turned out, Mr.

Donaldson was not disabled in any tangible work-performance way and did not

request or need any assistance.  Thus, the retention of a temporary accountant for

less than a week during a time period three months ___*prior*___ to Mr. Donaldson's

ultimate termination date is not suggestive in any way of discriminatory intent.

When asked at his deposition how the hiring of a temporary accountant for

less than a week to assist in Company accounting when Mr. Donaldson was

hospitalized was indicative of a discriminatory intent to fire him illegally three

months later, Mr. Donaldson was unable to articulate a reason. Donaldson Dep. Tr.

at 117-120, attached hereto as Exhibit 17.  Instead he agreed that it was a

reasonable course of action ("Yeah"). *Id.* at 118, lines 8-10.

His email exchange with fellow cancer survivor Kevin Whyrick on May 20,

2014 also demonstrates the reasonableness of the Company decision to hire a

temporary accountant to assist Mr. Donaldson: "Yes, I talked to John [Frink] on

yesterday and I believe that is a good move to get someone to help out from Robert

Half. I'm more than willing to train so there will be continuity for Trae-Fuels

regardless of the ultimate outcome.  The doctor came in and she said I'll be here for at least one more day.  I feel fine though." Plaintiff's Exhibit 26.

4. **There is No Evidence That Trae Fuels or EnviroTech Knew Insurance Premiums Would Increase or Were In any Way Motivated by Such a Concern**

Mr. Donaldson's counsel, with no factual support, finally argues that discriminatory motive is demonstrated by the contention that the Company's annual insurance policy was up for renewal in September 2014.  There is no contention that this issue was ever mentioned or considered by any person at Trae Fuels or EnviroTech at any time in 2014 or at any other time in connection with Mr. Donaldson's health condition.  Mr. Donaldson points to Exhibit 44 in his Opposition for support.  The exhibit consists of a routine email from EnviroTech's Controller, Michelle Mills, to Michael Donaldson at Trae Fuels attaching the monthly insurance bill from Cigna for _**all**_ Trae Fuels employees for the month of February 2014.  The insurance bill was sent to Mr. Donaldson so he could pay the invoice in his role as controller and include the insurance costs in his monthly financial report for Trae Fuels.  There is nothing specific to Mr. Donaldson in the email.  Most importantly, the email and invoice are sent three months _**before**_ Mr. Donaldson was diagnosed with cancer in May 2014.

In addition, Ms. Mills writes in the email the following: "The way the self-insured works is that if we are healthy and come in under the claim amount, then we will get money back."  Donaldson Exhibit 44.  There is no evidence of what the "claim amount" is and there is no evidence to suggest that the combined policy for

Trae Fuels and EnviroTech did not come in "under the claim amount," even taking into account Mr. Donaldson's treatment beginning in May.  There is no evidence that either Trae Fuels or EnviroTech tracked Mr. Donaldson's health care costs or even knew what they were at any time.

The record also shows that the person with the most knowledge of insurance issues was Human Resources Manager Beth Aleman.  Her uncontradicted Declaration ¶ 21 states as follows on this issue: "I am familiar with the health insurance coverage provided by Cigna Insurance to Trae Fuels and EnviroTech employees during 2013-2014.  Insurance premiums were not affected by the health condition or medical treatment provided to a single employee.  The Company health insurance premiums were not affected by Mr. Donaldson's medical treatment."

It is pure speculation that possible increased insurance premiums affected the decision to terminate Mr. Donaldson's employment.  And of course, to allow such rank speculation to support a showing of intentional discrimination would mean that an employer could never again prevail on a motion for summary judgment; every employee covered by a company health insurance policy that is self-funded or partially self-funded would seek to avoid summary judgment in an ADA case by speculating that insurance premiums might increase.

While Mr. Donaldson cites no legal authority for his theory about insurance costs, other courts faced with this issue have rejected the concept that it is suggestive of a motivation for discrimination:

> McCully argues that AA is self-insured and that 'the trier of fact may infer
> that a self-insured employer has terminated an 'expensive' employee to save

itself money.'  McCully cites *Trujillo v. PacifiCorp,* 524 F.3d 1149 (10th Cir. 2008), for the proposition that '[s]uch evidence weighs heavily in favor of demonstrating motive to discriminate against an employee with a serious illness.' However, *Trujillo* does not support the assertion that pretext may be inferred solely from the fact that an employer is self-insured.  McCully has presented no such evidence in this case. The record is entirely devoid of any evidence that AA was tracking the cost of McCully's health care claims, that McCully's claims were unusual or particularly expensive, or even that AA was generally concerned about its health care.  In this case, the mere fact that AA is self-insured cannot give rise to the inference that actions were taken against McCully because she has cancer.

*McCully v. Am. Airlines, Inc.*, 695 F. Supp. 2d 1225, 1244-45 (N.D. Ok. 2010).

There is no evidence to suggest that Trae or EnviroTech knew anything about whether their insurance premiums would rise because of Mr. Donaldson's condition. Thus, Mr. Donaldson's speculation that the premiums could rise is just that – speculation.  It is not probative of unlawful discrimination.

In sum, the four theories of discrimination offered by Mr. Donaldson on page 30 of his Opposition fail, individually and collectively, to raise an inference of discrimination that is anything more than speculation.

## B. Mr. Donaldson's Disagreement with the Company's Assessment of His Job Performance is Legally Insufficient and Irrelevant

Defendants have demonstrated in Section A. *supra* that Mr. Donaldson has not offered any evidence to suggest that the Company harbored a discriminatory motive to terminate Mr. Donaldson.  On that basis, the Court should enter summary judgment in favor of Defendants.  Mr. Donaldson's extensive challenge of nearly every single workplace criticism he endured does not alter that conclusion. The fact that Mr. Donaldson disputes the Company's assessment of his performance

does not create a dispute of material facts that precludes the entry of summary judgment.

Again, the relevant standard is this: "In evaluating performance, [it] is the perception of the decision maker which is relevant." *Johnson v. Mechanics & Farmers Bank*, 309 F. App'x 675, 683 n.8 (4th Cir. 2009) (alteration in original) (quoting *Smith v. Flax*, 618 F.2d 1062, 1067 (4th Cir. 1980)). A plaintiff's own testimony "cannot establish a genuine issue as to whether" the plaintiff met the defendant's expectations. *King v. Rumsfeld*, 328 F.3d 145, 149 (4th Cir. 2003). *See David v. Winchester Med. Ctr.*, 2018 U.S. Dist. LEXIS 2530, at *35-37, 2018 WL 310140 (W.D. Va. 2019).

In assessing whether the reasons Trae Fuels and EnviroTech have given for his termination are not just incorrect, but actually "false," Mr. Donaldson must present facts showing that the Company's explanation for his termination is "so incoherent, weak, inconsistent, or contradictory that a rational factfinder could conclude the reason [is] unworthy of belief." *Young v. Dillon Cos. Inc.,* 468 F.3d 1243, 1250 (10th Cir. 2006). The Company's justification for termination must be found to be "unworthy of credence." *Morgan v. Wells Fargo Bank, N.A.,* 585 Fed. Appx. 152, 153 (4th Cir. 2014). "Unworthy of credence" is a standard that is even higher than the "obviously contrived" language used by the Supreme Court in *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 524 (1993).

Pages 2-14 of Mr. Donaldson's Opposition Brief consist of a section mis-titled as "Material Facts in Dispute." Most of the facts are basic background facts that

are not in dispute or even relevant to the motion (e.g., ¶ 2: "On October 17, 2013 Donaldson began working for Trae Fuels."). On pages 14-23 of his Opposition, Mr. Donaldson takes issue with various workplace criticism. His self-serving rebuttal of the Company's criticism only shows that he disagrees with the Company on every point raised; but, none of the issues he raises come close to rendering the contemporaneously documented criticism of his work as "unworthy of credence."

His post-hoc construction of the June 4, 2014 meeting in which he was counseled on his poor work performance by HR Manager Beth Aleman, GM John Frink, and corporate strategist Chris LaRocco is an extraordinary example. Despite the existence of a detailed personnel counseling memo prepared contemporaneously by Ms. Aleman (Ex. 3 to Motion for Summary Judgment), Mr. Donaldson now argues that the meeting was actually convened for the purpose of directing Mr. Donaldson to "force Frink not to spend money he had been spending to fix issues in the plant and keep it operating. I explained that . . . I could not control Frink or other external factors that caused Trae Fuels to lose money." Plaintiff's Opposition at 10, ¶ 37; Donaldson Declaration ¶ 28. Thus, according to Mr. Donaldson's revisionist history, the June 4, 2014 meeting to assess **_his_** job performance was instead a meeting to critique **_his boss'_** (Mr. Frink) spending proclivities. *See also,* Plaintiff's Response to Interrogatory No. 17, Plaintiff's Exhibit 3 at p. 17 ("Ms. Aleman did not criticize Plaintiff's performance . . . ."); Plaintiff's Exhibit 36 (Donaldson concerned about review and "probation periods.").

This pattern is repeated time and again throughout the Plaintiff's Opposition and provides a detailed preview of what Mr. Donaldson would ask the Court (or jury) to do at trial: that is, act as a "super-personnel department weighing the prudence of" his employer's decision to terminate his employment. *See Staley v. Gruenberg,* 575 Fed. Appx. 153, 156 (4th Cir. 2014).

### 1. The Line of Credit

In paragraphs 56-66, Mr. Donaldson claims that the Trae Fuels line of credit was not overdrawn.  In support of this contention, Mr. Donaldson cites a bald statement in his own declaration that the line was not overdrawn.  This statement is unsupported by any documentary evidence and is directly contradicted by Mr. Whyrick's deposition testimony explaining that the cash-flow analysis prepared by Mr. Donaldson was incorrect and that as a result the actual limit on the line of credit was lower than everyone in the Company had believed.  Plaintiff's Exhibit 2, Whyrick Dep. Tr. at 225-30.  Mr. Whyrick also testified that he (not Mr. Donaldson) received a telephone call from the loan officer informing him that the Trae Fuels line of credit had been ***overdrawn*** by an estimated $1 million.  *Id.*  at 226-27.

The line of credit overdraft is fully consistent with every other factual assertion made by Mr. Donaldson.  He claims the company lost $1.7 million in the first two quarters of 2013-14. Opp. at p. 1.  He notes that Trae Fuels was "hemorrhaging money for months due to its lack of sales [and] . . . . the acute need to draw on the credit line was caused by a customer failing to pay a $515,000 bill when expected." Opp. at p. 27.  He noted that a massive draw on the line of credit

was planned for May 30 ($669,000). Opp. at 16, ¶ 62. The draw on the line was then reduced to $500,000. *Id.* In ¶ 64 of the Opposition, Mr. Donaldson then states that the Company had to make a "capital call" on its investors due to lack of revenue. In addition, Trae Fuels has stopped operations due to financial difficulties. Plaintiff's Exhibit 2, Whyrick Dep. Tr. at 47.

In sum, there is simply no dispute that Trae Fuels was losing money and had little to no revenue as it began production. The record shows that there were multiple draws on a line of credit whose limits were variable based on the cash flow projections prepared by the Company controller, Michael Donaldson. Mr. Whyrick testified he received a telephone call from the Company loan officer notifying him of the line of credit overdraft. He responded by causing EnviroTech to loan funds to Trae Fuels to cover the deficit. *Id.* at 227. An investor capital call then ensued. There is nothing that is "false" or "unworthy of credence" or "obviously contrived" in this scenario. The employer's perception of events controls; Mr. Donaldson's rebuttal is legally entitled to no weight. And regardless of whether the Court accepts Mr. Donaldson's unsupported contentions, Mr. Donaldson's effort to deny the occurrence of the overdraft and shift the responsibility for the draws on the line of credit does not establish pretext on the part of the Company.

### 2. The IFS System

In paragraphs 67-77 of his Opposition, Mr. Donaldson contends that his operation of the IFS system was not the reason Trae Fuels was required to draw on its line of credit and that he was not "re-trained" on the IFS system in May 2014.

His garden variety explanation of how the system worked and his ability or inability to use its functions is not relevant to the outcome of the motion. These two sections offer no evidence at all to suggest that the Company's assessment of his ability to use the IFS system was "false" or "unworthy of credence." He freely admits that he had a two-hour call "with an IFS consultant" in May 2014; he simply objects to the characterization of the call as a re-training. Opp. at ¶ 75. He also admits that Kevin Whyrick and Gohar Wise came to Trae Fuels in May 2014 and showed him how to use the Purchase Order IFS module, even though he had been introduced to this module in November 2013. *Id.* at ¶ 76. This was obviously a "re-training." The Company has demonstrated that it believed Mr. Donaldson could not fully and competently operate IFS; Mr. Donaldson disagrees. Mr. Donaldson's email dated February 14, 2014 (five months after he began work) states the following: "One question I forgot to ask on our call since I'm learning IFS." Plaintiff's Exhibit 61.

The law is clear that the perception of the decision maker is all that counts; Mr. Donaldson's subjective self-assessment is not relevant. *Johnson v. Mechanics & Farmers Bank*, 309 F. App'x 675, 683 n.8 (4th Cir. 2009).

### 3. The Human Resource Files

In paragraphs 78-82, Mr. Donaldson blames the HR file compliance issues on Ms. Aleman's failure to train him properly and Mr. Frink's failure to follow Mr. Donaldson's directions. Neither explanation make the criticism of Mr. Donaldson "false" or "unworthy of credence" or "obviously contrived."

### 4. Failure to Communicate with Mr. Frink / Financial Reports / Other Criticisms

In three separate sections spanning paragraphs 83-96 Mr. Donaldson claims that he was correct and his employer was incorrect on a variety of workplace issues from communicating with Mr. Frink, to the quality and accuracy of his financial reports, to IFS purchase order functionality, to his stubborn use of separate excel spreadsheets outside the IFS system, to Mr. Donaldson's failure to timely provide insurance papers for new workers. Again, Mr. Donaldson's subjective self-assessment is entitled to no weight. It is the perception of the employer that counts. *Johnson v. Mechanics & Farmers Bank*, 309 F. App'x 675, 683 n.8 (4th Cir. 2009). The Court is not required to act as a "super-personnel" department and adjudicate the routine workplace differences between Trae Fuels / EnviroTech and Mr. Donaldson. There is nothing in Mr. Donaldson's self-assessment on these issues that remotely suggests that the Company did not itself believe the criticism and evaluations of its employee, Mr. Donaldson.

### C. Mr. Donaldson's Claims Fail for Additional Reasons

Mr. Donaldson makes several points toward the end of his Opposition that are legally and factually deficient. In addition, there are other key omissions and deficiencies in Mr. Donaldson's theories. Defendants address them below.

### 1. Failure to Follow Procedures

Mr. Donaldson claims that the Company failed to follow procedures because the June 4, 2014 employee counseling form (Defendants' Exhibit 3) was not presented to Mr. Donaldson for his signature. First, Trae Fuels was a start-up

organization that had been functioning for less than a year and had 15-20 employees and no independent human resources department, thus there were no written or established policies. Plaintiff's Exhibit 2, Whyrick Dep. Tr. at 23-24. Second, Mr. Donaldson testified that all the items identified on the employee counseling form were discussed with him in the June 4 meeting and he was provided with the "scorecard" identified in the counseling form. Donaldson Dep. Tr. at 82-111, attached hereto as Exhibit 17; *See also* Defendants' Exhibits 11 & 13. **He specifically recalls that in order to improve his work performance he was told to produce work at a faster pace and that he was told to "get out of the weeds."** Defendants' Exhibit 17, Donaldson Dep. Tr. at 110.

Other courts have assessed the question of whether failure to follow the precise procedures set forth in an employee manual is sufficient to show discriminatory intent; the answer is no: "[T]he mere failure of a company's employees to follow their employer's manuals and written directives, without more does nothing to suggest discrimination as opposed to perhaps, say, laxity on the part of company employees." *Hinds v. Spring/United Management,* 523 F.3d 1187, 1199 (10th Cir. 2008) (Gorsuch, J., affirming grant of summary judgment in age discrimination case).

The Company's ministerial oversight in not obtaining Mr. Donaldson's signature on the employee counseling form is irrelevant and is logically explained by the fact that Beth Aleman's main office location was in Colorado.

2.   **There is No Showing that Other Employees Were Treated Differently**

In many discrimination cases, the terminated employee provides evidence that he or she was subject to harsher discipline for the same workplace conduct that similarly situated employees outside the protected group.  *See, e.g., Brooks v. Potomac Family Dining Group Operating Co. LLC*, 2019 U.S. Dist. LEXIS 55024, *17-22, 2019 WL 1441628 (W.D. Va. 2019).  In this case, Mr. Donaldson has offered no such evidence and there is none.

3.   **The "Shifting Explanations" Claim**

On pages 27-28 of the Opposition, Mr. Donaldson claims that the Company has provided different justifications for its termination of Mr. Donaldson during the course of the litigation.  Mr. Donaldson offers no evidence to support this contention.  All the criticism of Mr. Donaldson's performance with respect to the quality and content of his financial reports was documented contemporaneously in 2014.  Neither Trae nor EnviroTech have ever taken a different position during the litigation.

Mr. Donaldson claims that the June 4 counseling session did not mention inaccurate financial statements.  The text of the counseling form tells a different story.  *See* Defendants' Exhibit 3; Plaintiff's Exhibits 31 & 63.  Mr. Donaldson was told on June 4 that he needed to be "current at all times with financial reporting, including current cash flow."  He was told he needed to know "what does it cost us to open the door everyday."  He was counseled on the importance of correlating inventory levels with financials.  Chris LaRocco promised to (and did) make a

"scorecard" so Mr. Donaldson could "start collecting vital financial information which will help with reporting and creating a 'State of the Union' style report that he can share with corporate and John [Frink] at all times."

The level of "handholding" that was required for a senior executive such as a controller at a manufacturing facility is remarkable; these topics are plainly "Accounting 101." Moreover, the topics set forth on the employee counseling form, and follow up documentation in 2014 on these topics, are completely consistent with the reasons Mr. Donaldson was eventually terminated. The Defendants have not changed the rational for Mr. Donaldson's termination at any point in time during the EEOC investigation or this litigation.

### 4.   Mr. Donaldson's Declaration Should be Stricken

Mr. Donaldson's Declaration is set forth as Exhibit 1 to his Opposition Brief. The Declaration is signed by his attorney, Jack Jarrett. It is not signed by the Plaintiff Michael Donaldson. Further, although there is a reference to 28 U.S.C. § 1746 on page one of the Declaration, there is no statement that the Declaration is executed under oath under penalty of perjury. The Declaration should be stricken. *See Nissho-Iwai American Corp. v. Kline,* 845 F.2d 1300, 1305-07 (5th Cir. 1988).

### 5.   Mr. Donaldson has Abandoned his Failure to Accommodate Claim in Count 1

Mr. Donaldson does not devote one word in his Opposition Brief to defending his failure to accommodate claim. He has therefore abandoned the claim and the Defendants are entitled to summary judgment on Count 1 for the reasons set forth in their October 31 Motion and Brief in Support.

### III.    Conclusion

When Ms. Aleman and Mr. Frink terminated Mr. Donaldson's employment on August 20, 2014, he stated words to the effect of "you can't fire me . . . . I am old and I am sick." Aleman Declaration at ¶ 16.  Mr. Donaldson does not dispute Ms. Aleman's sworn declaration on this point.  It is revealing, however, that Mr. Donaldson made this statement.  It suggests that even though his cancer diagnosis and treatment did not interfere with his ability to work long hours, that he believed he was somehow "untouchable."  This was not a realistic self-assessment given the abundance of evidence pointing out his errors and demonstrating his inability to perform the basic functions of the comptroller role.

The concept that his cancer diagnosis or treatment played any role in his ultimate termination is further undermined by the fact that his primary supervisor, Kevin Whyrick, was a Stage III cancer survivor. Whyrick Declaration ¶ 12.

Finally, "employment discrimination law 'is not a vehicle for substituting the judgment of a court for that of the employer.'" *Jiminez v. Mary Washington College,* 57 F.3d 369, 377 (4th Cir. 1995).  Because Mr. Donaldson has offered no evidence supporting his claim of unlawful discrimination, and the circumstances surrounding his termination do not remotely suggest that an inference of discrimination is plausible, the Defendants' Motion For Summary Judgment should be granted.

Dated: November 18, 2019.

Respectfully submitted,

/s/ Jackson S. Nichols
_____
Jackson S. Nichols, Esq.
(VSB # 87225)
Cohen Seglias Greenhall Pallas & Furman PC
1828 L. Street, N.W., Suite 705
Washington, D.C.  20036
(202) 466-4110
JNichols@CohenSeglias.com

--and--

/s/ Lars H. Liebeler

_____

Lars H. Liebeler, Esq. *(admitted pro hac vice)*
Lars Liebeler PC
1828 L. Street, N.W., Suite 705
Washington, D.C. 20036
(202) 774-1510
LLiebeler@LHL-LawFirm.com

## CERTIFICATE OF SERVICE

This is to certify that I have on November 18, 2019 served all the parties in this case with this **Reply Brief in Support of Motion for Summary Judgment** in accordance with the notice of electronic filing ("ECF"), which was generated as a result of electronic filing in this court.

/s/ Lars H. Liebeler
_____
Lars H. Liebeler, Esq.