IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

| | |
|---|---|
| MICHAEL DONALDSON,<br><br>  Plaintiff,<br><br>  v.<br><br>TRAE FUELS, LLC., et al.<br><br>  Defendants. | Case No.: 3:18CV00097 |

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

EXHIBIT 17

**Page 1**

```
 1           IN THE UNITED STATES DISTRICT COURT
 2           FOR THE WESTERN DISTRICT OF VIRGINIA
 3                   CHARLOTTESVILLE DIVISION
 4      - - - - - - - - - - - - x
 5   MICHAEL DONALDSON,       :
 6         Plaintiff,         :
 7      v.                    :  Civil Action No.
 8   TRAE FUELS, LLC., et     :  3:18CV00097
 9   al.,                     :
10         Defendants.        :
11      - - - - - - - - - - - - x
12
13            Deposition of MICHAEL DONALDSON
14         WASHINGTON, DISTRICT OF COLUMBIA
15              Thursday, October 3, 2019
16                   10:30 a.m.
17
18
19
20   Job No.: 263611
21   Pages: 1 - 180
22   Reported By: Kaylee Lachmann, RPR
```

**Page 2**

```
 1      Deposition of MICHAEL DONALDSON, held at the
 2   offices of:
 3
 4
 5         Cohen Seglias Pallas Greenhall & Furman PC
 6         1828 L Street, NW
 7         Suite 705
 8         Washington, DC 20036
 9         (202) 466-4110
10
11
12
13
14      Pursuant to notice, before Kaylee Lachmann,
15   Registered Professional Reporter and Notary Public
16   in and for the District of Columbia.
```

**Page 3**

```
 1                    A P P E A R A N C E S
 2      ON BEHALF OF THE PLAINTIFF, DONALDSON:
 3         JACK JARRETT, ESQUIRE
 4         ALAN LESCHT & ASSOCIATE, PC
 5         1825 K Street NW
 6         Suite 750
 7         Washington, DC 20006
 8         (202) 463-6036
 9
10      ON BEHALF OF THE DEFENDANTS, TRAE FUELS, LLC,
11   et al.:
12         LARS H. LIEBELER, ESQUIRE
13         JACKSON S. NICHOLS, ESQUIRE
14         COHEN SEGLIAS PALLAS GREENHALL & FURMAN PC
15         1828 L Street, NW
16         Suite 705
17         Washington, DC 20036
18         (202) 466-4110
```

**Page 4**

```
 1                    C O N T E N T S
 2   EXAMINATION OF MICHAEL DONALDSON          PAGE
 3      By Mr. Liebeler                           5
 4
 5
 6
 7                    E X H I B I T S
 8                      (Attached)
 9   DONALDSON DEPOSITION EXHIBIT              PAGE
10   Exhibit 1    Confidentiality Agreement     38
11   Exhibit 2    Employee Counseling Notice    82
12   Exhibit 3    Supplemental Interrogatories 113
13   Exhibit 4    6/23/14 E-mail Correspondence 127
14   Exhibit 5    1/31/14 E-mail Correspondence 134
15   Exhibit 6    1/31/14 E-mail Correspondence 143
16   Exhibit 7    1/31/14 E-mail Correspondence 147
17   Exhibit 8    2/24/14 E-mail Correspondence 150
18   Exhibit 9    2/24/14 E-mail Correspondence 153
19   Exhibit 10   4/14/14 E-mail Correspondence 154
20   Exhibit 11   8/7/14  E-mail Correspondence 165
21   Exhibit 12   6/26/14 E-mail Correspondence 169
```

81

1  criticism for that? I'm not asking you whether
2  the criticism was right or wrong.
3      A  Right.
4      Q  I understand that you don't agree with it?
5      A  Yes.
6      Q  The question is whether they criticized
7  your performance for putting reports in his chair.
8  Is the answer yes?
9      A  That --
10         MR. JARRETT: Objection to the form of the
11 question. You can answer.
12     A  There was -- that was just that there was
13 a reason behind it.
14     Q  Okay. All right. You also included
15 control John's spending. Is that a complaint that
16 they made of you, that it was your responsibility
17 to control John's spending and you weren't doing
18 it adequately? Whether you agree with it or not
19 -- and I assume you disagree with it -- did they
20 criticize you for that?
21     A  Yeah, for their -- for whatever reason
22 they had, yeah. Yeah.

82

1         (Whereupon, Exhibit 2, Employee Counseling
2  Notice, was marked for identification.)
3      Q  I'm going to hand you what's been marked
4  as Exhibit 2. Please take a look at that and read
5  it and let me know when you're done reading it.
6      A  Okay.
7      Q  While you're reading that, I'm going to
8  have Cynthia make a copy of these interrogatories
9  that we've signed right here.
10     A  I read it.
11     Q  You can keep it. Have you had an
12 opportunity to read it?
13     A  Yes, sir.
14     Q  And have you seen this document before?
15     A  I never saw it until we had the EEOC
16 investigation, and it was after you did your
17 response, which was probably -- we got it two
18 years later or something like that. I had not
19 seen this document today because it was not
20 presented to me to sign.
21     Q  I see. Do you recognize whose signature
22 is in the bottom left?

83

1      A  It looks like Beth Aleman. Yes, sir.
2      Q  But your testimony is that you did not see
3  this during the time that you were employed with
4  Trae Fuels?
5      A  I never saw this until, you know, you had
6  it as an exhibit in your EEOC rebuttal.
7      Q  Okay. All right. Does reading this
8  document help to refresh your recollection about
9  more details of the meeting, which was either on
10 June 3rd on June 4th? Do you remember which the
11 date was? Because this document is dated
12 June 4th, but in your complaint you said that the
13 meeting was on June 3rd.
14     A  Well, I don't -- I thought it was
15 June 3rd. I could be wrong, I mean, the day -- I
16 thought it was on June 3rd. Maybe this was
17 written up the next day.
18     Q  Right. To your understanding, does this
19 summary of the meeting here correspond with the
20 paragraph 72 in the meeting that you've described
21 in paragraph 72 and 73 of your complaint?
22        MR. JARRETT: Objection. Vague as to the

84

1  meaning of correspond. You can answer.
2         THE WITNESS: Did you want me to answer?
3         MR. JARRETT: Yeah. You can answer.
4         THE WITNESS: Okay. Sorry.
5      Q  There's not two meetings; it's just one
6  meeting, correct?
7      A  What, this right here? 72 and 73?
8      Q  Right.
9      A  I'm sorry. Okay.
10     Q  I'm just trying to reconcile the
11 difference in the dates here. I want to make sure
12 that we're all --
13     A  There were no -- there were not two
14 meetings, just one meeting.
15     Q  Just one meeting. Got it.
16     A  Yes, sir. Just one meeting. Yeah.
17     Q  All right. Now, the next question is does
18 reading this document refresh your recollection
19 about more details that occurred in that meeting
20 on -- we're going to call it June 3rd because
21 that's what's in your complaint?
22     A  Yeah. I mean, I see it here. Basically I

**85**

mentioned about getting out of the weeds. We see that in the employee counseling list that I never got, form -- focus on a higher level to make it profitable. I mean, that's basically what I was saying.
  Q  Let's go through it. I'm just -- my question was did it help refresh your recollection about what happened in the meeting?
  A  Yeah, I guess so. I guess so.
  Q  Let's look at the first sentence. It says, John Frink, Chris LaRocco, and I met with Michael to establish performance expectations. Do you recall that the purpose of the meeting was to establish performance expectations?
    MR. JARRETT: Objection. Calls for speculation. You can answer.
  A  I don't know if I agree with it or not. I mean, that's what it appears to be, as we say in accounting. We use the word appear. But it says, for the next two weeks. Why in the next two weeks? They were monitoring me during those two weeks' time. Even people out in the plant came in

**86**

and sat in the office. I mean, that's why this whole thing seemed to be something different than what it was.
    MR. JARRETT: He's asking you about --
    THE WITNESS: I know.
    MR. JARRETT: -- the meeting, not necessarily what the document says, what the purpose of the meeting was.
    THE WITNESS: Well, that's what they said.
  Q  Do you agree or disagree?
  A  They -- well, that's what they said. I didn't call the meeting, so I have to agree with -- they say that's what it was for. That's what they said. I don't know, you know, fully.
  Q  Were you put on a performance improvement plan for the next two weeks as a result of this meeting?
  A  No. I wasn't given anything about a performance improvement plan. They monitored me. They told me to -- I mean, it was -- John Frink was going back to Colorado. He goes there quite a bit. And when he -- he gave me a little

**87**

checklist, do this, do that, do this, do that. I did all those things, but I never had them before this meeting, and it was really trivial things.
  Q  But they ask you to improve your performance over the next two weeks and they give you a list, is that correct?
  A  Well --
    MR. JARRETT: Objection. Assumes facts not in evidence. You can answer.
  A  Well, some of the things had nothing to do with performance. It was just --
  Q  No, no. You're going by my question. They gave you a list --
  A  Yeah.
  Q  -- after this meeting of things that you should do to improve your performance. Is that right or wrong?
    MR. JARRETT: Objection. Assumes facts not in evidence. You can answer.
  A  I would say it's wrong in the sense that it had nothing to do -- like follow up on this, follow up on that. This is -- this is something,

**88**

you know -- things that John wanted to do, and John had to prepare this list after this meeting, so they didn't give me this list during this session.
  Q  Okay.
  A  John --
  Q  As a result of the meeting, John prepared a list?
  A  John prepared a list. Yes, sir.
  Q  And he gave it to you?
  A  He did.
  Q  And there were tasks for you to perform on the list?
  A  That's correct. But I don't think that's in reference to my performance. It's just tasks to do. Had nothing to do with the performance.
  Q  And you did the tasks?
  A  Yeah. Like I would do the tasks two months ago or three months ago.
  Q  That's fine. You're not answering the question. You're giving me much more information.
  A  Okay. But it had nothing to do with

89

1 performance.
2   Q  Okay.  It didn't have anything to do with
3 performance?
4   A  No, no.
5   Q  Okay.  Even though they say it's to
6 establish performance expectations in this
7 meeting, the list that's generated after the
8 meeting has nothing to do with your performance?
9       MR. JARRETT:  Objection.  Asked and
10 answered.  You can answer it again.
11   A  I don't -- I don't feel it had anything to
12 do with performance because they would have said,
13 this is wrong, that's wrong, this is wrong, do
14 this, do that, do that.  And a lot of things were
15 just, you know, follow up on this, follow up on
16 that.  And then there was — we was going do this
17 cash — what Chris called a cash flow.  He was
18 going to show me how to do that, or we were
19 talking about doing that, and I did that.  But
20 other that — other than that, things were fairly
21 normal.  It was normal things, but it had nothing
22 to do with — from my perspective, performance

90

1 issues.
2   Q  Let's take a look at the sentence that
3 looks like it's at the end of that first
4 paragraph.  It reads, discussion also included
5 making decisions faster, knowing inventory at all
6 times, and how that data correlates with
7 financials.  Do you see that?
8   A  I do.  Yes, sir.
9   Q  And does that refresh your recollection
10 that they asked you to make decisions faster?
11   A  I didn't know I was making them slow.  So
12 no.  I don't — I don't recall that, no, to be
13 quite honest from that meeting.  I don't recall
14 that, those words.  I got this, like I said, two
15 years later or whatever the EEOC -- about
16 inventory.  I knew what the inventory was pretty
17 much, so they were saying things that — they
18 were -- because I would tell John, this is where
19 we're at, but they were using this because of the
20 situation, you know, with the capital call, and
21 they knew it.  John knew it, and so this is
22 written from their vantage point, making these

91

1 assumptions on paper, that —
2       MR. JARRETT:  He's just asking your
3 recollection as to whether in the meeting you
4 recall him saying --
5       THE WITNESS:  Yeah.
6   A  I don't recall — I don't recall about
7 making decisions faster.  No.  I don't recall
8 that.
9   Q  So you don't recall one way or the other?
10 It could have happened; you just don't recall at
11 this point?
12   A  No.  I don't recall making decisions
13 faster because I made the decisions, what I could
14 make — there's things I couldn't do.  I had to
15 pretty much rely on Kevin or any other of the five
16 people, but you know — so it wasn't like I had
17 autonomy to do —
18   Q  So as you recall the situation now, you're
19 saying you disagree -- if someone criticized you,
20 because you weren't making decisions fast enough,
21 your position is, I disagree with that, I'm making
22 them as fast as I can?  So just you don't agree

92

1 that you were making decisions slowly?
2   A  Yeah.  I don't agree.  I don't agree with
3 that, and some things would be out of my
4 decision-making power.  Yeah.
5   Q  And then the next clause says, knowing
6 inventory at all times.  But the fact that it's in
7 an employee counseling notice, doesn't that imply
8 that you didn't know what the inventory was at all
9 times?
10       MR. JARRETT:  Objection.  Calls for
11 speculation.  Assumes facts not in evidence.  But
12 you can answer.
13   A  No.  It doesn't.
14   Q  Okay.  Did anybody criticize you about
15 your knowledge of the inventory during this
16 meeting?
17   A  I don't recall, but I will say that I knew
18 what was the inventory was.
19   Q  So if they did say that, you just disagree
20 and you knew what of the inventory was?
21   A  I knew what it was.
22   Q  Let's read the next line.  I'll read it

93

1  for you.  I emphasized the he, parentheses,
2  Michael, needs to meet daily with John to discuss
3  current financials and updates, parentheses, no
4  more leaving reports on his desk without
5  conversation.  Do you see that language?
6     A  I see that language.  Yes, sir.
7     Q  Do you remember them discussing that topic
8  with you?
9     A  I remember them discussing that, and I
10 left it in his chair, actually.  I didn't leave it
11 on the desk.  I put it on his chair.
12    Q  You disagree with the desk, but you left
13 it in his chair?
14    A  Yeah, because he was never available.  You
15 know, I tried to get him in -- you know, I
16 can't -- John is out there at the plant, fixing
17 it.  John has to make himself available, and we
18 tried to do that, right?  So -- but did they give
19 John a counseling notice?  You know, that's --
20    Q  So you're saying it's at least some or all
21 of John's fault that he's not available for you to
22 talk to?

94

1     A  Well, partially.  But I did go to -- I did
2  go to and try to talk to him, and he would say a
3  lot of times, if there's no there out in the
4  plant, there's no here.  So that was -- and I
5  understand that, prioritizing.  And then sometimes
6  I would give him something and he says, yeah, I
7  know all about this.  You know, I had a business
8  in Colorado.  I know how to read financials.
9  So -- yes.
10    Q  After this June 3rd or June 4rd meeting,
11 did you use a different strategy to try to get
12 more face time and communications and direct
13 meetings with John as a result of this meeting?
14    A  Yeah.  I think we -- I think we both did.
15 I think we both did, because John was sitting
16 there, and John was really passive.  He wasn't --
17 you know, Beth was controlling the meeting and
18 she's not even there physically, you know?  But
19 yeah.  We tried to do more, but things would come
20 up, and I would try, yes.  And I tried before, but
21 still, things would happen, you know.  And I said,
22 John, you know, we got to meet, we have to meet,

95

1  or we got to review the financials for this month,
2  and then, you know, give everybody, the plant
3  managers information and stuff to help them.  And
4  we did do that eventually, but it was -- it was
5  sporadic, and this is June, right?  So you're
6  talking June closing, and I was only there a month
7  later, like July and -- August 20th I was gone.
8  So we hadn't even finished August, so I wasn't
9  there.  After this meeting I was only there less
10 than two months with one financial report after
11 June, so --
12    Q  The nest clause reads, he needs to focus
13 on performing at a higher level and not in the
14 day-to-day, quote, weeds of things going on in the
15 office.  Do you recall that discussion during the
16 meeting?
17    A  I do.  I do.  Yes, sir.
18    Q  And how did you respond, if you recall, to
19 the criticism that you need to focus on performing
20 at a higher level?
21        MR. JARRETT: Objection.  Assumes facts
22 not in evidence.  You can answer.

96

1     A  Well, first of all, I said, I'm the only
2  degree -- I probably said -- I'm not 100 percent
3  sure -- I am the only degreed accountant here.
4  I'm the only one that knows how to do certain
5  things.  There's no one else.  So the weeds --
6  someone's got to be in the weeds.  If I'm not in
7  the weeds, who is going to be there?  And then I
8  did ask them for help, because when they made this
9  statement, right, and I was passive, I had asked
10 them, even John, I said, I need help, okay?  If
11 you want me to do things at a higher level, I need
12 help so I can get out of weeds, right?  And not
13 that I can't do it at a higher level; I was doing
14 the things necessary, but I was doing so many
15 different things, you know, that had to be done.
16    Q  So you thought you were -- had too many
17 things on your plate in order to perform at a --
18 the high-level tasks that you wanted to do -- or
19 they wanted you to do?
20    A  Yeah.  I would say -- yeah.  I would say
21 that whatever else they wanted me to do, but I was
22 doing the financial statements.  I was doing

**Page 97**

1  payroll, HR -- some HR functions. I was doing --
2  working with sales, doing bids. If something
3  comes up for a job, I got to stop everything and
4  work out a complicated bid, you know. That takes
5  a day or more to do. And I was able to do some
6  things, like provide feedback to the managers, you
7  know, as far as their performance and stuff. But
8  I asked them for help, so that if there was
9  another task they wanted me to do, I could do
10 them. And Chris told -- LaRocco told me, we're
11 going to get you some help.
12    Q You mean help in the form of assistants?
13    A Yes.
14    Q Accountants?
15    A Correct, correct. Eventually he said he
16 was going to get me help. The next thing I know,
17 I was terminated.
18    Q Was there any e-mail or formal request
19 that you made to anybody within the company to
20 say, I need official staffing in order to do the
21 job you want me to do?
22       MR. JARRETT: Objection. Vague. You can

**Page 98**

1  answer. Vague and compound. But you can answer.
2    A I don't know, but I do know it was verbal.
3  See, here's the disadvantage. I don't have the
4  e-mails. They could provide you with all their
5  e-mails and maybe some of mine, but I don't have
6  any of my e-mails where I responded. They could
7  be selective. I don't know. But I know I did
8  discuss it, you know, verbally. And Chris LaRocco
9  said, we're going to get you some help.
10    Q Next line reads, I also removed all HR
11 employee file responsibilities except the five
12 exempt manager positions from Michael's
13 responsibility. Do you see that?
14    A Yes, sir.
15    Q Is that an accurate statement?
16    A That is accurate. Yes, sir.
17    Q Okay. And why did she do that? Did she
18 tell you?
19    A It's a long story behind all this.
20    Q Did she tell you at the meeting why she
21 was taking that responsibility away from you?
22    A She didn't exactly say. No. But she --

**Page 99**

1  she kept me with the five managers' files, and all
2  the hourly people went back to the office manager.
3  It was a -- I didn't have those in the first --
4  when I first came there, and there was some office
5  things going on between Michelle and Beth Aleman.
6  They didn't -- EnviroTech didn't want Fran to have
7  access --
8    Q Executives?
9    A Not only that, the hourly people in the
10 office. They didn't want her to have them, so
11 they gave everything to me.
12    Q Let me read the next sentence.
13    A Yeah.
14    Q During the audit of the files in this
15 visit, I found the files to be out of federal
16 compliance. Confidentiality agreements were
17 missing and random accounts payable items were
18 placed in the employee files. Do you remember a
19 discussion of that topic during the June 3rd or
20 June 4th meeting?
21    A I remember -- not during the meeting. I
22 remember that Beth had got Fran Holliday, who was

**Page 100**

1  the office manager, and myself together -- that
2  might be in the next sentence somewhere. Yeah.
3  It's in the second sentence. She got us both
4  together because Fran was doing it, and she said
5  to both of us, these are out of federal
6  compliance. Now, what she meant by that, fully I
7  don't know. But this is -- this is the part that
8  I do remember: Any counseling notices that I put
9  in employees' files, because I've sat in a number
10 of meetings with John when they brought someone
11 from the plant in for counseling or terminating
12 them or disciplining them --
13    Q I'm sorry. It seems like you're going off
14 in a different direction.
15    A Well, I'm --
16    Q Do you agree or disagree with her
17 conclusion that the files were out of federal
18 compliance?
19    A I don't know. I don't know the federal
20 law on all that. I can't speak to that.
21    Q Okay.
22    A But I do know -- I do know the complaints

101

1 that were in there, she wanted me to take all the
2 counseling notices out, and I didn't understand
3 why. How would you -- why wouldn't you want to
4 keep employee counseling notices in the file?
5 Where would you put them? Why do you want to hide
6 it?
7     Q  So you disagreed with her?
8     A  Well, I didn't -- I don't think it was --
9 to me, it didn't seem like a logical -- a logical
10 thing, but I didn't argue with her about it. I --
11 she took the files away, and that was less I had
12 to do, and that was fine. But other than that, I
13 don't know.
14    Q  The files were your responsibility before
15 they were taken away from you?
16    A  They were, and they were Fran's before
17 that, but no one told me anything about federal
18 compliance. I had counseling notices in each
19 person's file. I think that's where they should
20 belong. I had insurance forms in their file,
21 applications in their file, copies of Social
22 Security cards for I-9 verifications, two that you

102

1 needed, and if there were counseling, yeah, I put
2 them there. That's where I felt they belonged,
3 but I didn't know — she said they shouldn't be in
4 there.
5     Q  So you didn't know whether they were
6 within federal compliance or not?
7     A  Yeah. I don't have any idea. No, sir. I
8 don't know that.
9     Q  You testified earlier that you had
10 previous HR functions and responsibilities?
11    A  I did. I did.
12    Q  I assume training, correct?
13    A  I did years ago, right, years ago. I
14 mean, first time I had HR responsibilities, when I
15 first started in 1981, and I just did kind of like
16 payroll stuff, but I had full range of it — of
17 that in 1986, and you know, that was 30-some years
18 ago, and the laws changed. But I-9 came in during
19 1986, because I remember that's when that came in.
20 So I knew that — what forms you had to have and
21 verifications and stuff like that, but she said it
22 was out of federal -- how was it? How it was out

103

1 of federal compliance? I don't know. She would
2 have to state how it was out. I don't know how it
3 was.
4     Q  You don't know what the federal
5 requirements were to know whether she was
6 compliant or not?
7     A  Yeah. I don't even know if she can
8 remember what was out of compliance, but I do know
9 she didn't want the counseling notices in there.
10 That I know. And I assume -- I just assume that
11 she thought that was a reason to be out of federal
12 compliance with. You know, to me that didn't
13 sound copacetic, but yeah.
14    Q  Last sentence reads, in addition I told
15 Michael he needs to create accounts payable files
16 for all the vendors they are using, and those
17 files need to be current at all time [sic]. Do
18 you remember that discussion point during the
19 meeting?
20    A  Yeah. There were accounts payable files.
21 They were there. Now, she's talking about me
22 putting files in the employee files? I mean,

104

1 prior to that, right?
2     Q  I'm just reading what it says.
3     A  Yeah.
4     Q  It says, I told Michael he needs to create
5 accounts payable files, so that certainly implies
6 that there were not accounts payable files,
7 correct?
8     A  Well, it says, during the audit of the
9 files, during this visit I found the files to be
10 out of federal compliance. Confidential
11 agreements were missing.
12        MR. JARRETT:  That's not what he's reading
13 from.
14    Q  The last --
15    A  Random accounts payable items were placed
16 in employees' files. So she's saying that --
17    Q  Look at the -- look at the --
18        MR. JARRETT:  Hold on.
19    Q  Please stop. Just look at the last
20 sentence in this block here.
21    A  Okay.
22    Q  It's the last sentence. Read along with

105

1  me: In addition I told Michael he needs to create
2  accounts payable files for all the vendors they
3  are using and those files need to be current at
4  all time. That's the only thing I want to talk
5  about right now. Does reading that refresh your
6  recollection that Beth discussed that issue with
7  you during the June 3rd or June 4th meeting?
8     A  No, because there were accounts payables
9  files. There was already —
10    Q  So you disagree with her statement in here
11 that implies that there were not accounts payable
12 files?
13    A  Yeah. There were plenty of accounts
14 payable files. But if she's referring to the
15 items that were placed in employees' file, if
16 that's what — I don't know.
17    Q  But that's a different issue, isn't it?
18    A  It makes —
19    Q  Why do you keep going back to that issue?
20    A  Well, I don't know. Maybe -- maybe
21 because she says, it's an employee's file and not
22 an accounts payable file. Maybe that's what she's

106

1  saying.
2     Q  Okay. But account payable files are
3  different than employee files, right?
4     A  But if I -- they are, but if I have a --
5  if I have a -- let me give you a good example. If
6  an employee — which many of them did, they came
7  to John wanting an advance on their salary.
8     Q  Okay.
9     A  Okay? We'd have to cut accounts payable
10 check for that. I would place that in the file,
11 the employee file —
12    Q  That's not a vendor, is it?
13    A  Well, it is. Yeah. Sure.
14    Q  How is that a vendor? It's an employee.
15    A  But it's — if you pay anything to an
16 employee outside of payroll, it's — they're
17 created — they're called a vendor. You have to
18 set up a vendor number in the account payable
19 system with that person's name on it so they can
20 get cut a check from the system. So they are a
21 vendor. They are a vendor. Yes, sir.
22    Q  All right.

107

1     A  Yeah.
2     Q  Did Ms. Aleman criticize you for the fact
3  that she believed that accounts payable files were
4  not current at the time that she reviewed them?
5     A  I — no. I don't recall that at all
6  unless she's talking about if I put an employee
7  vendor check in their file. Other than that, I
8  don't know of any. No, sir.
9     Q  Okay. Let's go to the next section.
10 That's the section titled action taken on this
11 notice?
12    A  Okay.
13    Q  Do you see where that is?
14    A  Yes, sir.
15    Q  Chris is going to make a score card and/or
16 Excel spreadsheet for Michael to use to start
17 collecting vital financial information, which will
18 help with recording and create a, quote, state of
19 union, end quote, style report that she can share
20 with corporate and John at all times. Do you see
21 that language?
22    A  I do. Yes, sir.

108

1     Q  Is that an accurate summary of an item
2  that was discussed during the meeting?
3     A  Yeah. That is accurate. Yes, sir.
4  That's accurate.
5     Q  Did Chris provide you with the score card
6  that's referred there [sic]?
7     A  Yes, yes. We would have done that. Yes,
8  sir.
9     Q  Is that different than the task list that
10 John provided you or is that the same thing?
11    A  I don't have the list, so it may have been
12 a part of that, but John would have -- John
13 probably wouldn't have said those words on there.
14 And they may have coached John what to put on the
15 list.
16    Q  I'm just asking whether it's the same or
17 different list.
18    A  Well, it may have been a part of it, but I
19 do know that we did it right after this meeting.
20 Yes. We did do that. So that was handled. Yes,
21 sir.
22    Q  And that was part of your counseling

109

1 activities, was to help you by creating the score
2 card, correct?
3    MR. JARRETT: Objection. Calls for
4 speculation. Assuming facts not in evidence. You
5 can answer.
6    A Well, I don't think it was counseling -- I
7 wasn't doing anything wrong because I had never
8 done it before. I was never asked to do it
9 before, so it was something new they wanted me to
10 do. Yes.
11    Q Reading the last section that's written,
12 the topic is next step if infraction is repeated.
13 Quote, this is not discussed as this first meeting
14 was to convey the expectations that are needed for
15 the controller position and more specifically for
16 Michael to understand he needs to produce more
17 qualitative/quantitative work and be a hands-on
18 controller. Do you see that language?
19    A What wasn't discussed? The infractions?
20    Q Next step is infraction, I assume.
21    A Yeah.
22    Q We're reading the same document.

110

1    A Yes. So there was no process improvement.
2    Q Do you have a recollection that they asked
3 you to produce more qualitative/quantitative work
4 and be a hands-on controller?
5    A They were saying, get out of the weeds. I
6 remember that. But I wasn't -- I was doing
7 quality work, quantitative work.
8    Q So you disagree with the criticism?
9    A Well, I think it's -- they're reflecting
10 getting out of the weeds again. So they may have
11 said that, but I was producing the work that I
12 could produce. I was producing it. Yeah.
13    Q How did you feel when you got done with
14 the meeting?
15    A I felt very bad.
16    Q Why?
17    A Well, I felt bad for a couple -- a couple
18 reasons. First, John was scared to go to the
19 meeting himself. And they pulled, you know, us in
20 there. I felt -- I felt bad for the company in
21 the sense that they had to do this capital call,
22 not because it was my fault. Now they're getting

111

1 external pressure, you know, from the investors,
2 and you know, they were in a position as
3 management, EnviroTech, you know -- it was
4 probably shame for them.
5    Q Do you feel that you were being unfairly
6 blamed for the financial position of the company
7 at that time?
8    A I do. Yes, sir. I did.
9    Q Let's turn to page 9 of the complaint. On
10 paragraph 77, please -- you can take that exhibit
11 and just set it right here in a pile.
12    A Okay. There you are.
13    Q Okay. It reads, plaintiff was to be
14 treated with chemotherapy two out of every three
15 Fridays, is that correct?
16    A That is correct.
17    Q Okay. And --
18    A That was -- that was -- I had different
19 regimens, but that was when I had to go to the
20 hospital to have intervenous, but I also had the
21 little pill, but that had nothing to do with being
22 off on Fridays. But yeah. Two out of every three

112

1 Fridays, that's correct.
2    Q And paragraph 79, is this accurate,
3 plaintiff also told Frink that he would be able to
4 maintain a 40-hour week despite the chemotherapy?
5    A That is correct.
6    Q And did you, in fact, maintain a 40-hour
7 week during the time that you were employed with
8 Trae?
9    A Yes.
10    MR. JARRETT: Objection. Asked and
11 answered. But answer.
12    A Yeah. 40 to 45.
13    Q 40 to 45?
14    A And they were watching me. They were
15 going to make sure I did that because they would
16 have probably wrote it up after these meetings,
17 right? I did.
18    Q And it's true that Trae and EnviroTech
19 agreed to your four-day workweek on some weeks
20 while still performing 40 to 45 hours per week?
21    A I assume that's correct. I told John.
22 John talked to Kevin. They approved that. I gave

117

1  10, and let's take a look at interrogatory number
2  11.
3      A  Okay.
4      Q  And the interrogatory reads, describe in
5  detail each and every fact in support of your
6  contention in paragraph 91 of the complaint that
7  your employment was terminated because of your
8  actual or perceived disability of pancreatic
9  cancer.  Do you see that question?
10     A  I do.
11     Q  Mr. Donaldson, how does the hiring of a
12 temporary accountant constitute a fact in support
13 of your allegation that your employment was
14 terminated because of your actual or perceived
15 disability of pancreatic cancer?
16        MR. JARRETT:  Objection.  Calls for legal
17 conclusion.  You can answer.
18     A  Repeat that again, please.
19     Q  In the body of your answer, you include
20 the fact that Mr. Whyrick hired a temporary
21 accountant upon Mr. Donaldson's hospitalization on
22 May 19th?

118

1      A  Mm-hmm.
2      Q  Why does that give any indication of why
3  you were eventually terminated on August 20th?
4         MR. JARRETT:  Objection.  Calls for legal
5  conclusion.  You can answer.
6      A  Well, I will say that I didn't hire an
7  accountant.  I can't make a conclusion on that.
8      Q  You agreed it was a reasonable course of
9  action when you were initially hospitalized?
10     A  Yeah.  I would think that -- I would think
11 that -- since I was hospitalized in March with
12 something going on and I had been going to
13 treatments -- not treatments, chemotherapy, but
14 different doctor's appointments and MRIs and
15 sonograms and ultrasounds and all that kind of
16 stuff, GI doctors, and then I was hospitalized,
17 the work has to get done.  And I was the only
18 accountant.  It wasn't like I could say, okay, I
19 had a backup person or -- because my supervisor,
20 they supervise up to eight people direct, 22
21 indirect.  I cross-train people.  Everyone knew.
22 I was the only person.  So we didn't know how long

119

1  I would be in the hospital.  We didn't know -- he
2  didn't know and I didn't know.  So he took this
3  upon his own to do that for whatever -- for
4  whatever reason, maybe to get the work done.
5      Q  My question is simply how is this relevant
6  to any reason about why you were eventually
7  terminated on August 20.  Is it relevant or
8  irrelevant your eventual termination?
9         MR. JARRETT:  Objection.  That calls for
10 legal conclusion.  You can answer.
11     Q  It's not relevant, is it?
12        MR. JARRETT:  Objection to the form of the
13 question, and that calls for legal conclusion.
14 You can answer.
15     A  I'll have to let you guys decide.  I'm not
16 -- I don't know.  I don't know how to answer it.
17 I can't say because I'm not the one hiring the
18 person, and I know that the person didn't stay
19 long.  I do know that.  And --
20     Q  That's because you were performing your
21 job well, right?  You didn't need her?
22        MR. JARRETT:  Objection.  Calls for

120

1  speculation.  You can answer if you know.
2      A  Well, I guess they assumed that.
3      Q  But you told them that you didn't need
4  her, didn't you?  You said, I can work 40 to 45
5  hours a week, I don't need an assistant at that
6  time?
7      A  No, no.  I said I was going to train the
8  person.
9      Q  Okay.  So did you want her there or not?
10     A  I did, because they hired her.  They hired
11 her.  They had modus for hiring her, and I would
12 train that person, and I did it willingly.
13     Q  Did you disagree when they let her go?
14        MR. JARRETT:  Objection.
15     A  It wasn't up to me.
16        MR. JARRETT:  Hold on.  Let me object.
17        THE WITNESS:  Okay.
18        MR. JARRETT:  Objection.  Relevance.  Now
19 you can answer.
20     A  It wasn't my decision to make.
21     Q  Did you disagree with them --
22     A  I didn't --

177

1  that. Yes.
2    Q Any time prior to it not getting done, did
3  you ask anyone for any assistance to help getting
4  it done [sic]?
5    A Well, like I said, the 15th, right?
6  They're showing me on the 15th. I'm leaving for a
7  doctor's appointment on the 15th. I didn't get
8  back until the 27th.
9    Q My question is, did you ask -- did you
10 tell anyone you needed help getting the job done?
11   A There was no one there to help me.
12   Q Did you ask for help to get the job done?
13      MR. JARRETT: Yes or no?
14   A No, no, because there's no one to ask.
15 I'm doing financial statements. There's no one to
16 ask. There's no one to ask. But then he says,
17 you know, I'm very good at accounting and detailed
18 -- I'm very detailed in my communications and
19 detailed as an auditor, so I don't know. But we
20 did get that PO system done so they wouldn't have
21 to enter those 300 lines anymore. So we got them
22 done in June.

178

1    Q Okay.
2    A We got them done.
3    Q All right. Is there anything -- any
4  medications that you're taking that would have
5  interfered with you giving full and complete
6  answers here today for the deposition?
7    A None.
8    Q Thinking back over your testimony from the
9  time we started at 10:30, are you satisfied with
10 all your answers or is there anything upon
11 reflection that you need to change to any of the
12 questions I've asked you?
13   A No, no. I'm pretty satisfied with the
14 answers I gave. Yes, sir.
15   Q Okay. All right. Thank you for your
16 time. The deposition is over.
17     (Off the record at 1:50 p.m.)
18
19
20
21
22

179

1              ACKNOWLEDGMENT OF DEPONENT
2       I, MICHAEL DONALDSON, do hereby
3  acknowledge that I have read and examined the
4  foregoing testimony and the same is a true,
5  correct, and complete transcription of the
6  testimony given by me and any corrections appear
7  on the attached errata sheet signed by me.
8
9  _____    _____
10   (SIGNATURE)                (DATE)

180

1         CERTIFICATE OF SHORTHAND REPORTER-NOTARY PUBLIC
2       I, Kaylee Lachmann, the officer before
3  whom the foregoing deposition was taken, do hereby
4  certify that the foregoing transcript is a true
5  and correct record of the testimony given; that
6  said testimony was taken by me stenographically
7  and thereafter reduced to typewriting under my
8  direction; that reading and signing was requested;
9  and that I am neither counsel for, related to, nor
10 employed by any of the parties to this case and
11 have no interest, financial or otherwise, in its
12 outcome.
13       IN WITNESS WHEREOF, I have hereunto set my
14 hand and affixed my notarial seal this 9th day of
15 October, 2019.
16
17
18  *Kaylee Lachmann* (signature)
19
20 My commission expires: March 14, 2024
21
22