# CORRECTED EXHIBIT 1[1]

---

[1] The only difference between this Corrected Exhibit 1 and the original Exhibit 1 is that this version does not inadvertently omit the language declaring under penalty of perjury that the declaration is true correct and includes Mr. Donaldson's signature rather than a signature he authorized on his behalf.

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Charlottesville Division

| | |
|---|---|
| **MICHAEL DONALDSON,**<br><br>　　Plaintiff,<br><br>　　v.<br><br>**TRAE-FUELS, LLC,** *et al.*<br><br>　　Defendants. | Case No.: 3:18-cv-00097 |

## DECLARATION OF MICHAEL DONALDSON

　　Pursuant to 28 U.S.C. § 1746, I, Michael Donaldson, affirm that I am competent to testify to the matters stated herein, and hereby declare as follows:

　　1.　I am an adult citizen of the U.S., competent to testify to the matters in this Affidavit, and I have personal knowledge of the facts set forth herein.

　　2.　I worked as an accountant and controller for various companies for thirty-two years.

　　3.　On October 17, 2013, I began working for Defendant Trae Fuels.

　　4.　Trae Fuels had between thirty and forty employees during 2013 and 2014, including both office staff and employees that worked on the production line. The office staff consisted of General Manager John Frink, who was responsible for the overall management of Trae Fuels, Plant Manager Clayton Walker, who was responsible for managing the production line, Christian Bach, who was responsible for sales, myself, who was the controller, and Office Manager Fran Holliday, who was responsible for assisting the other office staff and working in the scale house measuring incoming inventory and outgoing product.

*My job duties*

1

5. As Controller, I was responsible for creating various financial reports and for informing Frink of the financial position of Trae Fuels. As part of my duties, I created monthly financial reports that Trae Fuels sent to EnviroTech and eventually sent to Trae Fuels's and EnviroTech's bank to support a line of credit Trae Fuels had with the bank. I also provided Frink frequent cash reports explaining the funds Trae Fuels was spending, making, and had available to spend.

6. Additionally, Trae Fuels made me responsible for maintaining employee files and sending hiring and insurance paperwork to EnviroTech's Human Resources Manager, Beth Aleman. I was also responsible for managing Trae Fuels's payroll system.

7. I was not responsible for hiring or firing employees.

8. I did not have authority to sign checks or send wire transfers without approval on behalf of Trae Fuels. To my knowledge, only Frink, EnviroTech Chief Financial Officer Kevin Whyrick, of EnviroTech, and EnviroTech Chief Executive Officer Roger Knoph had authority to sign checks or approve wire transfers.

9. I did not have authority to borrow against Trae Fuels's line of credit with the bank without supervisor approval.

10. I was not responsible for sales and did not have authority to decide how much inventory to buy or product to produce. Those responsibilities were handled by Trae Fuels salesman Christian Bach, General Manager Frink, and Plant Manager Clayton Walker, who were experienced in the heating pellet business.

11. For about the first two months of my employment, Trae Fuels was not producing pellets and was instead preparing the plant to be operational. In December 2013, I began

completing monthly financial reports that I sent to my EnviroTech accounting supervisors, CFO Whyrick and Controller Michelle Mills.

*Trae Fuels struggled with operational and sales problems and lost money*

12. Throughout the beginning of my employment, Trae Fuels struggled with operational problems that prevented Trae Fuels from producing pellets from the logs it purchased. General Manager Frink, and others, spent significant portions of their time attempting to fix the various problems that prevented the plant from running.

13. Trae Fuels also struggled to obtain significant sales and only had one major customer.

14. Trae Fuels was funded by an initial investment from EnviroTech and its minority owners with the exception of Frink, who failed to provide Trae Fuels the funds for his 20% ownership. CFO Whyrick repeatedly directed me to ask Frink about these funds but Frink failed to pay.

15. In addition to its initial funding, Trae Fuels was approved for a line of credit with UMB Bank, the same bank EnviroTech used.

*From October 2013 until mid-May 2014, my employment went well*

16. From my hiring in October 2013 until mid-May 2014, my supervisors praised my work and indicated they were satisfied with my performance. Frink indicated he was happy with my work, as did Whyrick, LaRocco, and Aleman.

17. My supervisors and I exchanged day-to-day questions and instructions about how EnviroTech wanted Trae Fuels to characterize certain accounting items, the payroll system and IFS system, and requests and instructions regarding insurance and new hire paperwork. These interactions were normal in accounting and with these systems, and experienced EnviroTech

employees Aleman, Whyrick, Controller Michelle Mills, Debby Vannest, and Gohar Wise had similar questions or problems arise in their day-to-day work.

18.     CFO Whyrick approved my monthly financial reports each month. Additionally, Whyrick periodically agreed with my suggestions for better processes for Trae Fuels's accounting procedures and financial practices, although I was constricted in the changes I was authorized to make and had to get permission for simple tasks, such as adding an account to the general ledger.

19.     To the extent I made mistakes in my work, they were minor and my supervisors gave no indication that they believed my performance was deficient.  Prior to my diagnosis with cancer, I was not provided any counseling forms nor was I told by anyone that I needed to improve my work. When instructed to do something differently, I made the corrections and followed the advice of my supervisors.

*I experienced health issues and was diagnosed with pancreatic cancer*

20.     On March 25, 2014, I experienced significant blood loss and had to be hospitalized in the Intensive Care Unit.  The next morning, I called Trae Fuels and informed them that I was at the ICU and would need leave.  Frink and Walker visited me in the hospital.

21.     To discover why I had experienced this blood loss, I began undergoing medical testing.  In April 2014, I learned that I had a mass on my pancreas.  I informed Frink of this the day of my diagnosis as we were both at work at the time.  On Thursday May 15, I learned I had Stage IV inoperable adenocarcinoma pancreatic cancer and that I would need to see an oncologist on Monday, May 19.  In 2014, fifty percent of people diagnosed with this cancer died within six months while the five-year survival rate was 6%.  On Monday, May 19, 2014, I called Frink and told him of the diagnosis and that I would be out that Monday morning.

4

22. On May 19, during my appointment with my oncologist, I was diagnosed with pancreatitis and taken to the hospital. I called Frink and informed him that I was being hospitalized and not to expect me at work.

23. On May 21, I was able to go home from the hospital. While I was in the hospital, my wife and I had learned that we were chosen to be adoptive parents by the birth mother of a baby that would be born on Friday, May 23, 2014 and that she wanted to meet us on Thursday, May 22, 2014. The next morning after being discharged from the hospital we would have to fly to Utah to meet the birth mother and adopt the baby. Immediately after my discharge from the hospital and before leaving for Utah the next morning, I drove one-hour to Trae Fuels and dropped off my company phone (which I had been using to work from the hospital) because it was not charging properly. I went to Utah, adopted my son, and returned to work the day after Memorial Day on May 27, 2014.

*Defendants immediately subjected me to intense scrutiny and unfair criticism following my return to work after my cancer diagnosis*

24. On the day I returned to work, Frink asked me to have a meeting in his office. When I met with Frink, I learned that EnviroTech's head of HR Beth Aleman was on the phone. Aleman started off the meeting by saying "I'm documenting," and then began interrogating me about me leaving my work phone at work during my trip to Utah.

25. I explained that I had brought the phone to the office because it had not been charging properly and had asked that it be sent to be fixed. I further explained that I had been available on my personal cell phone number, which Trae Fuels and EnviroTech were aware of and had called me on before my trip.

26. Aleman backed off her criticism at that point and the call ended.

*Aleman and LaRocco met with Frink and I on June 4, 2014*

5

27.     About a week later, Aleman and corporate strategist LaRocco traveled to Virginia and met with Frink and me.

28.     In this meeting, Aleman and LaRocco told Frink and I that EnviroTech was not happy with Trae Fuels's financial losses and the fact that Trae Fuels was running out of cash. They told me to focus on ensuring that Frink understood Trae Fuels's finances and LaRocco said that he would develop a "score card," to help capture Trae Fuels's financial position. Aleman and LaRocco directed me to essentially force Frink not to spend money he had been spending to fix issues in the plant and keep it operating. I explained that I had been informing Frink of the financial status and that I could not control Frink or other external factors that caused Trae Fuels to lose money.

*Trae Fuels and EnviroTech secretly documented false performance concerns about me*

29.     After the June 4 meeting, Aleman drafted an Employee Counseling Form that claimed I had engaged in deficient performance.

30.     Even though Trae Fuels's and EnviroTech's policy was to provide the employee a copy of a counseling form (and the form has a place for the employee's signature acknowledging receipt), Aleman did not provide the form to me or even inform me that she had created it. I did not learn of the form until Defendants provided it to EEOC in response to my charge of discrimination.

31.     LaRocco and Aleman did not tell me that I was on probation or that I needed to improve my performance. LaRocco and Aleman also did not mention that I had two weeks to improve my performance, (LaRocco, Aleman, Frink, and I discussed how Trae Fuels would operate while Frink was out of town between June 9 and June 26).

32. It is true that several weeks later, LaRocco sent an email (which I didn't learn of until my deposition on October 3, 2019) in which he claimed I was concerned about suddenly being criticized after informing Defendants that I had cancer, however, the term "probation" was the word LaRocco used in the email, no me.  No one told me that I was on probation.

33. From my cancer diagnosis through to my termination on August 20, 2014, Aleman, Whyrick, and Whyrick's subordinates engaged in near-constant questioning and testing of me and secretly documented what they claimed were performance concerns.

34. Although Defendants were expending significant effort to document my supposedly deficient performance, they were not sharing these documents with me or explaining what they wanted me to do to improve my performance.

*I took periodic leave to undergo treatment but was able to complete my tasks*

35. While Defendants secretly created justifications to terminate my employment, I continued performing the tasks of my position

36. Following my cancer diagnosis, I requested periodic medical leave to obtain treatment and then worked a modified schedule that allowed me to attend chemotherapy on Fridays.  Defendants permitted me to take this time off and I was able to continue working at least forty hours a week

*My supervisors asked about and commented on his cancer diagnosis*

37. Following my cancer diagnosis, Trae-Fuels and EnviroTech management asked me questions about my condition with the apparent goal of assessing the effect of my illness on the company.  For example, EnviroTech's corporate strategist, Christopher LaRocco, asked me something to the effect of "What do you want to do now, work part-time? Plus, you're a new father?"  LaRocco also told me that his aunt or great aunt had died from pancreatic cancer.

7

When I responded that I planned to work full-time, LaRocco then inquired "Your wife must have good insurance?" I responded that I was insured by EnviroTech's policy, not my wife's insurance.

38. On another occasion, Whyrick asked me if my cancer was slow or aggressive, to which I responded that it was slow.

*Defendants terminated me on August 20, 2014*

39. On August 20, 2014, Defendants terminated me.

*The explanations Defendants have proffered for my termination are demonstrably false*

A. <u>I never caused Trae Fuels to overdraw its line of credit</u>

40. Defendants claim that one of the biggest problems they had with my performance was that I allowed Trae Fuels to overdraw its line of credit.

41. This allegation is patently false. Trae Fuels never overdrew its line of credit during my employment.

42. What actually happened is that in June 2014, Trae Fuels drew on its line of credit to pay its operating expenses after months of operating at a loss while getting the plant operational.

B. <u>My use of IFS did not cause Trae Fuels to need to draw on its line of credit.</u>

43. Defendants' claim that my mismanagement of IFS was the reason Trae Fuels had to draw on its line of credit at all is also a total fabrication.

44. On April 30, 2014, I prepared a cash flow analysis for May 2014 that relied on just two cash inflows, one from a customer named Northcrest Forest Products and the other from

8

a customer named Eco – Pellet. I explicitly mentioned that these payments were based on information provided by salesman Bach.

45. As it turns out, Eco – Pellet failed to timely pay for the pellets Trae Fuels produced for it from April 15 to May 15, 2014, causing Trae Fuels a shortfall of $515,000.

46. Further, Trae Fuels was generally unprofitable throughout the time period leading up to its draw on its line of credit. Through the first two quarters of the 2013-2014 fiscal year, Trae Fuels had lost more than $1.7 million dollars.

47. My use of IFS had nothing to do with Trae Fuels's need to draw on its line of credit.

C. <u>My use of the IFS system was proper and I was not "re-trained" on IFS on May 14-15.</u>

48. Defendants' claim that I failed to appropriate use and understand the IFS system are likewise incorrect.

49. I was not re-trained on IFS on May 14-15. Trae Fuels used a standard costing method to value its inventory. Under a standard costing method, a company assigns a set value to a type of inventory based on historical information and past prices rather than the actual price paid for a particular piece of inventory. These standards are used to set prices or evaluate bids and also can be used as a metric to ascertain favorable or unfavorable variances. In December 2013, Trae Fuels established standard costs for its various inventory items based largely on Frink's experience and knowledge, since he had experience in the pellet business.

50. After the company struggled to obtain manufacturing jobs because its prices were too high, LaRocco asked Frink if he had set the standard costs too high and Frink acknowledged that he had probably "padded," the costs. I then evaluated the standard costs against what the

9

company had actually paid for inventory and confirmed that we had set the standard costs too high.

51. In May 2014, Frink, Walker, Debby Vannest, and I met to discuss re-evaluating the cost standards and modify them. We had a two-hour call with an IFS consultant (I cannot recall whether this call took place on one or two separate days) to ensure that we properly modified the old cost standards to the new cost standards number and utilized the right application in the cost / inventory module of the IFS system.

52. Additionally, while Whyrick and Gohar Wise were in Virginia for other reasons in May 2014, we discussed optimizing IFS by implementing a Purchase Order module. Although this module, and many other optional modules had been shown to me when I first began learning about IFS in November 2013, I had not been directed to use the Purchase Order IFS module. The May 14-15 adjustments to IFS was not a re-training.

53. My use of IFS was appropriate and my periodic questions about how to perform certain tasks were not indicative of deficient performance. Even EnviroTech accounting employees with more time working in the IFS system periodically had questions or issues.

D. I did not inappropriately manage HR files.

54. Defendants' claims that I demonstrated poor performance by inappropriately managing HR files is also false.

55. When Aleman came to Virginia to counsel me the week after I returned from being diagnosed with cancer, Aleman audited Trae Fuels HR files and claimed they were "out of federal compliance," confidentiality agreements were missing, and accounts payable documents were in some files.

10

56. To the extent these files were not organized in the manner Aleman preferred, this was because she had not trained or directed me on what to include in the files and how to organize documents within the file. Without this direction, I had placed managers' credit card statements in their files and also made notes when Frink approved a payroll advance to an employee, which is what Aleman apparently refers to in claiming there were accounts payable items in the folder.

57. With respect to the files' purported "federal compliance," I ensured all employees had appropriate authorization to work and I9 forms before beginning work, however, on occasions Frink ignored my directives and had people work before they completed their paperwork without my knowledge. While I do not recall if any I9s were actually missing on June 4, 2014, it would only have been for employees that I did not know Frink had hired.

58. In any event, Fran Holliday and I followed Aleman's directives regarding future organization of the files after Aleman communicated her alleged expectations in June 2014. Notably, Aleman had periodically visited Trae Fuels prior to June 2014 and had not said anything about the HR files being managed incorrectly.

E. <u>I did not fail to keep Frink informed of company finances and was appropriately strategic in my role.</u>

59. Defendants also claimed that I exhibited poor performance by failing to keep General Manager Frink aware of Trae Fuels's finances and by not being "strategic," in my role.

60. This criticism was also false, as I had provided Frink detailed cash projections and financial explanations throughout my employment. To the extent I was ever forced to provide Frink a financial document without explaining it to Frink, it was because Frink did not have the time to meet with me, despite my repeated attempts to do so, due to Frink's other responsibilities.

11

61. I also been appropriately strategic, recommending cost-cutting methods and providing analyses concerning Trae Fuels's production and profitability.

F. <u>My financial reports, production logs, and cash flow analyses did not evidence poor performance</u>.

62. Trae Fuels's claim that my financial reports were inaccurate and demonstrated poor performance are also incorrect. EnviroTech CFO Whyrick had to approve each of my monthly financial reports and reviewed other reports I created regularly. Any questions or corrections Whyrick had were within the normal course of business in deciding how Trae Fuels and EnviroTech wanted to classify certain items, which are typical in any accounting cycle operation and review. My financial reports were always approved.

63. Likewise, the claims that my cash flow analyses were deficient and evidenced poor performance are false. I regularly provided cash flow analyses (which along with Frink, CFO Whyrick and CEO Knoph relied upon).

64. When LaRocco proposed that they use a different format he called a "scorecard" to project cash flow and provided me the format he suggested, I successfully provided that information. The only issue that I had once he was provided the scorecard was my reluctance to include Bach's and Frink's projected sales with new customers to paint a rosier picture of Trae Fuels's finances than was accurate, but LaRocco and other supervisors did not criticize me for this directly.

65. My work with respect to inventory counts and production logs was not deficient either. I repeatedly directed plant employees to keep accurate production logs and inventory counts, and when they failed to do so, I appropriately raised the issue to EnviroTech leadership. My action with respect to inventory and production logs were appropriate.

G. <u>My implementation of the IFS Purchase Order functionality in June 2014 did not evidence poor performance.</u>

66. Another criticism Defendants allege against me is that I failed to implement a purchase order functionality in IFS between May and June 2014.

67. This criticism is a fabrication. Although it is true that my supervisors and I discussed using IFS's purchase order functionality during meetings in May 2014, no one directed me to prioritize the implementation of the system and it was not a high priority task.

68. After May 15, I was immediately out of work for twelve days following my cancer diagnosis and adoption of my son. Then, when I returned on May 27, I had to complete the month-end tasks, catch up on determining the cash position, train the temporary accountant, and deal with drawing on the line of credit to address the issue caused by a customer not timely paying for purchase.

69. I did not have time to implement the purchase order functionality until mid-June, and when Defendants directed me to do so, I immediately took steps to implement the procedure.

H. <u>Various additional unfair and incorrect criticisms</u>

70. In addition to the unfair criticisms explained above, EnviroTech controller Michelle Mills criticized my process for paying accounts payable (AP). This criticism is improper because EnviroTech and Frink set up the procedure by which he would have to sign off on every accounts payable item before it was entered in IFS, and although I wanted to change the procedure, I did not have authority to do so until EnviroTech and Frink eventually approved the change.

71. Whryick also criticized me for using a separate spreadsheet to perform this accounts payable process. However, the process I followed was efficient and I completed the work in IFS as requested. I did not disregard any instructions in using both the spreadsheet to

13

maintain accounting of the accounts payable while I waited for Frink to approve the payment so that I could enter them in IFS. After Whyrick and Frink changed the process and the Purchase Order System was implemented, this resolved the majority of the redundancy.

72. Last, Aleman criticized me for failing to get an employee's insurance paperwork in on time for the employee to be covered by insurance in August 2014. This criticism is improper because I had warned the employee of the deadline and the consequences of missing it—the exact same procedure Aleman herself had used with employees that were slow to return their insurance paperwork.

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT. EXECUTED ON this 22nd day of November, 2019

_Michael Alan Donaldson_
Michael Donaldson

**CERTIFICATE OF SERVICE**

I hereby certify that on November 22, 2019, I served the foregoing Corrected Exhibit 1 to Brief in Opposition to Summary Judgment on counsel of record for Defendants by filing with the Court's CM/ECF system.

/s/Jack Jarrett