IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

| | | |
|---|---|---|
| MICHAEL DONALDSON, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 3:18CV00097 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| TRAE-FUELS, LLC, et al., | ) | By: Hon. Glen E. Conrad |
| | ) | Senior United States District Judge |
| Defendants. | ) | |

Michael Donaldson filed this action against Trae-Fuels, LLC ("Trae-Fuels") and

EnviroTech Services, Inc. ("EnviroTech"), asserting that he was terminated because of his

disability, in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C.

§§ 12101–12213. The case is presently before the court on the defendants' motion for summary

judgment. The motion has been fully briefed, and the court heard oral argument on the motion on

November 25, 2019. For the reasons set forth below, the motion will be denied with respect to

Donaldson's claim of discriminatory termination.[1]

**Factual Background**

The following facts are either undisputed or presented in the light most favorable to

Donaldson. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (198) ("The evidence of the

nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor [when ruling

on a motion for summary judgment].").

Donaldson worked as an accountant and controller for various companies for 32 years.

Donaldson Decl. ¶ 2, Dkt. No. 34. On October 17, 2013, Donaldson began working as the

controller for Trae-Fuels, a start-up company in Bumpass, Virginia that manufactured heating

---

[1] Donaldson's complaint also included a reasonable accommodation claim under the ADA. Donaldson's counsel confirmed at oral argument that Donaldson had elected to abandon that claim. Therefore, it will be dismissed without further discussion.

pellets.[2]  Id. ¶ 3; Compl. ¶ 1, Dkt. No. 1.  EnviroTech, a corporation headquartered in Colorado, was the managing member of Trae-Fuels and jointly controlled Donaldson's employment. Comp. ¶ 92.  Donaldson reported directly to John Frink, the general manager of Trae-Fuels, and Kevin Whyrick, the chief financial officer of EnviroTech.  Compl. ¶¶ 30–31.  Chris LaRocco, EnviroTech's corporate strategist, and Beth Aleman, its director of human resources, also supervised the performance of certain duties assigned to Donaldson.  Id. ¶¶ 35–36.

During the first few months of Donaldson's employment, Trae-Fuels was not yet producing heating pellets.  Donaldson Decl. ¶ 11.  Instead, the defendants were still preparing the plant to be operational.  Id.  It is undisputed that Trae-Fuels "had little to no revenue as it began production."  Defs.' Reply Br. 18, Dkt. No. 33.

As Trae-Fuels' controller, Donaldson was responsible for creating financial reports and informing Frink of the company's financial position.  Donaldson Decl. ¶ 5.  Donaldson also managed Trae-Fuels' payroll system and performed other human-resource functions, such as maintaining employee files and sending hiring and insurance paperwork to Aleman.  Id. ¶ 6. Donaldson was not responsible for any sales, inventory, or production decisions, and he did not have authority to sign checks, send wire transfers, or borrow against Trae-Fuels' line of credit at UMB Bank without the approval of a supervisor.  Id. ¶¶ 8–10, 15.

From the time of his hiring in October 2013 until mid-May 2014, Whyrick, Frink, LaRocco, and Aleman advised Donaldson that they were satisfied with his performance.  Id. ¶ 16. Whyrick approved Donaldson's monthly financial reports during that period, and Whyrick and LaRocco responded favorably to the financial data and other information Donaldson provided. Id. ¶ 18; see also Pl.'s Ex. 7, Dkt. No. 29-1 ("Great work!  Keep those sales guys on the straight and narrow."); Pl.'s Ex. 9, Dkt. No. 29-1 ("Okay, great data [Donaldson]!"); Pl.'s Ex. 11, Dkt. No.

---

[2] Trae-Fuels is no longer in operation due to financial difficulties.

29-2 ("FYI, here's an email from [Donaldson]. This tells me that he is getting it. I think he will be the guy that can take this stuff and run with it, and make sure that it is accurate."). The only negative written feedback Donaldson received during that period pertained to his handling of paperwork required of new employees and his method of creating journal entries for certain invoices, which was viewed as being too time-consuming. See Defs.' Ex. 1, Dkt. No. 27-5; Defs.' Ex. 2, Dkt. No. 27-6; Defs.' Ex. 8, Dkt. No. 27-12.

On March 25, 2014, Donaldson was hospitalized after experiencing significant blood loss. Donaldson Decl. ¶ 20. In April of 2014, Donaldson learned that he had a mass on his pancreas. Id. A biopsy was performed on May 2, 2014. Pl.'s Ex. 24, Dkt. No. 29-2. A subsequent pathology report indicated that the mass was "[p]ositive for malignant cells characteristic of well differentiated adenocarcinoma." Pl.'s Ex. 24, Dkt. No. 29-2. On Thursday, May 15, 2014, Donaldson was informed that he had "Stage IV inoperable adenocarcinoma pancreatic cancer," and that he would need to see an oncologist on Monday, May 19, 2014. Donaldson Decl. ¶ 21. Donaldson shared the diagnosis with Frink and advised Frink that he would need to take time off for the oncology appointment. Id.

During the oncology appointment, Donaldson was diagnosed with pancreatitis. Id. ¶ 22; Pl.'s Ex. 24. He was taken directly to the hospital, where he remained until May 21, 2014. Donaldson Decl. ¶¶ 22–23. Donaldson called Frink and informed him of the situation. Id. ¶ 22.

While Donaldson was in the hospital, he emailed Whyrick regarding preliminary financial projections. Pl.'s Ex. 25, Dkt. No. 29-2. In response, Whyrick indicated that he knew that Donaldson had been out with "health issues" and inquired as to "when [Donaldson would] be back in the office to get the team together to work on this." Id. In reply, Donaldson advised Whyrick that he was awaiting instructions from his doctors, and that he would let Whyrick know as soon as possible. Id. Later that same day, Whyrick sent Donaldson another email advising that the

3

defendants were in the process of trying to find a controller to temporarily work part-time while Donaldson was "going through this," and that they "would need [Donaldson] there to get [the temporary employee] up to speed." Id. On another occasion, Whyrick, who is a survivor of Stage III colon cancer, "asked [Donaldson] if [his] cancer was slow or aggressive, to which [Donaldson] responded that it was slow." Donaldson Decl. ¶ 38.[3]

During his hospital stay, Donaldson and his wife learned that they had been chosen to adopt a baby who was scheduled to be born on May 23, 2014. Donaldson Decl. ¶ 23. Upon being released from the hospital, Donaldson and his wife flew to Utah to adopt the baby. Id. Prior to traveling, Donaldson drove to Trae-Fuels and dropped off his company phone to be repaired while he was gone. Id.

Donaldson returned to work on May 27, 2014. Id. That same day, Frink asked Donaldson to meet with him. Id. ¶ 24. When Donaldson entered Frink's office, he learned that Aleman was participating in the meeting via telephone. Id. According to Donaldson, "Aleman started off the meeting by saying 'I'm documenting,' and then began interrogating [Donaldson] about . . . leaving [his] work phone at work during [his] trip to Utah." Id. Donaldson explained that the phone was not charging properly, and that he had asked that the phone be sent for repair. Id. Donaldson further explained that he was reachable on his personal cell phone. Id. At that point, "Aleman backed off her criticism . . . and the call ended." Id.

On May 29, 2014, Whyrick and Donaldson engaged in email communications regarding Trae-Fuels' financial position and the fact that the company would need to draw on its line of credit with UMB Bank. Pl.'s Ex. 47, Dkt. No. 29-2. Donaldson emphasized that Trae-Fuels' account was down to $115,000, that $60,000 would be debited the following day for a loan

---

[3] According to Donaldson, Whyrick was not the only supervisor who inquired about the severity of Donaldson's medical condition. LaRocco informed Donaldson that one of his family members had died from pancreatic cancer, and he asked if Donaldson would want to work part-time as a result of the diagnosis. Donaldson Decl. ¶ 37.

4

payment, and that the following week was a payroll week. Id. In response, Whyrick advised Donaldson that he would "just need to let Yolanda Russell [at the bank] know that [he needs] to borrow the money and how much." Id. Whyrick also indicated that Donaldson would need to submit a borrowing base report to the bank each month, which should be signed by Frink. Id.

On May 30, 2014, Donaldson sent Russell a borrowing base report via email. Pl.'s Ex. 48, Dkt. No. 29-2. In the email, which was copied to Whyrick and Frink, Donaldson advised Russell that Trae-Fuels "would like to draw the eligible $669,981." Id. On June 3, 2014, after speaking with Russell and confirming that the borrowing base report was acceptable, Donaldson informed Russell that Trae-Fuels would only like to draw $500,000 immediately and reserve the remaining balance for future needs. Pl.'s Ex. 49, Dkt. No. 29-2. That same day, Whyrick emailed Russell and confirmed that he agreed with the borrowing schedule proposed by Donaldson. Pl.'s Ex. 50, Dkt. No. 29-2.

On June 4, 2014, Aleman and LaRocco traveled to Virginia to meet with Donaldson and Frink. Donaldson Decl. ¶ 27. The parties dispute what was said during the meeting. According to the declarations submitted by the defendants, the meeting was a "counseling session," held at the request of the "management group," after Donaldson submitted financial reports that were "inaccurate and missing important data." Whyrick Decl. ¶ 10, Dkt. No. 27-2; LaRocco Decl. ¶ 3, Dkt. No. 27-4; see also Aleman Decl. ¶ 9, Dkt. No. 27-1 ("I . . . became aware from . . . Whyrick that the financial reports that Mr. Donaldson prepared were incomplete and inaccurate. Mr. Whyrick asked me to travel from EnviroTech's Colorado headquarters to Trae[-]Fuels in Virginia to participate in a face to face employee counseling session with Mr. Donaldson on June 4, 2014."). According to Donaldson's declaration, however, LaRocco and Aleman did not tell Donaldson that he needed to improve his performance. Donaldson Decl. ¶ 31. Instead, Aleman and LaRocco advised Donaldson and Frink that EnviroTech was unhappy with Trae-Fuels'

5

financial losses, and that Donaldson needed to ensure that Frink understood Trae-Fuels' financial status. Donaldson Decl. ¶ 28.

On June 5, 2014, LaRocco sent Whyrick and other EnviroTech executives a list of "findings" from his visit to Trae-Fuels' plant. Defs.' Ex. 12, Dkt. No. 27-16. LaRocco observed that "[Frink] is hampered by day to day operational issues and struggles to meet startup and expansion expectations." Id. As for Donaldson, LaRocco noted that "Donaldson's general disposition favors scrutiny which lends to being overanalytical," that he "lacks the ability to translate [Trae-Fuels'] finances into actionable plans," and that he "also is lacking the confidence to voice his concerns to [Frink] in a way that protects them from missing profitability expectations and cash management objectives (financial analysis)." Id.

On June 6, 2014, Whyrick emailed Aleman and requested that she and LaRocco "document" the meeting that was held with Donaldson and Frink. Pl.'s Ex. 28, Dkt. 29-2. Whyrick noted that "corrective actions should also be documented should [Donaldson] not show improvement." Id. Aleman subsequently completed and signed an EnviroTech form titled "Employee Counseling Notice." Defs.' Ex. 3, Dkt. No. 27-7. Under the heading "Reason for Notice," Aleman indicated that she, LaRocco, and Frink met with Donaldson to "establish performance expectations, specifically for the next two weeks." Id. Aleman noted that LaRocco "explained the necessity and the importance of how vital the controller position is to the success of Trae-Fuels and how this position needs to be current at all times with financial reporting, including current cash flow." Id. Aleman further noted that Donaldson was advised that he "needs to meet daily with [Frink] to discuss current financials and updates," and that "he needs to focus on performing at a higher level and not in the day-to-day 'weeds' of things going on in the office." Id. Aleman also noted that she had "removed all HR employee file responsibilities (except the 5 exempt manager positions) from [Donaldson's] responsibility" and reassigned them to the office

6

manager. Id. Under the heading "Next Step if Infraction is repeated," Aleman indicated that "[t]his was not discussed, as this first meeting was to convey the expectations that are needed for the controller position and more specifically, for [Donaldson] to understand he needs to produce more qualitative/quantitative work and be a hands on controller." Id. Although the Employee Counseling Notice includes a line for the employee to sign and date, Aleman did not have Donaldson sign the form or provide him with a copy of it. Id.; see also Donaldson Decl. ¶ 30.

On Monday, June 9, 2019, Aleman emailed LaRocco to inform him that Donaldson had left that morning for a second medical evaluation and would not be returning until Friday at the earliest. Pl.'s Ex. 42, Dkt. No. 29-2. Aleman also noted that Donaldson had left his company phone for Frink to use while he was gone. Id. In a subsequent email, Aleman questioned the amount of time that Donaldson would be away from the office. See id. ("[P]er conversations with [Frink and the office manager], he told them he was going to be gone 2 days, then it did go to 3 days when you and I were there. Now it is 4 days and no communication??").

On June 17, 2014, Donaldson emailed Frink, LaRocco, and Whyrick, and advised them that he had requested that the bank transfer the remaining balance of Trae-Fuels' line of credit. Pl.'s Ex. 52, Dkt. No. 29-2. Donaldson noted that Trae-Fuels would be left with only $35,000 in cash, after paying invoices and issuing payroll checks. Id. In response, Whyrick indicated that he thought that it was time for the members to make a "capital call," and that he "would recommend that this be an amount that can sustain [Trae-Fuels] through this slow period in revenue." Id.

That same day, Frink forwarded Aleman a copy of his handwritten notes from the June 4, 2014 meeting with Donaldson. Pl.'s Ex. 38, Dkt. No. 29-2. In the email, Frink indicated that there had been "some improvement" and that he would "stay in touch with [Aleman] as things progress." Id.

7

At some point thereafter, LaRocco and Michelle Mills, EnviroTech's controller, were asked to evaluate Donaldson's performance. On June 26, 2014, LaRocco drafted a memorandum summarizing "Performance Observations for Michael Donaldson" for the period of June 4, 2014 to June 20, 2014. Defs.' Ex. 4, Dkt. No. 27-8. In the memorandum, LaRocco noted that he had asked Donaldson to perform a cash-flow analysis on June 9, 2014, and that Donaldson's "work product was substandard." Id. LaRocco also noted that when he asked Donaldson for the "current total obligations of Trae-Fuels for cash-flow and [a] current cash analysis" on June 17, 2014, Donaldson "neglected to divulge the values of open Purchase Orders and unpaid Credit Card statements which were needed to have the total obligations value." Id. LaRocco then provided the following "General observations":

> Mr. Donaldson is very good at accounting. Mr. Donaldson is very detailed in his communications, and is very detailed as an auditor. Mr. Donaldson has failed however in his responsibilities to keep Trae-Fuels['] cash position in line with production outputs.

> Example: On 6-4-14 Mr. Donaldson drew on Trae-Fuels['] line of credit to pay for SG&A, and general operating costs. Hence the draw against the line and used towards paying for operating costs and current obligations in this scenario meant that Trae-Fuels had gone cash negative/broke.

Id.

Mills also prepared an undated report criticizing Donaldson's performance. Defs.' Ex. 10, Dkt. No. 27-14. In the report, Mills indicated that Donaldson had "his own way of thinking and doing things" and did not respond well to suggestions, that he took time to perform duties that other employees should be doing, that he was slow to use the company's industrial and financial systems ("IFS") program, that concepts had to be explained multiple times, and that Donaldson was "more concerned on the things that don't matter, than the big items he should be doing and reporting." Id. Mills further opined that Donaldson was "not performing as the controller of a

company," that he was not taking responsibility for decisions, and that his time management skills were not adequate enough to perform all of his required duties.  Id.

On July 3, 2014, Donaldson began undergoing chemotherapy treatment at Johns Hopkins' cancer center. Pl.'s Ex. 23, Dkt. No. 29-2.  That same day, Whyrick drafted a three-page, single-space memorandum summarizing his personal observations of Donaldson. Defs.' Ex. 7, Dkt. No. 27-11.  The first two pages of the memorandum describe instances in which Donaldson allegedly had problems adjusting to Trae-Fuel's IFS program and required additional training.  Id. Whyrick also indicated that Donaldson's "slow work pace and over analysis was causing issues in him getting timely information to the [g]eneral [m]anager," and that Donaldson's "timid and passive aggressive nature" was affecting his ability to perform the "higher level duties of his job as the controller."  Id.  Whyrick noted that Donaldson "would provide pretty accurate data, but would not help the [general manager] or key management understand what that data meant, nor what decisions should be made based on that data."  Id.  Whyrick acknowledged that Donaldson had "put some effort toward getting better with communication" since the June 4, 2014 "formal sit down" with Aleman and LaRocco.  Id.  However, Whyrick opined that Donaldson was "still lacking the leadership and strategy needed for [the controller] position."  Id.  Whyrick concluded the memorandum with a discussion of Donaldson's health issues:

> Recently [Donaldson] has been dealing with some health issues. As part of this, we have told him that we will support him, but need him to communicate with us when he will miss work, and help us find people to fill in while he is gone.  We have had a couple of instances, when [Donaldson] left his work to go to the doctor, and has not finished items and did not tell anyone or ask for help.  In one case, he left his phone with the [general manager] and asked him to deal with any calls and/or messages.
>
> Based on these observations, I serious question whether [Donaldson] will be able to adequately fill the role we hired him for as the manufacturing controller for Trae-Fuels.

Id.

On July 17, 2014, Whyrick, Aleman, and LaRocco met to discuss Donaldson. Defs.' Ex. 5, Dkt. No. 27-9. In her handwritten notes from the meeting, Aleman referenced a "lack of accountability" and "execution," and a "lack of involvement in financial accountability to investors." Id.

On July 23, 2014, Donaldson sent Whyrick and Frink an email advising that he would be unable to attend a meeting on July 25, 2014, because he was scheduled to undergo chemotherapy that day. Pl.'s Ex. 41, Dkt. No. 29-2. Donaldson reminded Whyrick and Frink of his chemotherapy schedule. Id.

On August 4, 2014, Aleman informed Donaldson via email that they had "once again . . . missed the last day of the month for getting [Donaldson's] new employees signed up for insurance." Defs.' Ex. 6, Dkt. No. 27-10. In response, Donaldson advised Aleman that the new employees were repeatedly told that they would not be eligible for insurance if they did not submit the required paperwork in a timely fashion. Id. Donaldson suggested that new employees not be allowed to start work after a certain date each month, in order to allow sufficient time for completion of the necessary forms. Id.

On August 20, 2014, Aleman and Frink met with Donaldson and advised him that he was being terminated. Aleman Decl. ¶ 16. The termination decision was made by Whyrick, Aleman, and Frink. Whyrick Dep. Tr. Vol. I at 47, Dkt. No. 29-1. According to Aleman, Donaldson was advised that "his termination was based only on his poor work performance." Aleman Decl. ¶ 16. However, according to a typewritten note drafted by Frink on the day of Donaldson's termination, Donaldson was advised that the adverse employment decision was based on "cultural" differences:

> Beth and I went into [Donaldson's] office and told him that the culture wasn't right for him and Trae-Fuels. We felt like it wasn't a good fit and it just wasn't working. [Donaldson] stated that he did his work and put in overtime every week. We told him it wasn't the time but just a cultural difference and we didn't want to get in an argument over it. It just wasn't working! We told him that we

> thought he would be good in a larger company but he said that we
> didn't give him a chance and didn't give him a warning. We stated
> that it was just not working with the whole team and we had already
> made a decision.

Pl.'s Ex. 43, Dkt. No. 29-2.

Following his termination, Donaldson filed a charge of discrimination with the Equal

Employment Opportunity Commission ("EEOC"), alleging that he had been subjected to

disability discrimination. On January 16, 2015, Trae-Fuels filed a position statement asserting

that Donaldson's termination was "solely based on his substandard performance." Pl.'s Ex. 45,

Dkt. No. 29-2. Among other alleged deficiencies, Trae-Fuels asserted that, "based on his

mismanagement of IFS, Mr. Donaldson was forced to draw on Trae-Fuels' line of credit to pay for

the company's general operating costs which meant that the company had gone cash negative."

Id. Trae-Fuels alleged that "[t]his emergency event was undetected by Mr. Donaldson until the

last moment due to his lack of understanding and implementation of the IFS system tools and

applications." Id.

On October 30, 2019, Whyrick was deposed as the defendants' Rule 30(b)(6) designee.

When asked to explain the basis for Donaldson's termination, Whyrick testified as follows:

> [H]e just didn't -- he wasn't understanding the job. He didn't have
> the ability to do the things we needed him to do. Based on all the
> mistakes and inaccuracies.

Whyrick Dep. Tr. Vol. I. at 110. Whyrick then indicated that Donaldson had not just drawn on

Trae-Fuels' line of credit, but "allowed the credit line . . . to overdraw," and that this was "one of

the main reasons [the defendants] weren't happy" with him. Id. (emphasis added); see also id. at

110–11 ("Well, the line of credit overdrew, meaning it went past its limit, and it was a pretty large

number.").

The Rule 30(b)(6) deposition continued on November 5, 2019. Once again, Whyrick

testified that Donaldson had been criticized for overdrawing Trae-Fuels' line of credit:

11

> Q. So, I believe one of the criticisms that you guys had regarding Mr. Donaldson was that his alleged . . . mismanagement of IFS caused Trae-Fuels to draw on Trae-Fuels' line of credit to pay for the company's general operating costs. Are you aware of that incident?
>
> A. As I mentioned last time, it was an overdraft of the line of credit. The drawing on the line of credit is why it's there. You know, you have a line of credit so you can draw on it for needs and, as I mentioned last time, it's a zero balance account . . . . What the criticism was, was the overdraft of that line of credit. It was drawn on in excess of what was allowed at the bank.

Whyrick Dep. Tr. Vol. II at 225, Dkt. No. 29-1. Whyrick could not recall when the alleged overdraft occurred or whether Trae-Fuels received any documents from the bank regarding an overdraft. Id. at 227. Whyrick was also unable to recall the precise amount of the alleged overdraft. Id. at 299. However, he testified that he thought "it was a million [dollars] or more." Id.

Whyrick also referenced the alleged overdraft in his declaration filed in support of the defendants' motion for summary judgment. According to the declaration, Trae-Fuels "had to borrow on an emergency basis in excess of its Line of Credit" in "June 2014." Whyrick Decl. ¶ 7. Whyrick asserted that it was Donaldson's "job . . . to be sure that this didn't happen," and that this was a "major issue that showed [Donaldson's] poor understanding of Trae[-]Fuels' finances." Id.

### Procedural History

After exhausting his administrative remedies, Donaldson filed the instant action under the ADA. Donaldson claims that the defendants terminated his employment because of his disability or because they regarded him as disabled. Compl. ¶ 113.

The defendants previously moved to dismiss the complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. That motion was denied on May 21, 2019. See Donaldson v. Trae-Fuels, LLC, No. 3:18-cv-00097, 2019 U.S. Dist. LEXIS 85678 (W.D. Va. May 21, 2019).

Following the completion of discovery, the defendants moved for summary judgment. The court held a hearing on the motion on November 25, 2019. The motion has been fully briefed and is ripe for review.

## Standard of Review

An award of summary judgment is only appropriate when there are no material facts in dispute and the moving parties are entitled to judgment as a matter of law. Wilson v. Prince George's Cty., 893 F.3d 213, 218 (4th Cir. 2018) (citing Fed. R. Civ. P. 56(a)). In considering a motion for summary judgment, the court must view the record in the light most favorable to the nonmoving party. Anderson, 477 U.S. at 255; Tolan v. Cotton, 572 U.S. 650, 657 (2014). The court does not weigh the evidence or make credibility determinations. Wilson, 893 F.3d at 218.

## Discussion

Title I of the ADA prohibits employers from "discriminat[ing] against a qualified individual on the basis of disability in regard to . . . the hiring, advancement, or discharge of employees." 42 U.S.C. § 12112(a). Disability discrimination may be proven through direct and indirect evidence or through the burden-shifting framework articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Jacobs v. N.C. Admin. Office of the Courts, 780 F.3d 562, 572 (4th Cir. 2015). In this case, the parties have confined their arguments to the McDonnell Douglas framework.

Under this framework, Donaldson has the initial burden of establishing a prima facie case of discrimination. McDonnell Douglas, 411 U.S. at 802. If he succeeds, the burden shifts to the defendants to produce evidence of a legitimate, non-discriminatory reason for the adverse employment action. Id.; Jacobs, 780 F.3d at 572. Once the defendants proffer a justification for the action at issue, the burden shifts back to the plaintiff to "prove by a preponderance of the evidence that the legitimate reasons offered by the defendant[s] were not [their] true reasons, but

13

were a pretext for discrimination." Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981).

## I. **Prima Facie Case of Discrimination**

The plaintiff's initial burden of establishing a prima facie case is "not onerous." Id. To establish a prima facie case of discriminatory firing under the ADA, Donaldson must prove: (1) that "he has a disability"; (2) that "he is a qualified individual"; and (3) that "in discharging him, his employer discriminated against him because of his disability." Martinson v. Kinney Shoe Corp., 104 F.3d 683, 686 (4th Cir. 1997) (internal quotation marks, citations, and alterations omitted); see also Jacobs, 780 F.3d at 572 (citing EEOC v. Stowe-Pharr Mills, Inc., 216 F.3d 373, 377 (4th Cir. 2000)).

In this case, the defendants argue that Donaldson is unable to satisfy any of the elements of his prima facie case. For the reasons that follow, the court disagrees and concludes that Donaldson has presented evidence sufficient to establish each element.

## A. **Element One: Disability**

The defendants initially challenge whether Donaldson was disabled within the meaning of the ADA. The ADA provides three avenues for establishing the existence of a "disability." 42 U.S.C. § 12102(1). The term is defined, with respect to an individual, as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." Id. The term "major life activities" is defined to include, among others, seeing, concentrating, thinking, and working, as well as "the operation of a major bodily function," including "normal cell growth" and "digestive" function. Id. § 12102(2).

In 2008, Congress enacted the ADA Amendments Act of 2008 ("ADAAA"), Pub. L. No. 110-325, 122 Stat. 3553, which "broadened the definition of 'disability.'" Summers v. Altarum

14

Inst., Corp., 740 F.3d 325, 329 (4th Cir. 2014). The principal purpose of the ADAAA was "to make it 'easier for people with disabilities to obtain protection under the ADA.'" Jacobs, 780 F.3d at 572 (quoting 29 C.F.R. § 1630.1(c)(4)). Its implementing regulations clarify that "[t]he primary object of attention in cases brought under the ADA should be whether covered entities have complied with their obligations and whether discrimination occurred, not whether the individual meets the definition of a disability." 29 C.F.R. § 1630.1(c)(4). Accordingly, "'[t]he question of whether an individual's impairment is a disability under the ADA should not demand extensive analysis.'" Jacobs, 780 F.3d at 572 (quoting Pub. L. No. 110-325, § 2(b)(5) (2008)).

In this case, Donaldson claims that he was actually disabled at all times relevant to this action, since his "pancreatic cancer was a physical limitation that substantially limited his major bodily functions regarding his normal cell growth and his digestive functions." Compl. ¶ 40. Donaldson has presented medical records confirming that he was diagnosed with pancreatic cancer, that a biopsy revealed malignant cells characteristic of adenocarcinoma, and that he was required to undergo chemotherapy treatment. In light of such evidence, the court concludes that a reasonable jury could easily find that Donaldson had a physical impairment that substantially limited one or more major life activities. This conclusion is consistent with the regulations implementing the ADAAA, which recognize that cancer will qualify as a disabling impairment "in virtually all cases," since "cancer substantially limits normal cell growth." 29 C.F.R. § 1630.2(j)(3).

In arguing that "Donaldson was not disabled," the defendants emphasize that there is no evidence that Donaldson's cancer affected his ability to work. Defs.' Br. Supp. Summ. J. 22, Dkt. No. 27. However, such evidence is not required for an impairment to qualify as disabling for purposes of the ADA. Indeed, "[t]he ADA makes plain that a condition which substantially affects normal cell growth constitutes an impairment of a major life activity." EEOC v. Optimal

Sols. & Techs., Inc., No. 8:17-cv-02861, 2019 U.S. Dist. LEXIS 200285, at *12 (D. Md. Nov. 19, 2019). This is true even if an individual remains able to work. See Norton v. Assisted Living Concepts, Inc., 786 F. Supp. 2d 1173, 1185 (E.D. Tex. 2011) ("The Act now clarifies that as along as an impairment substantially limits one major life activity, such as normal cell growth, it need not limit other major life activities, such as working, in order to be considered a disability."); 42 U.S.C. § 12102(4)(C) ("An impairment that substantially limits one major life activity need not limit other major life activities in order to be considered a disability."). Moreover, the determination of whether an impairment substantially limits a major life activity must be made "without regard to the ameliorative effects of mitigating measures such as . . . medication" or other forms of treatment. 42 U.S.C. § 12102(E). Given these directives, the court concludes that Donaldson has offered sufficient evidence to withstand summary judgment on the issue of whether his pancreatic cancer substantially limited one or more major life activities and was therefore disabling for purposes of the ADA.[4]

### B.   **Element Two: Qualified Individual**

The court turns next to the second element of the prima facie case: whether Donaldson has shown that he was qualified for the employment in question. Jacobs, 780 F.3d at 574. The defendants argue that no reasonable jury could find that, that the time of his termination, Donaldson was "performing [his] job at a level that met [the defendants'] legitimate expectations." Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc., 53 F.3d 55, 58 (4th Cir. 1995). The defendants support this argument with declarations, memoranda, and other evidence detailing Donaldson's alleged shortcomings as an employee.

---

[4] In light of the court's decision that a reasonable jury could find that Donaldson had a physical impairment that substantially limited one or more major life activities, the court need not consider whether a reasonable jury could find that Donaldson had a record of such an impairment or was regarded as having such an impairment. See 42 U.S.C. § 12102(1).

Donaldson responds by denying the defendants' allegations and arguing that the defendants' own evidence could be discredited at trial as inconsistent and contradictory. See Jacobs, 780 F.3d at 575 (citing various inconsistencies in the record regarding the plaintiff's performance in determining that a reasonable jury could find that the plaintiff was qualified for her position). For instance, while Whyrick testified at the Rule 30(b)(6) deposition that the termination decision was "[b]ased on all the mistakes and errors and inaccuracies in Donaldson's work," Whyrick noted on July 3, 2014 that Donaldson was "very analytical and methodical" and "would provide pretty accurate data." Defs.' Ex. 7. Likewise, LaRocco observed that Donaldson was "very good at accounting" and "very detailed as an auditor." Defs.' Ex. 4. Although LaRocco noted that Donaldson had to draw on Trae-Fuels' line of credit to pay for general operating costs, there is no documentary evidence of any alleged overdraft and no mention was made of such a "major issue" until after the instant action was filed. Whyrick Decl. ¶ 7. Additionally, Frink's typewritten notes from the day of Donaldson's termination indicate that the decision was based on "cultural" differences, rather than performance issues, and that the defendants were of the opinion that Donaldson "would be good in a larger company." Pl.'s Ex. 43 (emphasis added).

Viewing the record in the light most favorable to Donaldson, the court concludes that a reasonable jury could find that Donaldson was qualified for the position of controller. Existing caselaw makes clear that a plaintiff's "burden in this regard is not an onerous one." Hill v. Se. Freight Lines, Inc., 523 F. App'x 213, 216 (4th Cir. 2013). A plaintiff is not required to show that he was a "perfect or model employee." Haynes v. Waste Connections, Inc., 922 F.3d 219, 225 (4th Cir. 2019). "Rather, a plaintiff must show only that he was qualified for the job and that he was meeting his employer's legitimate expectations." Id. Based on the evidence set forth above, the court concludes that a genuine issue of material facts exists as to whether Donaldson was

performing satisfactorily at the time of his termination. Accordingly, the defendants are not entitled to summary judgment on this element.

### C.   Element Three: Causation

The court also concludes that disputed issues of material fact exist with respect to the third element of the prima facie case—causation. Donaldson was terminated three months after he was diagnosed with pancreatic cancer and one month after he began chemotherapy. "Such close temporal proximity weighs heavily in favor of finding a genuine dispute as to causation." Jacobs, 780 F.3d at 575; see also Haulbrook v. Michelin N. Am. Inc., 252 F.3d 696, 706 (4th Cir. 2001) (finding that temporal proximity alone can great a genuine dispute as to causation). Additionally, Donaldson has produced other affirmative evidence from which a reasonable jury could find that he was terminated because of his disability. For instance, Whyrick's memorandum summarizing his observations of Donaldson specifically referenced Donaldson's "health issues" and the fact that Donaldson had "left his work to go to the doctor [without] finish[ing] items" on a few occasions. Defs.' Ex. 7. Likewise, in email communications with LaRocco, Aleman appeared to criticize the amount of time that Donaldson would be away from work to obtain a second medical opinion. Such evidence, combined with the timing of Donaldson's termination, is sufficient to withstand summary judgment on the causation element.[5]

For these reasons, the court concludes that Donaldson has presented sufficient evidence to establish a prima facie case of disability discrimination.

---

[5] During oral argument, defense counsel emphasized that Whyrick is a cancer survivor and therefore "would not think to have someone replaced because they had cancer." Whyrick Decl. ¶ 12. While such evidence may persuade a jury at trial, it does not preclude a successful discrimination claim. See, e.g., Ferguson v. Waffle House, Inc., 18 F. Supp. 3d 705, 711 (D.S.C. 2014) (acknowledging that "the fact that some of the individuals who allegedly discriminated against Plaintiff are the same race as the Plaintiff is not a dispositive fact when determining whether discrimination occurred").

## II. Pretext

Under the McDonnell Douglas framework, the burden shifts to the defendants to produce evidence of a legitimate, non-discriminatory reason for terminating Donaldson. See Jacobs, 780 F.3d at 575 (citing McDonnell Douglas, 411 U.S. at 802). The defendants have presented evidence indicating that the termination decision was based on Donaldson's "lack of performance," and they have provided specific examples of performance-related concerns. Whyrick Decl. ¶ 12; see also Aleman Decl. ¶ 15 ("In early August, Kevin Whyrick told me that Mr. Donaldson should be terminated from his position at Trae[-]Fuels due to his failure to improve the quality of his work and his overall job performance. I agreed with this decision."). For purposes of the pending motion, the court concludes that the defendants have satisfied their "relatively modest burden." Jacobs, 780 F.3d at 575; see also Warch v. Ohio Cas. Ins. Co., 435 F.3d 510, 514 (4th Cir. 2006) (observing that the defendants' burden at this stage "is one of production, not persuasion," and "can involve no credibility assessment") (internal quotation marks and citation omitted).

The burden therefore shifts back to Donaldson to prove that the asserted justifications for his termination are pretextual. Jacobs, 780 F.3d at 575–76. A plaintiff may do so by "show[ing] that an employer's proffered nondiscriminatory reasons for the termination are inconsistent over time, false, or based on mistakes of fact." Haynes, 922 F.3d at 225 (citing Sears Roebuck, 243 F.3d at 852–53). A plaintiff may also establish pretext "by demonstrating that the asserted justifications, even if true, are post hoc rationalizations invented for purposes of litigation." Jacobs, 780 F.3d at 576 (citing Dennis v. Columbia Colleton Med. Ctr., Inc., 290 F.3d 639, 647 (4th Cir. 2002)).

In this case, Donaldson has produced evidence indicating that the defendants have "offered different justifications at different times" for his termination, which "is, in and of itself, probative

19

of pretext." Sears Roebuck, 780 F.3d at 576. According to Frink's handwritten notes from the day Donaldson was terminated, Frink and Aleman "told [Donaldson] that the culture wasn't right for him and Trae-Fuels," that "it wasn't a good fit," that it was "just a cultural difference," and that they "thought he would be good in a larger company." Pl.'s Ex. 43. In response to Donaldson's EEOC complaint, the defendants asserted that Donaldson's termination was "solely based on his substandard performance" Pl.'s Ex. 45. After Donaldson filed suit, the defendants indicated for the first time that "one of the main reasons [they were unhappy with Donaldson] was that he had . . . allowed [Trae-Fuels'] credit line . . . to overdraw" by as much as a million dollars, and that this was a "major issue that showed [Donaldson's] poor understanding of Trae[-]Fuels' finances." Whyrick Dep. Tr. Vol. I at 110; Whyrick Dep. Tr. Vol. II at 229; Whyrick Decl. ¶ 7.

Donaldson correctly points out that the defendants have not presented any financial records or written communications demonstrating that Trae-Fuels overdrew on its line of credit prior to his termination. Even more striking is that no one at Trae-Fuels or EnviroTech documented this major issue in any way. Although Whyrick was unable to recall the timing of the alleged overdraft during his deposition, he asserted in his October 29, 2019 declaration that Donaldson caused Trae-Fuels to overdraw its line of credit in June of 2014. Whyrick Decl. ¶ 7. On July 3, 2014, Whyrick complied a three-page, single-space memorandum detailing his "observations regarding Michael Donaldson." Defs.' Ex. 7. Notably absent from the memorandum is any mention of an overdraft, much less Donaldson's responsibility for it. The same is true for the memorandum that LaRocco prepared on June 26, 2014, and the position statement that was subsequently submitted to the EEOC on January 16, 2015. Although both documents reference the fact that Donaldson "drew" on Trae-Fuels' line of credit to pay general operating costs, neither

20

document suggests that the line of credit was overdrawn by Donaldson.[6]  And as defense counsel acknowledged at oral argument, there is a difference between drawing on a line of credit and overdrawing it.

A reasonable jury could also find the timeline of events to be probative of pretext.  Prior to his cancer diagnosis, Donaldson received favorable comments from his supervisors regarding his work performance.  Less than two weeks after Donaldson was diagnosed with pancreatic cancer, the defendants began to formally document alleged performance deficiencies.  Approximately three months later, the defendants terminated his employment.  During the interim period, Donaldson's supervisors asked him questions about the severity of his medical condition and made arguably critical comments regarding his absences from work for medical appointments. Although "[t]emporal proximity alone is insufficient to defeat summary judgment at the pretext stage," a plaintiff may rely on temporal proximity along with "other evidence such as inconsistent employer explanations, to defeat summary judgment." Kwan v. Andalex Grp., LLC, 737 F.3d 834, 847 (2d Cir. 2013); see also Burton v. Freescale Semiconductor, Inc., 798 F.3d 222, 240 (5th Cir. 2015) ("[T]he combination of suspicious timing with other significant evidence of pretext, can be sufficient to survive summary judgment.") (internal quotation marks and citation omitted). Because such evidence exists in this case, the defendants are not entitled to summary judgment on the discriminatory termination claim.

### Conclusion

In sum, the court concludes that Donaldson has established a prima facie case of disability discrimination, and that he has shown that genuine issues of material fact exist as to whether the defendants' proffered non-discriminatory reasons for his termination are mere pretext for

---

[6] According to the evidence submitted by Donaldson, Whyrick approved the requests to draw on the line of credit and was responsible for finding out what Trae-Fuels would need to submit to the bank in order to do so.

21

discrimination. Accordingly, the defendants' motion for summary judgment will be denied with respect to Donaldson's claim of discriminatory termination.

The Clerk is directed to send copies of this memorandum opinion and the accompanying order to all counsel of record.

DATED: This 5th day of December, 2019.

_____
Senior United States District Judge